1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ELIZABETH DE COSTER, NEMANJA KRSTIC, JOHN MARIANE, OSAHON OJEAGA, and EMMA ZABALLOS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMAZON.COM, INC., a Delaware corporation,<br><br>Defendant. | Case No. 2:21-cv-693<br><br>CLASS ACTION COMPLAINT<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

I.      JURISDICTION ...........................................................................................................6

II.     VENUE .........................................................................................................................6

III.    PARTIES .......................................................................................................................7

        A.      Plaintiffs ...........................................................................................................7

        B.      Defendant .........................................................................................................7

IV.     BACKGROUND...........................................................................................................8

V.      RELEVANT MARKET ..............................................................................................13

VI.     MARKET POWER ......................................................................................................16

        A.      Amazon is the subject of a government investigation for possible antitrust
                violations, including whether it uses its relationship with its third-party
                sellers to harm competition. ...........................................................................22

VII.    AMAZON HAS UNLAWFULLY MONOPOLIZED THE MARKET FOR
        ECOMMERCE PLATFORMS ....................................................................................24

VIII.   AMAZON'S CONDUCT HARMS CONSUMERS AND OVERALL
        COMPETITION ..........................................................................................................35

IX.     CLASS ACTION ALLEGATIONS .............................................................................40

X.      CAUSES OF ACTION ...............................................................................................43

FIRST CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 1)..............43

SECOND CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT –
        MONOPOLIZATION (15 U.S.C. § 2) ........................................................................45

THIRD CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – ATTEMPTED
        MONOPOLIZATION (15 U.S.C. § 2) ........................................................................46

JURY TRIAL DEMANDED ...................................................................................................46

PRAYER FOR RELIEF..........................................................................................................46

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693                                    i

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

**PRELIMINARY STATEMENT**

1.      At the heart of Amazon's storefront is its Amazon Marketplace, which operates as a platform connecting third-party sellers and consumers.  In fact, when consumers search for goods and services on Amazon, their query results usually bring up goods for sale by sellers other than Amazon, and third-party sales make up the majority of all Amazon.com sales.  Thus, Amazon is wholly distinct from traditional retailers, which buy goods at wholesale prices and then mark them up at retail to sell directly to consumers.  Instead, the Amazon Marketplace is functionally a marketplace platform like eBay, serving as an intermediary between disparate sellers and disparate buyers.

2.      Nicholas Denissen, Amazon's Vice President of Marketplace Business, describes the Amazon Marketplace as "an online marketplace where millions of third-party sellers" sell their goods.[1]  This arrangement gives sellers access to millions of buyers, and buyers access to millions of sellers.[2]  He likens it to "an online mall where independent merchants display their products to people perusing the website."[3]  And Amazon is indeed the largest and most dominant "online mall" in the country.  Amazon's share of the market for ecommerce marketplaces is over 70%, with few meaningful competitors.  Amazon has held this position of power for many years.

3.      Amazon charges those selling on its site hefty fees for its middleman services.  Amazon Marketplace deducts a variety of fees from every transaction executed on its marketplace, including "Referral" fees, "Closing" fees, and various administrative fees.  Altogether, these fees add up to roughly 27% of every marketplace transaction.[4]  In turn, the need for sellers to pay Amazon this hefty cut inflates the price of every good sold on the Amazon Marketplace.

---

[1]   Declaration of Nicholas Denissen, Amazon's Vice President of Marketplace Business (Jun. 30, 2017), *Oberdorf v. Amazon.com*, Case No. 16-cv-1127MWB (M.D. Pa.), Dkt. No. 31 ("Denissen Decl."), ¶ 5.

[2]   *Id* at ¶ 8.

[3]   *Id* at ¶ 5.

[4]   Karen Weise, *Prime Power: How Amazon Squeezes the Businesses Behind Its Store*, NYT (Dec. 19, 2019), https://www.nytimes.com/2019/12/19/technology/amazon-sellers.html.

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

4.       Among ecommerce platforms, Amazon has the highest commission and charges the most for its services.   Amazon is able to maintain these inflated commissions because it blocks competition.  One would expect that competitors would challenge Amazon's inflated fee structure by offering lower commissions, which would allow sellers to sell more goods at lower prices to consumers.  But Amazon mandates that all sellers who use its must-have platform agree they will not offer *lower* prices to consumers through any other channel—even if that other channel involves a lower commission, or no commission at all.  Amazon imposes this restraint through a provision that acts as a "platform most favored nations" clause (the "PMFN").

5.       While Amazon has changed the specific language and form of the PMFN over time, in part, as discussed below, to try to evade regulatory scrutiny, the purpose and the effect has stayed the same—alternative low-commission platforms cannot compete with Amazon on price because the PMFN prevents them from recruiting sellers and consumers (and taking sales away from Amazon) with lower commissions and other perks that would result in lower consumer prices.  Instead, because of the PMFN, anyone wanting to sell on Amazon must not only pay Amazon's inflated commissions and charge higher prices to consumers as a result, but also agree to charge the same inflated price on *all* platforms in the United States.  And they must do this even when they list goods for sale on their own direct-to-consumer storefronts at the implicit commission price of 0%.

6.       Because Amazon Marketplace is a must-have for sellers, with over 70% of the market for ecommerce marketplaces, sellers have little choice but to comply with Amazon's anticompetitive scheme.  Almost half of Amazon's third-party sellers generate 81% to 100% of

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

2

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

their revenues from sales on the Amazon Marketplace.[5]  As one third-party seller, Molson Hart, succinctly puts it: "[W]e have nowhere else to go and Amazon knows it."[6]

7.     Many of the 2 million retailers who sell on the Amazon Marketplace platform do so reluctantly, but nevertheless realize the Amazon Marketplace is a must-have for their businesses. "Virtually every manufacturer and retailer of consumer goods in America faces [the] same predicament," explains Stacy Mitchell, co-director of Institute for Local Self-Reliance, in recent testimony to the House of Representatives' Judiciary Committee.[7]  In order to reach the highest number of potential customers in the U.S., they *must* list through Amazon.  And Amazon's PMFN cements its stranglehold over sellers, because it prevents competing platforms from gaining scale by offering lower commissions to sellers and lower prices to consumers.

8.     To enforce this anticompetitive provision, Amazon deploys an army of algorithms and robots to crawl the internet and detect violations.  Punishment is swift, and can involve removal from Amazon.com altogether, which can be devastating for the many small- and medium-sized businesses trying to survive.  Jarvin Karnani, who has been selling on Amazon Marketplace for two years, told the FTC, "[I]f Amazon suspends you, it's like a death knell . . . [W]hen Amazon shuts you off, they sit on your money for 90 days and there's nothing you can do."[8]  To

---

[5]   J. Clement, *Percentage of e-commerce revenue from Amazon sales according to Amazon marketplace sellers in 2018*, Statista (May 4, 2019), https://www.statista.com/statistics/259782/third-party-seller-share-of-amazon-platform/.

[6]   Molson Hart, *How Amazon's Business Practices Harm American Consumers: Why Amazon Needs a Competitor and Why Walmart Ain't It*, Medium (July 18, 2019), https://medium.com/swlh/amazon-needs-a-competitor-and-walmart-aint-it-5997977b77b2.

[7]   Testimony of Stacy F. Mitchell, Co-Director Institute for Local Self-Reliance, (Jul. 16, 2019), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-MitchellS-20190716.pdf.

[8]   Spencer Soper & Ben Brody. *Amazon Probed by U.S. Antitrust Officials Over Marketplace*, Bloomberg (Sept. 11, 2019), https://www.bloomberg.com/news/articles/2019-09-11/amazon-antitrust-probe-ftc-investigators-interview-merchants.

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

3

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

ensure compliance with Amazon's price policies, some sellers have come to rely on an external

service to replicate their prices across multiple marketplaces.[9]

9.      Amazon has faced challenges to its PMFN from competition regulatory authorities

all over the world.  In 2013, Amazon withdrew this very practice in Europe under pressure from

British and German regulators.[10]

10.      In the United States, Amazon came under fire for its PMFN in December 2018,

when Richard Blumenthal, the senior United States Senator from Connecticut, called for the

Federal Trade Commission ("FTC") to investigate the practice.[11]  In response, Amazon also

pretended to withdraw its PMFN in the U.S. in March of 2019.[12]  At the time, Dani Nadel,

president of Feedvisor, a company that advises Amazon sellers, expected it to be a watershed

moment that would lead "the greater e-commerce landscape" to be "much more dynamic."[13]

Likewise, David Simnick, co-founder and CEO of Soapbox, a Washington, D.C.-based soap and

shampoo maker that sells on Amazon, reported that when he learned that Amazon was revoking its

PMFN, "I almost did a back flip in the hotel gym."[14]

---

[9]  E.g., Rupert Heather, *The Little-Known Amazon Pricing Rule that Would Burn Your Business*, Xsellco, https://www.xsellco.com/resources/amazon-pricing-rule-burn-business/.

[10]  European Commission, *Germany and United Kingdom: Antitrust Cases against Amazon formally closed*, https://ec.europa.eu/competition/ecn/brief/05_2013/amaz_deuk.pdf.

[11]  Letter from Senator Richard Blumenthal to Josephs Simons, Federal Trade Commission Chair (Dec. 19, 2018), https://www.blumenthal.senate.gov/imo/media/doc/12.19.18%20-%20FTC%20-%20Price%20Parity.pdf.

[12]  Catherine Shu, *Amazon Reportedly Nixes Its Price Parity Requirement for Third-Party Sellers in the U.S.*, Tech Crunch (Mar. 11, 2019), https://techcrunch.com/2019/03/11/amazon-reportedly-nixes-its-price-parity-requirement-for-third-party-sellers-in-the-u-s/.

[13]  Daphne Howland, *Amazon Caves on Seller Pricing*, Retail Dive (Mar. 13, 2019), https://www.retaildive.com/news/amazon-caves-on-seller-pricing/550388/.

[14]  Guadalupe Gonzalez, *You're No Longer Required to Sell Products for Less on Amazon. The Problem? If You Don't, You've Got Another Penalty Coming*, Inc. (Mar. 13, 2019), https://www.inc.com/guadalupe-gonzalez/amazon-removes-price-parity-not-fair-price-rule-third-party-sellers-antitrust-violations.html.

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

4

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

11.     But in fact, Amazon quietly readopted the PMFN under a new name—a "fair pricing" provision, which has the same effect as its former PMFN, which it called a "price parity" provision.[15]  Whereas the "price parity" PMFN prohibited sellers from offering cheaper deals through competing retail ecommerce channels, the "fair pricing" rule likewise imposes severe penalties on merchants who sell their products at cheaper prices on competing platforms, including by terminating selling privileges, removing the product from the coveted Buy Box, or suspending shipping options.[16]

12.     Amazon, therefore, continues to enforce its PMFN and to punish retailers who price lower on other sites.[17]  As a result, "many sellers are still operating by the price parity rule in fear that their account will be impacted as a result."[18]  In short, nothing changed but the name Amazon gave to its anticompetitive restraint.

13.     Amazon's PMFN has market-wide harmful effects on competition and protects its dominance.  After an extensive investigation, the Chair of the House Judiciary Antitrust, Commercial and Administrative Law Subcommittee concluded that Amazon captures "70% of all online marketplace sales."[19]  Amazon has obtained monopoly power in the U.S. ecommerce platform market, as demonstrated by its power to set the prevailing prices of the vast majority of consumer goods offered for sale on the internet.

14.     Amazon has willfully acquired its monopoly power in the market for U.S. ecommerce platforms through anticompetitive conduct, including enforcement of its PMFN, thereby causing supracompetitive prices for all products sold in the U.S. ecommerce platform market.  Amazon's imposition and enforcement of PMFN clauses in its seller contracts amounts to

---

[15]  *Id*.

[16]  *Id.*

[17]  *Supra* Hart; Gonzalez.

[18]  Catie Grasso, *Amazon Pricing Strategy: How Much Should You Sell a Product For?*, Feedvisor (Jan. 31, 2020), https://feedvisor.com/resources/marketplace-fees-policies/amazon-pricing-strategy/.

[19]  Press Release from U.S. House Antitrust Subcommittee (July 29, 2020), https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=3199.

Class Action Complaint
Case No. 2:21-cv-693

5

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

1   restraints of trade that violate Section 1 of the Sherman Act, and its conduct is also an abuse or

2   attempted abuse of monopoly power in violation of Section 2 of the Sherman Act.

3       15.     Plaintiffs on their own behalf and that of similarly situated consumers, seek

4   monetary recovery and injunctive relief for harm caused by Amazon's violations of federal

5   antitrust law—harm that persists and will not abate unless Amazon is stopped.

6                           **I.      JURISDICTION**

7       16.     This Court has federal question jurisdiction pursuant to the federal antitrust laws

8   invoked herein, including the Sherman Act and Clayton Antitrust Act, *e.g.*, 28 U.S.C. § 1331, 28

9   U.S.C. § 1337(a), and 15 U.S.C. § 15(a).

10      17.     This Court also has subject matter jurisdiction pursuant to the Class Action

11  Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse

12  citizenship from Amazon, there are more than 100 Class members nationwide, and the aggregate

13  amount in controversy exceeds $5,000,000.

14      18.     Plaintiffs are residents of Illinois, Maryland, Texas, and Washington, D.C., who

15  purchased consumer goods online.  Plaintiffs were harmed and injured financially because of

16  Amazon's conduct, as described further herein.

17      19.     This Court has personal jurisdiction over Amazon because Amazon has its

18  principal headquarters in Washington, does business in Washington, directly or through agents,

19  and has registered with the Washington Secretary of State such that it has sufficient minimum

20  contacts with Washington.

21                           **II.      VENUE**

22      20.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Amazon's principal

23  place of business is in this judicial district and a substantial part of the events or omissions giving

24  rise to the claims occurred in this judicial district.

25      21.     Venue is proper in the United States District Court for the Western District of

26  Washington because Defendant Amazon consented to being sued in this District.

27

28

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

### III.    PARTIES

**A.    Plaintiffs**

22.    Plaintiff Elizabeth De Coster is a resident of Maryland.  Ms. De Coster has purchased, from Amazon, products offered by third party sellers on the Amazon platform, including one or more items purchased on or after May 5, 2021.

23.    Plaintiff Nemanja Krstic is a resident of Illinois.  Mr. Krstic has purchased, from Amazon, products offered by third party sellers on the Amazon platform, including one or more items purchased on or after May 5, 2021.

24.    Plaintiff John Mariane is a resident of Illinois.  Mr. Mariane has purchased, from Amazon, products offered by third party sellers on the Amazon platform, including one or more items purchased on or after May 5, 2021.

25.    Plaintiff Osahon Ojeaga is a resident of Texas.  Ms. Ojeaga has purchased, from Amazon, products offered by third party sellers on the Amazon platform, including one or more items purchased on or after May 5, 2021.

26.    Plaintiff Emma Zaballos is a resident of Washington, D.C.  Ms. Zaballos has purchased, from Amazon, products offered by third party sellers on the Amazon platform, including one or more items purchased on or after May 5, 2021.

**B.    Defendant**

27.    Amazon is an online retail giant with its principal headquarters in Seattle, Washington.  Amazon sells directly to its retail customers on the Amazon.com platform.  Amazon also maintains Amazon Marketplace, a platform for its two million third-party sellers, whom it also permits to sell on the Amazon.com platform.  Amazon contractually obligates its third-party sellers to adhere to the pricing policies challenged in this lawsuit.

28.    Amazon's third-party sellers' registration is handled on the Amazon.com platform, where Amazon also has maintained the agreements with its third-party sellers relevant to this lawsuit.  Substantially all of the misconduct alleged in this complaint occurred in or emanated from Amazon's headquarters and principal place of business in Seattle, Washington.

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

7

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

# IV.   BACKGROUND

29.     Amazon Marketplace is a marketplace platform that connects sellers and consumers, allowing sellers to find buyers and buyers to find sellers.  Because of its utter dominance, the Amazon Marketplace is not just "a" marketplace platform—it is "*the*" marketplace platform.  For example, a third-party seller named Molson Hart, who sells toys on Amazon reports: "Were we to be suspended from selling on Amazon.com, it would probably take 3–6 months before we'd be bankrupt.  We are not alone.  This is typical for small to medium sized businesses which sell online today.  In fact, most companies like our own, would probably go bust even faster."[20]

30.     Sellers need access to the Amazon Marketplace so they can reach Amazon's 105 million Prime members in the United States, a subscription service that locks buyers into the Amazon.com platform.[21]  To put that into perspective, more American households have Amazon Prime accounts than attend church regularly or have a landline phone.[22]

31.     According to a survey, an estimated 20% of Amazon Prime members shopped on Amazon a few times per week, and 7% did so almost daily.[23]  U.S. Prime members spend an average of $1,400 per year on the Amazon.com platform.[24]  Another survey found that *96% of all*

---

[20]  Molson Hart, *How Amazon's Business Practices Harm American Consumers: Why Amazon Needs a Competitor and Why Walmart Ain't It*, Medium (July 18, 2019), https://medium.com/swlh/amazon-needs-a-competitor-and-walmart-aint-it-5997977b77b2.

[21]  *Number of Amazon Prime members in the United States as of June 2019*, Statista (Dec. 1, 2020), https://www.statista.com/statistics/546894/number-of-amazon-prime-paying-members/.

[22]  Margot Whitney, *Complete Beginner's Guide to Advertising on Amazon*, WordStream (Aug. 27, 2019), https://www.wordstream.com/blog/ws/2017/09/11/amazon-advertising.

[23]  Supra *Number of Amazon Prime members in the United States as of June 2019*.

[24]  *Average annual amount spent on Amazon according to U.S. Amazon Prime and non-Prime members as of March 2019*, Statista (Nov. 30, 2020), https://www.statista.com/statistics/304938/amazon-prime-and-non-prime-members-average-sales-spend/.

Class Action Complaint
Case No. 2:21-cv-693

8

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

Prime members are more likely to buy products from the Amazon.com platform than any other ecommerce site.[25]

32. Because of the hefty fees it charges its third-party sellers, the Amazon Marketplace is hugely profitable for Amazon.  Amazon's profit margin on its seller service fees is significantly higher than the margin on its own first-party retail sales.[26]  Whereas Amazon operates its own retail operations with razor-thin margins, it takes a significant percentage of each sale by its third-party sellers, plus additional charges to store and ship the inventory of the merchants that use the "Fulfillment by Amazon" ("FBA") service.[27]  Because of this, financial analysts at Evercore ISI valued Amazon's third-party services at more than $250 billion, while giving its in-house retail operations a value of just $120 billion.[28]

33. The seller's relationship with Amazon typically begins with a $40 fee.[29]  Then Amazon adds a commission ("referral fees") for each item sold on its platform, typically around 15%.[30]  Amazon also charges a per-item fee or a monthly subscription and it charges the seller the lesser of $5 or 20% of the price as a fee for any refunds when a shopper returns the product.[31]

---

[25]   Kiri Masters, *89% Of Consumers Are More Likely To Buy Products From Amazon Than Other E-Commerce Sites: Study*, Forbes (Mar. 20, 2019), https://www.forbes.com/sites/kirimasters/2019/03/20/study-89-of-consumers-are-more-likely-to-buy-products-from-amazon-than-other-e-commerce-sites/#452623b04af1.

[26]   Adam Levy, *Amazon's Third-Party Marketplace Is Worth Twice as Much as Its Own Retail Operations*, Motley Fool (Apr. 11, 2019), https://www.fool.com/investing/2019/03/07/amazons-third-party-marketplace-is-worth-twice-as.aspx.

[27]   *Id.*

[28]   *Id.*

[29]   Amazon Services Registration Page, https://services.Amazon.com/sem-landing.html?ref=pd_sl_2thvswwc79_b&hvdev=c&ld=SEUSSOABING-B20000SC-D&hvadid=78615157546872&hvqmt=p&tag=mh0b-20&hvbmt=bb.

[30]   David Hamrick, *Amazon FBA Fees, How They Work, and How to Profit as a Seller*, Jungle Scout (Mar. 24, 2021), https://www.junglescout.com/blog/amazon-fba-fees/.

[31]   *Id.*

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

34.     Optionally, and for an additional fee, FBA will store, pick up, pack, ship orders, and manage customer service and returns.  Sellers who enroll in FBA qualify for Amazon Prime and free shipping for eligible orders; otherwise most sellers must join a waitlist to join Seller Fulfilled Prime, which commits sellers to fulfill orders with two-day delivery at no additional charge for Prime customers.[32]  Accepting FBA services also greatly increases the likelihood that Amazon's algorithm will select the seller's product for the coveted Amazon Buy Box.[33] Meanwhile, sellers' enrollment in FBA is a win for Amazon, who never takes title to the third-party seller's inventory,[34] yet enjoys a steady revenue from its sellers, who do all the merchandising and take on the inventory risk.[35]

35.     Amazon's middleman fees are a huge source of revenue and profit for Amazon as a company.  Between 2015 and 2018, Amazon's revenue from third-party seller fees grew from $16 billion to $43 billion, outpacing both the overall growth of Amazon's retail sales, and the growth of sales made by third-party sellers on the Amazon.com platform.[36]  And this is on top of the numerous other fees Amazon collects via Amazon Marketplace.[37]

36.     "Amazon collects 27 cents of each dollar customers spend buying things its merchants sell, a 42 percent jump from five years ago, according to Instinet, a financial research

---

[32]  *Sell products with the Prime badge directly from your warehouse*, Amazon Seller Central, https://services.Amazon.com/services/seller-fulfilled-prime.html.

[33]  Leanna Zeibak, *How to Win the Amazon Buy Box in 2021*, Tinuitu (Mar. 25, 2020), https://tinuiti.com/blog/amazon/win-amazon-buy-box/.

[34]  Declaration of Ella Irwin, Director of Marketplace Abuse at Amazon (Jul. 13, 2018), *Kangaroo Mfg., Inc. v. Amazon.com*, Case No. 17-cv-1806SPL (D. Ariz.), Dkt. No. 75 ("Irwin Decl."), ¶ 5.

[35]  *Supra* Howland.

[36]  *Supra* Mitchell.

[37]  Pamela N. Danziger, *Amazon's Third-Party Marketplace Is Its Cash Cow, Not AWS*, Forbes (Feb. 5, 2021), https://www.forbes.com/sites/pamdanziger/2021/02/05/amazons-third-party-marketplace-is-its-cash-cow-not-aws/?sh=486294bc21c0.

firm.  That does not include what companies pay to place ads on Amazon, a business that Wall Street considers as valuable as Nike."[38]

37.     On-platform advertising is another cost that sets Amazon apart from other platforms.  Amazon is the third largest provider of digital advertising.[39]  Investors expect its $10 billion advertising sales[40] to jump $28.4 billion over the next five years.[41]  (By comparison, Walmart's ad offerings to its third-party sellers are at the nascent stage.[42])

38.     According to John Denny, who ran ecommerce for the drink company Bai, companies used to believe that if they had a great product, it would show up in Amazon's search results, and sales would follow.  "Those days are over," Mr. Denny said.  "There are no lightning strikes on Amazon anymore."[43]

39.     For many Amazon sellers, placing advertisements on the Amazon.com platform is necessary to getting or maintaining a high ranking on the platform.  That means that Amazon's third-party sellers must pay more money to sell the same products.  For example, on a $150 product, Amazon charges Molson Hart's company a $17.58 advertising fee to appear in Amazon's search results.[44]

---

[38] *Supra* Weise.

[39] Eugene Kim, *Amazon quietly removes promotions of its own products as calls for tech regulation escalate*, NBC (Apr. 3, 2019), https://www.nbcnews.com/tech/tech-news/amazon-quietly-removes-promotions-its-own-products-calls-tech-regulation-n990666?cid=public-rss_20190410.

[40] Nicole Perrin, *Amazon Advertising 2019. Growth and Performance Are Strong at the No. 3 US Digital Ad Seller*, Emarketer (Nov. 7, 2019), https://www.emarketer.com/content/amazon-advertising-2019.

[41] Lara O'Reilly and Laura Stevens, *Amazon com: Emerges as Advertising Giant*, Market Screener, (Nov. 27, 2018), https://www.marketscreener.com/AMAZON-COM-12864605/news/Amazon-com-Emerges-as-Advertising-Giant-27665223/.

[42] Tara Johnson, Selling on Walmart: Vendor vs. Third Party vs. Hybrid, Tinuiti (JUN 26, 2020), https://tinuiti.com/blog/walmart/selling-on-walmart-vendor-vs-third-party-vs-hybrid/.

[43] *Supra* Weise.

[44] *Id.*

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

40.     "It's increasingly pay-to-play," said Melissa Burdick, a 10-year Amazon veteran who now advises major consumer brands.[45]  Quartile tested the importance of on-platform ads in 2018 when it stopped running ads on Amazon for 750 popular products and found that sales shrank by 24%.[46]  The effect only increased over time.  After 10 weeks, sales of the products without ads had tumbled 55%.[47]

41.     Since 2014, Amazon began charging its third-party sellers advertising fees to ensure their products show up when customers search for their products on the Amazon.com platform.  For consumers, that means that advertising influences search results more than relevance; for third-party sellers, it means higher selling costs.  For example, Amazon charged its third-party seller, Molson Hart, $763,000 for advertising and commissions in 2018:

> In exchange for this $763,000, they operate an online catalog and deliver search results.  We sell about 200 products on Amazon.
>
> Does it cost anywhere near $763,000 to display our products there? Definitely not.[[48]]

42.     Walmart's on-platform advertising service, which began in 2020, is neither as extensive as Amazon's nor, because of the relatively small number of sellers and products, as necessary to make sellers' products visible.[49]  Amazon's third-party sellers could therefore profitably lower their prices on Walmart's platform (and therefore put competitive pressure on Amazon) if not restrained by Amazon's PMFN.  In fact, Walmart routinely fields requests from

---

[45]  *Supra* Weise.

[46]  *Id.*

[47]  *Id.*

[48]  *Supra* Hart.

[49]  Greg Swan, *The Ultimate Walmart Marketplace Guide (Pros, Cons, Secrets and More)*, Tinuiti (Jan 9, 2020), https://tinuiti.com/blog/walmart/sell-on-walmart-marketplace/.

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

12

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1   third-party sellers to raise prices on its marketplace because they worry that a lower price on the

2   Walmart platform will jeopardize their sales on the Amazon.com platform.[50]

3        43.    Amazon also charges sellers fees for some types of customer reviews.[51]  All of

4   these added fees mean that sellers' prices go up on the Amazon.com platform, and by virtue of

5   Amazon's pricing policies, other platforms as well.  Some third-party sellers report giving

6   Amazon 40% or more for each transaction, an increase from 20% just a few years ago.[52]

7                             **V.       RELEVANT MARKET**

8        44.    The relevant geographic market is the United States of America.

9        45.    The relevant product market is the market for ecommerce platforms.  That market

10  has two principle types of competitors:  ecommerce marketplaces (also referred to as multilateral

11  platforms) and direct-to-consumer online storefronts (which are functionally single-seller

12  platforms).  Examples of ecommerce marketplaces include Amazon, eBay, and Walmart.

13  Examples of direct-to-consumer online storefronts include Adorama.com and Pharmapacks.com.

14  Many sellers that utilize the Amazon Marketplace also operate their own direct-to-consumer

15  storefronts, like Adorama and Pharmapacks.

16       46.    In the market for ecommerce platforms, competitors compete to offer the lowest,

17  best, and most innovative execution method for a sale.  That is, they compete to offer the best

18  intermediation between disparate buyers and sellers.  Through this lens, direct-to-consumer

19  storefronts are competing against the Amazon Marketplace by offering a system to connect the

20  seller with consumers on the seller's own website.

21       47.    Ecommerce platforms are not reasonably interchangeable with traditional

22  wholesale/retail retailers.  Ecommerce platforms provide opportunities for end-sellers to directly

23

---

24      [50]  Spencer Soper, *Amazon Squeezes Sellers That Offer Better Prices on Walmart*, Bloomberg

25  (Aug. 5, 2019) https://www.bloomberg.com/news/articles/2019-08-05/amazon-is-squeezing-
    sellers-that-offer-better-prices-on-walmart.

26      [51]  *Id*.; Amazon, *What is the Early Reviewer Program?*,

27  https://www.Amazon.com/gp/help/customer/display.html?nodeId=202094910.

28      [52]  *Supra* Soper.

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

13

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

reach end-buyers without the need to sell their wares at wholesale prices.  Instead, end-sellers are able to control price and transact directly with end-buyers.  Moreover, in the case of ecommerce marketplaces, sellers and buyers are able to exploit the indirect network effects caused by participation from both types of marketplace users, sellers and buyers.

48.     Market participants—including Amazon itself, retailers, and consumers—recognize a distinct market for ecommerce platforms.  In a response to a recent investigation by the United States House of Representatives that asked Amazon to provide information regarding its competitors, it produced internal documents indicating that, in fact, it has "No direct competitors."[53]  Thus Amazon itself acknowledged its core business (at least for the Amazon Marketplace product) is providing a marketplace rather than selling goods to consumers.

49.     Similarly, U.S. retailers recognize that ecommerce platforms are a separate relevant market.  Almost half of Amazon's third-party sellers generate 81% to 100% of their revenues from sales on the Amazon.com platform.[54]  As its third-party seller, Molson Hart, succinctly puts it: "[W]e have nowhere else to go and Amazon knows it."[55]

50.     Consumers likewise view ecommerce platforms as a distinct market.  As early as 2016, the internet-marketing firm BloomReach Inc. found that 55% of those surveyed first start with Amazon when searching for products.[56]  Consumer preference for the Amazon.com platform as a starting point for product searches has only increased with time.  A survey conducted by

---

[53]   *See* U.S. House of Representatives Subcommittee on Antitrust, Commercial and Administrative Law, *Investigation of Competition in Digital Markets* (2020), https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf?utm_campaign=4493-519 ("U.S. House Antitrust Report"), at page 255-56.

[54]   J. Clement, *Percentage of e-commerce revenue from Amazon sales according to Amazon marketplace sellers in 2018*, Statista (May 4, 2019), https://www.statista.com/statistics/259782/third-party-seller-share-of-amazon-platform/.

[55]   *Supra* Hart.

[56]   Spencer Soper, *More than 50% of Shoppers Turn First to Amazon in Product Search*, Bloomberg (Sept. 26, 2016), https://www.bloomberg.com/news/articles/2016-09-27/more-than-50-of-shoppers-turn-first-to-amazon-in-product-search.

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

14

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

Feedadviser in 2019 found that 66% of consumers start their search for new products on the Amazon.com platform and 74% start there when they are ready to buy a specific product.[57]

51.     Unlike traditional retail outlets, ecommerce platforms traditionally require consumers to create an account.  These accounts not only serve as a repository for consumer-submitted data, such as address, telephone number, or payment card information, but also allow ecommerce platform operators to store data relating to consumer purchasing habits.[58]

52.     These distinctive facilities allow ecommerce platform operators to produce additional functionality for their platforms by engaging in a wide range of data analytics, to predict future purchasing patterns, manage supply chains, or simply recommend consumers additional products to buy on the platform.[59]  As Lina Khan—recently nominated to be an FTC Commissioner by President Joe Biden—wrote in her seminal article:  "The degree to which a firm can tailor and personalize an online shopping experience is different in kind from the methods available to a brick-and-mortar store – precisely because the type of behavior that online firms can track is far more detailed and nuanced."[60]

53.     There is little cross-elasticity of demand between the use of ecommerce platforms and the use of other retail venues.  A hypothetical monopolist in the ecommerce platform market could profitably impose a small but significant and non-transitory increase in price ("SSNIP") in the form of an increased commission.  (Such an increase—say, a 5% increase—would, for example, increase Amazon's already highest-in-the-industry commission from 15% to 15.75%.)  Because sellers must use ecommerce platforms to reach their customers, they could not (and therefore would not) switch away from the market in response to a SSNIP.  Thus a SSNIP would

---

[57]  Feedadvisor, *The 2019 Amazon Consumer Behavior Report*, https://feedvisor.com/resources/amazon-trends/the-2019-amazon-consumer-behavior-report/.

[58]  Stigler Committee on Digital Platforms, *Final Report* (2019), https://research.chicagobooth.edu/-/media/research/stigler/pdfs/digital-platforms---committee-report---stigler-center.pdf, at 45.

[59]  *Id*. at 48.

[60]  Lina M. Khan, *Amazon's Antitrust Paradox*, 126 Yale L.J. 710, 764 (2017).

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

15

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1  not cause a sufficient number of sellers or their buyers to switch away from the use of ecommerce

2  platforms to render the SSNIP unprofitable to the hypothetical monopolist.

3  ## VI.   MARKET POWER

4  54.   Amazon is a monopolist in the market for ecommerce marketplaces, with an

5  estimated share of over 70%.

6  55.   Amazon's market power is directly evident by its power over price:  over the span

7  of five years, Amazon increased the cost of its ecommerce platform services by 42%, to a

8  staggering 27 cents for each dollar spent by consumers on its platform.[61]  Yet, despite these

9  meteoric price increases, Amazon increased its share of *all* online transactions (including non-

10  Platform transactions) from 38.1% percent in 2016[62] to roughly 50% in 2021.[63]

11  56.   At the same time, Amazon's hefty fees suppress output below what would prevail

12  in a competitive world, absent its PMFN restraints.  Absent those restraints, fees for sellers would

13  be lower, enabling them to make more sales to consumers at lower prices.  Absent Amazon's

14  PMFNs, American consumers would have purchased more goods at lower prices over the past

15  four years.

16  57.   There is also significant circumstantial evidence of Amazon's market power in the

17  ecommerce platform market.  Amazon "reportedly controls about 65% to 70% of all U.S. online

18  marketplace sales."[64]  As of 2018, Amazon's next closest ecommerce marketplace competitors—

19  eBay and Walmart—have a market share of only 6.6% and 3.7% respectively.[65]

20

21

22  [61]  *Supra* Weise.

23  [62]  "*Amazon could be responsible for nearly half of U.S. e-commerce sales in 2017*," Vox

24  (Oct. 24, 2017), https://www.vox.com/2017/10/24/16534100/amazon-market-share-ebay-walmart-apple-ecommerce-sales-2017.

25  [63]  *Supra* U.S. House Antitrust Report, at 255.

26  [64]  *Id*. at 255.

27  [65]  *Amazon Now Has Nearly 50% of US Ecommerce Market*, Emarketer (Jul. 16, 2018), https://www.emarketer.com/content/amazon-now-has-nearly-50-of-us-ecommerce-market.

28

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

16

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

58.     Amazon's market power in the ecommerce platform market is further demonstrated by its must-have status for retailers.  Due to indirect network effects and the fact that nearly three-quarters of consumers look to Amazon first when selecting an ecommerce platform,[66] most retailers cannot profitably operate their businesses without selling on Amazon, regardless of the price of that platform.

59.     "[C]ompanies that once drew sufficient consumer traffic from search engines to their own sites are now compelled to become vendors or sellers on Amazon's platform — or forego access to a majority of online shopping traffic."[67]  This "gives [Amazon] an unprecedented degree of structural power in the economy."[68]  As early as 2016, the internet-marketing firm BloomReach Inc. found that 55% of those surveyed first start with Amazon when searching for products.[69]  Consumer preference for the Amazon.com platform as a starting point has only increased with time.  A survey conducted by Feedadviser in 2019 found that 66% of consumers start their search for new products on the Amazon.com platform and 74% start there when they are ready to buy a specific product.[70]

---

[66]   *"74% of consumers go to Amazon when they're ready to buy something. That should be keeping retailers up at night,"* CNBC (March 19, 2019), https://www.cnbc.com/2019/03/19/heres-why-retailers-should-be-scared-of-amazon-dominating-e-commerce.html.

[67]   *Supra* Mitchell.

[68]   *Id.*

[69]   Spencer Soper, *More than 50% of Shoppers Turn First to Amazon in Product Search*, BLOOMBERG, Sept. 26, 2016, https://www.bloomberg.com/news/articles/2016-09-27/more-than-50-of-shoppers-turn-first-to-amazon-in-product-search.

[70]   Feedadvisor, *The 2019 Amazon Consumer Behavior Report*, https://fv.feedvisor.com/rs/656-BMZ-780/images/Feedvisor-Consumer-Survey-2019.pdf.

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

17

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000



60.     With 600 million products and two million sellers on the Amazon.com platform Amazon has unparalleled inventory, mostly housed in a sprawling network of roughly 100 warehouses scattered across the United States.[71]  Amazon has surpassed DHL to become the world's largest provider of shipping and fulfillment services, giving it a vast edge over its

---

[71]  Nate Rattner and Annie Palmer, *This map shows how Amazon's warehouses are rapidly expanding across the country*, CNBC (Jan. 19, 2020), https://www.cnbc.com/2020/01/19/map-of-amazon-warehouses.html.

Class Action Complaint
Case No. 2:21-cv-693

18

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

1   competitors in the distribution of products.[72]  It delivers a little less than half of all items ordered

2   on the Amazon.com platform and by 2022, it is expected to deliver 65% of them.[73]

3       61.    This also allows Amazon to wield tremendous power over its third-party sellers.

4   Approximately 94% of them rely on Amazon to store and fulfill their orders; about 64% rely on

5   Amazon exclusively for these services, and 37% rely on Amazon as the sole source of their

6   income.[74]

7       62.    When Amazon made the decision to prioritize household essentials during the

8   COVID-19 pandemic, it left these sellers in a bind because they could not sell the products stored

9   in Amazon's warehouses.  Sellers, who borrowed from Amazon, were even worse off.  For

10  example, Miles Szczurek, head of operations at the 3D-printing tool manufacturer AMX3d, said

11  his company took out a small business loan with Amazon, and when it could not stock products in

12  Amazon's warehouses, he feared it would be impossible to pay back: "When Amazon put this

13  restriction in place, they made no adjustments to the terms of the loans."[75]  He expressed concerns

14  about the time it will likely take for Amazon to resume full service, adding:  "I think this points to

15  a significant weakness with a single venue having this much market share."[76]

16      63.    The Amazon.com platform accounts for 70% of all online marketplace sales.[77]  In

17  2018, it generated almost half of the revenue of all retail ecommerce in the United States, while its

18  nine closest competitors had a distant 1.1%-6.6% share in revenue of the retail ecommerce

19

20

---

21      [72]   *Supra* Weise.

22      [73]   Emma Cosgove, *Amazon Logistics parcel volume will surpass UPS and FedEx by 2022*,
23   Retail Dive (Dec. 16, 2019), https://www.retaildive.com/news/amazon-logistics-volume-surpass-
     ups-fedex-2022-morgan-stanley/569140/.

24      [74]   *Amazon's New 'Essential Items' Policy Is Devastating Sellers*, Wired (Mar. 24, 2020),
25   https://www.wired.com/story/amazon-essential-items-policy-devastating-sellers/.

26      [75]   *Id.*

       [76]   *Id.*
27
       [77]   *Supra* U.S. House Antitrust Report, at 255.
28

Class Action Complaint
Case No. 2:21-cv-693                                    19

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

1  market.[78]  Amazon has gained this market share in, large part, on an acquisition strategy that has

2  focused on acquiring its potential competitors.[79]

3      64.    The market for ecommerce platforms is dominated by strong indirect network

4  effects.  These indirect network effects create substantial barriers to entry.  *See e.g. Biden v.*

5  *Knight First Amend. Inst. At Columbia Univ.*, 141 S. Ct. 1220, 1224 (2021) ("[T]oday's dominant

6  digital platforms derive much of their value from network size.  The Internet, of course, is a

7  network.  But these digital platforms are networks within that network. . . .  That these companies

8  have no comparable competitors highlights that the industries may have substantial barriers to

9  entry.") (J. Thomas, concurring).

10     65.    Leading economists have likewise observed that "[d]igital platforms combine

11 economies of scale, low marginal costs, economies of scope through data and an installed base of

12 users, network effects, multi-sidedness, and sometimes a global reach."[80]  The combination of

13 these attributes "tend[s] to generate concentrated markets, or market structures containing few

14 firms," and, "the addition of inertial (or 'sticky') consumers these markets feature high entry

15 barriers which make it difficult for new firms to enter the market to create competition."[81]

16     66.    Moreover, "large technology firms" like Amazon "can maintain market power in

17 part because it is not easy for users to switch away from the incumbent's technology."[82]  For

18 example, an online seller who has received hundreds of reviews and ratings on Amazon

19 Marketplace cannot easily download and migrate this data to one of Amazon's competitors but,

20

21

22 [78]  Marianne Wilson, *eMarketer: Amazon to capture 47% of all U.S. online sales in 2019*,
23 Chain Store Age (Feb. 15, 2019), https://chainstoreage.com/technology/emarketer-amazon-to-
   capture-47-of-all-u-s-online-sales-in-2019.

   [79]  *Supra* U.S. House Antitrust Report, at 262.
24
   [80]  Testimony of Fiona M. Scott Morton, Ph.D., House Judiciary Committee (Mar. 7, 2019),
25 https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-
   ScottMortonF-20190716.pdf.
26
   [81]  *Id.*
27
   [82]  *Supra* U.S. House Antitrust Report, at 41.
28

Class Action Complaint
Case No. 2:21-cv-693                                20

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

1   instead, would have to start from scratch on a new platform.[83]  These switching costs are

2   sufficiently high that the ecommerce platform market is said to exhibit "lock-in" effects:  Buyers

3   and sellers stick with Amazon even though they may prefer the services of one of Amazon's

4   rivals.[84]

5        67.     Amazon designs its platform specifically to enhance these lock-in effects by,

6   among other things, obfuscating the source of origin of sales (i.e., the third-party seller) on

7   Amazon Marketplace.  Amazon forbids third-party sellers from contacting buyers, and the order

8   confirmation email and delivery packaging for third-party sales do not contain any reference to the

9   seller while also featuring the Amazon brand front and center.[85]  The ultimate effect is to lock-in

10  sellers, and accordingly buyers as well, to the Amazon Marketplace, as sellers' attempts to create

11  their own e-commerce presence on other channels (without the Amazon customer base) would be

12  "futile."[86]

13       68.     Amazon's anticompetitive restraints—specifically its PMFN—solidify its market

14  power in the ecommerce platform market.  Amazon's competitors in the ecommerce platform

15  market told the U.S. House that "as Amazon raises the costs to sellers, and requires that Amazon

16  have the lowest prices available, for a seller to be able to make significant sales on its marketplace,

17  these sellers will raise the price on competitor sites to match Amazon's price."[87]  Without the

18  ability to offer lower prices on goods, there is no incentive for competing ecommerce platforms to

19

20  _____

21       [83]   *Id.* at 42.

22       [84]   *Id.* at 41-42.

23       [85]   *Id.* at 258.

24       [86]   *Id.* (citation omitted).

25       [87]   *Id.* at 296 (citing Submission from Source 11, to H. Comm. on the Judiciary, 4 (Oct. 14,
    2019) (on file with Comm.); Submission from Jason Boyce, Founder & CEO, Avenue7Media
26  (Sept. 25, 2020) (on file with Comm.) ("Amazon prohibiting sellers from offering lower prices on
    other online retail platforms clearly hurts consumers if the only way for sellers to regain their
27  listing on Amazon is to raise their prices on other platforms or remove their listings all together,
    therefore limiting competition.")).

28

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

21

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1   offer lower prices on platform fees.  Consequently, Amazon's massive market share cannot be

2   challenged by competition.

3         69.     The European Commission highlighted this phenomenon as well, stating that when

4   sellers cannot offer lower prices on competing ecommerce platforms, "it can be difficult for other

5   internet marketplaces that compete with Amazon, especially new platforms entering the market,"

6   to compete for customers.[88]

**A.**    **Amazon is the subject of a government investigation for possible antitrust violations, including whether it uses its relationship with its third-party sellers to harm competition.**

9         70.     In the summer of 2019, the Washington Post reported that the FTC planned to

10   investigate Amazon as part of a broad investigation into large technology companies.[89]  This

11   followed an earlier announcement that the FTC had established a special task force to monitor the

12   big tech companies and to investigate "any potential anticompetitive conduct in those markets, and

13   tak[e] enforcement actions when warranted."[90]  According to Gene Kimmelman, the president of

14   Public Knowledge, a Washington-based consumer advocacy group: "This should be a wake-up

15   call to both Google and Amazon to behave themselves because it at least shows that the Justice

16   Department and FTC are thinking about them."[91]

17         71.     Vox reported that the FTC started questioning some of Amazon's competitors

18   about its business practices, according to someone briefed on the discussions.[92]  Bloomberg also

---

[88]  European Commission, *Germany and United Kingdom: Antitrust Cases against Amazon formally closed*, https://ec.europa.eu/competition/ecn/brief/05_2013/amaz_deuk.pdf.

[89]  Tony Romm, *Amazon could face heightened antitrust scrutiny under a new agreement between U.S. regulators*, Wash. Post (June 1, 2019) https://www.washingtonpost.com/technology/2019/06/02/amazon-could-face-heightened-antitrust-scrutiny-under-new-agreement-between-us-regulators/.

[90]  *Id.*

[91]  *Id.*

[92]  Jason Del Rey, *Amazon may soon face an antitrust probe. Here are 3 questions the FTC is asking about it.*, Vox (Jun. 4, 2019), https://www.vox.com/recode/2019/6/4/18651694/ amazon-ftc-antitrust-investigation-prime.

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

22

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

reported that FTC investigators began interviewing Amazon's third-party sellers as part of a sweeping probe to determine whether Amazon uses its market power to hurt competition.[93] Reportedly, several attorneys and an economist conducted interviews that typically lasted about 90 minutes.[94]

72.     According to Michael Kades, who spent 20 years at the FTC, the length of the interviews and the manpower devoted to examining Amazon point to a serious inquiry: "Early in an investigation, that's a sign of staff doing a serious job," Kades said. "They're spending lots of time with witnesses and trying to really understand what they're saying."[95]  Reportedly, regulators are skeptical that shoppers and suppliers have real alternatives to Amazon.[96]

73.     Jennifer Rie, an analyst at Bloomberg Intelligence who specializes in antitrust litigation, opined that FTC investigators are "in a background phase," when they are "trying to learn as much as they can about the industry from people who aren't the target of their investigation."[97]

74.     Diana Moss, president of the American Antitrust Institute, a nonprofit that advocates for aggressive antitrust enforcement, further noted that "the central question in an inquiry like this" is whether "merchants are so reliant on Amazon for sales that they are unwilling to offer better prices on other platforms like Walmart and EBay" and whether that can hurt competition.[98]

75.     The Free & Fair Markets Initiative likewise applauded the FTC's efforts: "It is welcome news to see that regulators are finally getting serious about taking on the unfair

---

[93]   *Supra* Soper & Brody.

[94]   *Id.*

[95]   *Id.*

[96]   *Id.*

[97]   *Id.*

[98]   *Id.*

advantage Amazon has staked out on its platform," said Robert B. Engel, a spokesperson for the group, in a statement.[99]

76.     The House Judiciary Committee has held multiple hearings as part of its antitrust investigation into digital markets, touching on issues like data privacy, innovation, the free press and competition.  As part of that investigation, the Committee requested documents and information on Amazon's market share and closest competitors.[100]

77.     In late July 2020, Amazon CEO Jeff Bezos testified in person at a hearing entitled "Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google," where the Committee raised concerns about Amazon's market power and whether it gives Amazon an unfair advantage over third-party merchants when it competes with them to sell similar products on its own platform.

78.     In a written statement, the presiding Chair expressed concerns that Amazon's dominance in "online marketplace sales" presents a risk that a single action by that company could "affect hundreds of millions of us in profound and lasting ways."[101]

### VII.    AMAZON HAS UNLAWFULLY MONOPOLIZED THE MARKET FOR ECOMMERCE PLATFORMS

79.     Amazon has unlawfully monopolized the market for ecommerce platforms through a straightforward strategy—blocking any rivals from offering lower prices.  Knowing that Amazon.com is a must-have for sellers, Amazon makes all sellers agree to the PMFN, and sellers therefore agree to not sell their products at lower prices through any non-Amazon channel.  This prevents price competition on Amazon's commissions, which would put downward pressure on those commissions and lower retail prices for consumers.

---

[99]   Ben Fox Rubin, *FTC investigation into Amazon reportedly gearing up*, C/net (Sept. 11, 2019), https://www.cnet.com/news/ftc-investigation-into-amazon-reportedly-gearing-up/.

[100]   Letter from U.S. House of Representatives Committee on the Judiciary to Jeff Bezos, Amazon CEO (Sept. 13, 2019), https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/Amazon%20RFI%20-%20Signed.pdf.

[101]   *Supra* Press Release (Jul. 29, 2020).

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

80.     As explained above, Amazon implements its price restraint by contracts and coercion.  When a seller registers with Amazon Marketplace, "it agrees to the terms of the Amazon Services Business Solutions Agreement (BSA) and the policies incorporated in that agreement.[102]  The BSA establishes rules for selling on the Amazon.com platform, and any seller holding an Amazon Seller Account must adhere to them.[103]  It costs less to sell on the sellers' own websites and other third-party marketplaces, and in a competitive market third-party sellers would sell their products at lower prices on other platforms because their cost structure allows them to do so while still making more than on the Amazon.com platform.  But the BSA prevents them from offering a competitive price on external platforms.

81.     To enforce this provision, Amazon deploys an army of algorithms and robots to crawl the internet and detect violations.  Amazon's "automated system continually checks and informs the seller within 15 minutes if a violation has occurred."[104]  If Amazon finds that a seller violated this restraint, it issues a policy warning in the seller's central account.[105]  Violations could result in removal of the seller's product listing or suspension of the seller's account.[106]  It was reported that "Amazon even checks [the seller's] listings for similar products that are differently described, by color or size, for example.  In other words, there's no hiding place."[107]

82.     Jarvin Karnani, who has been selling on Amazon Marketplace for two years, told the FTC, "[I]f Amazon suspends you, it's like a death knell . . . [W]hen Amazon shuts you off,

---

[102]   Irwin Decl., ¶ 4.

[103]   *Amazon Pricing Policy*, Feedadvisor, https://feedvisor.com/university/amazon-pricing-policy/.

[104]   Rupert Heather, *The Little-Known Amazon Pricing Rule that Would Burn Your Business*, Xsellco, https://www.xsellco.com/resources/amazon-pricing-rule-burn-business/.

[105]   *Id.*

[106]   *Id.* Amazon's contracts with its third-party sellers are confidential.  Plaintiffs therefore rely on publicly available third-party sources for their content.

[107]   *Id.*.

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

25

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

they sit on your money for 90 days and there's nothing you can do."[108]  To ensure compliance with Amazon's price policies, some sellers have come to rely on an external service to replicate their prices across multiple marketplaces.[109]

83.     Amazon continues to enforce its anticompetitive restraint of third-party sellers to this day, although it now relies on a different contractual provision than it did before March 2019. Until then, the BSA included an express "price parity" (*i.e.*, platform most favored nation or "PMFN") provision, governing the price of products the seller offered for sale through its or any of its affiliates' other retail channels other than physical stores.[110]  The PMFN required that sellers:

> maintain parity between the products you offer through Your Sales Channels and the products you list on any Amazon Site by ensuring that ... the purchase price and every other term of sale ... is at least as favorable to Amazon Site users as the most favorable terms via Your Sales Channels (excluding consideration of Excluded Offers).[[111]]

84.     In March 2019, under threat of an FTC investigation about this specific restraint, Amazon officially "withdrew" its PMFN provision.[112]  But Amazon continues to enforce its illegal restraint under the new "fair pricing" provision.[113]  Amazon's "fair pricing" policy states that "Amazon regularly monitors the prices of items on our marketplaces," and that if it sees "pricing practices" on the Amazon.com platform "that harm[] customer trust, Amazon can remove the Buy

---

[108]    Spencer Soper & Ben Brody. *Amazon Probed by U.S. Antitrust Officials Over Marketplace*, Bloomberg (Sept. 11, 2019), https://www.bloomberg.com/news/articles/2019-09-11/amazon-antitrust-probe-ftc-investigators-interview-merchants.

[109]    *Supra* Heather.

[110]    Irwin Decl., Ex. A at 14 (definition) and 18 (section S-4 Parity with Your Sales Channel).

[111]    *Id.*, Ex. A at 18.

[112]    *See, e.g.*, Greg Magana, *Amazon is ending its restrictive pricing practice*, Business Insider (Mar. 13, 2019), https://www.businessinsider.com/amazon-ends-restrictive-pricing-parity-2019-3.

[113]    *See, e.g.*, Guadalupe Gonzalez, *You're No Longer Required to Sell Products for Less on Amazon. The Problem? If You Don't, You've Got Another Penalty Coming*, https://www.inc.com/guadalupe-gonzalez/amazon-removes-price-parity-not-fair-price-rule-third-party-sellers-antitrust-violations.html.

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

Box, remove the offer, suspend the ship option, or, in serious or repeated cases, suspend[] or terminat[e] selling privileges."[114]  One of the pricing practices Amazon identifies as "harmful" to customer trust is "[s]etting a price on a product or service that is significantly higher than recent prices offered *on or off* Amazon."[115]

85.     Amazon's "fair pricing" provision reimposes the requirement of its former price parity provision.  Both require Amazon third-party sellers to maintain equal or higher prices on other platforms or lose privileges on the Amazon.com platform.  Under the "fair pricing" provision, "[a]ny single product or multiple products packages must have a price that is equal to or lower than the price of the same item being sold by the seller on other sites or virtual marketplaces."[116]  The "fair pricing" provision "applies to both the individual product price as well as the collective price that the item or items are being sold for."[117]  Third-party sellers receive "price alerts" with a warning from Amazon that shows the product, the price on Amazon, and the price found elsewhere on the web without identifying the competing website.[118]

86.     The outcome is the same both under the PMFN clause and under the "fair pricing" provision: both have "the effect of getting sellers to raise prices elsewhere, rather than risk lower revenue from Amazon."[119]  This, in turn, leads to higher prices on all sites, rather than lower prices on all sites, due to price competition between Amazon and other ecommerce outlet

---

[114]  *Amazon Marketplace Fair Pricing Policy*, Amazon Seller Central, https://sellercentral.Amazon.com/gp/help/external/G5TUVJKZHUVMN77V?language=en_US&ref=efph_G5TUVJKZHUVMN77V_cont_521.

[115]  *Id.* (emphasis added).

[116]  *Amazon Pricing Policy*, Feedadvisor, https://feedvisor.com/university/amazon-pricing-policy/.

[117]  *Id.*

[118]  Spencer Soper, *Amazon Squeezes Sellers That Offer Better Prices on Walmart*, Bloomberg (Aug. 5, 2019), https://www.bloomberg.com/news/articles/2019-08-05/amazon-is-squeezing-sellers-that-offer-better-prices-on-walmart.

[119]  Nick Statt, *Amazon price alerts are leading sellers to raise prices on Walmart or risk losing perks*, The Verge (Aug. 5, 2019), https://www.theverge.com/2019/8/5/20755342/amazon-marketplace-antitrust-sellers-raise-prices-walmart-competition-ftc.

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

27

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1    providers that would have otherwise offered lower commissions, or whose lower commission

2    levels would have created actual price competition between them and Amazon.  Had Amazon not

3    restrained that price competition, lower commissions for sellers on both Amazon and other

4    ecommerce outlet providers would have translated into lower consumer prices.

5        87.    Consider Adorama, a seller of photography equipment that runs its own website

6    www.adorama.com.  Reflecting the must-have nature of the Amazon.com Marketplace, even

7    though Adorama has a direct-to-consumer website, Adorama sells a large volume of products on

8    Amazon.com.  To sell on Amazon.com, Adorama must inflate its prices to pay for Amazon's

9    roughly 30% commission.  And even though it could sell the same products profitably at a lower

10   price on other platforms, including its own website, Adorama must raise its prices on its own

11   website to comply with Amazon's price restraint.  If it is caught offering a lower price to

12   consumers elsewhere by Amazon's algorithm, Adorama faces the catastrophic loss of selling

13   privileges with Amazon.

14       88.    Eighty percent of Amazon's third-party sellers also sell their products on other

15   online retail websites, most commonly on eBay, their own websites, or Walmart.[120]

16       89.    Each of these sellers must price their products on other websites based on the high

17   cost of selling on the Amazon.com platform, rather than setting competitive prices commensurate

18   with lower-cost platforms and thereby forcing Amazon to compete with those other platforms by

19   reducing its commission levels.

20       90.    Amazon injures consumers by driving up the price of consumer goods.  For

21   example, Amazon third-party seller Molson Hart reports that a $150 item sold on Amazon would

22   make his company the same profit as an item sold for $37 less on his company website:

23

24

---

25   [120]   Rani Molla & Jason Del Rey, *A fifth of professional Amazon merchants sell more than $1
     million a year — double the share from last year*, Vox (May 23, 2018),

26   https://www.vox.com/2018/5/23/17380088/amazon-sellers-survey-third-party-marketplace-
     walmart-ebay; Catie Grasso, *The State of the Amazon Marketplace 2019*, Feedadvisor (May 15,

27   2019), https://feedvisor.com/resources/amazon-trends/the-state-of-the-amazon-marketplace-2019/.

28

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

28

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1
2

> We designed, manufactured, imported, stored, shipped the item, and
> then we did customer service.  Amazon hosted some images, swiped
> a credit card, and got $40 [for a $150 toy].

3
4

> This is the core problem.  Were it not for Amazon, this item would
> be $40 cheaper.  And this is how Amazon's dominance of the
> industry hurts consumers.[121]

5   Nevertheless, they must sell at the same levels on both sites, and Molson Hart's (as well as all

6   other third-party sellers') ability to constrain Amazon's commission through competition (which

7   would lead to lower consumer prices) is eliminated.

8        91.     Many of Amazon's marketplace competitors already offer lower commissions in

9   the real world—lower commissions that would generate lower prices for consumers in the absence

10  of Amazon's illegal restraint.  For example, Amazon's third-party sellers incur considerably lower

11  fees when selling on Amazon's nearest competitor, eBay.  As the following examples illustrate, in

12  total Amazon charges its third-party sellers about 23% to sell a $30 book, while eBay charges

13  16%, and Amazon charges its third-party sellers 31% to sell a $15 DVD, while eBay charges 21%

14  to sell on its platform:122

15
16
17
18
19
20
21
22
23
24

25       121   Molson Hart, *How Amazon's Business Practices Harm American Consumers: Why
26  Amazon Needs a Competitor and Why Walmart Ain't It*, Medium (Jul. 18, 2019),
    https://medium.com/swlh/amazon-needs-a-competitor-and-walmart-aint-it-5997977b77b2.

27       122   Max Godin, *Selling on Amazon vs eBay – Discover Which is Better and Why*, CrazyLister
28  (May 15, 2018), https://crazylister.com/blog/selling-on-amazon-vs-ebay/.

| Example 1: Books | | |
|---|---|---|
| Sale Price | $30.00 | |
| | 🛒 eBay | a Amazon |
| Final Value Fee | $3.40 | $4.50 |
| Closing Fee | $0.00 | $1.35 |
| Listing Fee | $0.30 | $0.99 |
| Paypal Fee | $1.17 | $0.00 |
| Total Fees | $4.87 | $6.84 |
| Total Profit | $25.13 | $23.16 |
| Profit Margin | 83.77% | 77.20% |

| Example 2: DVDs | | |
|---|---|---|
| Sale Price | $15.00 | |
| | 🛒 eBay | a Amazon |
| Final Value Fee | $2.12 | $2.25 |
| Closing Fee | $0.00 | $1.35 |
| Listing Fee | $0.30 | $0.99 |
| Paypal Fee | $0.75 | $0.00 |
| Total Fees | $3.16 | $4.59 |
| Total Profit | $11.85 | $10.41 |
| Profit Margin | 78.97% | 69.40% |

92.     Walmart operates its own competing online marketplace platform.  Many of Amazon's third-party sellers also sell there and incur fewer (and lower) fees.  Unlike Amazon, Walmart does not charge any registration or subscription fees.[123]  For example, an Amazon

---

[123]   Marketplace Commission Rates Comparison: Amazon, eBay and Walmart (2021 Update), Zentail (Mar. 23, 2021), https://www.zentail.com/blog/marketplace-commission-rates-comparison-jet-com-walmart-amazon-ebay.

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

30

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

account manager—a service that would be free on Walmart—costs $1600 per month + 0.3% of total sales on Amazon, capped at $5,000 per month.[124]  Amazon added this service (and the additional fee) to address the oft-cited complaint from its third-party sellers that Amazon's largely faceless organization makes it impossible for them to navigate glitches and changing rules.[125] About 92% of third-party sellers rely on storage, packaging, and delivery by Amazon (Fulfillment by Amazon or FBA), and until 2020, Walmart had no equivalent of this service.[126]  One non-service-related cost to FBA sellers is a $0.20 per unit charged to provide individual sku stickers—otherwise, Amazon will store a seller's products with other sellers' inventory, and "if other sellers have sent in a counterfeit product or used-condition product that they are trying to pawn off as a new-condition product, now the new seller may get itself into trouble with Amazon for selling a problematic product to a customer even if it was technically not their product."[127]  Walmart has no equivalent fee.

93.     "A staggering number (82%) of consumers cited price as a very important factor when buying a product on Amazon."[128]  But Amazon's PMFN has the effect of *reducing* price competition between ecommerce platforms, thereby maintaining its market dominance.  Third-party sellers, who would have sold their products for less, for example, on their own websites

---

[124]   Strategic Account Services-Core, Amazon, https://sell.Amazon.com/programs/paid-services.html?ref_=asus_soa_rd&.

[125]   Hilary Milnes, *Amazon is chasing growth and shifting resources to third-party sellers*, Digiday (Jan. 31, 2019), https://digiday.com/marketing/amazon-chasing-growth-shifting-resources-third-party-sellers/.

[126]   David Hamrick, *Amazon FBA vs FBM Comparison Guide*, Jungle Scout (Mar. 4, 2020), https://www.junglescout.com/blog/amazon-fba-vs-fbm/ ; Melissa Repko, Walmart steps up competition with Amazon by fulfilling orders for third-party vendors, CNBC (Feb. 25, 2020), https://www.cnbc.com/2020/02/25/walmart-wants-to-make-it-easier-for-third-party-vendors.html.

[127]   James Thompson, *Amazon Selling Pitfalls Even the Savviest Sellers Forget* , Big Commerce, https://www.bigcommerce.com/blog/amazon-selling-pitfalls-problems/#fulfillment-by-amazon.

[128]   Catie Grasso, *Amazon Pricing Strategy: How Much Should You Sell a Product For?*, Feedadvisor (Jan. 31, 2020), https://feedvisor.com/resources/marketplace-fees-policies/amazon-pricing-strategy/.

(*e.g.*, by avoiding Amazon's estimated 15% fee),[129] were prevented from selling at lower prices.[130] The reduced price competition means that Amazon is no longer meaningfully constrained from raising or maintaining its fees to third-party sellers at supracompetitive levels, which in turn leads to supracompetitive consumer prices.

94.     As noted, Amazon came under fire for its PMFN in December 2018, when Senator Blumenthal called for an FTC investigation of the practice.[131]  Years earlier, Amazon withdrew this very practice in Europe under pressure from British and German regulators.[132]  In response to the Blumenthal letter, Amazon also pretended to withdraw its PMFN in the U.S. in March of 2019.[133]  At the time, Dani Nadel, president of Feedvisor, a company that advises Amazon sellers, expected it to be a watershed moment that would lead "the greater e-commerce landscape" to be "much more dynamic."[134]  Likewise, David Simnick, co-founder and CEO of Soapbox, a Washington, D.C.-based soap and shampoo maker that sells on Amazon, reported that when he learned that Amazon was revoking its PMFN, "I almost did a back flip in the hotel gym."[135]

95.     But Amazon continues to punish retailers, who price lower on other sites.[136] Despite Amazon's official withdrawal of the price parity provision, the Feedadviser website

---

[129]  *Amazon Seller Fees: The Cost of Selling on Amazon in 2020,*, Xsellco, https://www.xsellco.com/resources/amazon-seller-fees//; *supra* Hart ("Amazon takes a 15% commission on every product we sell on their website.  We don't have this fee when we sell toys on our own website, so we could sell our products for 15% less and make roughly the same amount of money as we do on Amazon.").

[130]  Letter from Senator Richard Blumenthal to Joseph Simons, Federal Trade Commission Chair (Dec. 19, 2018), https://www.blumenthal.senate.gov/imo/media/doc/12.19.18%20-%20FTC%20-%20Price%20Parity.pdf.

[131]  *Id*.

[132]  *Id.*

[133]  Catherine Shu, *Amazon Reportedly Nixes Its Price Parity Requirement for Third-Party Sellers in the U.S*., Tech Crunch (Mar. 11, 2019), https://techcrunch.com/2019/03/11/amazon-reportedly-nixes-its-price-parity-requirement-for-third-party-sellers-in-the-u-s/.

[134]  *Supra* Howland.

[135]  *Supra* Gonzalez.

[136]  *Supra* Hart; Gonzalez.

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

32

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

reported in 2020 that "many sellers are still operating by the price parity rule *in fear that their account will be impacted as a result*."[137]

96.     In fact, while Amazon claimed it had withdrawn its PMFN, it began to enforce a "fair pricing" provision that has the same effect as its former "price parity" provision.[138]  Whereas the "price parity" provision prohibited sellers from offering cheaper deals through competing retail ecommerce channels, the "fair pricing" rule likewise penalizes merchants who sell their products at a cheaper price on a competing platform by removing the product from the Buy Box, suspending shipping options, and terminating selling privileges.[139]  Products outside the Buy Box are overlooked by the algorithms Amazon uses to determine which products shoppers see on the platform.[140]

97.     The "Buy Box" is the white box on the right side of the product details page where shoppers can click "Add to Cart" or "Buy Now."  It is a critical listing for third-party sellers.  Over 80% of Amazon purchases made on desktops are done via the Buy Box, and due to the smaller screen size, an even higher percentage of mobile Amazon purchases are made through the Buy Box option.[141]

98.     When users click the "Add to Cart" button on the Amazon.com platform, they are buying the Buy Box winner's product.[142]  Similarly, when a user opts for the "Buy Now" button that, too, will lead to the Buy Box owner's product..[143]  Over 90% of sales occur using the Buy

---

[137]  *Supra Amazon Pricing Strategy: How Much Should You Sell a Product For*? (emphasis added).

[138]  *Supra* Gonzalez.

[139]  *Id.*

[140]  *Supra,* Soper, *Amazon Squeezes Sellers That Offer Better Prices on Walmart.*

[141]  Conor Bond, *Why You Need the Amazon Buy Box—and How to Get It*, Ecommerce Strategy (Aug. 27, 2019), https://www.wordstream.com/blog/ws/2018/10/03/amazon-buy-box.

[142]  *Supra* Zeibak.

[143]  *Id.*

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693                                                                33

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

Box.[144]  Eligibility depends on a number of factors, including the seller's reputation, price, efficiency, and whether the seller is selling its product for a lower price through competing retail ecommerce channels.[145]

99.    When Amazon discovers that a third-party seller offers the same product on another site at a lower price, it sends a pricing alert that warns the seller that its product is no longer eligible for the Buy Box.  The effect is chilling for most third-party sellers, who cannot afford to jeopardize their sales on Amazon by offering better deals on other sites.[146]  Jason Boyce, a former Amazon third-party seller, who runs a consulting firm, Avenue 7 Media, instructs clients to offer the same prices on all sites to avoid losing prominence on Amazon even if they can afford to sell for less on other sites.  He explains:  "Amazon is in control of the price, not the merchant."[147]

100.    For example, retailer David Simnick reports that his sales plunge as much as 40-50% a day when his listings lose the Buy Box, and that he can reclaim the Buy Box only if he changes its pricing either at the Amazon.com platform or at the cheaper retailer, so that both offerings are priced equally.[148]  He said that despite the purported withdrawal of Amazon's PMFN, his company had about six different products removed from the Buy Box option when it sold some of the same products at Target for just $1 less.[149]

101.    Molson Hart, whose company, Viahart, sells toys online, says that 98% of its sales come from the Amazon.com platform and that other platforms like eBay and Walmart account for less than 2% of his company's revenue.[150]  He confirmed Amazon continues to punish sellers who

---

[144]  *Id.*

[145]  *Id.*

[146]  *Supra,* Soper, *Amazon Squeezes Sellers That Offer Better Prices on Walmart.*

[147]  *Id.*

[148]  *Supra* Gonzalez.

[149]  *Id.*

[150]  Spencer Soper & Ben Brody, *Amazon Probed by U.S. Antitrust Officials Over Marketplace*, Bloomberg (Sept. 11, 2019), https://www.bloomberg.com/news/articles/2019-09-11/amazon-antitrust-probe-ftc-investigators-interview-merchants.

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

34

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

list prices on other websites for less than the price on Amazon: "If we sell our products for less on channels outside Amazon and Amazon detects this, our products will not appear as prominently in search and, if you do find them, they will lose their prime check mark and with that, their sales."[151]

## VIII.   AMAZON'S CONDUCT HARMS CONSUMERS AND OVERALL COMPETITION

102.    Amazon's conduct has led to overall supracompetitive prices, reduced output, and reduced quality.

103.    As noted, selling on Amazon Marketplace is not cheap.[152]  Amazon's average "all-in" commissions for each transaction on the Amazon.com marketplace are roughly 27%.[153]

104.    These commissions greatly exceed cost, and are therefore supracompetitive.  The Amazon Marketplace has been described as a "cash cow" and analysts have estimated the Amazon Marketplace has generated around ***$120 billion*** in revenue for Amazon in a single year.[154]

105.    During the pandemic, Amazon's stock price rose a staggering 75% in 2020, almost doubling in value.[155]  Amazon's overall profitability is so high that its founder, Jeff Bezos, is the richest person in the entire world, with a net worth of over $170 billion.[156]  Mr. Bezos has recently purchased a "superyacht" that is 417 feet long with an estimated cost of $500 million.[157]  The new

---

[151]   *Supra* Hart.

[152]   *See*, *e.g.*, *supra* Hart.

[153]   Karen Weise, *Prime Power: How Amazon Squeezes the Businesses Behind Its Store*, New York Times (Dec. 19, 2019), https://www.nytimes.com/2019/12/19/technology/amazon-sellers.html.

[154]   *Supra* Danziger.

[155]   Allison Morrow, *Jeff Bezos' superyacht is so big it needs its own yacht*, CNN Business (May 10, 2021), https://www.cnn.com/2021/05/10/business/jeff-bezos-yacht/index.html

[156]   Dan Moskowitz, *The 10 Richest People In the World*, Investopedia (May 6, 2021)m, https://www.investopedia.com/articles/investing/012715/5-richest-people-world.asp.

[157]   Spencer Soper & Ben Brody, *Amazon Probed by U.S. Antitrust Officials Over Marketplace*, Bloomberg (Sept. 11, 2019), https://www.bloomberg.com/news/articles/2019-09-11/amazon-antitrust-probe-ftc-investigators-interview-merchants.

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

35

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1  yacht is so massive that it needs a second "support yacht" to provide enough space to land

2  helicopters.[158]

3      106.    In the absence of the PMFN, Amazon would not be able to maintain

4  supracompetitive commissions, and instead competition would drive commissions to cost.  These

5  supracompetitive commissions affect both sellers and consumers that use the Amazon

6  Marketplace.

7      107.    If Amazon Marketplace commissions decreased to competitive levels, sellers

8  would be able to sell more products at lower prices and enjoy higher revenues.  And consumers

9  would be able to afford to buy more goods at lower prices.  In a more competitive market with

10  competitive commissions, sellers would compete away some of the commission savings, resulting

11  in lower retail prices for consumers.  Thus when Amazon imposes supracompetitive commissions,

12  both sellers and buyers are harmed.

13      108.    Absent Amazon's anticompetitive price policies, sellers would have set a lower

14  price on a platform with lower fees than Amazon, or an even lower price on the seller's own

15  website.  For example, a customer who purchased a $150 toy on Viahart (the same price

16  concurrently offered at Amazon) paid $37 more for the toy than if the seller was able to sell the

17  product for $37 less on its own website, while making the same profit.[159]  Competition from other

18  websites and platforms would have forced Amazon to reduce its own commissions to competitive

19  levels as well, and thus Amazon purchasers would have similarly paid the lower price ($113).

20      109.    Amazon's conduct has also reduced output.  In a world without Amazon's PMFN,

21  retail prices would have been lower, leading to greater demand and more units sold.  More sellers

22  would have come to market as well if offered lower, competitive commission rates.

23      110.    Amazon's conduct has also reduced quality.  Amazon has blocked robust

24  competition among platforms that would have involved competition among many dimensions

---

[158]  *Id.*

[159]  Spencer Soper & Ben Brody. *Amazon Probed by U.S. Antitrust Officials Over Marketplace*, Bloomberg (Sept. 11, 2019), https://www.bloomberg.com/news/articles/2019-09-11/amazon-antitrust-probe-ftc-investigators-interview-merchants.

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

36

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

including but not limited to price.  By doing so, Amazon has largely been able to continue as a monopolist ecommerce platform without the threat of competition.  This has harmed innovation and inhibited the development of new platform features.

111.    Amazon's PMFN has a broad reach, encompassing virtually all consumer products. Consumers who make purchases from competing retail ecommerce channels of any of the hundreds of millions of products concurrently offered at the Amazon.com platform are reasonably likely to be injured in the future by Amazon's current PMFN.

112.    There are well-known anticompetitive effects that result from the imposition of MFN clauses by companies, like Amazon, with durable market power.[160]  As noted, PMFNs are a particular category of MFNs that occur when an online platform requires that providers using its platform not offer their products or services at a lower price on other platforms.  Economists recognize that PMFNs can harm competition by "keeping prices high and discouraging the entry of new platform rivals."[161]  PMFNs guarantee that other platforms cannot charge a "lower final price, not because the focal platform has worked to ensure that it has the lowest cost, but rather because it has contracted for competitors' prices to be no lower."[162]

113.    By deploying its PMFN, Amazon can ensure that the retail prices set in the Amazon Marketplace (and which are paid directly to Amazon) are equal to or better than the prices offered in any rival distributor's storefront.  Thus, the Amazon PMFN gives Amazon the ability to police the prices set on rival storefronts.  PMFNs disincentivize sellers from offering low prices, because discounts must be offered to all buyers.[163]

114.    PMFNs also create artificial barriers to market entry:

---

[160]  *See generally* Steven C. Salop & Fiona Scott Morton, *Developing an Administrable MFN Enforcement Policy*, 27 Antitrust ABA 15, 18 (Spring 2013).

[161]  Jonathan B. Baker & Fiona Scott Morton, *Antitrust Enforcement Against Platform MFNs*, 127 Yale L.J. 2176, 2201 (May 2018) ("Baker I").

[162]  Baker I at 2178.

[163]  Baker I at 2179.

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

37

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

[S]uppose an entrant wishes to gain customers by charging a lower price (perhaps because it has no established brand name or installed base). It can profitably sell at a low price by undertaking selective contracting with suppliers willing to offer a discount in exchange for more volume or other favorable terms. If those suppliers also supply the incumbent, however, an MFN imposed by the incumbent would require the supplier to charge the same price to the entrant. This parity undermines the entrant's business model by preventing it from making an attractive offer to customers. The symmetry that MFNs impose on the marketplace thus can prevent new competition that would lower prices.[164]

115. Here, the Amazon PMFN prevents "outbreaks of competition" because Amazon mandates any sellers using the Amazon Marketplace to "set the same price on a rival's or entrant's platform. This parity may undermine the discount . . . business model by preventing it from making attractive offers to" both third-party sellers and consumers.[165]

116. When a company imposes a PMFN prohibiting lower prices on other platforms, that provision "serves to suppress competition on the crucial dimension of price[,]" and keeps new entrants from undercutting the dominant platform's commission, and, but for the PMFN, driving consumers to the rival platform.[166]

117. Because of the vast number of sellers subject to the Amazon PMFN, discount platforms are unable to compete. Sellers are unwilling to price at a lower level on discount platforms, because they must do so across all platforms, and therefore gain no price benefit for themselves from lower-commission platforms.[167]

118. Economic modeling demonstrates that when a dominant platform requires its sellers to agree to a PMFN, there are (a) higher platform fees; (b) higher retail prices; and (c) firms with lower-cost models are discouraged from entry.[168] As shown in the Boik & Courts model, for

---

[164]  Baker I at 2180.

[165]  Baker I at 2181– 82.

[166]  Benjamin Edelman & Julian Wright, *Price Restrictions in Multi-sided Platforms: Practices and Responses*, 10 Competition Policy Int'l 86 (Jan. 30, 2015).

[167]  Baker I at 2182.

[168]  Andre Boik & Kenneth S. Courts, T*he Effects of Platform Most-Favored Nation Clauses on Competition and Entry*, 59 J.L. & Econ. 105, 113–29 (Feb. 2016).

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

38

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

1   example, a lower price entrant cannot successfully enter because the platform's MFN does not

2   allow the entrant to lower prices to attract both sellers and consumers.[169]

3       119.    Additionally, MFNs "tend to raise industry prices" because they "kill a retailer's

4   incentives to compete in the terms of trade that it offers suppliers.  The reason is that a retailer who

5   raises the commission it charges . . . knows that the price set through its store will not increase

6   relative to that at other stores. . . . This means that suppliers cannot asymmetrically adjust their

7   prices to divert demand towards retailers offering more attractive contractual terms."[170]

8       120.    MFNs thus "harm competition by assisting an incumbent in foreclosing the entry or

9   expansion of rivals."[171]  MFNs harm competition "by making it impossible for a dominant

10  incumbent firm's rivals, including entrants, to bargain . . . for a low price."[172]

11      121.    Real world examples show that, when PMFNs like the Amazon's PMFN are

12  banned, prices to consumers fall.[173]  A leading booking site, for example, responded to an MFN

13  ban in its region (and its resulting inability to impose MFNs) by introducing quality improvements

14  to the service it provided,[174] suggesting online platform competition increases when PMFNs were

15  banned.

16      122.    As discussed herein, the Amazon PMFN: (a) raises prices to consumers (which

17  they pay directly to Amazon, who then pays that amount to third-party sellers net of its fees);

18

---

19  [169]  *See also, e.g.*, Ameila Fletcher & Morten Hviid, *Broad Retail Price MFN Clauses: Are They*

20  *RPM "At Its Worst"?*, 81 Antitrust L.J. 65, 74 (2016) ("MFNs can restrict entry at the retail level.
    Specifically, they can disadvantage potential retail competitors with low-end business models by

21  eliminating such an entrant's ability to win customers away from the incumbent by offering lower
    prices and earning a smaller margin.").

22  [170]  Justin P. Johnson, *The Agency Model and MFN Clauses*, 84 The Review of Economic

23  Studies, 1153–54 (Jan. 2017).

24  [171]  Jonathan B. Baker & Judith A. Chevalier, *The Competitive Consequences of Most-Favored-*
    *Nation Provisions*, 27.2 Antitrust, 20, 24 (Spring 2013) ("Baker II").

25  [172]  *Id.* at 24.

26  [173]  Andrea Mantovani, et al., *The Dynamics of Online Hotel Prices and the EU Booking.com*
    *Case*, NET Institute Working Paper No. 17-04 (2017), available at

27  http://ssrn.com/abstract_id=3049339 [http://perma.cc/W9K9-Y546].

28  [174]  See id. at 6 tbl.1.

---

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

(b) prevents rival platforms from competing on price; (c) discourages new entry by a low-commission-charging platform; and (d) suppresses output by game developers.  Under the economics applicable to MFNs, Amazon's PMFN is anticompetitive and causes anticompetitive effects that harm all publishers and consumers.

## IX.   CLASS ACTION ALLEGATIONS

123.    Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and injunctive relief pursuant to federal law on behalf of the members of the following Class:

> All persons who have purchased, from Amazon, a good offered by a third-party seller, on the Amazon.com platform from May 26, 2017 to the present, with at least one purchase coming on or after May 4, 2021.

124.    Excluded from the Class are Amazon and its officers, directors, management, employees, subsidiaries, or affiliates.  Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities.

125.    During the Class Period, Plaintiffs and Class members directly purchased third-party sellers' products from Amazon through the Amazon.com platform.  Because of Amazon's anticompetitive conduct, Plaintiffs and Class members were forced to pay more than they would have if Amazon had not blocked competition.  Amazon therefore has caused Plaintiffs and Class members to suffer overcharge damages.  Because Amazon continues to enforce its anticompetitive "fair pricing" policy, Plaintiffs and Class members are reasonably likely to incur future overcharges.  Both the actual harm and the threat of future harm are cognizable antitrust injuries directly caused by Amazon's violations of federal antitrust laws, including its anticompetitive agreement with its third-party sellers, its monopolization, or its attempted monopolization of the relevant markets, as alleged herein.

126.    Amazon, through its unlawful conduct alleged herein, increased prices offered through competing retail ecommerce channels, reduced choice for purchasers, and caused antitrust injury to purchasers in the form of overcharges.  Plaintiffs and Class members have sustained, and

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

40

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

continue to sustain, significant losses in the form of artificially inflated prices caused by Amazon's anticompetitive activity. The full amount of such overcharge damages will be calculated after discovery and upon proof at trial. Unless Amazon's anticompetitive conduct is stopped, Plaintiffs and the Class will incur future overcharges in their direct purchases from the Amazon Marketplace.

127. The identity of all relevant transactions and Class members are readily identifiable from information and records maintained by Amazon.

128. **Numerosity:** Members of the Class are so numerous that joinder is impracticable. Plaintiffs believe that there are tens of millions of members of the Class (if not more), geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

129. **Typicality:** Plaintiffs' claims are typical of the claims of the other Class members. The factual and legal bases of Amazon's liability are the same and resulted in injury to Plaintiffs and all other members of the proposed Class.

130. **Adequate representation:** Plaintiffs will represent and protect the interests of the proposed Class both fairly and adequately. They have retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed Class, and their interests do not conflict with the interests of the proposed Class members they seek to represent.

131. **Commonality:** Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Amazon has acted on grounds generally applicable to the Class and because Class members share a common injury. Thus, determining damages with respect to the Class as a whole is appropriate. The common applicability of the relevant facts to claims of Plaintiffs and the proposed Class are inherent in Amazon's wrongful conduct, because the overcharge injuries incurred by Plaintiffs and each member of the proposed Class arose from the same anticompetitive conduct alleged herein.

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

41

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

132.     There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

(a)     Whether Amazon and its third-party sellers unlawfully contracted, combined, or conspired to unreasonably restrain trade in violation of Section 1 of the Sherman Act by agreeing under Amazon's PMFN that third-party sellers would not sell their products to buyers through competing retail ecommerce channels at a price lower than what they offered at the Amazon.com platform;

(b)     Whether Amazon and its third-party sellers unlawfully contracted, combined, or conspired to unreasonably restrain trade in violation of Section 1 of the Sherman Act by agreeing that third-party sellers would be penalized under Amazon's "fair pricing" policy if they offered their products to buyers through competing retail ecommerce channels at a lower price than what they offered at the Amazon.com platform;

(c)     Whether Amazon has unlawfully monopolized, or attempted to monopolize, the U.S. ecommerce platforms, including by way of the contractual terms, policies, practices, mandates, and restraints described herein;

(e)     Whether competition in the U.S. ecommerce platforms has been restrained and harmed by Amazon's monopolization, or attempted monopolization, of these markets;

(f)     Whether consumers and Class members have been damaged by Amazon's conduct;

(g)     The amount of any damages; and

(h)     The nature and scope of injunctive relief necessary to restore a competitive market.

133.     **Prevention of inconsistent or varying adjudications:**  If prosecution of a myriad of individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results.  This would have the effect of establishing incompatible standards of conduct for Amazon.  Certification of Plaintiffs' proposed Class would prevent these undesirable outcomes.

134.   **Injunctive relief:**  By way of its conduct described in this complaint, Amazon has acted on grounds that apply generally to the proposed Class.  Accordingly, final injunctive relief is appropriate respecting the Class as a whole.

135.   **Predominance and superiority:**  This proposed class action is appropriate for certification.  Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable.  Even if members of the proposed Class could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter.  Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court.  Further, uniformity of decisions will be ensured.

136.   Amazon's activities as alleged in this complaint were within the flow of, and substantially affected, interstate commerce.  Amazon sells goods on its own behalf and as a platform for its third-party sellers across, and without regard to, state lines.

## X.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF THE SHERMAN ACT
### (15 U.S.C. § 1)

137.   Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

138.   Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

139.   In violation of Section 1 of the Sherman Antitrust Act, Amazon entered into a series of agreements with third-party sellers on Amazon Marketplace concerning the price they were allowed to sell their products in the United States.  These restraints directly limit horizontal price competition by requiring third-party sellers to agree they will not offer their products to their customers in the U.S. ecommerce market at a price lower than the price they offer them on the

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

43

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

Amazon.com platform.  These unlawful agreements have unreasonably restrained price competition among ecommerce platforms.

140.    Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for transactions than they would have paid or would pay in the future in the absence of Amazon's unlawful acts.

141.    The agreements have an open and obvious adverse effect on competition.  By forcing its third-party sellers to raise prices on other platforms, Amazon limits the number of meaningful choices consumers have in the sale of Amazon Marketplace products.

142.    Amazon's PMFN and "fair pricing" have actual detrimental effects, *i.e.*, less competitive pricing, less output, and lower quality.

143.    As set forth above, because of its substantial market power and because of the anticompetitive effects of these restraints on competition, Amazon is liable for the creation, maintenance, and enforcement of the agreements under a *per se*, "quick look," or rule of reason standard.

144.    There is no legitimate, pro-competitive business justification for Amazon's PMFN and fair pricing agreements or any justification that outweighs their harmful effect.  Even if there were some conceivable justification, the agreements are broader than necessary to achieve such a purpose, and the anticompetitive effects of the restraints outweigh any purported pro-competitive business justification.

145.    Plaintiffs and members of the Class were injured in their business or property by paying higher prices for transactions than they would have paid in the absence of Amazon's unlawful conduct.

146.    Plaintiffs and Class members are direct purchasers because they directly purchase from Amazon through the Amazon Marketplace at inflated prices.

147.    Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693

44

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

**SECOND CAUSE OF ACTION**
**VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION**
**(15 U.S.C. § 2)**

148.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

149.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

150.    The relevant market is the market for ecommerce platforms.

151.    As set forth above, Amazon possesses monopoly power. It controls 70% of ecommerce marketplace sales, and 50% or more of all online sales.  Amazon also has unique advantages that allow it to exercise and maintain market power, *e.g.*, search, inventory, data, and infrastructure dominance. Amazon's market power is also demonstrated by the exorbitant fees it charges its third-party sellers and the power to adopt and enforce rules on the platform that benefit itself and jeopardize its third-party sellers' businesses.

152.    Amazon has willfully acquired and/or maintained its monopoly power in the applicable markets by unlawful and improper means, including through its enforcement of its former "price parity" provision and its current "fair pricing" provision.  These provisions establish a price floor based on the seller's price listing on the Amazon.com platform.  By requiring its two million third-party sellers to apply a price floor on all other retail ecommerce channels, Amazon caused all goods sold through the Amazon Marketplace to be sold at inflated prices, and Amazon charged supracompetitive commissions to buyers and sellers using the Amazon Marketplace.

153.    Plaintiffs and Class members are direct purchasers because they directly purchase from Amazon through the Amazon Marketplace at inflated prices.

154.    Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more than they would have paid or would pay in the future in the absence of Amazon's unlawful acts.

155.    Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000

**THIRD CAUSE OF ACTION**
**VIOLATION OF THE SHERMAN ACT – ATTEMPTED**
**MONOPOLIZATION (15 U.S.C. § 2)**

156.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

157.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

158.    If Amazon does not already have monopoly power in the alleged relevant market, it has attempted to monopolize that market.

159.    Through enactment of the pricing policies challenged herein—Amazon's former "price parity" provision and its current "fair pricing" provision—Amazon has demonstrated its intent to control online prices of virtually every consumer good offered in the relevant market.

160.    Through its enforcement of its former "price parity" provision and its current "fair pricing" provision, Amazon has furthered its goal of controlling prices of virtually every consumer good offered in the relevant market.

161.    There is a dangerous probability that Amazon will succeed in obtaining monopoly power in the relevant market.

162.    Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for transactions than they would have paid or would pay in the future in the absence of Amazon's unlawful acts.

163.    Plaintiffs and Class members are direct purchasers because they directly purchase from the Amazon Marketplace that are set at inflated prices as a direct result of Amazon's anticompetitive conduct.

164.    Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

**JURY TRIAL DEMANDED**

165.    Plaintiffs hereby demand a trial by jury of all the claims asserted in this Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Amazon as follows:

A.      The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representative and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.      Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C.      Adjudication that the acts alleged herein constitute monopolization or attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

D.      Adjudication that the acts alleged herein violate the state laws alleged herein;

E.      Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

F.      Pre-judgment and post-judgment interest on such monetary relief;

G.      Equitable relief in the form of restitution and/or disgorgement of all unlawful or illegal profits received by Amazon as a result of the anticompetitive conduct alleged herein;

H.      Equitable relief requiring that Amazon cease the abusive, unlawful, and anti-competitive practices described herein (including pursuant to federal antitrust law: *see, e.g.*, 15 U.S.C. § 26), as requested he therein;

I.      The costs of bringing this suit, including reasonable attorneys' fees; and

J.      All other relief to which Plaintiffs and members of the Class may be entitled at law or in equity.

Class Action Complaint
Case No. 2:21-cv-693

47

Quinn Emanuel Urquhart & Sullivan
1109 First Avenue, Suite 210
Seattle, Washington 98101
Tel: (206) 905-7000

1   DATED:  May 26, 2021

2                                            QUINN EMANUEL URQUHART &
                                             SULLIVAN, LLP
3

4

5                                            By   */s/ Alicia Cobb*
                                                 Alicia Cobb, WSBA # 48685
6                                                1109 First Avenue, Suite 210
                                                 Seattle, WA 98101
7                                                Telephone: (206) 905-7000
                                                 Email: aliciacobb@quinnemanuel.com
8

9                                                Steig D. Olson (*pro hac vice* forthcoming)
                                                 David D. LeRay (*pro hac vice* forthcoming)
10                                               Nic V. Siebert (*pro hac vice* forthcoming)
                                                 51 Madison Avenue, 22nd Floor
11                                               New York, NY 10010
                                                 Telephone: (212) 849-7000
12                                               Email: steigolson@quinnemanuel.com
13

14                                               Adam B. Wolfson (*pro hac vice* forthcoming)
                                                 865 South Figueroa Street, 10th Floor
15                                               Los Angeles, CA 90017-2543
                                                 Telephone: (213) 443-3000
16                                               Email: adamwolfson@quinnemanuel.com
17                                               *Attorneys for Plaintiffs*
18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT
CASE NO. 2:21-cv-693                              48

QUINN EMANUEL URQUHART & SULLIVAN
1109 FIRST AVENUE, SUITE 210
SEATTLE, WASHINGTON 98101
TEL: (206) 905-7000