THE HONORABLE RICARDO S. MARTINEZ

1

2

3

4

5

6

7

8  UNITED STATES DISTRICT COURT
   WESTERN DISTRICT OF WASHINGTON
9  AT SEATTLE

10 ELIZABETH DE COSTER, MAYA GOLD,      No. 2:21-cv-00693-RSM
   JOHN MARIANE, OSAHON OJEAGA,
   MEGAN SMITH, ROBERT TAYLOR,          CONSOLIDATED AMENDED
11 KENNETH DAVID WEST, and EMMA         COMPLAINT
   ZABALLOS, on behalf of themselves and all
12 others similarly situated,            **DEMAND FOR JURY TRIAL**

13                        Plaintiffs,

14 vs.

15 AMAZON.COM, INC., a Delaware
   corporation,
16
                         Defendant.
17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED AMENDED COMPLAINT
Case No. 2:21-CV-00693-RSM



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................. 1

II.  JURISDICTION .................................................................................................. 11

III. VENUE ................................................................................................................ 12

IV.  PARTIES ............................................................................................................. 12

    A.   Plaintiffs ...................................................................................................... 12

    B.   Defendant .................................................................................................... 13

V.   STATEMENT OF FACTS ................................................................................. 13

    A.   Amazon Is the Gatekeeper for Retail Ecommerce ..................................... 13

        1.   Amazon's marketplace both creates and benefits from strong
            network effects. ..................................................................................... 15

            a. Amazon retains the vast majority of its customer base through
               Prime membership, which creates high switching costs. ..................... 16

            b. Amazon uses Prime to pressure third-party merchants to enroll in
               Amazon's fee-based shipping service, which allows Amazon to
               extract an even greater share of each transaction. ............................... 17

        2.   Having firmly established itself as the gateway to online sales,
            Amazon today extracts supra-competitive fees and prices from
            sales on its marketplace. ....................................................................... 18

    B.   Amazon Has Monopoly Power in the Market for U.S. Online
        Retail Marketplaces and the Broader Market for U.S. Online Retail
        Sales. ........................................................................................................... 20

        1.   The Online Retail Marketplace Market does not include brick
            and mortar retailers or single-merchant online sites. ..................................... 20
        2.   Amazon dominates the Online Retail Marketplace Market. ......................... 23
        3.   Amazon's control over the Online Retail Marketplace Market
            has given it market power in the broader Online Retail Sales Market,
            which is a distinct market from brick-and-mortal retail sites. ..................... 28

    C.   Amazon Harms Competition by Imposing Most Favored Nation
        Requirements on Third-Party Merchants. .................................................... 33



D.   Government Authorities Have Repeatedly Concluded That Amazon Has Harmed Competition Through the Use of Most Favored Nation Pricing Policies. ........................................... 42

VI.    INTERSTATE TRADE AND COMMERCE ................................................. 47

VII.   CLASS ACTION ALLEGATIONS ................................................. 47

VIII.  ANTITRUST INJURY AND STANDING ................................................. 50

IX.    CAUSES OF ACTION ................................................. 50

First Cause of Action  Violation of the Sherman Act (15 U.S.C. § 1) Per Se ............... 50

Second Cause of Action  Violation of 15 U.S.C. § 1 (Alternative to Per Se) ............... 51

Third Cause of Action  Violation of the Sherman Act – Monopolization (15 U.S.C. § 2) ....................................................... 54

Fourth Cause of Action  Violation of the Sherman Act – Attempted Monopolization (15 U.S.C. § 2) ....................................................... 55

X.     JURY TRIAL DEMANDED ................................................. 56

XI.    PRAYER FOR RELIEF ................................................. 56



1    Plaintiffs allege the following on personal knowledge with respect to themselves and

2 their acts, and on information and belief with respect to all other matters based on the

3 investigation made by their attorneys.

## I.    INTRODUCTION

5    1.    Amazon operates the largest online retail marketplace in the United States, which

6 includes its website, applications for mobile devices, and voice-controlled devices that allow

7 consumers to make purchases from Amazon ("Amazon's marketplace").

8    2.    Amazon directly sells a wide range of consumer goods—approximately 12

9 million goods—to customers on its marketplace.[1]

10    3.    Amazon also designed its marketplace to be a platform where other businesses

11 ("third-party merchants") can register and list their goods for Amazon to sell. In that sense,

12 Amazon's marketplace is like "an online mall where independent merchants display their

13 products to people perusing the website," according to Amazon's Vice President of Marketplace

14 Business.[2] Amazon presents its marketplace "as a single integrated platform that makes no"

15 significant "distinction between Amazon's own retail business and the Marketplace business."[3]

16 Third-party merchants "post their products on the platform," which Amazon presents to users

17 together with its own goods "according to a certain algorithm that takes the form of a ranking

18 list."[4]

19    4.    Sales on Amazon's marketplace make up between 65% and 70% of all online

20 marketplace sales in the United States and account for over 50% of all online retail sales

---

22    [1] *How Many Products Does Amazon Carry?*, 360PI (May 2016), https://0ca36445185fb449d582-
f6ffa6baf5dd4144ff990b4132ba0c4d.ssl.cf1.rackcdn.com/IG_360piAmazon_9.13.16.pdf; *Amazon Store Directory*,
AMAZON.COM, https://www.amazon.com/gp/site-directory?ref_=nav_em_T1_0_2_2_36__fullstore (last visited July
21, 2021).

24    [2] Declaration of Nicholas Denissen, Amazon's Vice President of Marketplace Business (June 30, 2017)
("Denissen Decl.") at ¶ 5, *Oberdorf v. Amazon.com, Inc.*, No. 16-cv-1127MWB (M.D. Pa.), Dkt. No. 31.

25    [3] *Amazon Removes Price Parity Obligation for Retailers on Its Marketplace Platform*, BUNDESKARTELLAMT
(Federal Cartel Office of Germany), at 2 (Dec. 9, 2013) ("BKartA Decision"),
http://www.bundeskartellamt.de/SharedDocs/Entscheidung/EN/Fallberichte/Kartellverbot/2013/B6-46-
12.pdf%3F__blob%3DpublicationFile%26v%3D2.

27    [4] *Id.*

CONSOLIDATED AMENDED COMPLAINT - 1
Case No. 2:21-CV-00693-RSM



revenue in the United States.[5] By comparison, Amazon's two closest competitors, eBay and Walmart, account for only 6.1% and 4.6%, respectively, of that revenue.[6]

5.      Many third-party merchants listing their goods on Amazon's marketplace also sell their goods on other platforms—including on their own websites and on competing online marketplaces, such as those offered by eBay and Walmart.[7] Amazon nonetheless dwarfs all competing marketplaces in its breadth of product offerings and the number of competing third-party merchants: Amazon hosts 2.3 million active third-party merchants, about *45 times* more than the 52,000 third-party sellers that Walmart hosts on its competing marketplace.[8]

6.      Amazon therefore competes both (a) as a retailer, including against the third-party merchants that list their goods on Amazon's marketplace and (b) as a marketplace, including against other online retail marketplaces, such as eBay and Walmart, where third-party merchants can likewise list their goods.

7.      Amazon's marketplace is a "must have" for third-party merchants. Almost half of the third-party merchants who list their goods on Amazon's marketplace generate between 81% and 100% of their revenues on it, according to a 2018 survey.[9] And, on Amazon's marketplace, third-party merchants have access to 147 million of Amazon's most loyal customers: its Prime members,[10] 96% of whom are more likely to buy goods from Amazon's

---

[5] SUBCOMMITTEE ON ANTITRUST, COMMERCIAL, AND ADMINISTRATIVE LAW OF THE COMMITTEE ON THE JUDICIARY, 116th CONG., INVESTIGATION OF COMPETITION IN DIGITAL MARKETS, MAJORITY STAFF REPORT AND RECOMMENDATIONS ("House Report") 255 (2020), *available at* https://kl.link/3jGISfK.

[6] Marianne Wilson, *eMarketer: Amazon to Capture 47% of All U.S. Online Sales in 2019*, CHAIN STORE AGE (Feb. 15, 2019), https://chainstoreage.com/technology/emarketer-amazon-to-capture-47-of-all-u-s-online-sales-in-2019.

[7] As used throughout this Complaint, "marketplace" refers to online sites (such as those of Amazon and eBay) that allow third-party sellers to list their goods, as opposed to single-merchant websites (like Nordstrom's) that do not.

[8] House Report at 249.

[9] J. Clement, *Percentage of E-commerce Revenue from Amazon Sales According to Amazon Marketplace Sellers in 2018*, STATISTA (May 4, 2019), https://www.statista.com/statistics/259782/third-party-seller-share-of-amazon-platform/.

[10] As described in more detail in this complaint, Prime members are Amazon customers who pay annual fees to obtain free shipping on many goods sold in Amazon's marketplace and other benefits.



1  marketplace than any other online retail marketplace.[11] As one third-party merchant put it:

2  "[W]e have nowhere else to go and Amazon knows it."[12]

3      8.    Amazon uses its market power in the market for online retail marketplaces to

4  impose significant fees on customers and on third-party merchants for the use of its

5  marketplace. To secure the right to list their goods on Amazon's marketplace, third-party

6  merchants must first choose one of two selling plans: a flat monthly fee of $39.99 or a per-sale

7  fee of $0.99.[13] And when an Amazon customer buys an item listed by a third-party merchant,

8  Amazon retains a significant percentage of the customer's payment as a "referral fee" for the

9  use of Amazon's marketplace.[14] After deducting that and other fees, Amazon remits the

10  remainder to the third-party merchant. Altogether, roughly 27% of every dollar an Amazon

11  customer pays to Amazon when making purchases on its marketplace goes to Amazon.[15]

12      9.    Rival marketplaces (like eBay) impose significantly lower fees on third-party

13  sellers. For example, for a book listed at $30, Amazon takes 23% in total fees, whereas eBay

14  takes 16%. And for a DVD listed at $15, Amazon takes 31% in total fees, whereas eBay takes

15

16

17

18

19

20

21

22      [11] Kiri Masters, *89% of Consumers Are More Likely to Buy Products from Amazon than Other E-Commerce
Sites: Study*, FORBES (Mar. 20, 2019), https://www.forbes.com/sites/kirimasters/2019/03/20/study-89-of-consumers-

23  are-more-likely-to-buy-products-from-amazon-than-other-e-commerce-sites/#452623b04af1.

24      [12] Molson Hart, *How Amazon's Business Practices Harm American Consumers: Why Amazon Needs a
Competitor and Why Walmart Ain't It*, MEDIUM (July 18, 2019), https://medium.com/swlh/amazon-needs-a-
competitor-and-walmart-aint-it-5997977b77b2.

25      [13] *Pricing: Let's Talk Numbers*, AMAZON.COM, https://sell.amazon.com/pricing.html (last visited July 21,
2021).

26      [14] *Id.*

27      [15] Karen Weise, *Prime Power: How Amazon Squeezes the Businesses Behind Its Store*, N.Y. TIMES (Dec. 19,
2019), https://www.nytimes.com/2019/12/19/technology/amazon-sellers.html.

28

CONSOLIDATED AMENDED COMPLAINT - 3
Case No. 2:21-CV-00693-RSM



21%.

| Example 1: Books | | |
|---|---|---|
| Sale Price | $30.00 | |
| | 🛒 eBay | a Amazon |
| Final Value Fee | $3.40 | $4.50 |
| Closing Fee | $0.00 | $1.35 |
| Listing Fee | $0.30 | $0.99 |
| Paypal Fee | $1.17 | $0.00 |
| Total Fees | $4.87 | $6.84 |
| Total Profit | $25.13 | $23.16 |
| Profit Margin | 83.77% | 77.20% |

| Example 2: DVDs | | |
|---|---|---|
| Sale Price | $15.00 | |
| | 🛒 eBay | a Amazon |
| Final Value Fee | $2.12 | $2.25 |
| Closing Fee | $0.00 | $1.35 |
| Listing Fee | $0.30 | $0.99 |
| Paypal Fee | $0.75 | $0.00 |
| Total Fees | $3.16 | $4.59 |
| Total Profit | $11.85 | $10.41 |
| Profit Margin | 78.97% | 69.40% |

10.     Similarly, other online retail platforms impose lower fees than Amazon—or no fees at all. For example, third-party merchants selling goods directly to consumers on their own websites pay no fees for those sales.

11.     To account for Amazon's inflated fees, third-party merchants must inflate the total prices at which they list goods on Amazon's marketplace. And, as a result, the consumer



1   plaintiffs bringing this lawsuit, and the putative class they seek to represent, pay supra-

2   competitive prices directly to Amazon that reflect Amazon's supra-competitive fees.

3        12.     In a competitive market, rival marketplaces would be able to compete on price

4   against Amazon's inflated fees. And both third-party merchants and Amazon customers would

5   derive economic benefits from online platforms with lower fees. Third-party merchants would

6   receive a higher percentage of their list prices and therefore be able to reduce their list prices,

7   resulting in significant savings for consumers on those competing marketplaces. This

8   competitive pressure would, in turn, compel Amazon to lower its fees, which would result in

9   third-party merchants' listing goods at lower prices on Amazon. Finally, to continue competing

10  as a retailer against those now-cheaper third-party goods on its marketplace, Amazon would

11  have to lower the prices of the goods it sells as a first-party merchant on its marketplace.

12  Customers on Amazon would therefore benefit from lower, competitive prices and fees for all

13  goods listed on Amazon's marketplace.

14       13.     Amazon, however, bars this type of competition, denying Amazon customers—

15  the class that Plaintiffs seek to represent—the benefits of lower prices and fees. It does so by

16  imposing on third-party merchants Platform "Most Favored Nation" ("MFN") policies.

17  Amazon's MFN policies forbid third-party merchants from listing their goods anywhere else on

18  the internet at prices lower than their Amazon list prices. This is a clear restriction on price

19  competition that harms every class member.

20       14.     Economic literature has widely recognized that MFN policies often harm

21  competition when employed by a platform with market power.[16] And that rings true here. An

22  investigation by the House of Representatives Judiciary Committee's Subcommittee on

23  ──────────────

24  [16] *See, e.g.*, Jonathan B. Baker & Fiona Scott Morton, *Antitrust Enforcement Against Platform MFNs*, 127 YALE L.J. 2177 (2018), https://digitalcommons.law.yale.edu/cgi/viewcontent.cgi?article=9302&context=ylj; OECD

25  DIRECTORATE FIN. & ENTER. AFF'S COMPETITION COMM., SUMMARY RECORD: ANNEX TO THE SUMMARY RECORD OF THE 124TH MEETING OF THE COMPETITION COMMITTEE HELD ON 27-28 OCTOBER 2015 (2015), https://www.oecd.org/officialdocuments/publicdisplaydocumentpdf/?cote=DAF/COMP/M(2015)2/ANN2/FINAL&

26  doclanguage=en; Benjamin Edelman & Julian Wright, *Price Restrictions in Multi-sided Platforms: Practices and Responses*, 10 COMPETITION POL'Y INT'L 86 (2014); Andre Boik & Kenneth S. Corts, *The Effects of Platform Most-

27  Favored-Nation Clauses on Competition and Entry*, 59 J.L. & ECON. 105, 113–29 (2016).

28


HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   Antitrust, Commercial, and Administrative Law (the "House subcommittee on antitrust") found

2   that "Amazon has a history of using MFN clauses to ensure that none of its suppliers or third-

3   party sellers can collaborate with an existing or potential competitor to make lower-priced or

4   innovative product offerings available to consumers."[17]

5      15.   Amazon imposes its MFN policies on third-party merchants through the Amazon

6   Business Solutions Agreement (BSA). Every third-party merchant that registers to list goods on

7   Amazon's marketplace must "agree[] to the terms of the [BSA] and the policies incorporated in

8   that agreement."[18]

9      16.   Until March 2019, Amazon enforced its MFN policies through BSA's "Price

10  Parity Clause,"[19] which expressly prohibited third-party merchants from listing goods on other

11  online retail platforms—whether marketplaces or single-merchant websites—at prices lower

12  than their Amazon list prices. This version of Amazon's MFN policies, introduced in 2012,

13  quickly drew international scrutiny from antitrust regulators. In particular, regulators in the U.K.

14  and Germany concurrently launched investigations into the anticompetitive effects of Amazon's

15  MFN Price Parity Clause. The German authority ultimately concluded that Amazon's MFN

16  policies had anticompetitive effects stemming from restraints on competition between both

17  (1) Amazon and third-party merchants listing goods on Amazon's marketplace, and (2) Amazon

18  and other online retail marketplaces.

19     17.   Specifically, the German authority "found that the [Amazon] Marketplace

20  constitutes a horizontal trade cooperation between Amazon and third-party sellers that has as its

21  object and effect various restrictions of competition" and that the "horizonal price-fixing"

---

22  [17] House Report at 295.

23  [18] Declaration of Ella Irwin, Director of Marketplace Abuse at Amazon (July 13, 2018) ("Irwin Decl.") at ¶ 4,
    *Kangaroo Mfg., Inc. v. Amazon.com*, No. 17-cv-1806SPL (D. Ariz.), Dkt. No. 75. Amazon also has a limited

24  number of stand-alone agreements with certain third-party merchants, who are not subject to the Standard Business
    Agreement. For example, Amazon has a separate agreement with certain publishers to sell their eBooks directly to

25  customers on Amazon's marketplace. *See* Laura Owen, *Macmillan, too, Returns to Agency Pricing with Amazon*,
    Gɪɢᴀᴏᴍ (Dec. 18, 2014), https://gigaom.com/2014/12/18/macmillan-too-returns-to-agency-pricing-with-amazon/.

26  Amazon's anticompetitive agreements with these eBooks publishers are the subject of a separate class action. *See
    Fremgen v. Amazon.com, Inc.*, No. 1:21-cv-351-GHW-DCF (S.D.N.Y. filed Jan. 14, 2021).

27  [19] Irwin Decl., Ex. A at 14 (definition) and 18 (section S-4 Parity with Your Sales Channel).

28

CONSOLIDATED AMENDED COMPLAINT - 6
Case No. 2:21-CV-00693-RSM



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

agreement "resulted in significant price increases in e-commerce."[20] It further concluded that the "price parity clause is a hardcore restriction which is not indispensable for Marketplace efficiencies and [in violation of German and European competition laws] does not allow consumers a fair share of the resulting benefit."[21] Furthermore, the German authority found that Amazon's Price Parity Clauses "act as barriers to market entry for new competitors and hinder the expansion of existing competitors in the market" by "neutrali[zing]" the "major competitive parameter—the fees for platform services," such that "more favourable fees cannot be translated into more favourable prices for final customers."[22] Unsurprisingly, "[a]ccording to a poll of 2,500 online retailers carried out by the [German authority, the Price Parity Clause] has also resulted in significant price increases in e-commerce."[23] In late 2013, because of proceedings by German and U.K. antitrust regulators, Amazon voluntarily "abandoned its price parity clauses on an EU-wide basis."[24]

18.     Despite those international rulings and the recognition by multiple regulators of the anticompetitive nature of Amazon's Price Parity Clause, Amazon continued to enforce that clause in the United States for six more years, until March 2019. Then, under threat of an investigation by the Federal Trade Commission (FTC), Amazon finally withdrew its Price Parity Clause in the United States.

19.     But that withdrawal was nominal. Amazon continues to enforce MFN policies, now under the guise of its so-called "Fair Pricing" Policy. That policy is also in the BSA and so third-party merchants must agree to adhere to it when they register to list goods on Amazon's marketplace.

20.     The "Fair Pricing" Policy states that, if a third-party merchant engages in pricing practices with regard to "a marketplace offer that harms customer trust," Amazon may impose

---

[20] BKartA Decision at 2-3.
[21] *Id.* at 2 (legal citations omitted).
[22] *Id.* at 3.
[23] *Id.*
[24] *Id.* at 3.

CONSOLIDATED AMENDED COMPLAINT - 7
Case No. 2:21-CV-00693-RSM



1    sanctions.[25] According to the policy, a third-party merchant commits a "pricing practice that

2    harms customer trust" if that merchant lists goods on a competing online retail platform at prices

3    that are significantly below its Amazon list prices.[26] Amazon's sanctions for a third-party

4    merchant's daring to offer consumers lower prices elsewhere include making the merchant's

5    product ineligible for a feature (the "Buy Box" button) that would make the product the most

6    visible and easiest to purchase among similar goods; removing the third-party merchant's goods

7    from Amazon's marketplace; suspending shipping options for the merchant's goods; and

8    terminating or suspending the merchant's ability to have any goods sold on Amazon's

9    marketplace.[27]

10          21.    Amazon uses the sanctions under its "Fair Pricing" Policy "as a way to penalize

11   sellers that offer products at a lower price on competing sites."[28] For example, the suspension of

12   a third-party merchant's account has "dire consequences for the seller" and was cited by the

13   Congressional Investigation as an "egregious example[]" of Amazon's bullying of third-party

14   merchants.[29] And the elimination of the "Buy Box" button from the third-party merchant's

15   listing is devastating to the merchant's business because over 80% of all third-party-merchant

16   sales on Amazon's marketplace are made with the "Buy Box."[30] In fact, most buyers searching

17   for a product on Amazon's marketplace will see a third-party merchant's product only if it has

18

19

20

21   _____

22        [25] Amazon Seller Central, *Amazon Marketplace Fair Pricing Policy*,
     https://sellercentral.amazon.com/gp/help/external/G5TUVJKZHUVMN77V?language=
     en_US&ref=efph_G5TUVJKZHUVMN77V_cont_521.

23        [26] *Id.* (stating that "[s]etting a price on a product or service [on Amazon] that is significantly higher than recent
     prices offered on *or off* Amazon" violates the "Fair Pricing" Policy). This is an MFN policy because the third-party
24   merchant is out of compliance with Amazon's policy if it competes with Amazon's platform by setting prices on
     competing platforms at a price lower than the price it sets on Amazon).

25        [27] *Id.*
          [28] House Report at 296.
26        [29] *Id.* at 270.
          [30] Conor Bond, *Why You Need the Amazon Buy Box and How to Get It*, WORDSTREAM (Aug. 27, 2019),
27   https://www.wordstream.com/blog/ws/2018/10/03/amazon-buy-box.

28

CONSOLIDATED AMENDED COMPLAINT - 8
Case No. 2:21-CV-00693-RSM



the Buy Box. By forcing third-party merchants that violate the "Fair Pricing" Policy to sell their goods without the Buy Box, Amazon puts them at a significant competitive disadvantage.[31]

22.     The intent and effect of the "Fair Pricing" Policy are the same as those of the former Price Parity Clause. Both the Price Parity Clause and the "Fair Pricing" Policy amount to MFN policies that bar third-party merchants from listing their goods at lower prices on other platforms, including other marketplaces and their own websites. Those policies have two major anticompetitive effects.

23.     *First*, Amazon's MFN policies prohibit third-party merchants from lowering their prices anywhere on the internet.[32] Amazon has thereby insulated itself from horizontal price competition for the goods it sells as a retailer on its marketplace, allowing it to maintain supra-competitive prices for its goods. As the German authority found in its investigation of Amazon's marketplace, the point of Amazon's MFN policies is to safeguard its significant market share of retail sales as a first-party merchant against competition by third-party merchants. Specifically, the German authority concluded that Amazon's Price Parity Clause "cannot be seen" as "an indispensable restriction" on its third-party merchants, but rather, as a restriction to protect "Amazon's large own-account [*i.e.*, first-party] share of sales as a competitor."[33] But for Amazon's MFN policies, third-party merchants would list their goods at lower prices on other platforms that charged lower (or no) fees,[34] and—facing price competition from third-party merchants—Amazon would also have to lower prices for its own goods to compete with the lower-priced, third-party-merchant goods.

24.     *Second*, the MFN policies neutralize competition by other online retail marketplaces (like eBay) based on fees, allowing Amazon to continue to charge supra-

---

[31] Spencer Soper, *Amazon Squeezes Sellers That Offer Better Prices on Walmart*, BLOOMBERG (Aug. 5, 2019) https://www.bloomberg.com/news/articles/2019-08-05/amazon-is-squeezing-sellers-that-offer-better-prices-on-walmart.

[32] In its 2013 report on Amazon's marketplace rules in Germany, BKartA determined that Amazon's price parity clause was a "hardcore restriction" on the third-party merchants' competition "in all product categories" sold in Amazon's marketplace. A "poll of 2,500 online retailers" conducted by BKartA further demonstrated that the price parity clause caused "significant price increases in e-commerce." BKartA Decision at 3.

[33] *Id.*

[34] *Supra* Hart.



competitive fees for the use of its marketplace. That is because third-party merchants incorporate fees into their list prices. Normally, competing marketplaces therefore would have an incentive to lower fees so that third-party merchants would post lower list prices and thereby attract more customers. But Amazon's MFN policies prohibit lower list prices on competing marketplaces and therefore eliminate that essential price competition. Competing marketplaces cannot expand to attract more business—and new marketplaces cannot enter the market to compete—by lowering fees and prices. This is consistent with the Germany authority's findings: It concluded that Amazon's Price Parity Clause had a direct anticompetitive "effect on [competing] Internet marketplace operators."[35] The "major competitive parameter—the fees for platform services—[was] neutralised by the price parity clause, since more favourable fees [could] not be translated into more favourable prices for final customers."[36] Amazon's Price Parity Clause therefore created a "barrier[] to market entry for new competitors and hinder[ed] the expansion of existing competitors in the [online retail marketplace] market," preventing competing marketplaces "from establishing a greater reach."[37]

25.     Amazon's MFN policies act both as a restraint on the prices of third-party-merchant goods to protect the supra-competitive prices of Amazon's retail goods, and also as a restraint on the fees of competing marketplaces to protect the supra-competitive fees of Amazon's own marketplace. Amazon's MFN policies therefore cause Amazon customers to pay more for goods purchased on its marketplace than they would pay in a competitive market. Amazon's conduct has resulted in supra-competitive prices for all goods offered on Amazon's marketplace: those of third-party merchants and those of Amazon—prices that could not be maintained in the absence of Amazon's illegal MFN policies.

26.     Amazon's MFN policies are not mere policies on paper. Amazon regularly and aggressively enforces those policies. For example, Amazon systematically monitors the prices listed by third-party merchants on other online retail platforms, routinely using computer

---

[35] BKartA Decision at 3.
[36] *Id.*
[37] *Id.*



1  software to scan their price listings on other platforms and ensure that they are not listing their

2  goods at lower prices on those platforms.

3      27.    Though Amazon's MFN policies are burdensome, third-party merchants cannot

4  afford to disobey them because Amazon has massive and durable market power, as discussed

5  above. And, as the House subcommittee on antitrust found, Amazon's "market power is at its

6  height in its dealings with third-party sellers"[38]; they feel "forced to be on Amazon" and believe

7  that they "don't have a choice but to sell through Amazon."[39] In other words, in their view, it is

8  a "must have" marketplace. And Amazon's customers have no incentive to flee Amazon

9  because they typically cannot find better prices on rival marketplaces, even when those

10  marketplaces' lower fees would suggest that their prices would be lower.

11      28.    As a result of the above, Amazon's MFN policies harm competition and cause

12  consumers to pay higher prices than they would in a competitive market (1) for goods listed by

13  third-party merchants on Amazon's marketplace; (2) for goods listed by third-party merchants

14  on other platforms, including marketplaces and single-merchant websites;[40] and (3) for goods

15  listed by Amazon itself, as a retailer, on its marketplace. The loss of competition also represents

16  the loss of quality and innovation that a competitive market fosters. Existing marketplaces

17  cannot expand by competing on price and new marketplaces cannot enter the market to compete

18  on price.

19                                  **II.    JURISDICTION**

20      29.    This Court has subject matter jurisdiction over Plaintiffs' Sherman Act and

21  Clayton Antitrust Act claims because they arise under federal law. *See* 28 U.S.C. §§ 1331, 1337;

22  15 U.S.C. §§ 1, 2, 15(a).

23      30.    This Court also has subject matter jurisdiction pursuant to the Class Action

24  Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse

25

26  _____
   [38] House Report at 15.
27  [39] *Id.* at 87, 270.
   [40] *See Frame-Wilson v. Amazon.com, Inc.*, No. 2:20-CV-00424-RAJ (W.D. Wash. filed Mar. 19, 2020).
28



citizenship from Amazon, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

31.     Plaintiffs are residents of Maryland, Washington, D.C., Illinois, Texas, Tennessee, and Connecticut. As described in this Complaint, Plaintiffs purchased consumer goods online through Amazon's marketplace and suffered financial harm because of Amazon's anticompetitive conduct.

32.     This Court has personal jurisdiction over Amazon because Amazon has its principal headquarters in Washington, does business in Washington, and has registered with the Washington Secretary of State.

### III.     VENUE

33.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Amazon's principal place of business is in this judicial district, and a substantial part of the events giving rise to the claims occurred in this judicial district.

### IV.     PARTIES

**A.     Plaintiffs**

34.     Plaintiff Elizabeth De Coster is a resident of Maryland. Ms. De Coster has purchased numerous goods from Amazon's marketplace, including those listed by third-party merchants.

35.     Plaintiff Maya Gold is a resident of Washington, D.C. Ms. Gold has purchased numerous goods from Amazon's marketplace, including those listed by third-party merchants.

36.     Plaintiff John Mariane is a resident of Illinois. Mr. Mariane has purchased numerous goods from Amazon's marketplace, including those listed by third-party merchants.

37.     Plaintiff Osahon Ojeaga is a resident of Texas. Ms. Ojeaga has purchased numerous goods from Amazon's marketplace, including those listed by third-party merchants.

38.     Plaintiff Megan Smith is a resident of Tennessee. Ms. Smith has purchased numerous goods from Amazon's marketplace, including those listed by third-party merchants.



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

39.     Plaintiff Robert Taylor is a resident of Connecticut. Mr. Taylor has purchased numerous goods from Amazon's marketplace, including those listed by third-party merchants.

40.     Kenneth David West is a resident of Illinois. Mr. West has purchased numerous goods from Amazon's marketplace, including those listed by third-party merchants.

41.     Plaintiff Emma Zaballos is a resident of Washington, D.C. Ms. Zaballos has purchased numerous goods from Amazon's marketplace, including those listed by third-party merchants.

**B.      Defendant**

42.     Amazon is an online retail giant with its principal headquarters in Seattle, Washington. Amazon sells its own goods directly to retail customers in its online retail marketplace. Amazon also sells third-party merchants' goods on its marketplace.

## V.      STATEMENT OF FACTS

**A.      Amazon Is the Gatekeeper for Retail Ecommerce.**

43.     Amazon operates the largest online retail marketplace in the United States. As recognized by the House subcommittee on antitrust, Amazon is the undisputed "gatekeeper for ecommerce."[41] On average, more than 200 million consumers shop on Amazon's marketplace each month.[42] And sales on its marketplace make up between 65% and 70% of all online marketplace sales in the United States.[43]

44.     Amazon operates as a retailer on its own marketplace by selling directly to its customers. In this role, Amazon sells approximately 12 million items, encompassing a wide range of consumer goods.

45.     Amazon also designed its marketplace to be a platform where Amazon customers can buy goods listed by third-party merchants. Third-party merchants register with Amazon for

---

[41] House Report at 256.
[42] Jillian Hufford, *Amazon Statistics: Need To Know Numbers about Amazon [Infographic]*, NCHANNEL Blog (Feb. 20, 2020), https://www.nchannel.com/blog/amazon-statistics/.
[43] House Report at 255.

HB   HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Amazon to sell their goods on Amazon's marketplace, and Amazon manages those sales, largely prohibiting third-party merchants from communicating directly with Amazon's customers.[44]

46.     Amazon therefore competes both with third-party merchants that list their goods on Amazon's marketplace, and with other online retail marketplaces—such as eBay and Walmart—including for the business of third-party merchants. As noted, Amazon hosts 2.3 million active third-party merchants, about 45 times more than the 52,000 third-party sellers that Walmart hosts on its competing marketplace. This allows Amazon's marketplace to offer consumers an unparalleled range of goods and choices in a single virtual marketplace.

47.     Amazon's marketplace is integrated with an expanse of products and services that is staggering in its breadth and reinforces Amazon's position as the "gatekeeper for ecommerce."[45] Amazon's truck fleet consists of more than 10,000 trailers.[46] It also has its own freight airline, Amazon Air, which has about 50 leased aircraft and plans to expand its fleet to 70 this year.[47] Amazon has also built hundreds of package-sorting and delivery centers across the United States and has established its own network of contracted delivery providers exclusively dedicated to delivering packages for Amazon.[48]

48.     Parcel volume handled by Amazon's delivery service now rivals the top carriers, including UPS, FedEx, and the U.S. Postal Service. In 2019, Amazon delivered 2.5 billion parcels. An analysis by Morgan Stanley concluded that Amazon will overtake UPS and FedEx in market share for parcel delivery by 2022; it has already surpassed the U.S. Postal Service.[49]

49.     Amazon has also made extensive investments in an Internet of Things ecosystem to attract more customers to its marketplace and maintain its status as the hub of ecommerce. This includes the development of Amazon's voice assistant, Alexa, and numerous devices that employ it. These devices—like many of Amazon's products and services—provide Amazon

---

[44] *Supra* Hart; Irwin Decl., Ex. A at 6 (¶ 14).
[45] House Report at 256.
[46] *Id.* at 302.
[47] *Id.*
[48] *Id.* at 302-03.
[49] *Id.* at 303.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

with unique data about consumer habits and allow Amazon to individualize the targeting of consumers and keep their purchases on Amazon's marketplace. Another way in which Amazon has expanded both its reach and its consumer-data trove is by acquiring Whole Foods. With Whole Foods, Amazon broadened its range of products for first-party sales on its marketplace and enabled Amazon to monitor and compile even more data on how consumers shop.[50] These investments by Amazon reinforce other aspects of Amazon's business model. Notably, Amazon's voice assistants increase the importance of the Buy Box to third-party merchants because consumers who rely on voice assistants to make purchases on Amazon do not ever see that alternatives to the Buy Box goods exist. With the increasing reliance by consumers on voice assistants, it is even more critical for third-party merchants to abide by Amazon's MFN policies to avoid losing the Buy Box and, as a result, sales.

1. **Amazon's marketplace both creates and benefits from strong network effects.**

50. Amazon's marketplace both feeds and benefits from strong network effects. A network effect is the phenomenon by which increased engagement with a good or service increases the value or utility that a user derives from that good or service. Network effects may be either direct or indirect. Direct network effects arise when a product or service becomes more valuable to a group of users as additional participants use the same product or service. For example, having a telephone becomes more useful to a person the more other people also have telephones.[51] Indirect network effects exist when a product or service becomes more valuable to one group of users as additional users in *another* group also engage with that product or service. For example, the more riders use the Uber platform, the more valuable it becomes to drivers, because they have more business opportunities. The reverse is also true: the more drivers use the Uber platform, the more valuable it becomes to riders.[52]

---

[50] Lauren Hirsch, *A Year After Amazon Announced Its Acquisition of Whole Foods, Here's Where We Stand*, CNBC (June 15, 2018), https://www.cnbc.com/2018/06/15/a-year-after-amazon-announced-whole-foods-deal-heres-where-we-stand.html.

[51] Nicholas L. Johnson, *What are Network Effects?*, APPLICO, https://www.applicoinc.com/blog/network-effects/ (last visited Jul. 21, 2021).

[52] *Id.*

CONSOLIDATED AMENDED COMPLAINT - 15
Case No. 2:21-CV-00693-RSM



51.     Amazon's marketplace generates strong *indirect* network effects. The combination on Amazon's marketplace of hundreds of millions of online shoppers and 2.3 million third-party merchants creates powerful indirect network effects because the value of Amazon's marketplace to consumers goes up as the number of third-party merchants on the marketplace increases, and, conversely, the value to third-party merchants goes up as the number of consumers on the marketplace increases. Consumers can search for products across Amazon and its millions of third-party merchants simultaneously, making Amazon the preferred marketplace among consumers. Because far more consumers begin (and usually end) their search on Amazon's marketplace, merchants who want consumers to see their product offerings generally must list their products on Amazon's marketplace.

        a.      **Amazon retains the vast majority of its customer base through Prime membership, which creates high switching costs.**

52.     To further hook in consumers, Amazon created and aggressively promotes Amazon Prime ("Prime"). Amazon Prime is a paid membership that gives members "free" shipping on "Prime Eligible" goods on Amazon's marketplace. A Prime membership also includes access to Prime Video, Amazon's library of digital video content, and Amazon Music, its music streaming service.[53]

53.     Amazon has operated Prime as a loss leader for years, which has resulted in a staggering 147 million Prime members in the United States. These Prime members are overwhelmingly (96%) more likely to buy from Amazon's marketplace than any other online retail site.[54] To put the number of Prime members into perspective, more Americans have Amazon Prime accounts than go to church regularly or have a landline phone.[55] According to a survey, an estimated 20% of Prime members shopped on Amazon a few times per week, and 7%

---

[53] *About Amazon Prime Insider & Prime Membership Benefits*, AMAZON.COM, https://www.amazon.com/primeinsider/about/ (last visited July 21, 2021).
[54] *Supra* Masters.
[55] Margot Whitney, *Complete Beginner's Guide to Advertising on Amazon*, WORDSTREAM (Jan. 27, 2021), https://www.wordstream.com/blog/ws/2017/09/11/amazon-advertising.



did so almost daily.[56] Another survey found that Prime members in the United States spend an average of $1,400 per year on Amazon's marketplace.[57]

54.     Many industry analysts have estimated Amazon Prime's losses over the years, finding that it is unprofitable, and that Amazon is willing to spend significant amounts of money to prop up the program.[58] In 2016, a Forrester Research analysis estimated that free shipping on Prime costs Amazon $1 billion per year.[59] In 2018, J.P. Morgan estimated the value of a Prime subscription at $784 of which Amazon recouped only $119 through customer fees.[60]

55.     Amazon offers Prime membership at a loss to entice consumers to bind themselves to its marketplace. Once consumers have paid the subscription fee and are entitled to free shipping for many goods on Amazon's marketplace, they want to feel that they are recouping their sunk costs by making further purchases on Amazon's marketplace.

      b.     **Amazon uses Prime to pressure third-party merchants to enroll in Amazon's fee-based shipping service, which allows Amazon to extract an even greater share of each transaction.**

56.     Another service integrated into Amazon's marketplace—and marketed aggressively to third-party merchants—is Fulfillment by Amazon (FBA), Amazon's paid logistics service.[61] Amazon's FBA program combines warehousing, packing, and shipping services and relies on Amazon's massive infrastructure. While third-party merchants are not obligated to use FBA to list their products on Amazon's marketplace, it is difficult if not impossible to become "Prime Eligible" if a merchant does not pay Amazon for FBA. As the

---

[56] *Number of Amazon Prime members in the United States as of June 2019*, Statista, https://www.statista.com/statistics/546894/number-of-amazon-prime-paying-members/.

[57] *Average Annual Amount Spent on Amazon According to U.S. Amazon Prime and non-Prime Members as of March 2019*, Statista, https://www.statista.com/statistics/304938/amazon-prime-and-non-prime-members-average-sales-spend/.

[58] Stu Woo, *Amazon 'Primes' Pump for Loyalty*, WALL ST. J. (Nov. 14, 2011), http://www.wsj.com/articles/SB10001424052970203503204577036102353359784.

[59] Nanette Byrnes, *How Amazon Loses on Prime and Still Wins*, MIT TECH. REV. (July 12, 2016), https://www.technologyreview.com/2016/07/12/158869/how-amazon-loses-on-prime-and-still-wins/ (last visited Jul. 21, 2021).

[60] Gregory Magana, *Here's the actual dollar value of Amazon Prime*, BUSINESS INSIDER (May 22, 2018), https://www.businessinsider.com/amazon-prime-dollar-value-2018-5.

[61] House Report at 287.



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

House Report concluded, "FBA is functionally the only way" that third-party merchants can "get the Prime badge for their product listings."[62] Because most of Amazon customers are Prime members, the vast majority (75%) search only for goods that are Prime-eligible, and therefore third-party merchants are at a competitive disadvantage if their goods are not Prime-eligible.[63]

57.     Paying for FBA services also greatly increases the likelihood that the third-party merchants' goods will be selected for the coveted Amazon Buy Box, which makes goods most visible on the product-detail page and the easiest for consumers to purchase.[64] Conversely, the volume of purchases by Prime customers supports the extensive infrastructure Amazon uses to operate FBA at scale. Amazon thus "uses its dominance in each of these markets to strengthen and reinforce its position in the other."[65]

**2.     Having firmly established itself as the gateway to online sales, Amazon today extracts supra-competitive fees and prices from sales on its marketplace.**

58.     For access to this expansive marketplace, Amazon imposes significant fees on transactions made on its marketplace.

59.     When an Amazon customer buys an item listed by a third-party merchant, the customer pays Amazon directly and Amazon retains a significant percentage of the payment as the referral fee; after deducting that and other fees, Amazon remits the remainder to the third-party merchant.

60.     On the third-party merchant side, to list an item on Amazon's marketplace, third-party merchants must pay Amazon a flat monthly fee of $39.99 or a per-sale fee of $0.99. And they must pay the lesser of $5 or 20% of their list price as a fee for any refunds when a shopper returns a product.[66] Amazon also charges $1,600 per month plus 0.3% of total sales on Amazon

---

[62] *Id.*
[63] *Id.* at 287-88.
[64] Leanna Zeibak, *How to Win the Amazon Buy Box in 2021*, TINUITI (Mar. 25, 2021), https://tinuiti.com/blog/amazon/win-amazon-buy-box/.
[65] House Report at 287.
[66] *Pricing: Let's Talk Numbers*, AMAZON.COM, https://sell.amazon.com/pricing.html (last visited July 21, 2021).

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

(capped at $5,000) if a third-party merchant wants to have an account manager.[67] Amazon added this service, and the additional fee, to address the often-cited complaint from its third-party merchants that Amazon's largely faceless organization makes it impossible to navigate glitches and changing rules.[68] These cumulative fees are the highest of any online retail marketplace.

61.     As noted, most third-party merchants also pay Amazon to fulfill orders for them, and in fact face significant pressure to do so in order to become eligible for Prime shipping.[69] Amazon charges third-party merchants enrolled in FBA shipping and storage fees, which may run higher than alternative shipping and storage options.[70] Amazon also charges FBA third-party merchants $0.20 per unit to provide individual SKU stickers. If a third-party merchant opts not to purchase SKU stickers, that merchant's goods will be comingled with the inventory of other merchants without SKU stickers, and any counterfeit or flawed goods among the comingled inventory may be attributed to the third-party merchant. As a result, that third-party merchant can be sanctioned even though it did not actually provide the defective item.[71]

62.     Amazon also regularly extracts payments from third-party merchants in exchange for advertising on its marketplace. In other words, Amazon charges third-party merchants for more prominent product placement on its marketplace and relegates merchants that refuse to pay a premium to a correspondingly less prominent location. Amazon is the third-largest provider of

---

[67] *Strategic Account Services*, AMAZON.COM, https://sell.amazon.com/programs/paid-services.html?ref_=asus_soa_rd& (last visited July 21, 2021).
[68] Hillary Milnes, *Amazon Is Chasing Growth and Shifting Resources to Third-Party Sellers*, Digiday (Jan. 31, 2019), https://digiday.com/marketing/amazon-chasing-growth-shifting-resources-third-party-sellers/.
[69] David Hamrick, *Amazon FBA Fees, How They Work, and How to Profit as a Seller*, JUNGLE SCOUT (Mar. 24, 2021), https://www.junglescout.com/blog/amazon-fba-fees/.
[70] David Hamrick, *How to Sell & Ship Your Own Products with Amazon FBM*, JUNGLE SCOUT (Jan. 3, 2021), https://www.junglescout.com/blog/how-to-sell-on-amazon-fbm/.
[71] James Thompson, *Amazon Selling Pitfalls Even the Savviest Sellers Forget*, Big Commerce, https://www.bigcommerce.com/blog/amazon-selling-pitfalls-problems/#fulfillment-by-amazon. (last visited Jul. 27, 2021).

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  digital advertising.[72] Investors expect its $10 billion advertising sales[73] to jump $28.4 billion

2  over the next five years.[74]

3      63.    All of these fees and costs—which are largely unavoidable if a third-party

4  merchant wants to reach the majority of Amazon's customers—add to the total price of the

5  listed goods.

6  **B.**    **Amazon Has Monopoly Power in the Market for U.S. Online Retail Marketplaces and the Broader Market for U.S. Online Retail Sales.**

7

8      64.    Amazon dominates the market for U.S. online retail marketplaces ("Online Retail

Marketplace Market"). As used in this Complaint, the Online Retail Marketplace Market is

9

10  composed of online platforms that enable consumers to buy retail goods listed by multiple

independent sellers. As the House Report found, Amazon is the "dominant marketplace in the

11

12  United States for online shopping" and "has significant and durable market power in the U.S.

online retail market."[75]

13

14      **1.**    **The Online Retail Marketplace Market does not include brick and mortar retailers or single-merchant online sites.**

15      65.    Led primarily by Amazon, online retail platforms have become the digital

16  equivalent of shopping malls, which enable consumers to shop seamlessly for a wide range of

17  goods and services from their homes, smart phones, and a variety of internet-enabled devices.

18  And they can do so without limitations based on their individual geographic markets, the time of

19  day, or the day of the week. Online shopping also minimizes the risk that a product is out of

20  stock because online retailers typically store larger volumes of goods and stock a more diverse

21  inventory than physical stores.

22

23      [72] Eugene Kim, *Amazon Quietly Removes Promotions of Its Own Products as Calls for Tech Regulation Escalate*, NBC (Apr. 3, 2019), https://www.nbcnews.com/tech/tech-news/amazon-quietly-removes-promotions-its-own-products-calls-tech-regulation-n990666?cid=public-rss_20190410.

24

25      [73] Nicole Perrin, *Amazon Advertising 2019. Growth and Performance Are Strong at the No. 3 US Digital Ad Seller*, EMARKETER (Nov. 7, 2019), https://www.emarketer.com/content/amazon-advertising-2019.

26      [74] Lara O'Reilly & Laura Stevens, *Amazon, With Little Fanfare, Emerges as Advertising Giant*, WALL ST. J. (Nov. 27, 2018), https://www.wsj.com/articles/amazon-with-little-fanfare-emerges-as-an-advertising-giant-1543248561.

27      [75] House Report at 15.

28



1301 SECOND AVENUE, SUITE 2000 ● SEATTLE, WA 98101
(206) 623-7292 ● FAX (206) 623-0594

66.     In addition to avoiding the need to travel to a physical location, online retail marketplaces such as Amazon's offer other significant conveniences when compared to conventional "brick and mortar" retailers. Once a consumer creates an account with an online retail platform, the platform stores a host of details such as payment information, delivery addresses, and past purchases. This information allows consumers to order or re-order items with minimal transaction costs, sometimes with a single click. And through a customer's repeated engagement with the platform, the platform acquires a wealth of consumer data, allowing it to individualize its product sorting and display goods that are most relevant to the individual customer.

67.     As FTC Chair Lina Khan wrote in a seminal article: "The degree to which a firm can tailor and personalize an online shopping experience is different in kind from the methods available to a brick-and-mortar store—precisely because the type of behavior that online firms can track is far more detailed and nuanced."[76] Tellingly, Amazon's MFN policies dictate what third-party merchants can do only on other *online* retail platforms, and do not apply to physical retail sites.

68.     For all of the above reasons, "brick and mortar" retail locations are not reasonably interchangeable with online retail platforms. That is, there is little cross-elasticity of demand between the use of online retail platforms and the use of brick-and-mortar venues. A hypothetical monopolist in the Online Retail Marketplace Market could profitably impose a small but significant and non-transitory increase in price ("SSNIP") in the form of an increased commission. (Such an increase—say, a 5% increase—would, for example, increase Amazon's already high average referral fee from 15% to 15.75%.) In light of the numerous distinctions described above, a SSNIP would not cause a sufficient number of third-party merchants to delist their products from the monopolist platform, would not cause a sufficient number of consumers to make their purchases elsewhere, and ultimately would not cause a sufficient number of

---

[76] Lina M. Khan, *Amazon's Antitrust Paradox*, 126 YALE L.J. 710, 764 (2017) https://www.yalelawjournal.org/pdf/e.710.Khan.805_zuvfyyeh.pdf.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

transactions to switch to brick-and-mortar stores so as to render the SSNIP unprofitable for the hypothetical monopolist. Amazon's 147 million Prime members, who represent the majority of its customers, also have significant switching costs, making them unlikely to leave its platform in response to a SSNIP.

69.     Similarly, single-merchant online stores are not reasonably interchangeable with online retail marketplaces.[77] Because these stores do not offer the breadth and diversity of goods that can be offered by an online retail marketplace, any consumer who switched from purchasing from an online retail marketplace in response to a SSNIP would (a) be unable to obtain the same variety of merchandise and (b) face dramatically higher transaction costs as a result of having to identify, search product lists, and manage accounts and transactions at dozens if not hundreds of different online stores.

70.     There is accordingly little cross-elasticity of demand between the use of online retail marketplaces and the use of single-merchant online stores. A hypothetical monopolist in the Online Retail Marketplace Market could profitably impose a SSNIP in the form of an increased commission. Because single-merchant online stores are not open to multiple sellers and these sellers must continue to use online retail marketplaces to reach their customers, the third-party merchants could not (and therefore would not) switch away from the market in response to a SSNIP. And because of the significant differences to consumers between the two platforms, a SSNIP would not cause consumers to make a sufficient number of purchases away from online retail marketplaces to render the SSNIP unprofitable to the hypothetical monopolist.

71.     Market participants—including Amazon itself, retailers, and consumers—recognize a distinct market for online retail marketplaces.

---

[77] Competition with single-merchant online stores might be asymmetric: even if prices on those sites are constrained by prices on online retail platforms, prices on online retail platforms still may not be constrained by prices on single-merchant online sites. That is the case, for example, when prices at individual bakeries are constrained by prices at supermarkets, but the bakeries' prices do not constrain supermarket prices, because individual bakeries lack the supermarkets' scope of products.



## 2. Amazon dominates the Online Retail Marketplace Market.

72.     Aided by its anticompetitive conduct, Amazon has increased its market share in the Online Retail Marketplace Market to "65% to 70% of all U.S. online marketplace sales."[78]

73.     Those increases have largely been driven by third-party merchant sales, which account for the majority of sales on Amazon's marketplace.[79]

74.     Amazon's market power is reinforced by several features that allow the company to exert even greater control than is indicated by its platform's already dominant share of online marketplace sales. In particular, Amazon's platform creates strong network effects and high barriers to entry, is tied with Amazon's fulfillment services, which further increase barriers to entry, and is aided by a massive data advantage.

75.     Leading economists have observed that "[d]igital platforms combine economies of scale, low marginal costs, economies of scope through data and an installed base of users, network effects, multi-sidedness, and sometimes a global reach."[80] The combination of these attributes "tend[s] to generate concentrated markets, or market structures containing few firms," and, "[w]ith the addition of inertial (or 'sticky') consumers these markets feature high entry barriers which make it difficult for new firms to enter the market to create competition."[81]

76.     Moreover, "large technology firms" like Amazon "can maintain market power in part because it is not easy for users to switch away from the incumbent's technology."[82] For example, a third-party merchant who has received hundreds of reviews and ratings on Amazon's marketplace cannot easily download and migrate this data to one of Amazon's competitors but, instead, would have to start from scratch on a new platform.[83] These switching costs are

---

[78] House Report at 255.

[79] Lauren Thomas & Courtney Reagan, *Watch Out, Retailers. This Is Just How Big Amazon Is Becoming*, CNBC (July 13, 2018), www.cnbc.com/2018/07/12/amazon-to-take-almost-50-percent-of-us-e-commerce-market-by-years-end.html.

[80] Testimony of Fiona M. Scott Morton, Ph.D., House Judiciary Committee (Mar. 7, 2019), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-ScottMortonF-20190716.pdf.

[81] *Id.*

[82] House Report at 41.

[83] *Id.* at 42.



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

sufficiently high that the Online Retail Marketplace Market exhibits "lock-in" effects: Buyers and merchants stick with Amazon even though they may prefer one of Amazon's rivals.[84]

77.     Even more significantly, Amazon benefits from powerful network effects because Amazon's large customer base of hundreds of millions of regular customers, including over 140 million Prime users, makes Amazon's platform more valuable—and, in fact, indispensable—for most third-party merchants. Likewise, Amazon's ability to attract an unparalleled variety of third-party merchants helps lock in customers, who cannot find the breadth of options available on Amazon's marketplace on any other platform.

78.     These network effects create a significant barrier to entry. A nascent online retail platform with only a small number of customers will not be able to attract a large number of third-party merchants. And a platform that hosts only a small number of third-party merchants will not be able to attract a large number of customers. Of course, this effect is even more powerful because Amazon uses its MFN policies to block other platforms from competing with it by offering lower platform fees.

79.     Amazon is willing to incur substantial losses on Prime because "many of the 64% of American households that have Prime memberships are effectively locked into Amazon for their online shopping," as they think they are recouping the sunk costs of their Prime membership when they make additional purchases on Amazon's marketplace.[85] "Prime members will continue to use Amazon and not switch to competing platforms, despite higher prices and lower-quality items on Amazon compared to other marketplaces, and despite recent increases in the price of a Prime membership."[86]

80.     As described above, Amazon has also tied its fulfillment infrastructure—which represents an extremely high fixed cost—to access to Prime customers, which "strengthen[s] and reinforce[s] its position" as the dominant online retail platform.[87]

---

[84] *Id.* at 41-42.
[85] *Id.* at 256.
[86] *Id.* at 260.
[87] *Id.* at 287.

HB  HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

81.     Amazon further bolsters its market power through a significant data advantage. Amazon compiles a massive set of consumer data based on its retail customers' shopping information, including minutiae such as how long a consumer considers a product.[88] Former Amazon employees have reported that the internal data Amazon compiles is much more sophisticated than the information available in the public domain or any third-party tools built for third-party merchants.[89] This massive data collection apparatus has helped Amazon evolve into a giant among online retail platforms by collecting, storing, processing, and analyzing personal information from its retail customers to determine how they are spending their money.[90]

82.     Amazon's trove of data gives the company far greater insight into consumer behavior and preferences than any other competitor. As explained by a former Amazon employee, "It's important to understand that Amazon has access to every piece of data on what products each customer has searched and purchased [or] not purchased. . . . With information about what customers have searched, Amazon is able to create customized marketing [and] targeting of products for the individual customer."[91]

83.     Amazon is careful to maximize the extent of its data advantage. Indeed, Amazon generally forbids third-party merchants from contacting customers who buy the goods they list.[92] The packaging and even the order confirmation email for the sale of third-party goods feature the Amazon brand prominently and do not reference the merchant.[93] A typical Amazon customer is unaware of the source of the product. According to the Online Merchants Guild,

---

[88] *See Amazon.com Privacy Notice*, AMAZON.COM, https://www.amazon.com/gp/help/customer/display.html?nodeId=201909010#GUID-1B2BDAD4-7ACF-4D7A-8608-CBA6EA897FD3__SECTION_87C837F9CCD84769B4AE2BEB14AF4F01 (last visited July 21, 2021).
[89] Krystal Hu, *Revealed: How Amazon Uses Third-Party Seller Data to Build a Private Label Juggernaut*, YAHOO FINANCE (Sept. 27, 2019), https://www.yahoo.com/lifestyle/amazon-uses-thirdparty-sellers-data-to-build-private-labels-145813238.html.
[90] Jennifer Wills, *7 Ways Amazon Uses Big Data to Stalk You* (AMZN), INVESTOPEDIA (Oct. 20, 2018), https://www.investopedia.com/articles/personal-finance/070215/how-buying-amazoncom-works.asp.
[91] House Report at 283.
[92] *Supra* Hart; Irvin Decl., Ex. A at 6 (¶ 14).
[93] House Report at 258.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

"Many Amazon sellers use websites such as Shopify to try and establish their own eCommerce presence, but without the ability to market to their supposed core customer base, their Amazon customers, it's pretty futile."[94] And, of course, Amazon's MFN policies do not permit third-party merchants to lower their prices on other platforms to encourage consumers to seek them out.[95]

84.     Amazon has also used data gained by monitoring the sale of third-party goods to its own advantage as a retailer. As found by the House Report, "contrary to [Amazon's] own internal policy and testimony before Congress, Amazon routinely appropriates seller data to benefit its own private-label and retail businesses."[96]

85.     Extensive direct evidence confirms Amazon's monopoly power in the Online Retail Marketplace Market. In light of the volume of sales that takes place on Amazon's marketplace, third-party merchants consistently report that market realities "force[ them] to be on Amazon" and that they "don't have a choice but to sell through Amazon."[97] For example, Molson Hart, who lists toys on Amazon, reports: "Were we to be suspended from selling on Amazon.com, it would probably take 3 – 6 months before we'd be bankrupt. We are not alone. This is typical for small to medium sized businesses which sell online today. In fact, most companies like our own, would probably go bust even faster."[98]

86.     "Virtually every manufacturer and retailer of consumer goods in America faces [the] same predicament," explains Stacy Mitchell, co-director of Institute for Local Self-Reliance, in recent testimony to the House subcommittee on antitrust.[99] In order to reach a sufficient number of potential customers in the U.S., they *must* list through Amazon.

---

[94] *Id.*
[95] *Id.* at 296.
[96] *Id.* at 277.
[97] *Id.* at 87, 270.
[98] *Supra* Hart.
[99] Testimony of Stacy F. Mitchell, Co-Director Institute for Local Self-Reliance, House Judiciary Committee (Jul. 16, 2019), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-MitchellS-20190716.pdf.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

87.     Amazon has been able to exercise its market power to extract a higher percentage of every transaction on its marketplace than other platforms, while still retaining and growing its market share. Between 2015 and 2018, Amazon's revenue from third-party-sale fees grew from $16 billion to $43 billion, outpacing both the overall growth of Amazon's retail sales, and the growth of sales made by third-party merchants on the Amazon platform.[100] And yet, "[a]n internal Amazon document suggests the company can increase fees to third-party sellers without concern for them switching to another marketplace. The document notes that the amount of 'seller attrition as a result of [2018] fee increases' for its Fulfillment by Amazon program was '[n]othing significant.'"[101]

88.     "Amazon collects 27 cents of each dollar customers spend buying things its merchants sell, a 42 percent jump from five years ago, according to Instinet, a financial research firm. That does not include what companies pay to place ads on Amazon, a business that Wall Street considers as valuable as Nike."[102]

89.     At the same time, Amazon's hefty fees raise overall prices and suppress output below what would prevail in a competitive world, absent its MFN policies. Absent those restraints, fees for merchants would be lower, enabling them to make more sales to consumers at lower prices. Absent Amazon's MFN policies, American consumers would have purchased more goods at lower prices over the past four years.

90.     Amazon's ability to unilaterally restrict output is also evidence of its market power. For example, given the high likelihood that only the offer that wins the Buy Box will make the sale, withholding that right from an otherwise viable candidate as a sanction for violating Amazon's MFN policies can be expected to limit consumers' choices and reduce output. Furthermore, Amazon's ability to enforce its MFN policies—enforcing the Price Parity Clause until pressured by authorities to withdraw it, and continuing to enforce the "Fair Pricing" Policy, as evidenced by the experiences of individual third-party merchants—and thereby to

---

[100] *Id.*
[101] House Report at 274.
[102] *Supra* Weise.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  impose Amazon list prices across all online retail platforms, is itself direct evidence of

2  Amazon's market power. A platform without market power could not credibly enforce such a

3  restriction against the will of third-party merchants, which could simply threaten to delist from

4  Amazon when asked to bring prices into line.

5      91.    Finally, Amazon's size is direct evidence of its market power. Amazon's market

6  capitalization is currently $1.8 trillion. By that measure, Amazon is the world's fourth-biggest

7  company, setting fees against small businesses and individual consumers.

8      **3.    Amazon's control over the Online Retail Marketplace Market has given it
           market power in the broader Online Retail Sales Market, which is a distinct**

9      **market from brick-and-mortal retail sites.**

10     92.    Amazon's stranglehold over the Online Retail Marketplace Market has enabled it

11 to also gain market power in the broader market for U.S. online retail sales ("Online Retail Sales

12 Market"). In fact, the House Report concluded that "Amazon has significant and durable market

13 power in the U.S. online retail [sales] market."[103]

14     93.    As multiple authorities have recognized, there is widespread industry recognition

15 that the Online Retail Sales Market is separate and distinct from the physical, brick-and-mortar

16 retail sales market. The FTC has concluded that "a relevant market may be divided by channel

17 of sale resulting in separate markets for brick-and-mortar sales and online sales."[104] The House

18 Report found, based on extensive industry interviews and economic analysis, that the Online

19 Retail Sales Market was a distinct market and that Amazon controlled over 50% of it.[105] And the

20 U.S. Department of Commerce has acknowledged—again, based on industry research—the

21 distinction between online retail sales and physical retail sales, tracking online retail sales as a

22 separate category.[106]

23

24     [103] House Report at 15.
25     [104] *Id.* at 255 (quoting Complaint at 4, *In the Matter of Edgewell Personal Care Co. & Harry's Inc.*, No. 9390
       (FTC Feb. 2, 2020)).
26     [105] *Id.*
       [106] *See, e.g.*, U.S. DEP'T OF COM., ECON. & STAT. ADMIN., NEW INSIGHTS ON RETAIL E-COMMERCE (2017),
27     https://www.commerce.gov/sites/default/files/migrated/reports/new-insights-retail-e-commerce.pdf (collecting data
       on ecommerce sales since 1998).

28

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

94.     The fact that many prominent retailers routinely offer different prices in their physical locations from those offered online supports the conclusion that online sales represent a distinct market. According to the FTC/DOJ horizontal merger guidelines, differential pricing is a good indicator of the existence of a price-discrimination market. A price-discrimination market, in turn, is a relevant marker of market boundaries; it represents the market in which a hypothetical monopolist would have the ability and incentive to apply a SSNIP to the good because it knows that only an insignificant number of customers will switch to another seller. Because retailers typically price goods sold in-store at a higher price than online, the market already demonstrates that in-store retail prices are not constrained by online retail prices, and this indicates online retail prices are also not constrained by in-store retail prices.

95.     Economists agree that the "[i]nternet represents a fundamentally different environment for retailing from traditional retailing."[107] An online channel has distinct characteristics from a physical channel.[108] Yale economist Fiona Scott Morton notes that "[d]igital platforms combine economies of scale, low marginal costs, economies of scope through data and an installed base of users, network effects, multi-sidedness, and sometimes a global reach."[109] The combination of these attributes "tend to generate concentrated markets, or market structures containing few firms," and, "with the addition of inertial (or 'sticky') consumers these markets feature high entry barriers which make it difficult for new firms to enter the market to create competition."[110]

96.     Furthermore, U.S. retailers also agree that the Online Retail Sales Market is separate from the physical, brick-and-mortar retail sales market. Only 28% of small businesses

[107] Forsythe, S.M., & Shi, B., *Consumer Patronage and Risk Perceptions in Internet Shopping*, 56 J. BUS. RSCH. 867, 874 (2003).
[108] Katawetawaraks, C. & Wang, C. H., *Online Shopper Behavior: Influences of Online Shopping Decision*, 1 ASIAN J. BUS. RSCH. 66 (2011).
[109] *Supra* Morton.
[110] *Id.*



sell online.[111] Established large brick-and-mortar retailers, *e.g.*, Walmart, Target, and Costco, have online presences, but focus their efforts overwhelmingly on their physical stores. For example, in 2017, ecommerce accounted for only 5.5% of revenue for Target,[112] 4% for Costco,[113] and 3% for Walmart.[114] Online retailers commonly advertise only online, whereas store retailers advertise both on and offline.[115] Unlike brick-and-mortar stores, online retailers do not have a way to take payment by cash or checks.[116] Brick-and-mortar stores typically provide customer service in-store to respond to questions about product offerings, whereas customer service for online retail sales is typically less comprehensive or effective.[117]

97.    By controlling the Online Retail Marketplace Market, Amazon has secured its position as the gateway to online retail sales. Amazon sales on Amazon's marketplace account for over half of all online retail sales in the United States. And its market share has been increasing over the past five years, as shown by the growth of its sales.[118]

---

[111] Jia Wertz, *How Brick-And-Mortar Stores Can Compete with E-Commerce Giants*, FORBES (May 17, 2018), https://www.forbes.com/sites/jiawertz/2018/05/17/how-brick-and-mortar-stores-can-compete-with-e-commerce-giants/#4be14a943cc0.

[112] Nat Levy, *Target's Digital Sales Grew 10X Faster than In-Store Sales in 2018, as Retailer Adjusts to Battle Amazon*, GEEKWIRE (Mar. 5, 2019), https://www.geekwire.com/2019/targets-digital-sales-grew-10x-faster-store-sales-2018-retailer-adjusts-battle-amazon/.

[113] Tracy Maple, *E-commerce Accounts for 4% of Costco's Sales and Is Growing 12%*, DIGITAL COM. 360 (Mar. 6, 2017), https://www.digitalcommerce360.com/2017/03/06/e-commerce-accounts-4-costcos-sales-growing-12/. Costco's e-commerce sales are growing 12% per annum. *Id.*

[114] Trefis Team, *How Much of Wal-Mart's Revenue Will Come from E-Commerce in 2020?*, FORBES (Nov. 27, 2017), https://www.forbes.com/sites/greatspeculations/2017/11/27/how-much-of-wal-marts-revenue-will-come-from-e-commerce-in-2020/#454ed14359f2.

[115] Anna Johansson, *6 Fundamental Differences Between E-Commerce & Brick-and-Mortar Stores*, RETAILNEXT, https://retailnext.net/en/blog/6-fundamental-differences-between-e-commerce-brick-and-mortar-stores/. (last visited Jul. 21, 2021).

[116] *Id.*

[117] *Id.*

[118] J. Clement, *U.S. Amazon Marketplace Sales 2016-2019*, STATISTA (June 12, 2019), https://www.statista.com/statistics/882919/amazon-marketplace-sales-usa/.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594



Amazon Marketplace Sales in the United States (2016-2019)

98.     Amazon's nine closest competitors have a distant 1.1% to 6.6% share of the Online Retail Sales Market.[119] None has comparable infrastructure, inventory, customer bases, search advantages, or data advantages to challenge Amazon in this market.

99.     The House Report found that as "the dominant marketplace in the United States for online shopping, Amazon's market power is at its height in its dealings with third-party sellers," where it "has monopoly power over many small- and medium-sized businesses that do not have a viable alternative to Amazon for reaching online consumers."[120] The Report also noted that over one third of Amazon's third-party merchants rely on Amazon's marketplace as their sole source of income.[121] "[C]ompanies that once drew sufficient consumer traffic from search engines to their own sites are now compelled to become vendors or sellers on Amazon's platform—or forego access to a majority of online shopping traffic."[122] This "gives it an

---

[119] *Amazon Now Has Nearly 50% of US Ecommerce Market*, EMARKETER (July 16, 2018), https://www.emarketer.com/content/amazon-now-has-nearly-50-of-us-ecommerce-market.
[120] House Report at 15.
[121] *Id.*
[122] *Supra* Mitchell.



unprecedented degree of structural power in the economy."[123] A recent survey conducted by Feedvisor found that 66% of consumers start their search for new products on Amazon's marketplace and 74% start there when they are ready to buy a specific product.[124]



Amazon's dominance in consumer-product searches also permits it to exercise a significant level of control over the flow of available information to consumers on the internet.[125] FTC

---

[123] *Id.*
[124] FEEDVISOR, THE 2019 AMAZON CONSUMER BEHAVIOR REPORT 14 (2019), https://fv.feedvisor.com/rs/656-BMZ-780/images/Feedvisor-Consumer-Survey-2019.pdf.
[125] *See infra* Sec. V(E).



Chair Lina Khan explains that this "affords Amazon a lot of power and control."[126] In a written

statement, David Cicilline, Chair of the House subcommittee on antitrust, likewise recently

concluded that Amazon's platform "is a bottleneck for a key channel of distribution," evidently

referring to "online marketplace sales."[127]

**C.     Amazon Harms Competition by Imposing Most Favored Nation Requirements on Third-Party Merchants.**

100.    Amazon has achieved and maintains market dominance through the contractual

controls it exercises over the prices its third-party merchants can charge on other online retail

platforms. Amazon's MFN policies restrict and suppress price competition in two ways:

101.    *First*, by eliminating horizontal price competition between its own goods and the

directly competing goods of third-party merchants that would otherwise have been sold at lower

prices, Amazon broadly raised online prices throughout the Online Retail Sales Market. Without

its MFN policies, Amazon would have had to offer lower fees and lower prices for its own

goods to compete with the lower-priced third-party-merchant goods. Instead, Amazon's own

first-party sales are immense, accounting for a stunning 22% of all online retail sales revenue in

the United States.[128]

102.    *Second*, the MFN policies nullified competition by other online retail

marketplaces on the basis of fees, allowing Amazon to continue to charge supra-competitive

fees for the use of its marketplace. But for Amazon's MFN policies, third-party merchants

would rationally have set lower prices for their goods on their own websites and on competing

online retail marketplaces with lower fees. In turn, competing online retail marketplaces would

have lowered their fees to compete with Amazon on price, or—if their fees were already

lower—better succeeded at driving marketplace-level competition by attracting more third-party

merchants and more consumers. These market forces would have resulted in competitive

---

[126] Robinson Meyer, *When Does Amazon Become a Monopoly?*, ATLANTIC MONTHLY (June 16, 2017), https://www.theatlantic.com/technology/archive/2017/06/when-exactly-does-amazon-become-a-monopoly/530616/.
[127] *Supra* Press Release (Jul. 29, 2020).
[128] Daniela Coppola, *U.S. Amazon First-Party and Third-Party E-commerce Sales Share 2012-2017*, Statista (July 7, 2021), https://www.statista.com/statistics/917414/amazon-first-party-third-party-ecommerce-total-online-retail-sales-share/.



1    pressure that would have forced Amazon to lower its fees, and to lower the prices for its own

2    goods. However, Amazon's MFN policies have prevented third-party merchants from setting

3    lower prices on competing marketplaces and, in turn, have blocked competing marketplaces

4    from attracting consumers with lower prices. By eliminating price competition across

5    marketplaces, Amazon has protected its ability to charge supra-competitive fees for the use of

6    its marketplace and supra-competitive prices for the goods Amazon itself sells on its

7    marketplace. These restraints have kept overall prices high on its marketplace and, therefore,

8    across all online retail marketplaces.

9         103.    As discussed, the German antirust regulatory authority found that Amazon's

10   MFN clause had direct anticompetitive effects on competing third-party merchants and on

11   competing marketplace operators, and caused consumers to pay supra-competitive prices.[129]

12   Economic literature teaches that MFN policies typically result in supra-competitive fees because

13   they discourage fee discounting by rival marketplaces and discourage the entry of new

14   marketplaces that would otherwise challenge the incumbents by offering sellers lower fees.[130]

15   Walmart, Amazon's closest direct competitor, charges referral fees similar to Amazon's across

16   the same product categories. In a normal competitive market, a seller can increase its sales by

17   reducing its prices. But Walmart cannot gain sales from Amazon by charging lower fees than

18   Amazon because third-party merchants cannot offer lower prices on Walmart's marketplace

19   even if Walmart costs the merchants less than Amazon. Because Walmart cannot grow by

20   charging lower fees, it has no reason to do so and instead simply mimics Amazon's high fees.

21   This synchronization of referral fees between Amazon and Walmart suggests that the higher-

22   price structure imposed by Amazon has spread to competing online marketplaces:

23

24

25   [129] *See supra* Sec. 1.

26   [130] Andre Boik & Kenneth S. Corts, *The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry*, 59 J. L. & ECON. 105 (2016); https://www.journals.uchicago.edu/doi/pdf/10.1086/686971 ; U.K. OFF. FAIR TRADING, CAN "FAIR" PRICES BE UNFAIR? A REVIEW OF PRICE RELATIONSHIP AGREEMENTS, Paper No. 1438 (Sept.

27   2012), https://www.jura.uni-wuerzburg.de/fileadmin/02140600/Aktuelles/2012-10-24_-_brit._Kartellbehoerde/OFT1438.pdf.

28

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

| Item Category | Amazon | Walmart |
|---|---|---|
| Men's athletic shoes (Shoes) | 15% < $75.00, 18% > $75.00 | 15% |
| Kitchen and Dining | 15% | 15% |
| Home Improvement Tools | 15%, 12% for base equipment | 15% |
| Apparel and Accessories | 17% | 15% |
| Electronics | 8% | 8% |
| Beauty Products | 8% < $10.00, 15% > $10.00 | 15% |
| Books | 15% | 15% |
| Furniture & Décor | 15% < $200.00, 10% > $200.00 | 15% |
| Grocery & Gourmet Food | 8% < $15.00, 15% > $15.00 | 15% |
| Personal Computers | 6% | 6% |
| Camera and Photos | 8% | 8% |
| Automotive & Powersports | 12% | 12% |
| Baby Products | 8% < $10.00,  15% > $10.00 | 15% |
| Jewelry and Watches | 20% < $250.00, 5% > $250.00 | 20% |
| Toys and Games | 15% | 15% |
| Everything Else | 15% | 15% |

104.     Market analyst Simeon Siegel notes that "although every unit sold through [third-party merchants]. . . comes at lower reported revenue[,] . . . the collected fees flow through at much higher margin rates," meaning that Amazon's gross margin continues to grow through the sale of higher-margin, third-party goods even when selling fewer of its own goods through lower-margin, first-party sales.[131] For example, Amazon generated $80 billion in third-party merchant service revenues in 2020, which accounted for the second-largest revenue segment of the online retail marketplace, after Amazon's own retail product sales.[132]

105.     Collectively, the third-party merchant fees Amazon charges are substantial and built into the prices customers pay for third-party goods on Amazon's marketplace. Because Amazon's pricing policies do not permit third-party merchants to offer lower prices on other online retail platforms, these fees are also baked into the prices they offer throughout the Online Retail Sales Market.

[131] Daphne Howland, *Amazon Drives Sales from Service Fees*, RETAIL DIVE (Nov. 13, 2018), https://www.retaildive.com/news/amazon-drives-sales-from-service-fees/542097/.
[132] Stephanie Chevalier, *Amazon Third-Party Seller Share 2007–2021*, STATISTA (July 13, 2021), https://www.statista.com/statistics/259782/third-partyseller-share-of-amazon-platform/.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

106.     For example, retailer Molson Hart reports that a $150 item sold on Amazon would make his company the same profit as an item sold for approximately $40 less on his company website:

> We designed, manufactured, imported, stored, shipped the item, and then we did customer service. Amazon hosted some images, swiped a credit card, and got $40 [for a $150 toy].
>
> This is the core problem. Were it not for Amazon, this item would be $40 cheaper. And this is how Amazon's dominance of the industry hurts consumers.[133]

107.     This is a direct consequence of Amazon's MFN policies, *i.e.*, its former MFN clause, the Price Parity Clause, and its current, nearly identical "Fair Pricing" Policy. And these policies are not merely theoretical; they have been aggressively enforced by Amazon. To ensure compliance with the MFN policies, Amazon's "automated system continually checks and informs the seller within 15 minutes if a violation has occurred."[134] If Amazon finds a violation, the third-party merchant will receive a policy warning in the seller's central account.[135] Violations could result in removal of the third-party merchant's product listing or suspension of the merchant's account.[136] It was reported that "Amazon even checks [the third-party merchant's] listings for similar products that are differently described—by color or size, for example. In other words, there's no hiding place."[137] Jarvin Karnani, who has been selling on Amazon's marketplace for two years, told the FTC, "[I]f Amazon suspends you, it's like a death knell . . . [W]hen Amazon shuts you off, they sit on your money for 90 days and there's nothing you can do."[138] To ensure that they are in compliance with Amazon's price policies, some third-

---

[133] *Supra* Hart.
[134] Rupert Heather, *The Little-Known Amazon Pricing Rule that Would Burn Your Business*, Xsellco, https://www.xsellco.com/resources/amazon-pricing-rule-burn-business/ (last visited July 13, 2021).
[135] *Id.*
[136] *Id.* Amazon's contracts with its third-party merchants are confidential. Plaintiffs therefore rely on publicly available third-party sources for their content.
[137] *Id.*
[138] Spencer Soper & Ben Brody. *Amazon Probed by U.S. Antitrust Officials Over Marketplace*, Bloomberg (Sept. 11, 2019), https://www.bloomberg.com/news/articles/2019-09-11/amazon-antitrust-probe-ftc-investigators-interview-merchants.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

party merchants have come to rely on an external service to replicate their prices across multiple marketplaces.[139]

108.    "A staggering number (82%) of consumers cited price as a very important factor when buying a product on Amazon."[140] But Amazon's MFN policies have the effect of reducing price competition. Third-party merchants who would offer their goods for less, including on their own websites (e.g., by avoiding Amazon's estimated 15% referral fee),[141] are prevented from setting lower prices anywhere else.[142]

109.    Amazon came under fire for its Price Parity Clause in December 2018, when Senator Blumenthal called for an FTC investigation of the practice.[143] Years earlier, Amazon withdrew this very practice in Europe under pressure from British and German regulators.[144] In response to the Blumenthal letter, Amazon also quietly withdrew its Price Parity Clause in the United States in March 2019.[145] At the time, Dani Nadel, president of Feedvisor, a company that advises Amazon third-party merchants, expected it to be a watershed moment that would lead "the greater e-commerce landscape" to be "much more dynamic."[146] Likewise, when he learned that Amazon was revoking its Price Parity Clause, David Simnick, co-founder and CEO of Soapbox, a Washington, D.C.-based soap and shampoo maker that sells on Amazon, reported: "I almost did a back flip in the hotel gym."[147]

---

[139] *Supra* Heather.

[140] Catie Grasso, *Amazon Pricing Strategy: How Much Should You Sell a Product For?* FEEDVISOR (Jan. 31, 2020), https://feedvisor.com/resources/marketplace-fees-policies/amazon-pricing-strategy/.

[141] *Supra* Hart ("Amazon takes a 15% commission on every product we sell on their website. We don't have this fee when we sell toys on our own website, so we could sell our products for 15% less and make roughly the same amount of money as we do on Amazon.").

[142] *See* Letter from Senator Richard Blumenthal to Josephs Simons, Federal Trade Commission Chair (Dec. 19, 2018), https://www.blumenthal.senate.gov/imo/media/doc/12.19.18%20-%20DOJ%20-%20Price%20Parity.pdf.

[143] *Id.*

[144] *Id.*

[145] Catherine Shu, *Amazon Reportedly Nixes Its Price Parity Requirement for Third-Party Sellers in the U.S.*, TECHCRUNCH (Mar. 11, 2019), https://techcrunch.com/2019/03/11/amazon-reportedly-nixes-its-price-parity-requirement-for-third-party-sellers-in-the-u-s/.

[146] *Supra* Howland.

[147] Guadalupe Gonzalez, *You're No Longer Required to Sell Products for Less on Amazon. The Problem?  If You Don't, You've Got Another Penalty Coming*, INC. (Mar. 13, 2019) https://www.inc.com/guadalupe-gonzalez/amazon-removes-price-parity-not-fair-price-rule-third-party-sellers-antitrust-violations.html.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

110.    But the watershed moment never came. Instead, Amazon continues to punish retailers who price goods lower on other platforms, both marketplaces and single-merchant websites.[148] While Amazon withdrew its Price Parity Clause, it continues to enforce its "Fair Pricing" Policy, which has the same effect.[149] Whereas the Price Parity Clause specifically prohibited third-party merchants from offering cheaper deals through other online retail platforms, the "Fair Pricing" Policy prohibits pricing that "harms consumer trust," which Amazon interprets to impose the same requirements. Failure to comply with this interpretation results in stiff penalties, such as Amazon's removing the "Buy Box" from the relevant product page, suspending shipping options, and even terminating third-party merchants' selling privileges.[150]

111.    The "Buy Box" is the white box on the right side of the product details page where shoppers can click "Add to Cart" or "Buy Now." It is a critical listing benefit for third-party merchants: Buy Box goods are the most visible to consumers and the easiest for them to purchase. Over 80% of Amazon purchases made on desktops are done via the Buy Box, and due to the smaller screen size of mobile devices, an even higher percentage of mobile Amazon purchases are made through the Buy Box.[151] Voice assisted purchases, such as those made with Alexa, are all made using the Buy Box because consumers have no product-listing page to view other options.

---

[148] *Supra* Hart; *supra* Gonzalez.
[149] *Supra* Gonzalez.
[150] *Id*.
[151] House Report at 250.

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1
2
3
4
5
6
7
8
9
10
11
12



13   112.   Eligibility for the Buy Box depends on a number of factors, including the third-

14   party merchant's reputation, price, efficiency, and whether the merchant is selling its product for

15   a lower price through other online retail platforms.[152] When users click the "Add to Cart" button

16   on Amazon's marketplace, they are buying from one merchant and one merchant only—the Buy

17   Box winner.[153] Similarly, when a user selects the "Buy Now" button, that will also lead to the

18   Buy Box owner.[154] Over 90% of sales occur using the Buy Box.[155]

19   113.   Having the Buy Box provides tremendous value to third-party merchants. For

20   example, retailer David Simnick reports that his sales plunge as much as 40 or 50 percent in a

21   single day when his listings lose the Buy Box because of pricing goods for less on alternative

22   platforms. He is able to reclaim the Buy Box only if he changes product pricing so that he is no

23   longer offering a lower price on online retail platforms other than on Amazon.[156] Despite the

24

25   [152] *Supra* Zeibak.
     [153] *Id.*
26   [154] *Id.*
     [155] *Id.*
27   [156] *Supra* Gonzalez.

28

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

official withdrawal of Amazon's Price Parity Clause, through enforcement of another MFN policy, the "Fair Pricing" Policy, Amazon continues to strip his listing of the Buy Box if goods are sold elsewhere for less than on Amazon.[157]

114.    Molson Hart, whose company Viahart sells toys online, says that 98% of its sales come from Amazon's marketplace and that other marketplaces like eBay and Walmart account for less than 2% of his company's revenue.[158] He also found that even after Amazon officially ended its first MFN policy, it continues to use the "Fair Pricing" Policy to punish third-party merchants that list lower prices on other platforms: "If we sell our products for less on channels outside Amazon and Amazon detects this, our products will not appear as prominently in search and, if you do find them, they will lose their prime check mark and with that, their sales."[159]

115.    Amazon regularly uses its massive data-aggregation capabilities to monitor the prices that other online retail platforms offer to U.S. customers for the goods both of external competitors and of third-party merchants,[160] and it regularly enforces its MFN policies against third-party merchants, often within 15 minutes of discovering a price differential.[161] The enforcement and threat of enforcement has regularly prevented third-party merchants from setting lower prices on other platforms.[162]

116.    Amazon's MFN policies have an anticompetitive effect because they eliminate price competition from third-party merchants across the U.S. online retail sales market. Amazon's platform is not cheap, so to make up for the fees, third-party merchants must increase prices on Amazon's marketplace.[163] And Amazon's MFN policies require third-party merchants to list goods at these elevated prices on other online retail platforms as well, which eliminates price competition and results in higher online prices for consumers throughout the market. This means that output is reduced: there are fewer transactions because some consumers who would

---

[157] *See id.*
[158] *Supra* Hart.
[159] *Id.*
[160] *Supra* Heather.
[161] *Id.*
[162] *Id.*
[163] *See, e.g., supra* Hart.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1    buy at lower prices are cut out of the market at the higher price. And there are fewer online

2    retail marketplaces because would-be competitors have no incentive to enter the Online Retail

3    Marketplace Market if they cannot compete against Amazon on price to incentivize consumers

4    to use the new marketplace.

5           117.    Absent Amazon's anticompetitive MFN policies, third-party merchants would set

6    lower prices on marketplaces with lower fees than Amazon's. Price is a highly material factor

7    for consumers shopping on online retail marketplaces. In a competitive market, Amazon would

8    be forced to charge competitive fees—including the referral fee it charges consumers—rather

9    than supra-competitive fees. If Amazon charges a competitive referral fee rather than a supra-

10    competitive referral fee, consumers would be offered lower prices for the products listed by

11    third-party merchants. Market forces would also compel Amazon to lower the prices it charges

12    for its own goods in response to the lower prices being charged by competing retailers. And

13    consumers would pay lower prices both on and off the Amazon marketplace.

14           118.    Consumers who purchased goods offered by Amazon's third-party merchants on

15    other platforms—either on other marketplaces or on merchants' own websites—were also

16    injured because they purchased the goods at prices artificially inflated by Amazon's

17    anticompetitive price policies. For example, a customer who purchased a toy on Viahart.com for

18    $150 (the same price concurrently offered on Amazon's marketplace) paid approximately $40

19    more for the toy than if the third-party merchant had not had to abide by Amazon's MFN

20    policies; the third-party merchant could have sold the product for $40 less on its own website

21    while making the same profit as on Amazon.[164] Amazon's MFN policies have a broad reach,

22    encompassing virtually all consumer goods.

23           119.    Eliminating Amazon's anticompetitive pricing policies would not lead to any

24    discernible negative effects on either third-party merchants or consumers. For example, unlike

25    credit-card transaction platforms, allowing third-party merchants to compete on price through

26

27        [164] *Id.*

28



1   competing online retail marketplaces would not reduce the money available to pay rebates or

2   rewards to consumers because Amazon does not pay rebates or rewards to its retail customers.

3       120.    Amazon's price policies are also not needed to prevent free-riding by third-party

4   merchants; Amazon already collects substantial fees from these merchants and prohibits them

5   from directing Amazon customers to other platforms.[165]

6       121.    Nor are Amazon's price policies needed to combat free-riding by consumers,

7   who rely on Amazon's marketplace to get information about goods and pricing. Amazon

8   actively seeks to—and does—dominate consumers' online searches for goods, creating an

9   "information bottleneck" that prevents many consumers from ever receiving competitive price

10  information from other sources. If Amazon were truly worried about providing product and

11  pricing information to consumers for free (a service merchants routinely provide), it would have

12  several options short of forcing its supra-competitive prices onto its platform and other online

13  retail platforms. It could, for example, choose a different business model, such as subjecting

14  consumers to advertising if they conduct product searches on Amazon's marketplace.

15  **D.    Government Authorities Have Repeatedly Concluded That Amazon Has Harmed
16        Competition Through the Use of Most Favored Nation Pricing Policies.**

17      122.    Last summer, the House subcommittee on antitrust conducted an extensive

18  investigation of Amazon's pricing policies governing third-party merchants. The resulting

19  House Report concluded that "Amazon has a history of using MFN clauses to ensure that none

20  of its suppliers or third-party merchants can collaborate with an existing or potential competitor

21  to make lower-priced or innovative product offerings available to consumers."[166]

22      123.    The House Report rejected Amazon's claims that it competes with brick-and-

23  mortar retailers, outside the Online Retail Sales Market, explaining that "[t]his approach is

24  inconsistent with evidence gathered by Subcommittee staff, conventional antitrust analysis of

25  relevant product markets, and common sense."[167] The House Report further highlighted the

---

[165] *Supra* Hart; Irvin Decl., Ex. A at 6 (¶ 14).
[166] House Report at 295.
[167] House Report at 255.

CONSOLIDATED AMENDED COMPLAINT - 42
Case No. 2:21-CV-00693-RSM



HB  HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

FTC's recent conclusion that a "relevant market may be divided by channel of sale, resulting in separate markets for brick-and-mortar sales and online sales."[168]

124.    Referring to the Online Retail Sales Market, the House Report also concluded that "Amazon functions as a gatekeeper for ecommerce."[169] Further, "Amazon has monopoly power" over most third-party merchants that feel they "cannot turn to alternative marketplaces, regardless of how much Amazon may increase their costs of doing business or how badly they are treated."[170]

125.    Additionally, the House Report found that "Amazon also enjoys significant market power over online consumers" that "is durable and unlikely to erode in the foreseeable future."[171] This durable market power reflects significant barriers to entry that include: "(1) network effects, which make it difficult for another marketplace to achieve a comparable number of buyers and sellers; (2) switching costs associated with consumers shopping outside of the Amazon ecosystem; and (3) the steep costs of building a logistics network comparable in size and scope to Amazon's massive international footprint in fulfillment and delivery."[172]

126.    The German antitrust authority has already concluded that Amazon's MFN policies harm consumers with anticompetitive overcharges.

127.    With a 30-40% share of the market for the online sales of goods in Germany at the time of the enforcement action, Amazon's marketplace had a lower market share than it currently has in the United States. Nevertheless, the German antitrust authority took action against Amazon for the MFN policies at issue here: "the so-called price parity clause," which "largely prevented sellers on Amazon's Marketplace platform from offering their goods elsewhere online at a lower price," whether on "other e-commerce platforms" or on their "own online shops."[173]

---

[168] *Id.*
[169] *Id.* at 256.
[170] *Id.* at 257.
[171] *Id.* at 259-60.
[172] *Id.* at 260.
[173] BKartA Decision at 1-2.

HB HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

128.    Upon investigation, the German authority concluded that "Amazon and the third-party retailers are direct competitors" in e-commerce, and that "[t]he agreement of a price parity clause constitutes horizontal price-fixing."[174] The German authority explained that the agreement between Amazon and third-party merchants was "not based on purely vertical agreements" precisely because "Amazon and the third-party retailers are direct competitors in the trading markets concerned," and "[t]he content of the agreement is precisely not the use by retailers of the platform service of a neutral online service provider in exchange for a fee. Rather, the aim of participating in the [Amazon] Marketplace is to make a joint integrated presentation of an entire product range, including the Amazon product range, with a single address and the resulting simplified navigation. It is therefore a horizontal trade cooperation."[175]

129.    The German authority further concluded that the scope of that horizontal price-fixing agreement was market-wide: because "[a] general competitive relationship exists between Amazon and the third-party sellers in the retail markets in all product categories," "the price parity clause is a hardcore restriction in all product categories."[176]

130.    The German authority also explained that the agreement between Amazon and third-party merchants amounted to "horizontal price-fixing" even though it was only the third-party merchants who committed to listing their goods at a particular price (the Amazon price) across all online retail channels: "The agreement of a price parity clause constitutes horizontal price-fixing for which an understanding on the pricing of just one part of an agreement (here of the third-party retailer) is sufficient if that retailer is a direct competitor."[177]

131.    The German antitrust authority found that Amazon's MFN policies had the stark anticompetitive effect that economic literature predicts: reduced competition and higher prices.

---

[174] *Id.* at 2-3.
[175] *Id.*
[176] *Id.* at 3.
[177] *Id.* This is consistent with *Palmer v. BRG*, where the Supreme Court implicitly rejected the notion that horizontal price restraints are necessarily reciprocal, when it held that rival bar review providers' exclusive licensing agreement—which increased only one company's price—was a *per se* illegal price-fixing agreement. 498 U.S. 46 (1990).

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Because Amazon's MFN policies ensure a uniform, all-in price to the end consumer, the "[p]rice parity clauses thus act as barriers to market entry for new competitors and hinder the expansion of existing competitors in the market" by "neutrali[zing]" the "major competitive parameter – the fees for platform services – . . . more favourable fees cannot be translated into more favourable prices for final customers."[178]  The inevitable result is higher prices, fewer consumers, and fewer marketplaces entering the market to compete against Amazon. "According to a poll of 2,500 online retailers carried out by" the German authority, the Price Parity Clause "has also resulted in significant price increases to e-commerce."[179]

132.    As a result of the German authority's findings, as well as coordinated efforts by the U.K.'s Office of Fair Trading, Amazon ultimately abandoned its Price Parity Clause on an EU-wide basis.

133.    Last summer, the Washington Post reported that the FTC planned to scrutinize Amazon as part of a broad investigation into the large technology companies.[180] This followed an earlier announcement that the FTC had established a special task force to monitor the big tech companies and to investigate "any potential anticompetitive conduct in those markets, and tak[e] enforcement actions when warranted."[181] According to Gene Kimmelman, the president of Public Knowledge, a Washington-based consumer advocacy group: "This should be a wake-up call to both Google and Amazon to behave themselves because it at least shows that the Justice Department and FTC are thinking about them."[182]

134.    Vox reported that the FTC started questioning some of Amazon's competitors last summer about its business practices, according to someone briefed on the discussions.[183]

---

[178] BKartA Decision at 3.
[179] *Id.*
[180] Tony Romm, *Amazon Could Face Heightened Antitrust Scrutiny under a New Agreement Between U.S. Regulators*, WASH. POST (June 1, 2019), https://www.washingtonpost.com/technology/2019/06/02/amazon-could-face-heightened-antitrust-scrutiny-under-new-agreement-between-us-regulators/.
[181] *Id.*
[182] *Id.*
[183] Jason Del Rey, *Amazon May Soon Face an Antitrust Probe. Here Are 3 Questions the FTC Is Asking About It.*, VOX (June 4, 2019), https://www.vox.com/recode/2019/6/4/18651694/amazon-ftc-antitrust-investigation-prime.


HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

135.     Bloomberg reported that FTC investigators began interviewing Amazon's third-party merchants last fall as part of a sweeping probe to determine whether Amazon is using its market power to hurt competition.[184] Reportedly, several attorneys and an economist have been conducting interviews that typically last about 90 minutes.[185] According to Michael Kades, who spent 20 years at the FTC, the length of the interviews and the manpower devoted to examining Amazon point to a serious inquiry rather than investigators' merely responding to complaints and going through the motions: "Early in an investigation, that's a sign of staff doing a serious job," Kades said. "They're spending lots of time with witnesses and trying to really understand what they're saying."[186] Reportedly, regulators are skeptical that shoppers and suppliers have real alternatives to Amazon.[187]

136.     Jennifer Rie, an analyst at Bloomberg Intelligence who specializes in antitrust litigation, offered the opinion that FTC investigators are "in a background phase," when they are "trying to learn as much as they can about the industry from people who aren't the target of their investigation."[188]

137.     Diana Moss, president of the American Antitrust Institute, a nonprofit that advocates for aggressive antitrust enforcement says that "the central question in an inquiry like this" is whether "merchants are so reliant on Amazon for sales that they are unwilling to offer better prices in other marketplaces like Walmart and EBay" and whether that can hurt competition.[189]

138.     The Free & Fair Markets Initiative, likewise, applauded the FTC's efforts: "It is welcome news to see that regulators are finally getting serious about taking on the unfair

---

[184] *Supra* Soper & Brody.
[185] *Id.*
[186] *Id.*
[187] *Id.*
[188] *Id.*
[189] *Id.*

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

advantage Amazon has staked out on its Platform," said Robert B. Engel, a spokesperson for the group, in a statement.[190]

139.    The Attorney General for the District of Columbia filed a sovereign enforcement action against Amazon for violations of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, *et seq.*[191] Like Plaintiffs, the Attorney General alleges that Amazon restrains third-party merchants from offering their goods on any other online retail platform—including marketplaces and third-party merchants' own websites—for lower prices or on better terms than they offer their goods on Amazon's marketplace. The Attorney General alleges that this conduct results in supra-competitive prices to consumers across the Online Retail Sales Market and that it "reduce[s] and foreclose[s] competition from other online retail sales platforms."[192]

## VI.    INTERSTATE TRADE AND COMMERCE

140.    Amazon's activities as alleged in this complaint were within the flow of, and substantially affected, interstate commerce. Amazon sells goods on its own behalf and as a marketplace for its third-party merchants across, and without regard to, state lines.

## VII.    CLASS ACTION ALLEGATIONS

141.    Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and injunctive relief pursuant to federal law on behalf of the members of the following Class:

> All persons who on or after May 26, 2017, purchased one or more goods on Amazon's marketplace.

142.    Excluded from the Class are the Defendant and its officers, directors, management, employees, subsidiaries, or affiliates. Also excluded from the class are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities. Further

---

[190] Ben Fox Rubin, *FTC Investigation into Amazon Reportedly Gearing Up*, C/NET (Sept. 11, 2019), https://www.cnet.com/news/ftc-investigation-into-amazon-reportedly-gearing-up/.
[191] *District of Columbia v. Amazon.com, Inc.*, No. 2021-CA-001775-B (D.C. Super. Ct. filed May 25, 2021).
[192] *Id.* at 25.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

excluded from the class are individuals who are already pursuing antitrust claims based on Amazon's MFN policies on their individual behalf in arbitration before the American Arbitration Association.

143.    The identities of all Class members are readily identifiable from information and records maintained by Defendant.

144.    **Numerosity:** Members of the Class are so numerous that joinder is impracticable. Plaintiffs believe that there are more than two hundred million members of the Class, geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

145.    **Typicality:** Plaintiffs' claims are typical of the claims of the other Class members. The factual and legal bases of Defendant's liability are the same and resulted in injury to Plaintiffs and all other members of the proposed Class.

146.    **Adequate representation:** Plaintiffs will represent and protect the interests of the proposed Class both fairly and adequately. They have retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed Class, and their interests do not conflict with the interests of the proposed Class members they seek to represent.

147.    **Commonality:** Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendant has acted on grounds generally applicable to the Class and because Class members share a common injury. Thus, determining damages with respect to the Class as a whole is appropriate. The common applicability of the relevant facts to claims of Plaintiffs and the proposed Class are inherent in Defendant's wrongful conduct, because the overcharge injuries incurred by Plaintiffs and each member of the proposed Class arose from the same anticompetitive conduct alleged herein.

148.    There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:



(a)     Whether Defendant and third-party merchants unlawfully contracted, combined, or conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act by agreeing under Amazon's MFN policies that third-party merchants would not list their goods on other online retail platforms—either on marketplaces or on their own websites—at a price lower than what they offered on Amazon's marketplace;

(b)     Whether Defendant has unlawfully monopolized, or attempted to monopolize, the Online Retail Marketplace Market or the Online Retail Sales Market, including by way of the contractual terms, policies, practices, mandates, and restraints described herein;

(c)     Whether competition in the Online Retail Marketplace Market or the Online Retail Sales Market has been restrained and harmed by Amazon's monopolization, or attempted monopolization, of these markets;

(d)     Whether consumers and Class members have been damaged by Defendant's conduct;

(e)     The amount of any damages; and

(f)     The nature and scope of injunctive relief necessary to restore a competitive market.

149.   **Injunctive relief:** By way of its conduct described in this complaint, Defendant has acted on grounds that apply generally to the proposed Class. Accordingly, final injunctive relief is appropriate respecting the Class as a whole.

150.   **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on behalf of the Class members are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Resolution of the Class members' claims through the class action device will present fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court.



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

## VIII.   ANTITRUST INJURY AND STANDING

151.    During the Class Period, Plaintiffs and Class members directly made purchases on Amazon's marketplace. Because of Defendant's anticompetitive conduct, Plaintiffs and Class members were forced to pay more for those purchases than they would have if Amazon had permitted its third-party merchants to engage in price competition outside Amazon's marketplace. Defendant therefore has caused Plaintiffs and Class members to suffer overcharge damages. Because Defendant continues to enforce its anticompetitive "Fair Pricing" Policy, Plaintiffs and Class members are reasonably likely to incur future overcharges when they make additional purchases on Amazon's marketplace. Plaintiffs and Class members have standing as direct purchasers of goods sold on Amazon's marketplace at an inflated price. Both the actual harm and the threat of future harm are cognizable antitrust injuries directly caused by Defendant's violations of federal antitrust laws, including its anticompetitive agreement with third-party merchants, and its monopolization, or its attempted monopolization of the relevant markets, as alleged herein. The full amount of such overcharge damages will be calculated after discovery and upon proof at trial.

## IX.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### VIOLATION OF THE SHERMAN ACT
#### (15 U.S.C. § 1) PER SE

152.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

153.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed Class described above.

154.    Defendant and its 2.3 million third-party merchants are horizontal competitors.

155.    Defendant, the online retail giant, directly competes with its third-party merchants in online retail sales. Through first-party sales on its marketplace, Amazon directly offers online customers a broad range of goods for sale. Amazon's first-party sales account for 22% of all online retail sales in the United States. Each good Amazon sells on its marketplace competes with goods that third-party merchants list for sale on Amazon's marketplace.


1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  Amazon's goods are therefore reasonably interchangeable with its third-party merchants' goods,

2  such that there is cross-elasticity of demand between the goods Defendant sells and the ones that

3  its third-party merchants list on Amazon's marketplace.  Amazon's internal documents refer to

4  its third-party merchants as its "internal competitors."[193]

5         156.    In violation of Section 1 of the Sherman Antitrust Act, Defendant and its 2.3

6  million third-party merchants unlawfully agreed under Amazon's MFN policies that third-party

7  merchants will not list their goods on other online platforms at prices that are lower than their

8  list prices on Amazon's marketplace. These unlawful agreements have unreasonably restrained

9  price competition among retailers for online sales of consumer goods and had the effect of

10  establishing a price floor for goods listed on Amazon's marketplace. This combination is *per se*

11  unlawful price-fixing.

12         157.    Because Defendant has engaged in horizontal price-fixing, which is a *per se*

13  violation of the Sherman Act, no relevant market need be defined to establish liability under the

14  Sherman Act.

15         158.    Plaintiffs and the Class members have been injured and will continue to be

16  injured in their businesses and property by paying more for consumer goods than they would

17  have paid or would pay in the future in the absence of Defendant's unlawful acts.

18         159.    They are entitled to overcharge damages and an injunction that terminates the

19  ongoing violations alleged in this Complaint.

**SECOND CAUSE OF ACTION**

**VIOLATION OF 15 U.S.C. § 1
(ALTERNATIVE TO PER SE)**

23         160.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

This Count is brought in the alternative if the agreement between Amazon and its co-

conspirator, third-party merchants is determined not to be a *per se* violation.

---

[193] House Report at 16.



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

161.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

162.    Defendant is liable for the creation, maintenance, and enforcement of the agreements under a "quick look" or rule-of-reason standard.

163.    For purposes of Plaintiffs and Class members' quick-look or rule-of-reason claims, the relevant geographic market is the United States. The relevant product markets are one or both of the following markets: the Online Retail Marketplace Market and the Online Retail Sales Market.

164.    **Online Retail Marketplace Market**: Defendant's MFN policies have an open and obvious adverse effect on competition in the in the Online Retail Marketplace Market, where Defendant's MFN policies act as barriers to market entry for new marketplace competitors and hinder the expansion of existing competitors in that market. This is because the MFN policies prevent competitor marketplaces from competing on the most significant parameter—the fees for platform services. Competitor marketplaces cannot translate lower fees into lower prices for consumers. Amazon's MFN policies therefore raise prices above a competitive level, prevent competing marketplaces from entering the market, and restrict the expansion of existing competitors in the market. They also decrease innovation and consumer choice in the relevant market. Defendant also possesses market power in the Online Retail Marketplace Market, where Amazon accounts for 65% to 70% of all online marketplace purchases.

165.    **Online Retail Sales Market**: Defendant's MFN policies also have an open and obvious adverse effect on competition in the Online Retail Sales Market, where they raise prices, by shielding Amazon's first-party sales from price competition from its third-party merchants. In a competitive market, Amazon would have to lower its first-party prices to compete with lower prices offered by online retail merchants that compete with Amazon's marketplace. Defendant and its co-conspirators possess dominant market power. Retail sales on Amazon's marketplace represent well over 50% of all sales in the Online Retail Sales Market.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Amazon's nearest competitor (eBay) has a distant 6.6% of the market. That Amazon has dominant market power is evident from its power to raise prices above those that would be charged in a competitive market. Amazon also has unique advantages that allow it to exercise market power. It controls 66% of all online product searches for first-time purchases and 74% for goods previously purchased. It has a much larger inventory than any of its competitors. It has a vast digital advantage over its competitors, having amassed detailed consumer preferences and behavior over decades from its 200 million unique monthly customers.

166.     A straightforward application of fundamental economic principles shows that the arrangements in question would have an anticompetitive effect on customers and the relevant markets.

167.     Defendant and its co-conspirator, third-party merchants did not act unilaterally or independently when entering into the agreements. The agreements and their enforcement substantially, unreasonably, and unduly restrain trade in the relevant markets, and harmed Plaintiffs and the Class thereby.

168.     Amazon's relationship with its co-conspirator, third-party merchants is further evidence of its market power in both markets. Amazon charges exorbitant fees that give Amazon a competitive advantage over its co-conspirator, third-party merchants and uses their supplier information to contract directly with suppliers and their customer information to decide on what areas to focus its retail or product developments. It has the power to dictate and arbitrarily change the rules by which its co-conspirator, third-party merchants have access to Amazon's marketplace—for example, by extending the amount of time business buyers have to pay its co-conspirator, third-party merchants and by deciding what goods they can sell and whether they can participate as vendors or third-party merchants—and bends the rules to give itself advantages in battles for the Buy Box and for the best placement of sponsored advertising.

169.     There is no legitimate, pro-competitive business justification for Amazon's MFN policies or any justification that outweighs their harmful effect. Even if there were some conceivable justification, the agreements are broader than necessary to achieve such a purpose.

HB  HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

170.    Plaintiffs and members of the Class were injured in their business or property by paying higher prices for purchases on Amazon's marketplace than they would have paid in the absence of Defendant's unlawful conduct. They are entitled to overcharge damages and an injunction that terminates the ongoing violations alleged in this Complaint.

### THIRD CAUSE OF ACTION

### VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION
**(15 U.S.C. § 2)**

171.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

172.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

173.    The relevant geographic market is the United States. The relevant product markets are one or both of the following markets: the Online Retail Marketplace Market and the Online Retail Sales Market.

174.    Defendant obtained monopoly power in the applicable markets, as demonstrated by its power to set the price of platform services and goods. Defendant, inclusive of its co-conspirator, third-party merchants, already accounts for 65% to 70% of sales in the Online Retail Marketplace Market and over 50% of the revenue generated in the Online Retail Sales Market.

175.    Amazon has gained and maintains monopoly power in the applicable markets by improper and unlawful means.

176.    Defendant has willfully acquired its monopoly power in the applicable markets in part through its enforcement of its MFN policies. These provisions establish a price floor based on third-party merchants' price listings on Amazon's marketplace. By requiring its 2.3 million third-party merchants to apply a price floor on all other online retail platforms—both on marketplaces and on their own websites—Defendant has largely immunized its goods from competitive pricing in the Online Retail Sales Market and caused goods sold on Amazon's marketplace to be listed at supra-competitive prices. Amazon has likewise largely immunized its



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

marketplace services from more competitive fees in the Online Retail Marketplace Market because Amazon's MFN policies do not allow its 2.3 million third-party merchants to capitalize on the more favorable fees, *i.e.*, by lowering list prices for consumers on marketplaces that compete with Amazon's marketplace. This, in turn, causes higher prices in competing online retail marketplaces, and the absence of price competition compels consumers to shop on Amazon, where they pay supra-competitive prices.

177.    Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for goods on Amazon's marketplace than they would have paid or would pay in the future in the absence of Defendant's unlawful acts. They are entitled to overcharge damages and an injunction that terminates the ongoing violations alleged in this Complaint.

## FOURTH CAUSE OF ACTION

## VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION
### (15 U.S.C. § 2)

178.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

179.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

180.    If Defendant does not already have a monopoly in the applicable markets described above, it has attempted to monopolize these markets.

181.    Amazon's MFN policies demonstrate Amazon's intent to control online prices of virtually every consumer good offered in the relevant market.

182.    Through its enforcement of its MFN policies, Defendant has furthered its goal of controlling the prices of virtually every consumer good offered for sale and immunizing itself from significant competition in the applicable markets.

183.    There is a dangerous probability that Defendant will succeed in monopolizing the applicable markets. Defendant, inclusive of its co-conspirator, third-party merchants, already



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

accounts for 65% to 70% of sales in the Online Retail Marketplace Market and over 50% of the revenue generated in the Online Retail Sales Market.

184.    Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for goods on Amazon's marketplace than they would have paid or would pay in the future in the absence of Defendant's unlawful acts. They are entitled to overcharge damages and an injunction that terminates the ongoing violations alleged in this Complaint.

## X.      JURY TRIAL DEMANDED

185.    Plaintiffs hereby demand a trial by jury of all the claims asserted in this Complaint.

## XI.      PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

A.      The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representative and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.      Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C.      Adjudication that the acts alleged herein constitute monopolization or attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

D.      Actual damages, treble damages, and such other relief as provided by the statutes cited herein;

E.      Pre-judgment and post-judgment interest on such monetary relief;

F.      Equitable relief requiring that Amazon cease the abusive, unlawful, and anticompetitive practices described herein (including pursuant to federal antitrust law: *see, e.g.*, 15 U.S.C. § 26);



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1    G.    The costs of bringing this suit, including reasonable attorneys' fees; and

2    H.    All other relief to which Plaintiffs and members of the Class may be entitled at

3    law or in equity.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  DATED: July 21, 2021                    Respectfully submitted,

2

3  KELLER LENKNER LLC                      HAGENS BERMAN SOBOL SHAPIRO LLP
   *Interim Co-Lead Class Counsel*          *Interim Co-Lead Class Counsel*

4  By ____/s/ Zina Bash_____           By _____/s/ Steve W. Berman_____
5    Zina Bash (*admitted pro hac vice*)     Steve W. Berman (WSBA No. 12536)
     111 Congress Avenue, Suite 500        By _____/s/ Barbara A. Mahoney_____
6    Austin, TX, 78701                       Barbara A. Mahoney (WSBA No. 31845)
     Telephone: (512) 620-8375             1301 Second Avenue, Suite 2000
7    zina.bash@kellerlenkner.com           Seattle, WA 98101
                                           Telephone: (206) 623-7292
8    Warren D. Postman (*admitted pro hac vice*)  Facsimile: (206) 623-0594
9    Albert Y. Pak (*admitted pro hac vice*)      steve@hbsslaw.com
     1300 I Street N.W., Suite 400E        barbaram@hbsslaw.com
10   Washington DC, 20005
     Telephone: (202) 749-8334             QUINN EMANUEL URQUHART &
11   wdp@kellerlenkner.com                 SULLIVAN, LLP
12   albert.pak@kellerlenkner.com          *Plaintiffs' Executive Committee Member*

13  KELLER ROHRBACK L.L.P.                  By_____/s/ Alicia Cobb_____
    *Plaintiffs' Executive Committee Member*   Alicia Cobb, WSBA # 48685
14                                          1109 First Avenue, Suite 210
15  By_____/s/ Derek W. Loeser_____    Seattle, WA 98101
     Derek W. Loeser (WSBA No. 24274)       Telephone: (206) 905-7000
16   1201 Third Avenue, Suite 3200          aliciacobb@quinnemanuel.com
     Seattle, WA 98101-3052
17   Telephone: (206) 623-1900             Steig D. Olson (*admitted pro hac vice*)
     Facsimile: (206) 623-3384             David D. LeRay (*admitted pro hac vice*)
18   Dloeser@kellerrohrback.com            Nic V. Siebert (*admitted pro hac vice*)
                                           51 Madison Avenue, 22nd Floor
19                                          New York, NY 10010
                                           Telephone: (212) 849-7000
20                                          steigolson@quinnemanuel.com
21
                                           Adam B. Wolfson (*admitted pro hac vice*)
22                                          865 South Figueroa Street, 10th Floor
                                           Los Angeles, CA 90017-2543
23                                          Telephone: (213) 443-3000
24                                          adamwolfson@quinnemanuel.com

25                                          *Attorneys for Plaintiffs and the Proposed Class*
26
27
28

CONSOLIDATED AMENDED COMPLAINT - 58
Case No. 2:21-CV-00693-RSM



**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
Peggy J. Wedgworth*
Elizabeth McKenna*
Robert A. Wallner*
Blake Hunter Yagman*
100 Garden City Plaza, Suite 500
Garden City, New York 11530
Telephone: 212-594-5300
pwedgworth@milberg.com
emckenna@milberg.com
rwallner@milberg.com
byagman@milberg.com
*Pro Hac Vice Forthcoming

*Attorneys for Megan Smith*



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1

## <u>CERTIFICATE OF SERVICE</u>

2      I hereby certify that on July 21, 2021, a true and correct copy of the foregoing was filed

3  electronically by CM/ECF, which caused notice to be sent to all counsel of record.

4                    */s/ Steve W. Berman*

5                      Steve W. Berman

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED AMENDED COMPLAINT - 60
Case No. 2:21-CV-00693-RSM



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594