1

The Honorable Ricardo S. Martinez

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

ELIZABETH DE COSTER, *et al.*, on behalf of
themselves and all others similarly situated,

Case No. 2:21-cv-00693-RSM

11

12

Plaintiffs,

PLAINTIFFS' OPPOSITION TO
AMAZON.COM, INC.'S MOTION TO
DISMISS CONSOLIDATED AMENDED
COMPLAINT

13

v.

14

AMAZON.COM, INC., a Delaware
corporation,

NOTED FOR MOTION CALENDAR:
January 21, 2022

15

16

Defendant.

17

18

19

20

21

22

23

24

25

26

27

28



**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   BACKGROUND ...................................................................................................2

    A.    Amazon owns the gateway to online retail. ................................................2

    B.    Amazon imposes inflated fees on its marketplace. .....................................3

    C.    Amazon prohibits price competition and protects its inflated fees. ............3

III.  STANDARD OF REVIEW .....................................................................................4

IV.   ARGUMENT ..........................................................................................................5

    A.    Amazon's proffered justifications for its MFN policies cannot
         undermine the CAC's well-pleaded allegations. .......................................5

    B.    Amazon's third-party merchants engage in concerted action with
         Amazon by expressly agreeing to its MFN policies and setting
         their prices accordingly. ...............................................................................9

    C.    Plaintiffs plausibly allege a *per se* violation of the Sherman Act. ..........12

    D.    Plaintiffs adequately allege an Online Retail Marketplace Market
         and an alternative Online Retail Sales Market. ........................................14

         1.    Plaintiffs plausibly allege markets that exclude physical
             retail sales. .......................................................................................15

         2.    Plaintiffs plausibly allege the U.S. Market for Online Retail
             Marketplaces. ...................................................................................17

         3.    Plaintiffs plausibly allege the U.S. Market for Online Retail
             Sales. ................................................................................................19

    E.    Plaintiffs, as direct purchasers from Amazon, have standing
         because they allege the quintessential form of antitrust injury. ..............21

V.    CONCLUSION .....................................................................................................24


1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*2238 Victory Corp. v. Fjallraven USA Retail, LLC,*
  2021 WL 76334 (S.D.N.Y. Jan. 8, 2021) .............................................................13

*Apple v. Pepper,*
  139 S. Ct. 1514 (2019)...............................................................................22, 23, 24

*Arizona v. Maricopa Cnty. Med. Soc.,*
  457 U.S. 332 (1982)..............................................................................................5

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)..............................................................................................5

*Associated Gen. Contractors of California, Inc. v. California State*
  *Council of Carpenters,*
  459 U.S. 519 (1983).............................................................................................23

*Baar v. Jaguar Land Rover N. Am., LLC,*
  295 F. Supp. 3d 460 (D.N.J. 2018) .....................................................................11

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.,*
  2016 WL 3880989 (N.D. Cal. July 18, 2016).....................................................14

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007).........................................................................................4, 5

*Big Bear Lodging Ass'n v. Snow Summit, Inc.,*
  182 F.3d 1096 (9th Cir. 1999).............................................................................22

*Blue Shield of Va. v. McCready,*
  457 U.S. 465 (1982).............................................................................................23

*C-E Minerals, Inc. v. Carbo Ceramics, Inc.,*
  2012 WL 13008801 (N.D. Ga. Mar. 14, 2012)...................................................13

*Cargill, Inc. v. Monfort of Colorado, Inc.,*
  479 U.S. 104 (1986).............................................................................................22

*Chase v. Northwest Airlines Corp.*
  49 F. Supp. 2d 553 (E.D. Mich. 1999)................................................................11

*City of Vernon v. S. California Edison Co.,*
  955 F.2d 1361 (9th Cir. 1992) ............................................................................10

*In re DDAVP Direct Purchaser Antitrust Litig.,*
  585 F.3d 677 (2d Cir. 2009)...........................................................................23, 24

*Dyroff v. Ultimate Software Grp., Inc.,*
  934 F.3d 1093 (9th Cir. 2019) ..............................................................................4

HB  HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

*In re eBay Seller Antitrust Litig.*,
   545 F. Supp. 2d 1027 (N.D. Cal. 2008) ........................................................................20

*In re Elec. Books Antitrust Litig.*,
   2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ...........................................................24

*Federal Trade Comm'n v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) .......................................................................................24

*Federal Trade Comm'n v. Staples, Inc.*,
   190 F. Supp. 3d 100 (D.D.C. 2016) ............................................................................20

*Feitelson v. Google Inc.*,
   80 F. Supp. 3d 1019 (N.D. Cal. 2015) ........................................................................24

*Finkelstein v. Aetna Health Plans of New York*,
   1997 WL 419211 (S.D.N.Y. July 25, 1997) ..................................................................9

*FTC v. Whole Foods Mkt., Inc.*,
   548 F.3d 1028 (D.C. Cir. 2008) ......................................................................16, 20, 21

*In re German Auto. Mfrs. Antitrust Litig.*,
   497 F. Supp. 3d 745 (N.D. Cal. 2020) ........................................................................16

*Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*,
   433 F. App'x 598 (9th Cir. 2011) ...............................................................................21

*Gross v. New Balance Athletic Shoe, Inc.*,
   955 F. Supp. 242 (S.D.N.Y. 1997) .............................................................................22

*Hahn v. Oregon Physicians' Serv.*,
   868 F.2d 1022 (9th Cir. 1988) ....................................................................................14

*California ex rel. Harris v. Safeway, Inc.*,
   651 F.3d 1118 (9th Cir. 2011) ....................................................................................14

*Hicks v. PGA Tour, Inc.*,
   165 F. Supp. 3d 898 (N.D. Cal. 2016) ........................................................................16

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018) ..............................................................................14, 16

*Int'l Logistics Grp., Ltd. v. Chrysler Corp.*,
   884 F.2d 904 (6th Cir. 1989) ......................................................................................13

*Intel Corp. v. Fortress Inv. Grp. LLC*,
   511 F. Supp. 3d 1006 (N.D. Cal. 2021) ......................................................................21

*Jeanery, Inc. v. James Jeans, Inc.*,
   849 F.2d 1148 (9th Cir. 1988) ....................................................................................11



*Kartell v. Blue Shield of Massachusetts, Inc.*,
    749 F.2d 922 (1st Cir. 1984)...........................................................................7, 8

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) .........................................................................6, 17

*Kitsap Physicians Serv. v. Washington Dental Serv.*,
    671 F. Supp. 1267 (W.D. Wash. 1987).................................................................7

*Krehl v. Baskin-Robbins Ice Cream Co.*,
    664 F.2d 1348 (9th Cir. 1982) ............................................................................13

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
    551 U.S. 877 (2007).............................................................................11, 12, 13

*Little Rock Cardiology Clinic, P.A. v. Baptist Health*,
    573 F. Supp. 2d 1125 (E.D. Ark. 2008)..............................................................20

*Lorain J. Co. v. United States*,
    342 U.S. 143 (1951)..............................................................................................7

*Lorenzo v. Qualcomm Inc.*,
    603 F. Supp. 2d 1291 (S.D. Cal. 2009)..............................................................24

*Meyer v. Kalanick*,
    174 F. Supp. 3d 817 (S.D.N.Y. 2016)................................................................13

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019) ............................................................................22

*Nat'l Recycling, Inc. v. Waste Mgt. of Massachusetts, Inc.*,
    2007 WL 9797531 (D. Mass. July 2, 2007)........................................................7

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    990 F. Supp. 2d 996 (N.D. Cal. 2013) .................................................................5

*Newcal Indus. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) ...............................................................15, 18, 19

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield
of Rhode Island*,
    883 F.2d 1101 (1st Cir. 1989)..............................................................................7

*Ogden v. Little Caesar Enters., Inc.*,
    393 F. Supp. 3d 622 (E.D. Mich. 2019).............................................................13

*Ohio v. Am. Express*,
    138 S. Ct. 2274 (2018).................................................................................12, 19

*Oliver v. Am. Express Co.*,
    2020 WL 2079510 (E.D.N.Y. Apr. 30, 2020) ...................................................22



*Osborn v. Visa Inc.*,
   797 F.3d 1057 (D.C. Cir. 2015)...................................................................................7

*Palmer v. BRG of Georgia., Inc.*,
   498 U.S. 46 (1990)...................................................................................................12, 14

*Pennsylvania Ave. Funds v. Borey*,
   569 F. Supp. 2d 1126 (W.D. Wash. 2008).............................................................14

*PepsiCo, Inc. v. Coca-Cola Co.*,
   114 F. Supp. 2d 243 (S.D.N.Y. 2000)....................................................................20

*PSKS v. Leegin Creative Leather Prods. Inc.*,
   615 F.3d 412 (5th Cir. 2010) ...........................................................................16, 21

*Real Estate Exch. Inc. v. Zillow Inc.*,
   2021 WL 2352043 (W.D. Wash. June 9, 2021).....................................................10

*Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*,
   63 F. Supp. 2d 1218 (E.D. Cal. 1999)....................................................................11

*Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*,
   2020 WL 4194962 (S.D.N.Y. July 20, 2020) ........................................................11

*Rollins v. Dignity Health*,
   338 F. Supp. 3d 1025 (N.D. Cal. 2018) ...................................................................6

*Sambreel Holdings LLC v. Facebook, Inc.*,
   906 F. Supp. 2d 1070 (S.D. Cal. 2012)...................................................................11

*Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*,
   2012 WL 5990219 (E.D. Mich. Nov. 30, 2012).....................................................24

*Smith v. Ebay Corp.*,
   2012 U.S. Dist. LEXIS 1211 (N.D. Cal. Jan. 5, 2012) ..........................................16

*Standard Oil Co. v. United States*,
   337 U.S. 293 (1949).................................................................................................12

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ..................................................................................5

*Starr v. Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010)......................................................................................7

*Tennessean Truckstop, Inc. v. NTS, Inc.*,
   875 F.2d 86 (6th Cir. 1989) ......................................................................................9

*Toscano v. PGA Tour, Inc.*,
   70 F. Supp. 2d 1109 (E.D. Cal. 1999).....................................................................10



*Toscano v. Pro. Golfers Ass'n*,
258 F.3d 978 (9th Cir. 2001) ........................................................10, 11

*United States v. Apple*,
791 F.3d 290 (2015).............................................................6, 12, 13

*United States v. Blue Cross Blue Shield of Michigan*,
809 F. Supp. 2d 665 (E.D. Mich. 2011)...........................................7

*United States v. Delta Dental of Rhode Island*,
943 F. Supp. 172 (D.R.I. 1996).......................................................8

*United States v. Joyce*,
895 F.3d 673 (9th Cir. 2018) ..........................................................5

*United States v. Paramount Pictures*,
334 U.S. 131 (1948).......................................................................9

*United States v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940).....................................................................14

*Universal Grading Serv. v. eBay, Inc.*,
2012 WL 70644 (N.D. Cal. Jan. 9, 2012)......................................21

*US Airways, Inc. v. Sabre Holdings Corp.*,
938 F.3d 43 (2d Cir. 2019)..............................................................7

*Westchester Radiological Assocs. P.C. v. Empire Blue Cross & Blue Shield, Inc.*,
707 F. Supp. 708 (S.D.N.Y. 1989)..................................................9

*In re Wholesale Grocery Prod. Antitrust Litig.*,
752 F.3d 728 (8th Cir. 2014) ........................................................12

**OTHER AUTHORITIES**

Andre Boik & Kenneth S. Corts, *The Effects of Platform Most-Favored-Nation
Clauses on Competition and Entry*,
59 J.L. & Econ. 105 (Feb. 2016).....................................................7

Areeda and Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and
Their Application*, ¶ 565c2 (4th ed. 2021) .................................20, 21

Areeda and Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and
Their Application*, ¶ 1768a6 (4th ed. 2021) ....................................8

Areeda and Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and
Their Application*, ¶ 1605 (4th ed. 2021) ......................................13

Areeda and Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and
Their Application*, ¶ 1807b1 (4th ed. 2021)..................................7, 8



Areeda and Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 1909b (4th ed. 2021)..............................................................................12

Jonathan B. Baker, Fiona Scott Morton, *Antitrust Enforcement Against Platform MFNs*,
127 Yale L.J. 2176 (2018) ........................................................................................7



1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

# I.   INTRODUCTION

Amazon is the largest online retailer in the United States and operates the largest online retail marketplace, accounting for approximately **70%** of all U.S. online marketplace sales. Amazon operates its marketplace as a platform—an electronic site, where third-party merchants list their retail goods alongside, and in competition with, Amazon's own retail listings. Because so many consumers start and end their online retail purchases on Amazon, most online merchants consider it essential to use Amazon's marketplace to reach consumers. When a merchant does so, it sets the price of its goods—taking into account the fees that Amazon will retain—and is listed as the seller, but Amazon collects the payment from the consumer on each sale, and Amazon takes a commission (and other fees) from that payment price, before passing along the remainder to the merchant. As Plaintiffs' Consolidated Amended Complaint ("CAC") details, Amazon brandishes its colossal market power to keep at supra-competitive levels the fees it imposes on third-party merchants and consumers that utilize its marketplace platform. Indeed, Amazon keeps roughly 27 cents of every dollar consumers spend on Amazon's marketplace.

In a competitive world, rival marketplace platforms (like eBay and Walmart) would compete by setting lower fees, which would attract third-party merchants and allow them to offer their goods at lower retail prices. But Amazon has blocked that pro-consumer price competition through Platform "Most Favored Nation" ("MFN") policies. Amazon's policies prevent its third-party merchants from offerng their retail goods at lower prices anywhere else online. By restraining price competition in this way, Amazon can continue to impose supra-competitive fees on merchants and consumers that use its own marketplace. At the same time, Amazon's supra-competitive fees force up the prices for third-party merchants' goods, which means Amazon faces less price competition for its own goods. As a direct result, Amazon's customers—i.e., Plaintiffs and the proposed Class—pay inflated fees and prices when buying goods on Amazon.

Amazon's motion to dismiss rests entirely on fact-bound arguments and distortions of the CAC, underscoring why the case must proceed to discovery. *First*, backed by the findings of German antitrust authorities and the U.S. House Subcommittee on antitrust, the CAC plausibly alleges that Amazon's MFN policies cause "significant *price increases* in e-commerce" by



blocking lower prices on other retail sites. Yet Amazon improperly seeks to insert its own competing facts to contradict these well-substantiated allegations. *Second*, Amazon relies on inapposite cases to argue that Plaintiffs have not alleged a concert of action; in those cases, courts declined to infer collusion from contractual parties' acquiescence to permissible intrabrand restraints. None of those holdings apply to this case, where third-party merchants implement MFN policies by fixing prices of goods that Amazon does not produce and brands Amazon does not manage. *Third*, in arguing against *per se* treatment, Amazon ignores clearly established precedent and core allegations of the CAC. Under the *per se* rule, courts consider agreements between competing retailers not to compete on price—as alleged here—to be so manifestly anticompetitive that they are unlawful, regardless of the intent behind them or the actual market impact. *Fourth*, in seeking to dismiss Plaintiffs' claims that do not depend on *per se* liability, Amazon argues that Plaintiffs failed to plead plausible product markets. But Amazon ignores allegations demonstrating that brick-and-mortar retailers are not interchangeable with online retail marketplaces or retailers, and relies on inapposite cases to raise premature challenges to allegations that are more than sufficient at the pleading stage. *Finally*, Amazon attempts to inject needless complexity into Plaintiffs' straightforward factual allegations that Plaintiffs have standing to sue for overcharges they paid directly to Amazon and caused by Amazon's wrongful conduct. The Court should deny Amazon's motion to dismiss in full.

## II.     BACKGROUND

### A.     Amazon owns the gateway to online retail.

Amazon operates the largest online retail marketplace in the United States, where it offers to over 200 million monthly shoppers an integrated site that offers for sale its own retail goods alongside third-party merchants' goods—often the very *same* goods. CAC ¶¶ 1, 43-46, 64, 72-91, 101. Amazon dominates two markets. *First*, it controls between 65% and 70% of the Online Retail Marketplace Market, where a marketplace lists goods from multiple merchants. *Id.* ¶¶ 43, 64, 72-91. Amazon's "must have" status for online merchants bolsters its dominance, *id.* ¶ 7, as many report that their businesses' viability depends on access to Amazon's marketplace, *id.* ¶¶ 85-86, 114. Amazon further exerts its monopoly power by tying its fulfillment infrastructure

1   (Fulfillment by Amazon) to third-party merchants' access to Prime customers, Amazon's most

2   loyal buyers. *Id.* ¶¶ 56, 74, 79-80. *Second*, Amazon dominates the Online Retail Sales Market,

3   including sales by single-merchant online stores. Amazon.com accounts for over half of all

4   online retail sales, of which nearly half are Amazon's own first-party sales. *Id.* ¶¶ 1, 97, 101.

5   **B.     Amazon imposes inflated fees on its marketplace.**

6          When a consumer buys a third-party merchant's good on Amazon's marketplace, the

7   consumer pays Amazon for that purchase, and Amazon retains approximately 15% of the

8   payment as a "referral fee," which is effectively a commission. *Id.* ¶¶ 8, 59, 108. Together with

9   other, additional fees, Amazon pockets roughly 27% of every dollar a consumer pays Amazon

10  for retail purchases on its marketplace. *Id.* ¶¶ 8, 60, 88. Absent Amazon's inflated fees, third-

11  party merchants could reduce their list prices—both on Amazon and alternative sales channels—

12  and consumers could, therefore, buy more goods at lower prices. *Id.* ¶¶ 12, 89.

13  **C.     Amazon prohibits price competition and protects its inflated fees.**

14         In a competitive market, rival online retail marketplaces would undercut Amazon's

15  inflated marketplace fees, saving money for—and winning over—both consumers and third-

16  party merchants. *Id.* ¶¶ 12, 24, 102. But Amazon's MFN policies have blocked this type of price

17  competition. *Id.* ¶¶ 13-15, 164-165. The first of two policies, in effect from 2012 through March

18  2019, required Amazon's third-party merchants to enforce a "Price Parity Clause." *Id.* ¶¶ 16,

19  109-10. That clause expressly prohibited them from listing goods on other online retail channels

20  at prices that were lower than the price on Amazon. *Id.* ¶ 16, 110. German regulators found that

21  this MFN policy increased prices and restrained horizontal competition between Amazon and

22  third-party merchants for retail sales, and between Amazon and other online retail marketplaces

23  for marketplace services. *Id.* ¶¶ 16-17, 23-24, 103,108-12, 126-32. In late 2013, Amazon

24  withdrew the Price Parity Clause in Europe, but it continued to enforce it in the United States

25  through at least March 2019—well into the Class Period—when the U.S. Federal Trade

26  Commission began its own investigation. *Id.* ¶¶ 17-18, 109, 133-35. Although Amazon belatedly

27  withdrew that Clause domestically, it continues to enforce that MFN policy under its so-called

28  "Fair Pricing" Policy ("FPP"). *Id.* ¶¶ 19-22, 110-13. Like the Price Parity Clause, Amazon's FPP



penalizes merchants who offer lower prices on non-Amazon sales channels, including by disqualifying their goods from the "Buy Box," where over 90% of all Amazon marketplace sales are made. *Id.* ¶¶ 20-21, 111-13. This penalty alone can decimate a merchant's entire business. *Id.* Amazon also threatens to suspend or terminate merchants who try to offer lower prices elsewhere online. *Id.* ¶¶ 20-21, 110.

Amazon's MFN policies harm competition and consumers in two primary ways. *First,* they protect Amazon from price competition in the sale of its own goods. Absent its MFN policies, which prevent third-party merchants from lowering their prices on other platforms that charge lower (or no) fees, Amazon would have to lower the prices of its own goods to compete with the lower-priced, third-party-merchant goods. *Id.* ¶¶ 12, 23, 25, 89, 101, 116-117, 165. *Second,* the MFN policies protect Amazon's marketplace from having to compete on fees with other online retail marketplaces, allowing Amazon to maintain supra-competitive fees. *Id.* ¶¶ 12, 23-25, 89, 101-02, 116-117, 164. Without Amazon's MFN policies, third-party merchants would profitably steer consumers to alternative, lower-fee sales channels—for instance, the merchant's own website or other online retail marketplaces with lower fees—by setting lower retail prices there. *Id.* ¶¶ 24-25, 102. Competition from those sales channels would then force Amazon to lower its own marketplace fees, leading to lower retail prices on its marketplace, too.

But by eliminating price competition among online retail goods across sales channels, Amazon has profitably charged supra-competitive fees on its dominant marketplace and has sold both its own goods and those listed by third-party merchants at supra-competitive prices. Consumers foot the bill. *Id.* ¶¶ 24-25, 102-08, 151, 164.

## III.   STANDARD OF REVIEW

On a motion to dismiss, the Court must accept all of Plaintiffs' factual allegations as true, view them in the light most favorable to Plaintiffs, and draw all reasonable inferences in Plaintiffs' favor. *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096 (9th Cir. 2019). Plaintiffs need allege only "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

1  defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A

2  "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof . . . is

3  improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556. "If

4  there are two alternative explanations [of facts alleged], one advanced by defendant and the other

5  advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to

6  dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

## IV.  ARGUMENT

### A.  Amazon's proffered justifications for its MFN policies cannot undermine the CAC's well-pleaded allegations.

8  Amazon begins its motion by asserting, in direct contradiction to the CAC, that its MFN

10  policies promote lower prices and competition. Dkt. 35 ("MTD") 8-11. To begin with, even if

11  accepted as true, Amazon's proffered justifications are no defense to the *per se* illegal price-

12  fixing agreement Plaintiffs allege. *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 351

13  (1982).[1] What's more, Amazon's attempted justifications cannot be deemed true in this motion,

14  because they "are intrinsically factual, contrary to plaintiffs' pleading and inappropriate for

15  resolution at the motion to dismiss stage." *In re NCAA Student-Athlete Name & Likeness

16  Licensing Litig.*, 990 F. Supp. 2d 996, 1005 (N.D. Cal. 2013) (quotation omitted).

17  *First*, Amazon's contention that its MFN policies lead to *lower* consumer prices (MTD 8,

18  10-11) directly contradicts the CAC, which alleges that Amazon's MFN policies cause *higher*

19  prices for consumers. CAC ¶¶ 100-118, 151. Consumers pay *more* for online retail goods

20  because Amazon charges excessive fees to consumers and to third-party merchants, while

21  prohibiting third-party merchants from offering their goods for sale at lower prices elsewhere

22  online. *Id.* ¶¶ 8-11, 23, 25, 89, 101, 105-108. Without Amazon's MFN policies, "third-party

23  merchants would set lower prices on marketplaces with lower fees," forcing Amazon to lower its

24  own fees and the retail prices for goods sold on its platform. *Id.* ¶¶ 102, 117.

25  Amazon's allegation that it adopted its FPP to "prevent[] price-gouging," MTD 1, 10-11,

---

[1] *See also United States v. Joyce*, 895 F.3d 673, 676 (9th Cir. 2018) ("Under the per se rule, arguments and evidence relating to, *inter alia*, the procompetitive nature of the conduct at issue are excludable.").



also contradicts the CAC, which alleges that Amazon interprets and enforces its FPP the same as its Price Parity Clause. *Id.* ¶¶ 20-21, 110-114. The U.S. House Subcommittee on antitrust confirmed that the FPP penalizes "sellers that offer products at a lower price on competing sites." *Id.* ¶ 21 (quoting House Report at 296). Even if this Court *could* consider Amazon's attempted justification, it is not plausible. Amazon's use of the FPP to extract supra-competitive fees, and to protect those fees by preventing merchants from offering their goods elsewhere online at lower prices, is not for prevention of "price gouging." CAC ¶¶ 20-22, 107-15. Indeed, in related litigation, Amazon did not characterize this policy as countering price gouging but instead as a policy that "embodies Amazon's decision to give 'Featured Offer' status only to competitively priced products."[2] And the language of Amazon's Fair Pricing Policy betrays its true purpose as an MFN: Amazon punishes third-party sellers that "Set[] a price on a product or service that is significantly higher than recent prices offered on or off Amazon," MTD 6, which, as the House Subcommittee on antitrust found, means that third-party merchants continue to have to raise prices everywhere else to match Amazon's high fees and prices. Similarly, whether MFNs adopted by Walmart or Target violate the antitrust laws (MTD 9 & nn. 4-5) has no relevance to the legality of Amazon's own policies and cannot be considered on a motion to dismiss. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (It "is not the purpose of judicial notice" to allow defendants "to present their own version of the facts at the pleading stage.").[3]

     *Second*, Amazon wrongly asserts that "no court has ever condemned" MFN policies like Amazon's. MTD 8. As the Second Circuit observed in *United States v. Apple*, the Court would be "breaking no new ground in concluding that MFNs . . . can be 'misused to anticompetitive ends in some cases.'" 791 F.3d 290, 320 (2d Cir. 2015). Among other things, MFNs "can 'facilitate anticompetitive horizontal coordination' by 'reduc[ing] [a company's] incentive to deviate from a coordinated horizontal arrangement.'" *Id.* That is precisely what they do here—

---

[2] Amazon.com, Inc.'s Mot. to Dismiss First Am. Compl. at 13, *Frame-Wilson v. Amazon.com Inc.*, No. 2:20-cv-424-RAJ (W.D. Wash. Sept. 2, 2020), ECF No. 18.

[3] *See also Rollins v. Dignity Health*, 338 F. Supp. 3d 1025, 1032 (N.D. Cal. 2018) (rejecting "the notion that a document is judicially noticeable simply because it appears on a publicly available website").



1    enable Amazon to facilitate horizontal price coordination between Amazon and competing

2    online retailers by restraining other retailers from competing vigorously with Amazon.[4]

3          Leading economic research has shown that *platform* MFNs (like Amazon's)—which are

4    distinct from other types of MFNs—can harm competition by blocking firms with lower-price

5    models from gaining traction in the market.[5] Courts, too, have found platform MFN-type

6    provisions to be anticompetitive. *See Lorain J. Co. v. United States*, 342 U.S. 143, 152 (1951)

7    (affirming injunction against must-have newspaper, preventing it from blocking advertisers' use

8    of other advertising mediums); *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 63 (2d

9    Cir. 2019) (ordering new trial because evidence before jury was sufficient to find platform MFNs

10   to be anticompetitive); *Osborn v. Visa Inc.*, 797 F.3d 1057, 1069 (D.C. Cir. 2015) (declining to

11   dismiss antitrust claims, where dominant ATM networks allegedly blocked price competition

12   through platform MFN-type rules preventing ATM operators from offering lower prices to

13   consumers using rival networks).

14         Amazon cites (MTD 8 & n.3, 10) inapposite decisions from the 1980s arising in the

15   health insurance context.[6] *None* held all MFNs to be procompetitive as a matter of law at the

16   motion to dismiss stage. Amazon relies (MTD 8 & n.3) on *Kartell v. Blue Shield of*

17   *Massachusetts, Inc.*, 749 F.2d 922 (1st Cir. 1984), but *Kartell* "did not involve a MFN clause,"

18   *Nat'l Recycling, Inc. v. Waste Mgt. of Massachusetts, Inc.*, 2007 WL 9797531, at *3 (D. Mass.

19   July 2, 2007). In *Kartell*, the insurer set the total price for a provider's services and prevented

20

21   ───────────
     [4] *See also* Areeda and Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*,
     ¶ 1807b1 (4th ed. 2021) ("Areeda & Hovenkamp") (discussing potential anticompetitive concerns with MFNs);
22   *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 323, 326 (2d Cir. 2010) (denying motion to dismiss where
     consumers pled plausible *per se* price fixing claim against music producers who used MFNs to enforce industry-
23   wide minimum wholesale prices for songs); *United States v. Blue Cross Blue Shield of Michigan*, 809 F. Supp. 2d
     665, 674 (E.D. Mich. 2011) (rejecting argument on motion to dismiss that MFNs are procompetitive where
     complaint alleged MFN will result in price increase).

24   [5] *See, e.g.*, CAC ¶¶ 14, 103; Andre Boik & Kenneth S. Corts, *The Effects of Platform Most-Favored-Nation Clauses
     on Competition and Entry*, 59 J.L. & Econ. 105, 113–29 (Feb. 2016); Jonathan B. Baker, Fiona Scott Morton,
25   *Antitrust Enforcement Against Platform MFNs*, 127 Yale L.J. 2176, 2176 (2018) (explaining Platform MFNs can
     "harm competition by keeping prices high and discouraging the entry of new platform rivals").

26   [6] *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode Island*, 883 F.2d 1101, 1110 (1st
     Cir. 1989) (affirming a post-trial judgment in favor of the defendant Blue Cross, related to its policy that it would
27   not *pay a physician more for services* than its competitors paid, where the trial evidence showed the policy lowered
     prices); *Kitsap Physicians Serv. v. Washington Dental Serv.*, 671 F. Supp. 1267, 1269 (W.D. Wash. 1987) (denying
     a preliminary injunction where a dental care services provider had a nondiscrimination clause in its contract stating
28   it would not *pay more for services* than its competitors did, where evidence reflected that the policy caused the
     defendant to *lower* its payments).

providers from "balance billing" patients for additional fees. There, in reviewing a post-trial judgment, the court reasoned that the insurer was the buyer of the doctors' services, and the court was unwilling to "interfere with a buyer's (nonpredatory) determination of price." *Kartell*, 749 F.2d at 929. That is nothing like Amazon's MFN policies that block merchants from offering their competing goods for sale at *lower* prices elsewhere. Notably, Judge Breyer explained in *Kartell* that an "unlawful restraint" *would* exist if the insurer were "intervening" to "prevent[] willing buyers and sellers from independently coming together to strike price/quality bargains." *Id.* at 924. That is precisely how Amazon's MFN policies operate here.[7]

As observed in *United States v. Delta Dental of Rhode Island*, the holding in *Kartell* and related cases cited by *Amazon* flow from the premise that each of the insurers there was "acting as a purchaser when it purchased, on behalf of its enrollees, services from doctors at the lowest possible prices," 943 F. Supp. 172, 177 (D.R.I. 1996). As buyers, the insurers' incentives were to lower prices for themselves and for patients. Here, by contrast, Amazon is not a buyer but rather (a) a retail competitor of third-party merchants, and (b) a platform provider for their goods. In both capacities, Amazon benefits from blocking price competition and hiking up prices by charging supra-competitive fees: (a) As a retail competitor, higher prices for third-party-merchant goods keep Amazon from having to compete on the price of its goods, and (b) as a platform provider, higher prices allow it to collect higher commissions. CAC, ¶¶ 12, 23-25, 89, 101-02, 116-117, 164-65. Ample economic theory, *id.* ¶ 14 & n.16, ¶ 103 & n.130, case law, *see supra* pgs. 6-8, and consumer behavior, *see* CAC ¶¶ 21, 24-25, 102-08, 111-12, 151, 164, plausibly support the notion that the *platform* MFN policies at issue here are anticompetitive because they raise consumer prices and restrain competition.[8] Discovery will prove it.

---

[7] Amazon also quotes P. Areeda, Antitrust Analysis 530-31 (1981) for the proposition that "[i]t is difficult to see what could make [such an] arrangement anticompetitive.'" MTD 8 n.3. But the cited pages do not discuss MFNs.

[8] Amazon's citation to Areeda & Hovenkamp (MTD 10) is misguided for similar reasons. Areeda & Hovenkamp instructed against "condemn[ing] a dominant firm's insistence that *it obtain the lowest generally available price for a product*." Areeda & Hovenkamp ¶ 768a6 (emphasis added). Here, Amazon is not *purchasing a product* for which it demands a *low price*—it is demanding that its competitors maintain prices that are *at least as high* as its platform prices. Areeda & Hovenkamp recognize that such MFNs are illegal *per se. See id.* ¶ 1807b1 ("collusive MFN clauses can be illegal *per se* if naked").



*Third*, Amazon argues that courts "uphold contract provisions providing that consumers be offered competitive prices." MTD 9. But *none* of the cases Amazon cites address MFNs (and certainly not under facts similar to those alleged here); and none support Amazon's contention that antitrust claims should be dismissed whenever a defendant baldly claims in a motion to dismiss that its policies lower prices—contrary to well-pleaded allegations (and common sense). CAC ¶¶ 16-17, 23-24, 103,108-12, 126-32.[9]

## B.   Amazon's third-party merchants engage in concerted action with Amazon by expressly agreeing to its MFN policies and setting their prices accordingly.

Amazon next argues that Plaintiffs cannot establish "concerted action" under Section 1. Amazon seeks to pass off its binding agreements containing price restrictions with third-party merchants as if the conduct at issue were nothing more than Amazon's own "independent" or "unilateral" conduct (MTD 11), and it argues that courts "routinely dismiss Section 1 claims" that rest on one party's enforcement of contract terms (*id.* at 12-13). But here the third-party merchants are active participants in the price restraint, even if Amazon is the one driving it: "acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *United States v. Paramount Pictures*, 334 U.S. 131, 161 (1948). In *Delta Dental*, for example, dentists agreed to the defendant insurer's MFN policy that increased consumers' dental care costs by barring dentists from accepting lower reimbursement from rival insurers. 943 F. Supp. at 177. The court rejected the insurer's characterization of its MFN policy as a "unilateral policy" because, like the third-party merchants here, "'each participating dentist agrees explicitly to comply,'" so "'the requisite concerted action has been alleged.'" *Id.* at 175.

Even though Amazon's co-conspirators participate in Amazon's price restraints "involuntarily or under coercion," they violate the Sherman Act not only by agreeing to the restraints that Amazon imposes, but also by taking steps to enforce the agreement by actively setting prices on competing marketplaces or retail websites that are no lower than the prices at

---

[9] *See Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 90 (6th Cir. 1989) (credit card issuer negotiated term preventing merchants from charging card users more than a 5% surcharge when using credit cards to make purchases); *Finkelstein v. Aetna Health Plans of New York*, 1997 WL 419211, at *2 (S.D.N.Y. July 25, 1997) (contract allowing healthcare providers to be terminated without cause); *Westchester Radiological Assocs. P.C. v. Empire Blue Cross & Blue Shield, Inc.*, 707 F. Supp. 708, 713 (S.D.N.Y. 1989) (agreements between insurer and hospital requiring radiologists to bill through the hospital rather than to patients directly).



1  which they list goods on Amazon. *City of Vernon v. S. California Edison Co.*, 955 F.2d 1361,

2  1371 (9th Cir. 1992); CAC ¶¶ 16, 107, 109-13. As noted, German antitrust authorities concluded

3  that Amazon raised consumer prices by using its MFN policy as a horizontal price-fixing

4  agreement with its third-party merchants. CAC ¶ 17, 23. This constitutes concerted conduct.

5        Amazon's main case, *Toscano v. PGA Tour, Inc.*, was not a price-fixing case and is not to

6  the contrary. There, the plaintiff alleged that the PGA Tour and various local sponsors of golf

7  tournaments (*e.g.*, charitable organizations) conspired to restrain trade in professional golf based

8  on their acceptance of PGA Rules to determine who could participate in golf events. 70 F. Supp.

9  2d 1109, 1110-11 (E.D. Cal. 1999). The plaintiff argued that the contracts executed between the

10  Tour and the sponsors demonstrated the requisite concerted action, even though those

11  agreements "in no way suggest[ed] that the local sponsors have any influence or exert any

12  control over the rules themselves *or did anything other than to accede to the Tour's natural*

13  *desire to run its tournaments according to its rules.*" *Id.* at 1114 (emphasis added). In affirming

14  summary judgment in favor of the sponsors, the appellate court relied on the fact that the

15  sponsors played no role "in the establishment or enforcement" of the PGA's regulations and did

16  not comply with them to "restrain trade." *Toscano v. Pro. Golfers Ass'n*, 258 F.3d 978, 983-84

17  (9th Cir. 2001). Unlike in *Toscano*, here the co-conspirator third-party merchants who compete

18  with Amazon *actively implement* the very horizontal price restraints that underlie Plaintiffs' *per*

19  *se* claim by raising their prices on other online retail sites, so as not to compete with prices on

20  Amazon's marketplace. *See* CAC ¶¶ 24-25, 102, 106-07.

21        None of Amazon's cases involved agreements between competing merchants (like

22  Amazon and competing third-party merchants) not to compete on price. Amazon also relies on

23  other inapposite cases involving "intrabrand restraints," where a brand owner placed vertical

24  conditions on the sale or marketing of its *own products*.[10] MTD 12. Because vertical *intrabrand*

25  restraints (like a brand's requirement not to sell its product below a specified price) "can

26

27  _____

28  [10] "Vertical" refers to an agreement between parties that operate on different levels of distribution, like a manufacturer and a retailer, in contrast to "horizontal agreements" between competitors. *Real Estate Exch. Inc. v. Zillow Inc.*, 2021 WL 2352043, at *4 (W.D. Wash. June 9, 2021).



stimulate interbrand competition among manufacturers selling different brands of the same type of product," *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 878 (2007), courts are more cautious about inferring concerted action from a contractual partner's adherence to a brand owner's intrabrand restraint, *see, e.g., Baar v. Jaguar Land Rover N. Am., LLC*, 295 F. Supp. 3d 460, 465 (D.N.J. 2018). In such cases, courts decline to infer a concert of action between the brand owner and its contractual partners unless the plaintiff shows that the contractual partner created or enforced the intrabrand restraint. *Toscano*, 258 F.3d at 983-84.

For example, in *Baar*, the court declined to infer concerted action from dealers' compliance with a car manufacturer's non-arbitrage provision. *Baar* followed a DOJ guideline that courts should not consider vertical "intrabrand restraints as 'agreements' to conspire" because "manufacturers are permitted to *unilaterally* impose appropriate restraints without giving rise to a cognizable antitrust violation." 295 F. Supp. 3d at 465 (quotation omitted). Amazon's other authorities rest on the same inapposite principle.[11]

These cases do not control here, because Amazon's MFN policies are neither *vertical* price restraints (they do not place conditions on the resale of Amazon's own products), nor *intrabrand* price restraints (they restrain competitive pricing across all brands and unbranded goods that third-party merchants sell on Amazon's platform, even though produced and supplied by companies other than Amazon). Put simply, Amazon and each third-party merchant has entered into a horizontal price-fixing agreement that controls how third-party merchants set prices for goods that *directly compete with Amazon's goods*. The merchants participate in this

---

[11] *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1074-77 (S.D. Cal. 2012) (no group boycott inferred from Facebook's vertical agreement with application developers that required them to pre-approve their choice of advertising partners on its site because "Facebook has a right to control its own product" and exercise its "discretion as to parties with whom [it] will deal") (quotation omitted); *Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1153-55 (9th Cir. 1988) (dealer pricing complaints to manufacturer does not support concert of action because a "manufacturer is free to announce resale prices" to its distributors and to "terminate[] a price-cutter after receiving price complaints"); *Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218, 1239 and n.18 (E.D. Cal. 1999) (no group boycott inferred from suppliers' compliance with manufacturer's anti-counterfeit requirement that they not manufacture service-restricted parts for any other party); *Chase v. Northwest Airlines Corp.* 49 F. Supp. 2d 553, 560 (E.D. Mich. 1999) (travel agents' compliance with airline's restrictions on tickets sales did not support a concert of action); *Relevent Sports, LLC v. United States Soccer Fed'n, Inc.*, 2020 WL 4194962, at *6-7 (S.D.N.Y. July 20, 2020) (adherence to soccer organization's brand management rules not evidence of an anticompetitive agreement).

HB HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   conduct—albeit unwillingly—by setting prices in compliance with the agreed-upon price

2   restraint. This conduct plainly satisfies the requirement of a concert of action under Section 1.[12]

3   **C.**    **Plaintiffs plausibly allege a *per se* violation of the Sherman Act.**

4          The Court should defer until after discovery the question whether Amazon's misconduct

5   exposes it to *per se* liability, because that question is inherently factual. *In re Wholesale Grocery*

6   *Prod. Antitrust Litig.*, 752 F.3d 728, 733-34 (8th Cir. 2014).[13] But if the Court were to consider

7   this issue now, Amazon's arguments against *per se* liability would fail. MTD 13-16.

8          *First*, Amazon argues that its agreements with third-party merchants are "vertical"—and

9   thus not subject to *per se* liability—because its MFN policies do not address how each third-

10   party merchant competes with one another and with Amazon on price. MTD 14. But that is not

11   required for *per se* liability. In *United States v. Apple*, the Second Circuit confirmed Apple's *per*

12   *se* liability for participating in a horizontal conspiracy to increase eBook prices even though its

13   agreements with the co-conspirator publishers did not address how Apple would compete with

14   them. 791 F.3d at 320. And in *Palmer v. BRG of Georgia., Inc.*, the Supreme Court held that

15   competing companies' exclusive licensing agreement was a *per se* illegal price-fixing agreement

16   even though it increased only one company's price. 498 U.S. 46, 47-49 (1990). All the Supreme

17   Court requires for *per se* liability is an agreement among "competing retailers" to "reduce[]

18   competition in order to increase price." *Leegin*, 551 U.S. at 893. That is precisely what is alleged

19   here: Amazon and its third-party merchants, who compete with each other in online retail sales,

20   have agreed to restrain price competition. CAC ¶¶ 128-32. Amazon's MFN policies, which every

21   third-party merchant agrees to follow, are "and ought to be, *per se* unlawful" because they

22   increase prices by controlling the amount of price competition Amazon faces as an online retailer

23

---

24   [12] To the extent Amazon argues each agreement with its third-party merchants has too little impact on competition to rise to the level of an antitrust violation, Supreme Court precedent, which evaluates the *aggregate* impact on

25   competition, forecloses that argument. *See Standard Oil Co. v. United States*, 337 U.S. 293, 295, 314 (1949) (evaluating extent of competition foreclosed by aggregate "proportion of retail sales of petroleum" affected by the

26   defendant's exclusive dealing arrangements with 5,937 independent retail dealers); *Ohio v. Am. Express*, 138 S. Ct. 2274, 2284-87 (2018) (holding plaintiffs could have prevailed by showing cumulative effect of the defendant's

27   agreements with millions of retail merchants increased costs, reduced output, or stifled competition in relevant market).

28   [13] *See also* Areeda & Hovenkamp ¶ 1909b (a court should determine intermediate *factual* issues prior to choosing between the rule of reason or *per se* framework).



1  from fellow online retailers. *Leegin*, 551 U.S. at 893. None of the cases Amazon relies on

2  requires more. MTD 14.

3        Another of Amazon's cases in fact supports Plaintiffs. *Krehl v. Baskin-Robbins Ice*

4  *Cream Co.*, 664 F.2d 1348 (9th Cir. 1982), holds that whether to apply *per se* treatment depends

5  "not on whether the vertical or horizontal aspects of the system predominate, but rather, on the

6  actual competitive impact" of the system. *Id.* at 1356. Here Amazon's MFN policies restrain

7  competition between Amazon and competing third-party merchants at the same (horizontal)

8  level. Such an agreement between retailers to restrain retail price competition is a classic *per se*

9  unlawful restraint. It does not matter that Amazon and its co-conspirators implemented their

10  restraint through an agreement to abide by platform MFNs.[14] CAC ¶¶ 12-13.

11        *Leegin* distinguished horizontal price-fixing agreements between retailers from vertical

12  agreements between market participants that operate at different levels of distribution. It held

13  that a manufacturer's agreement with its retailer partners not to sell the *manufacturer's* product

14  below a minimum retail price should be analyzed under the rule of reason because such restraints

15  on the way that retailers compete with each other in the sale of the *same brand* can stimulate

16  *interbrand* competition between manufacturers offering competing products of the same type of

17  good. 551 U.S. at 890-91. The same rule and reasoning apply in the dual-distributor cases

18  Amazon relies on, even when the supplier also distributes its own product and thus to a certain

19  extent competes with its distributors. *Int'l Logistics Grp., Ltd. v. Chrysler Corp.*, 884 F.2d 904,

20  906 (6th Cir. 1989); *see also* MTD 15 n.8;[15] Areeda & Hovenkamp ¶ 1605. But, as noted above

21  (Section IV.B, *supra*), these intrabrand restraint cases do not help Amazon because, "unlike in

22  *Leegin*," Amazon "is not selling anything to [its third-party merchants] that is then resold to

23  [consumers]." *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 826 (S.D.N.Y. 2016). Amazon's MFN

24

25  ---
[14] *See also Apple*, 791 F.3d at 325 (court "need not consider whether the vertical agreements" between Apple and
publishers "restrained trade because all participants agreed to the horizontal restraint, which is 'and ought to be, *per
se* unlawful'"); *C-E Minerals, Inc. v. Carbo Ceramics, Inc.*, 2012 WL 13008801, at *4 (N.D. Ga. Mar. 14, 2012)

26  (enjoining enforcement of non-compete provision within supply contract because the "fact that such a horizontal
allocation agreement is contained within a vertical agreement does not save it" from *per se* analysis).

27  [15] *Citing Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, 35 F. App'x 29, 29 (2d Cir. 2002); *2238 Victory Corp. v.
Fjallraven USA Retail, LLC*, 2021 WL 76334, at *5 (S.D.N.Y. Jan. 8, 2021). Amazon's final case, *Ogden v. Little
Caesar Enters., Inc.*, stands only for the irrelevant point that no-poaching agreements are not subject to *per se*

28  treatment. 393 F. Supp. 3d 622, 632 (E.D. Mich. 2019).



1   policies restrain price competition among *all goods* and *all brands* that third-party merchants

2   sell, thereby decreasing *interbrand* competition.

3       *Second*, Amazon argues that the *per se* analysis should not apply because its MFN

4   policies are "procompetitive as a matter of law." MTD 11, 16. As discussed above (Section IV.C,

5   *supra*), that is simply inaccurate. Indeed, as Amazon acknowledges, German regulators found

6   that it used its MFN policy (the Price Parity Clause) to carry out a horizontal price-fixing

7   agreement with its third-party merchants. Amazon asks the Court to disregard this finding

8   because ostensibly Plaintiffs must prove that Amazon and its third-party merchants agreed to a

9   specific price. MTD 16. But in *Palmer* the Supreme Court rejected the argument "that *per se*

10  unlawful horizontal price fixing require[s] an explicit agreement on prices to be charged"; it

11  relied on the Court's holding in *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940),

12  "that an agreement among competitors to engage in a program of buying surplus gasoline on the

13  spot market in order to prevent prices from falling sharply was unlawful, even though there was

14  no direct agreement on the actual prices to be maintained." 498 U.S. at 48. Moreover, the House

15  Judiciary Committee on antitrust found that Amazon's current MFN policy (the FPP) continues

16  to operate anticompetitively to prevent third-party merchants from setting lower list prices on

17  other platforms. CAC ¶ 21. In any event, procompetitive justifications cannot cure a *per se* price

18  fixing violation by competing retailers. *See* Section IV.A. No case Amazon cites holds

19  otherwise.[16]

20  **D.   Plaintiffs adequately allege an Online Retail Marketplace Market and an alternative
        Online Retail Sales Market.**

21

22      As Amazon acknowledges (MTD 17), Plaintiffs' *per se* horizontal price-fixing claim can

23  be decided without an assessment of market effects. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109,

24  1120 (9th Cir. 2018). For Plaintiffs' other claims, the CAC plausibly alleges two alternative

25  _____
    [16] *Pennsylvania Ave. Funds v. Borey*, 569 F. Supp. 2d 1126, 1133-34 (W.D. Wash. 2008) (*per se* analysis not
26  applied because "no precedent mandates a *per se* analysis" to an agreement "among rival bidders in a contest for
    corporate control"); *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1134-38 (9th Cir. 2011) (applying the
    rule of reason after rejecting plaintiff's characterization of defendant's revenue sharing agreement as a market
27  allocation or profit pooling agreement); *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 2016 WL 3880989, at
    *8 (N.D. Cal. July 18, 2016) (competitive impact only considered because under *Hahn v. Oregon Physicians' Serv.*,
    868 F.2d 1022, 1030 (9th Cir. 1988), one of the characteristics of a *per se* group boycott is that "the practices are not
28  justified by plausible arguments that they enhanced overall efficiency or competition").



markets: an Online Retail Marketplace Market and an Online Retail Sales Market. CAC ¶¶ 64-139. The Online Retail Marketplace Market is made up of online platforms, like eBay and Walmart, that provide the services "that enable consumers to buy retail goods listed by multiple independent sellers." *Id.* ¶ 64. The Online Retail Sales Market includes all online retail sales. *Id.* ¶ 69. The contours of these two markets are well supported by Plaintiffs' allegations and by economic consensus.

Amazon launches several inherently factual (and thus improper) attacks against Plaintiffs' market definitions: *First*, that they improperly exclude physical stores (MTD 17-18); *second*, that the Online Retail Marketplace Market—which Amazon misrepresents as a "submarket" of Plaintiffs' alternative Online Retail Sales Market—lacks practical indicia of a distinct submarket (*id.* at 20-21); and *third*, that the Online Retail Sales Market "clusters" goods within the same market that are not interchangeable (*id.* at 18-20). These arguments are incorrect and improper because at this stage, as Amazon concedes (MTD 17), the only constraint is that Plaintiffs' markets not be "facially unsustainable," *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008). Since Plaintiffs' relevant markets are, as discussed below, eminently plausible, Amazon must save its attacks for a later stage in this litigation.

### 1. Plaintiffs plausibly allege markets that exclude physical retail sales.

Amazon argues that Plaintiffs "unnaturally gerrymandered" both market definitions by excluding physical retail sales. MTD 17-18. But the CAC plausibly alleges that physical retail sales are *not* suitable alternatives in either alleged market because the asserted online markets have distinctive characteristics: they are not limited by geography, time of day, or day of the week; they offer exponentially larger volumes and diversity of inventory compared to physical stores; and they offer consumers additional services not offered in physical stores, such as saving consumers' payment history and past purchases or using data to individualize product offerings, CAC ¶¶ 65-68 (both markets); ¶¶ 92-96 (specific to the Online Retail Sales Market).

The FTC, the House Subcommittee on antitrust, and the U.S. Commerce Department agree: "[A] relevant market may be divided by channel of sale resulting in separate markets for brick-and-mortar sales and online sales." *Id.* ¶¶ 93, 123. Just because a single product could be



sold through two different retail channels does not mean that one of those channels could not constitute a relevant market. *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1040 (D.C. Cir. 2008) (The "fact that a customer might buy a stick of gum at a supermarket or at a convenience store does not mean there is no definable groceries market."). The House Subcommittee on antitrust specifically rejected Amazon's attempt to ignore the distinction between online retail and physical retail. *Id.* ¶ 123. Even Amazon conforms its business to this economic reality: its MFN policies, while prohibiting lower pricing on other online sales channels, do *not* extend to pricing in physical stores. *Id.* ¶¶ 20, 67. Plaintiffs' allegations are more than sufficient at this stage, and the cases cited by Amazon (MTD 18) do not say otherwise.[17]

Amazon ignores these robust market definition allegations, arguing that "consumers would turn to a physical retailer just as they would look online" and criticizing Plaintiffs for purportedly "fail[ing] to connect" the differences between online platforms and physical stores "to consumers' shopping behavior." MTD 17-18. In asking this Court to resolve this factual dispute, Amazon incorrectly cites the CAC for the proposition that "to shoppers, it's all just 'shopping,'" claiming that this "commonsense notion" "allow[s] the Court to reject [Plaintiffs'] markets on this motion." MTD 18. But that quote does not appear in the CAC; it appears in an article *cited* in the CAC—and that article, in fact, explains that while it may superficially appear like it is "all just shopping," in fact there are significant *differences* between online and brick-and-mortar retailers.[18] Because "it is improper to assume the truth of an incorporated document if

---

[17] *Hicks v. PGA Tour, Inc.*, 897 F.3d at 1121 (finding that alleged markets "omit many economic substitutes" where plaintiffs alleged *no facts* to suggest products were not interchangeable); *see also Hicks v. PGA Tour, Inc.*, 165 F. Supp. 3d 898 (N.D. Cal. 2016) ("To implicate the antitrust laws, the caddies must allege facts from which one could plausibly conclude that these different methods of advertising to golf fans are not reasonably interchangeable . . . *The caddies have alleged no such* facts.") (emphasis added); *PSKS v. Leegin Creative Leather Prods. Inc.*, 615 F.3d 412, 418 (5th Cir. 2010) (market definition allegations are insufficient where, unlike the CAC here, the market is defined without "reference to the rule of reasonable interchangeability," or where it "clearly does not encompass all interchangeable substitute products *even when all factual inferences are granted in plaintiffs' favor*") (emphasis added); *In re German Auto. Mfrs. Antitrust Litig.*, 497 F. Supp. 3d 745 (N.D. Cal. 2020) (market definition allegations insufficient where, unlike in the CAC here, plaintiffs did not allege a SSNIP test). *Smith v. Ebay Corp.*, 2012 U.S. Dist. LEXIS 1211 (N.D. Cal. Jan. 5, 2012), also cited by Amazon, does not help Amazon because the court found that the proposed market definition was "sustainable on its face." *Id.* at *22.

[18] CAC ¶ 98 n. 115 (citing Anna Johansson, "6 Differences Between E-Commerce & Brick-and-Mortar Stores," RetailNext, March 26, 2018, *available at* https://retailnext.net/blog/6-differences-between-e-commerce-brick-and-mortar-stores) ("Both brick-and-mortar and e-commerce businesses are often shoved into the same classification of retail. After all, to shoppers, it's all just 'shopping.' However, while the two have their similarities, *there are a few key differences that are worthwhile to understand . . .*") (emphasis added).


1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

such assumptions only serve to dispute facts stated in a well-pleaded complaint," *Khoja*, 899 F.3d at 998, Amazon cannot ask this Court to assume the truth of such a snippet contained in an article cited in the CAC when Amazon seeks to contradict the well-pleaded allegations that online and physical sales are not interchangeable from the consumer's perspective.[19]

Further, Amazon's argument is unintelligible as to the Online Retail Marketplace Market. In that market, where online platforms compete to connect third-party merchants with consumers seeking to buy their goods, there is no counterpart in the brick-and-mortar world. To the extent Amazon's platform is analogous in any way to a digital mall, for example, Amazon's platform allows consumers to make purchases without the standard limitations imposed by physical malls, such as geography, time of day, or day of the week, and it offers a broader and more diverse inventory than a mall could—and available in a single transaction. *See* CAC ¶¶ 3, 65. And certainly there is no argument for including all physical retail sales in the alleged Online Retail Marketplace Market, because physical retailers offer no marketplace services.

### 2. Plaintiffs plausibly allege the U.S. Market for Online Retail Marketplaces.

Amazon also launches separate attacks on Plaintiffs' primary alleged market, the U.S. Online Retail Marketplace Market. *See* CAC ¶¶ 64-91; MTD 20-21.

As discussed above, online retail marketplaces—like the one Amazon provides—are a unique type of online retail platform that sell platform services to third-party merchants and consumers, connect the two sides of the marketplace, and ultimately sell the third-party merchants' goods to consumers. *See generally* CAC ¶¶ 5-12, 45-63. Online retail marketplaces drive consumer demand due to the convenience they offer and the breadth of goods available when compared to single-merchant stores. *Id.* ¶¶ 66-71. "Because these [single-merchant] stores

---

[19] Plaintiffs have specifically alleged that, from the consumers' perspective, (1) online retail platforms offer especially broad product variety, CAC ¶ 65 ("enable consumers to shop seamlessly for a wide range of goods and services from their homes, smart phones, and a variety of internet-enabled devices . . . [and] minimizes the risk that a product is out of stock because online retailers typically store larger volumes of goods"); (2) this product variety is uniquely personalized for, and recommended to, each consumer, *id.* at ¶ 66 ("the platform acquires a wealth of consumer data, allowing it to individualize its product sorting and display goods that are most relevant to the individual customer"); (3) consumers have ubiquitous access to those products, *id.* at ¶ 65 ("without limitations based on their individual geographic markets, the time of day, or the day of the week"); and (4) this access is unparalleled in terms of ease and convenience, *id.* at ¶ 66 ("avoiding the need to travel to a physical location," storing "a host of details such as payment information, delivery addresses, and past purchases" that "allow[] consumers to order or re-order items with minimal transaction costs, sometimes with a single click").


1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

do not offer the breadth and diversity of goods that can be offered by an online retail marketplace, any consumer who switched from purchasing from an online retail marketplace in response to a SSNIP would (a) be unable to obtain the same variety of merchandise and (b) face dramatically higher transaction costs as a result of having to identify, search product lists, and manage accounts and transactions at dozens if not hundreds of different online stores." *Id.* ¶ 69.

Online retail marketplaces like Amazon's also benefit from powerful network effects that distinguish them from single-seller retailers. *Id.* ¶ 77. This is especially true for Amazon—its consumer base makes it indispensable to third-party merchants, and its unparalleled variety of third-party merchants lock in its consumers, who cannot find the breadth of products that Amazon's marketplace offers anywhere else. *Id.*

Amazon dominates the Online Retail Marketplace Market with a 65%-70% share of this market. *Id.* ¶¶ 43, 64, 72-91. Contrary to Amazon's assertion, the Online Retail Marketplace Market is not a "submarket" of the Online Retail Sales Market. MTD 20-21. The Online Retail Marketplace Market is the *first* market underlying the CAC, CAC ¶¶ 64-91, and the word "submarket" is not found anywhere in the CAC. That is for good reason: It is fundamentally illogical to treat the Online Retail Marketplace Market as a "submarket" of the Online Retail Sales Market, because they sell different products to different buyers. Online retail marketplaces sell *marketplace services* to consumers and merchants alike. In contrast, online retailers sell products to consumers only, using online channels. Those channels *can*—but need not—include online marketplaces. In the latter market, retailers compete against each other for consumers only; in the former market, marketplaces compete for both consumers and merchants.

Nonetheless, even if one were to wrongly classify Plaintiffs' Online Retail Marketplace Market as a "submarket," Plaintiffs have alleged the requisite "practical indicia," MTD 21, to distinguish between the two alleged markets. The CAC alleges "industry or public recognition" of online retail marketplaces as distinct from single-merchant online stores, which are included in the Online Retail Sales Market but excluded from the Online Retail Marketplace Market. *Newcal*, 513 F.3d at 1045 (quoting *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962)); *see* CAC ¶ 69. Online retail marketplaces have "distinct customers, distinct prices," and "specialized

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   vendors" because only online retail marketplaces compete for third-party merchants. *Newcal*,

2   513 F.3d at 1045 (quoting *Brown Shoe*, 370 U.S. at 325); *see* CAC ¶¶ 5, 6, 46. Unlike single-

3   merchant stores, online retail marketplaces are two-sided platforms that connect consumers to

4   third-party merchants and through that connection offer consumers a broader variety of goods

5   than single-merchant stores can. CAC ¶¶ 69-70. Because "[o]nly other two-sided platforms can

6   compete with a two-sided platform for transactions," *Ohio v. Am. Express*, 138 S. Ct. 2274, 2287

7   (2018) ("*Amex*"), the CAC properly excludes single-merchant stores from this market. These

8   allegations satisfy Plaintiffs' burden at this stage.

9       Even if the Court considers Amazon's argument, relegated to a footnote, that Plaintiffs

10  purportedly fail to allege a plausible two-sided transaction platform market under *Amex*, that

11  argument is in error. First, Amazon and its rivals in the Online Retail Marketplace Market clearly

12  do "facilitate" a "simultaneous transaction" between the consumer and the third-party seller, by

13  definition. *Amex*, 138 S. Ct. at 2286. Amazon vaguely implies that Plaintiffs must show

14  "interchangeability" and "viability of switching," MTD 22 n.9, but those terms do not appear in

15  *Amex*. Nevertheless, to the extent Amazon implies that Plaintiffs must show that both third-party

16  sellers and consumers can utilize alternative marketplace platforms, they of course can—

17  Walmart.com and eBay are two examples of Amazon's marketplace competitors in the Online

18  Retail Marketplace Market, and both are used by merchants and consumers. CAC ¶¶ 4-6.

19  Moreover, unlike the plaintiffs in *Amex*, Plaintiffs here do expressly allege how both sides of the

20  Online Retail Marketplace Market (i.e., third-party merchants and consumers) are harmed by

21  Amazon's MFN policies. *See, e.g.*, *id.* ¶¶ 27-28. The CAC also alleges that entities in the Online

22  Retail Marketplace Market benefit from network effects, with consumers benefiting from greater

23  third-party merchant participation on a marketplace platform and *vice versa*. *E.g.*, *id.* ¶¶ 77-83.

24      **3.    Plaintiffs plausibly allege the U.S. Market for Online Retail Sales.**

25      Amazon also attacks Plaintiffs' alternative relevant market, arguing that the Online Retail

26  Sales Market is implausible because Plaintiffs have not adequately alleged that all goods sold by

27  online retailers are themselves interchangeable. MTD 18-20. This argument misses the mark.

28

1  Courts recognize that, when a retail-based relevant market is alleged, the key question is

2  *which retailers* (not goods) are considered reasonably interchangeable with each other. *See, e.g.*,

3  *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) (assessing market definition in

4  terms of types of grocery stores, rather than the specific goods each store sold); *In re eBay Seller*

5  *Antitrust Litig.*, 545 F. Supp. 2d 1027, 1032 (N.D. Cal. 2008) (denying motion to dismiss where

6  plaintiff alleged that one relevant market was "the market for online auctions"); *PepsiCo, Inc. v.*

7  *Coca-Cola Co.*, 114 F. Supp. 2d 243, 254-55 (S.D.N.Y. 2000), *aff'd* , 315 F.3d 101 (2d Cir.

8  2002) (explaining markets can be defined by retailers' methods of sale, so that a plausible market

9  consisting of only big box office supply stores could be sustained even though the goods sold in

10  such stores were also available through other types of retailers).[20] Here Plaintiffs allege a

11  plausible market defined by online retail sales, as online retailers compete against one another

12  for customers in terms of convenience, breadth of goods, and price. The Online Retail Sales

13  Market contains *all* online retailers, *see* CAC ¶¶ 92-99, which excludes no potential substitutes.

14  Amazon attempts to undercut the Online Retail Sales Market by describing it as a "cluster

15  market," relying on *Little Rock Cardiology Clinic, P.A. v. Baptist Health*, 573 F. Supp. 2d 1125,

16  1146 (E.D. Ark. 2008), to argue that goods cannot be "clustered" unless Plaintiffs plausibly

17  plead that Amazon has market power over each of the goods in the cluster. MTD 19-20. Notably,

18  that *Little Rock* decision, and Amazon in its Motion, rely on the 2007 version of the Areeda &

19  Hovenkamp treatise. *See Little Rock*, 573 F. Supp. 2d at 1136, 1139, 1145; MTD 19. That

20  treatise, however, has since been updated to provide clarity on how clustering applies to Amazon

21  specifically, and now explains: "One feature of large digital firms such as Amazon . . . is that

22  they cluster together a variety of products or services that do not compete with each other."

23  Areeda & Hovenkamp ¶ 565c2 (4th ed. 2021). The treatise goes on to explain:

24  Cluster market analysis is one way of addressing the question
whether firms such as ***Amazon*** have market power in its array of
25  products, even though most of them individually are sold in

26  _____
[20] Amazon cites *Federal Trade Comm'n v. Staples, Inc.*, 190 F. Supp. 3d 100, 123 (D.D.C. 2016), for the
27  proposition that products within a market must be "subject to the same 'competitive conditions.'" MTD 19. But
Amazon misses that case's holding. In *Staples*, the defendants argued that *more* products should be clustered into an
28  "office supplies" cluster market, not that they should be broken apart. *Id.* at 123-24. The Court rejected that
argument on the facts. *Id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

> competitive markets and Amazon's market share in each may be
> small. A fact finding that a single product, such as "tires," is the
> relevant market leads to the conclusion that Amazon has little
> market power. But if the relevant question is Amazon's dominance
> in retailing, then we should be querying whether its **platform sales
> as a whole** enable it profitably to increase price-cost margins
> above competitive levels without losing excessive sales to rivals.

*Id.* (emphasis added). Thus the current version of Amazon's own authority correctly explains

that the whole is greater than the sum of the parts—consumers visit Amazon for the ability to

purchase a wide spectrum of goods that are simply unavailable elsewhere, combined with

convenient checkout, tracking, and fulfillment services. It is illogical to view each product sold

on Amazon in separate relevant markets—the "relevant question is Amazon's dominance in

retailing," so a fact-finding about a "single product " plays no role in the market analysis. *Id.*

This approach to market definition is consistent with *Whole Foods*, where the court *did*

*not* require the plaintiff to prove market power in each of the more than 45,000 goods the

defendant sold. 548 F.3d at 1040. It recognized that retail experience can itself be a key

differentiator, and held that the plaintiff could be successful in defining a market for premium,

natural, and organic supermarkets, based on the unique experience a set of retailers provide. *Id.*

at 1041. Amazon's remaining cases, *see* MTD 20, are inapposite or support Plaintiffs.[21]

## E. Plaintiffs, as direct purchasers from Amazon, have standing because they allege the quintessential form of antitrust injury.

In challenging standing, Amazon argues that Plaintiffs' direct-purchaser status is a

necessary but insufficient basis for standing because the causal connection between their claimed

overcharge injury and the alleged anticompetitive conduct is purportedly "too attenuated," and

there are too many intervening causes. MTD 3, 22-24. To make that argument, Amazon attempts

to insert complexity into Plaintiffs' allegations. *See* MTD 22-23. But the causation is clear:

---

[21] *PSKS*, 615 F.3d at 418, rejected a "women's accessories" market, because the plaintiff did not "plausibly allege the defendant's market power." *Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*, 433 F. App'x 598, 599 (9th Cir. 2011), rejected a proposed "pharmaceutical industry" market, because it included non-interchangeable aspects of the pharmaceutical process, from R&D to manufacturing to sales. *Universal Grading Serv. v. eBay, Inc.*, 2012 WL 70644, at *7 (N.D. Cal. Jan. 9, 2012), rejected, as "amorphous," a market defined to include "any market which significantly depends on participation within online auctions, including the markets for coin grading and the market for certified coins." Finally, *Intel Corp. v. Fortress Inv. Grp. LLC*, 511 F. Supp. 3d 1006, 1023 (N.D. Cal. 2021), *helps* Plaintiffs because it found plausible product markets as broad as "techniques to enable multiple recipients to access a voice message," "techniques for identifying devices that are eligible for remote software updates," and "MOSFET channel fabrication," but rejecting markets that effectively encompass "a general technical field."

HAGENS BERMAN

1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  Amazon's MFN policies restrain competition in ways that cause consumers to pay supra-

2  competitive prices *directly to Amazon*. CAC ¶¶ 12, 23-25, 89, 101-02, 116-17, 151, 164-65. This

3  is a "classic antitrust claim," and Plaintiffs, who directly overpaid the alleged monopolist and

4  horizontal price-fixing conspirator, are plainly "entitled to sue" for their overcharge damages

5  "under the antitrust laws." *Apple v. Pepper*, 139 S. Ct. 1514, 1519 (2019) ("*Pepper*").[22]

6        Where, as here, "the retailer's unlawful monopolistic conduct caused a consumer to pay

7  the retailer a higher-than-competitive price, the consumer is entitled to sue the retailer under the

8  antitrust laws." *Pepper*, 139 S. Ct. at 1523. Against this clear authority, Amazon attempts to

9  muddy the waters by arguing that there are "obvious intervening causes" of the high fees and

10  prices that Plaintiffs pay Amazon, but the only one Amazon identifies is that competing

11  marketplaces and third-party merchants supposedly make their own "independent pricing

12  decisions." MTD 3, 23. This argument disregards Plaintiffs' allegations and clearly established

13  law.

14        *First*, the Supreme Court's decision in *Pepper* squarely forecloses Amazon's argument

15  that Plaintiffs lack standing because third-party merchants set the prices for which their goods

16  are offered on Amazon's platform. There the Court explained that "a 'who sets the price' rule

17  would draw an arbitrary and unprincipled line among retailers based on retailers' financial

18  arrangements with their manufacturers or suppliers." 139 S.Ct. at 1522. The same reasoning

19  applies here. Ignoring *Pepper*, Amazon cites inapposite cases where plaintiffs either did not seek

20  overcharge damages[23] or sought damages on purchases they did *not* make from the alleged

21  antitrust offender.[24] MTD 23. Those cases have no bearing here, as Plaintiffs are suing in

22  connection with purchases they made directly from Amazon, the alleged antitrust wrongdoer.

23

24  ─────────────────────

[22] *See also In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1157 (9th Cir. 2019) ("[A]

25  plaintiff who is the immediate purchaser from any of the conspirators is directly injured by the violation. . . . *Illinois Brick* is simply not applicable."); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 n.4 (9th Cir.

26  1999) ("[P]urchasers are preferred antitrust plaintiffs in price-fixing cases.").

[23] *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986).

27  [24] *See Oliver v. Am. Express Co.*, 2020 WL 2079510, at *9-10 (E.D.N.Y. Apr. 30, 2020) (dismissing complaint where Visa and Mastercard cardholders sued American Express); *Gross v. New Balance Athletic Shoe, Inc.*, 955 F.

28  Supp. 242, 246-47 (S.D.N.Y. 1997) (dismissing price-fixing claims against New Balance by consumers who purchased *from non-conspiring retailers*).

1    *Second*, Amazon's argument that third-party merchants make "independent pricing

2    decisions" also defies the CAC, which alleges that Amazon uses its MFN policies to *block* third-

3    party merchants from making truly independent pricing decisions. CAC ¶¶ 100-121. Amazon's

4    supra-competitive commissions "caus[e] the consumer to pay a higher-than-competitive price"

5    on Amazon's marketplace, *Pepper*, 139 S. Ct. at 1523, and Amazon uses its MFN policies to

6    punish third-party merchants who try to charge consumers lower prices on other sites, CAC

7    ¶¶ 16, 26, 107-15. It is Amazon that inflates fees and therefore prices on its own platform, and it

8    is Amazon that insists that third-party merchants not offer consumers lower prices elsewhere

9    online.

10    *Third*, the CAC also alleges that consumers are directly harmed by supra-competitive

11    fees set by *Amazon itself*, with no intervening party whatsoever. *Id.* ¶¶ 8, 88, 89, 108, 151.

12    *Fourth*, the CAC further alleges that Plaintiffs overpay for goods on Amazon's

13    marketplace when Amazon is the listed seller (and Amazon alone dictates the price) because

14    Amazon's MFN policies enable it to artificially shield its own supra-competitive list prices from

15    online retail competition. *Id.* ¶¶ 12, 23, 25, 89, 101, 116-17, 165.

16    *Fifth*, Amazon misrepresents the CAC when it argues that consumers lack standing

17    because it charges third-party merchants supra-competitive fees and enforces its MFN policies in

18    "different market[s]." MTD 24. That Amazon's conduct towards its competitors caused both

19    Plaintiffs' overcharge injuries and its competitors' lost profits is not a basis to deny Plaintiffs'

20    standing, because "harming competitors was simply a means for [the Defendant] to charge the

21    plaintiffs higher prices." *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688

22    (2d Cir. 2009) (direct purchasers had standing to pursue overcharges caused by defendants'

23    inequitable conduct before the Patent and Trade Office and sham infringement litigation against

24    potential competitors) (relying on *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982)).

25    Denying direct purchaser plaintiffs "a remedy" for overcharges "in favor of a suit by

26    competitors" for lost profits would also conflict with the Supreme Court's directive in *Associated*

27    *Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519

28    (1983), because it is "likely to leave a significant antitrust violation undetected or unremedied."



*DDAVP*, 585 F.3d at 689 (quoting *Associated Gen. Contractors*, 459 U.S. at 542). Because MFN agreements by their nature involve "policies applied" to non-consumers, such as "third-party sellers," MTD 24, accepting Amazon's position would mean that consumers would never have antitrust standing to pursue overcharge damages in the MFN context. This, of course, is not the law. *See, e.g.*, *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 2012 WL 5990219, at *4 (E.D. Mich. Nov. 30, 2012) (plaintiffs adequately alleged antitrust injury, where they purchased "hospital healthcare services" at "artificially inflated prices" as a result of the defendant health insurer's MFN agreements with hospitals).[25]

Amazon also relies on inapposite cases where *indirect purchasers*—end-users of a retail product—were held to lack standing to pursue claims stemming from anticompetitive conduct regarding a single input up the chain of production. MTD 24.[26] Such cases do not apply to Plaintiffs, who are *direct* purchasers *from Amazon*, in *the very markets* that Amazon monopolizes and restrains. CAC ¶¶ 8, 34-41, 59. Amazon also cites *Federal Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020), a post-trial decision where the FTC's standing was not at issue. MTD 24. Plaintiffs' claims are "straightforward," *Pepper*, 139 S. Ct. at 1520: Amazon has used its dominance and MFN policies to reduce price competition and force Plaintiffs to pay Amazon supra-competitive fees and prices, CAC ¶¶ 102-106, 151. This is precisely the type of injury the antitrust laws aim to prevent.

## V.   CONCLUSION

For the foregoing reasons, the Court should deny Amazon's motion in its entirety; however, if the motion is granted in any part, Plaintiffs hereby request leave to amend.

---

[25] *See also In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *14 (S.D.N.Y. Mar. 28, 2014) (purchasers of e-books conceded to have standing to challenge anticompetitive MFN policies between Apple's digital bookstore and book publishers).

[26] *See Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1024 (N.D. Cal. 2015) (purchasers of Android phones could not bring claims against Google for monopolization in the "market for general and handheld Internet search"); *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1301 (S.D. Cal. 2009) (cell phone purchasers could not challenge discriminatory licensing of patents to chip manufacturers, at least "three levels" up the supply chain).

HB HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   DATED: November 19, 2021                Respectfully submitted,

2                                           HAGENS BERMAN SOBOL SHAPIRO LLP

3                                           By ___*/s/ Steve W. Berman*___
                                                  Steve W. Berman (WSBA No. 12536)
4                                           */s/ Barbara A. Mahoney*_____
                                            Barbara A. Mahoney (WSBA No. 31845)
5                                           1301 Second Avenue, Suite 2000
6                                           Seattle, WA 98101
                                            Telephone: (206) 623-7292
7                                           Facsimile:  (206) 623-0594
                                            Email: steve@hbsslaw.com
8                                           Email: barbaram@hbsslaw.com

9                                           KELLER LENKNER LLC
10                                          Zina G. Bash (*pro hac vice*)
                                            111 Congress Avenue, Suite 500
11                                          Austin, TX, 78701
12                                          Telephone: (512) 690-0990
                                            Email: zina.bash@kellerlenkner.com

13
                                            Warren D. Postman (*pro hac vice*)
14                                          Albert Y. Pak (*pro hac vice*)
                                            1100 Vermont Avenue, N.W., 12th Floor
15                                          Washington DC, 20005
                                            Telephone: (202) 918-1123
16                                          E-mail: wdp@kellerlenkner.com
17                                          Email: albert.pak@kellerlenkner.com

18                                          *Interim Lead Counsel for Plaintiffs*

19                                          QUINN EMANUEL URQUHART &
20                                          SULLIVAN, LLP

21                                          By:___*/s/ Alicia Cobb*_____
                                            Alicia Cobb, WSBA # 48685
22                                          1109 First Avenue, Suite 210
                                            Seattle, WA 98101
23                                          Telephone: (206) 905-7000
                                            Email: aliciacobb@quinnemanuel.com
24

25

26

27

28



1    Steig D. Olson (*pro hac vice*)
     David D. LeRay (*pro hac vice*)
2    Nic V. Siebert (*pro hac vice*)
     51 Madison Avenue, 22nd Floor
3    New York, NY 10010
     Telephone: (212) 849-7000
4    Email: steigolson@quinnemanuel.com
5
     Adam B. Wolfson (*pro hac vice*)
6    865 South Figueroa Street, 10th Floor
     Los Angeles, CA 90017-2543
7    Telephone: (213) 443-3000
     Email: adamwolfson@quinnemanuel.com
8
9    KELLER ROHRBACK L.L.P.
10   By:    */s/ Derek W. Loeser*
     Derek W. Loeser (WSBA No. 24274)
11   1201 Third Avenue, Suite 3200
     Seattle, WA 98101-3052
12   Telephone: (206) 623-1900
     Facsimile: (206) 623-3384
13   Email: Dloeser@kellerrohrback.com
14   *Plaintiffs' Executive Committee Members*
15
     MILBERG COLEMAN BRYSON
16   PHILLIPS GROSSMAN, PLLC
17   Peggy J. Wedgworth*
     Elizabeth McKenna*
18   Robert A. Wallner*
     Blake Hunter Yagman*
19   100 Garden City Plaza, Suite 500
     Garden City, New York 11530
20   Telephone: 212-594-5300
     Email: pwedgworth@milberg.com
21   Email: emckenna@milberg.com
     Email: rwallner@milberg.com
22   Email: byagman@milberg.com
     *Pro Hac Vice Forthcoming*
23
24   *Attorneys for Megan Smith*
25
26
27
28

DeCoster Opp. to Mot. to Dismiss - 26
Case No. 2:21-cv-00693-RSM
010888-11/1706957 V1



1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1

## <u>CERTIFICATE OF SERVICE</u>

2          I hereby certify that on November 19, 2021, a true and correct copy of the foregoing was

3   filed electronically by CM/ECF, which caused notice to be sent to all counsel of record.

4

5                              */s/ Steve W. Berman*
                              Steve W. Berman

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

