The Honorable John H. Chun

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

ELIZABETH DE COSTER, et al., on behalf of
themselves and all others similarly situated,

No. 2:21-cv-00693-JHC

11

Plaintiffs,

SECOND CONSOLIDATED
AMENDED COMPLAINT

12

vs.

13

AMAZON.COM, INC., a Delaware
corporation,

**<u>DEMAND FOR JURY TRIAL</u>**

14

**[PUBLIC VERSION]**

15

Defendant.

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CONSOLIDATED COMPLAINT
Case No. 2:21-cv-00693-JHC



1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION .................................................................................................. 1

    A.    Summary of Amendments.................................................................................. 1

    B.    Amazon's Restraints of Trade and Monopolizing Conduct.................................... 2

II.     JURISDICTION ................................................................................................ 17

III.    VENUE .............................................................................................................. 17

IV.     PARTIES ........................................................................................................... 18

    A.    Plaintiffs ........................................................................................................... 18

    B.    Defendant .......................................................................................................... 18

V.      STATEMENT OF FACTS ................................................................................ 18

    A.    Amazon Is the Gatekeeper for Retail Ecommerce. ........................................... 18

        1.    Amazon's marketplace both creates` and benefits from
              strong network effects. ............................................................. 20

            a.    Amazon retains the vast majority of its customer
                 base through Prime membership, which creates high
                 switching costs. ................................................................. 21

            b.    Amazon uses Prime to pressure third-party
                 merchants to enroll in Amazon's fee-based shipping
                 service, which allows Amazon to extract an even
                 greater share of each transaction. .................................... 22

        2.    Having firmly established itself as the gateway to online
              sales, Amazon today extracts supra-competitive fees and
              prices from sales on its marketplace. ......................................... 23

    B.    Amazon Has Monopoly Power in the Market for U.S. Online Retail
        Marketplaces and the Broader Market for U.S. Online Retail Sales. .................. 25

        1.    The Online Retail Marketplace Market does not include
              brick and mortar retailers or single-merchant online sites. ....................... 25

        2.    Amazon dominates the Online Retail Marketplace Market. ...................... 27

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

3.    Amazon's control over the Online Retail Marketplace Market has given it market power in the broader Online Retail Sales Market, which is a distinct market from brick-and-mortal retail sites. ................................................................. 32

C.    Amazon Harms Competition by Imposing Most Favored Nation Requirements on Third-Party Merchants. ........................................ 38

D.    Government Authorities Have Repeatedly Concluded That Amazon Has Harmed Competition Through the Use of Most Favored Nation Pricing Policies. ................................................................................. 46

VI.        INTERSTATE TRADE AND COMMERCE ....................................... 50

VII.      CLASS ACTION ALLEGATIONS .................................................... 50

VIII.    ANTITRUST INJURY AND STANDING ........................................ 53

IX.        CAUSES OF ACTION ....................................................................... 53

FIRST CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 1) ........................................................................................ 53

SECOND CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION (15 U.S.C. § 2) ......................................................... 56

THIRD CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2) .................................... 57

X.         JURY TRIAL DEMANDED ............................................................... 58

XI.       PRAYER FOR RELIEF ...................................................................... 58

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Plaintiffs allege the following on personal knowledge with respect to themselves and their acts, and on information and belief with respect to all other matters based on the investigation made by their attorneys.

# I.    INTRODUCTION

## A.    Summary of Amendments

1.    The Court denied Amazon.com, Inc.'s ("Amazon") motion to dismiss Plaintiffs' monopoly claims asserted under Section 2 of the Sherman Act and Plaintiffs' rule-of-reason claim under Section 1 of the Sherman Act, but it granted Amazon's motion to dismiss Plaintiffs' horizontal price-fixing claim. In their Second Amended Consolidated Complaint ("SACC"), Plaintiffs do not seek to revive their dismissed claim. Instead, they seek to narrow their class definition (Sec. VII) and add factual allegations concerning agreements that Amazon used to continue to restrain competition with other online retail marketplaces, and to prevent sellers from selling at lower prices outside of Amazon Marketplace even after Amazon removed its express Price Parity Clause in March 2019. (Sec. I.B and V.C.)

2.    Amazon's former Price Parity Clause is a platform most favored nations clause (MFN). It expressly prohibited sellers from selling at lower prices through any other ecommerce channel. Economists widely recognize that such restraints are anticompetitive and increase retail prices because they (i) prohibit sellers from selling at lower prices on platforms that charge them lower fees, and (ii) restrain competition between platforms, in that lowering platform fees is no longer an effective means for platforms to grow market share by attracting lower retail prices. As the Court previously recognized, to violate antitrust laws, Amazon's platform MFNs need not be expressly stated, they may also operate implicitly, such as when Amazon removes a seller's product from Amazon's "Buy Box," or terminates a sellers' selling privileges in response to a lower price outside of Amazon Marketplace.[1]   Each additional agreement Plaintiffs challenge, likewise operates to stifle sellers' price competition outside of Amazon Marketplace, including removing sellers' products from the Buy Box and terminating or threatening to terminate selling privileges.

---

[1] *Frame-Wilson v. Amazon.com, Inc.*, 664 F. Supp. 3d 1198, 1209 (W.D. Wash. 2023); *De Coster v. Amazon.com, Inc.*, 2023 WL 372377, at *5-6 (W.D. Wash. Jan. 24, 2023).



1    Similarly, in its own enforcement action against Amazon, the Federal Trade Commission alleges

2    that Amazon's use of the very MFN policies that Plaintiffs challenge here violates the Sherman Act

3    and the FTC Act because the policies stifle price competition outside of Amazon, tend to create an

4    artificial price floor for products sold online, and prevent rival marketplaces from growing by

5    offering lower prices.[2]

6    **B.    Amazon's Restraints of Trade and Monopolizing Conduct**

7        3.    Amazon operates the largest online retail marketplace in the United States, which

8    includes its website, applications for mobile devices, and voice-controlled devices that allow

9    consumers to make purchases from Amazon ("Amazon's marketplace").

10        4.    Amazon directly sells a wide range of consumer goods—approximately 12 million

11    goods—to customers on its marketplace.[3]

12        5.    Amazon also designed its marketplace to be a platform where other businesses

13    ("third-party merchants") can register and list their goods for Amazon to sell. In that sense,

14    Amazon's marketplace is like "an online mall where independent merchants display their products

15    to people perusing the website," according to Amazon's Vice President of Marketplace Business.[4]

16    Amazon presents its marketplace "as a single integrated platform that makes no" significant

17    "distinction between Amazon's own retail business and the Marketplace business."[5] Third-party

18    merchants "post their products on the platform," which Amazon presents to users together with its

19    own goods "according to a certain algorithm that takes the form of a ranking list."[6]

20        6.    Sales on Amazon's marketplace make up between 65% and 70% of all online

21    marketplace sales in the United States and account for over 50% of all online retail sales revenue

22

23        [2] *See Federal Trade Commission v. Amazon*, Case No. 23-cv-01495-JHC, Dkt. No. 114 (Complaint), ¶¶ 7, 17-19, 236, 262-324, and Counts I-VI.

24        [3] *How Many Products Does Amazon Actually Carry? And in What Categories?*, Business Wire (Jun. 14, 2016), https://www.businesswire.com/news/home/20160614006063/en/How-Many-Products-Does-Amazon-Actually-Carry-And-in-What-Categories.

25        [4] Declaration of Nicholas Denissen, Amazon's Vice President of Marketplace Business (June 30, 2017) ("Denissen Decl.") at ¶ 5, *Oberdorf v. Amazon.com, Inc.*, No. 16-cv-1127MWB (M.D. Pa.), Dkt. No. 31.

26

27        [5] *Amazon Removes Price Parity Obligation for Retailers on Its Marketplace Platform*, BUNDESKARTELLAMT (Federal Cartel Office of Germany), at 2 (Dec. 9, 2013) ("BKartA Decision"), http://www.bundeskartellamt.de/SharedDocs/Entscheidung/EN/Fallberichte/Kartellverbot/2013/B6-46-12.pdf%3F__blob%3DpublicationFile%26v%3D2.

28        [6] *Id.*

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

in the United States.[7] By comparison, Amazon's two closest competitors, eBay and Walmart, account for only 6.1% and 4.6%, respectively, of that revenue.[8]

7.      Many third-party merchants listing their goods on Amazon's marketplace also sell their goods on other platforms—including on their own websites and on competing online marketplaces, such as those offered by eBay and Walmart. Amazon nonetheless dwarfs all competing marketplaces in its breadth of product offerings and the number of competing third-party merchants: Amazon hosts 2.3 million active third-party merchants, about *45 times* more than the 52,000 third-party sellers that Walmart hosts on its competing marketplace.[9]

8.      Amazon therefore competes both (a) as a retailer, including against the third-party merchants that list their goods on Amazon's marketplace and (b) as a marketplace, including against other online retail marketplaces, such as eBay and Walmart, where third-party merchants can likewise list their goods.

9.      Amazon's marketplace is a "must have" for third-party merchants. Almost half of the third-party merchants who list their goods on Amazon's marketplace generate between 81% and 100% of their revenues on it, according to a 2018 survey.[10] And, on Amazon's marketplace, third-party merchants have access to 147 million of Amazon's most loyal customers: its Prime members,[11] 96% of whom are more likely to buy goods from Amazon's marketplace than any other

---

[7] SUBCOMMITTEE ON ANTITRUST, COMMERCIAL, AND ADMINISTRATIVE LAW OF THE COMMITTEE ON THE JUDICIARY, 116th CONG., INVESTIGATION OF COMPETITION IN DIGITAL MARKETS, MAJORITY STAFF REPORT AND RECOMMENDATIONS ("House Report") 255 (2020), https://democrats-judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf.

[8] Marianne Wilson, *eMarketer: Amazon to Capture 47% of All U.S. Online Sales in 2019*, CHAIN STORE AGE (Feb. 15, 2019), https://chainstoreage.com/technology/emarketer-amazon-to-capture-47-of-all-u-s-online-sales-in-2019.

[9] House Report at 249.

[10] J. Clement, *Percentage of E-commerce Revenue from Amazon Sales According to Amazon Marketplace Sellers in 2018*, STATISTA (May 4, 2019), https://www.statista.com/statistics/259782/third-party-seller-share-of-amazon-platform/.

[11] As described in more detail in this complaint, Prime members are Amazon customers who pay annual fees to obtain free shipping on many goods sold in Amazon's marketplace and other benefits.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1   online retail marketplace.[12] As one third-party merchant put it: "[W]e have nowhere else to go and

2   Amazon knows it."[13]

3       10.    Amazon uses its market power in the market for online retail marketplaces[14] to

4   impose significant fees on customers and on third-party merchants for the use of its marketplace.

5   To secure the right to list their goods on Amazon's marketplace, third-party merchants must first

6   choose one of two selling plans: a flat monthly fee of $39.99 or a per-sale fee of $0.99.[15] And when

7   an Amazon customer buys an item listed by a third-party merchant, Amazon retains a significant

8   percentage of the customer's payment as a "referral fee" for the use of Amazon's marketplace.[16]

9   After deducting that and other fees, Amazon remits the remainder to the third-party merchant.

10  Altogether, roughly 27% of every dollar an Amazon customer pays to Amazon when making

11  purchases on its marketplace goes to Amazon.[17]

12      11.    Rival marketplaces (like eBay) impose significantly lower fees on third-party

13  sellers. For example, for a book listed at $30, Amazon takes 23% in total fees, whereas eBay takes

14  16%. And for a DVD listed at $15, Amazon takes 31% in total fees, whereas eBay takes 21%.

15

16

17

18

19

20

21

22

---

[12] Kiri Masters, *89% of Consumers Are More Likely to Buy Products from Amazon than Other E-Commerce Sites: Study*, FORBES (Mar. 20, 2019), https://www.forbes.com/sites/kirimasters/2019/03/20/study-89-of-consumers-are-more-likely-to-buy-products-from-amazon-than-other-e-commerce-sites/#452623b04af1.

[13] Molson Hart, *How Amazon's Business Practices Harm American Consumers: Why Amazon Needs a Competitor and Why Walmart Ain't It*, MEDIUM (July 18, 2019), https://medium.com/swlh/amazon-needs-a-competitor-and-walmart-aint-it-5997977b77b2.

[14] As used throughout this Complaint, "marketplace" refers to online sites (such as those of Amazon and eBay) that allow third-party sellers to list their goods, as opposed to single-merchant websites (like Nordstrom's) that do not.

[15] *Pricing: Let's Talk Numbers*, AMAZON.COM, https://sell.amazon.com/pricing.html (last visited July 21, 2021).

[16] *Id.*

[17] Karen Weise, *Prime Power: How Amazon Squeezes the Businesses Behind Its Store*, N.Y. TIMES (Dec. 19, 2019), https://www.nytimes.com/2019/12/19/technology/amazon-sellers.html.

SECOND AMENDED CONSOLIDATED COMPLAINT - 4
Case No. 2:21-cv-00693-JHC

| Example 1: Books | | |
|---|---|---|
| Sale Price | $30.00 | |
| | 🛒 eBay | a Amazon |
| Final Value Fee | $3.40 | $4.50 |
| Closing Fee | $0.00 | $1.35 |
| Listing Fee | $0.30 | $0.99 |
| Paypal Fee | $1.17 | $0.00 |
| Total Fees | $4.87 | $6.84 |
| Total Profit | $25.13 | $23.16 |
| Profit Margin | 83.77% | 77.20% |

| Example 2: DVDs | | |
|---|---|---|
| Sale Price | $15.00 | |
| | 🛒 eBay | a Amazon |
| Final Value Fee | $2.12 | $2.25 |
| Closing Fee | $0.00 | $1.35 |
| Listing Fee | $0.30 | $0.99 |
| Paypal Fee | $0.75 | $0.00 |
| Total Fees | $3.16 | $4.59 |
| Total Profit | $11.85 | $10.41 |
| Profit Margin | 78.97% | 69.40% |

12.    Similarly, third-party merchants selling goods directly to consumers on their own websites pay no fees for those sales.

13.    To account for Amazon's inflated fees, third-party merchants must inflate the total prices at which they list goods on Amazon's marketplace. And, as a result, the consumer plaintiffs bringing this lawsuit, and the putative class they seek to represent, pay supra-competitive prices directly to Amazon that reflect Amazon's supra-competitive fees.

14.    In a competitive market, rival marketplaces would be able to compete on price against Amazon's inflated fees. And both third-party merchants and Amazon customers would

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

derive economic benefits from online platforms with lower fees. Third-party merchants would receive a higher percentage of their list prices and therefore be able to reduce their list prices, resulting in significant savings for consumers on those competing marketplaces. This competitive pressure would, in turn, compel Amazon to lower its fees, which would result in third-party merchants' listing goods at lower prices on Amazon. Finally, to continue competing as a retailer against those now-cheaper third-party goods on its marketplace, Amazon would have to lower the prices of the goods it sells as a first-party merchant on its marketplace. Customers on Amazon would therefore benefit from lower, competitive prices and fees for all goods listed on Amazon's marketplace.

15.    Amazon, however, bars this type of competition, denying Amazon customers—the class that Plaintiffs seek to represent—the benefits of lower prices and fees. It does so by imposing on third-party merchants Platform "Most Favored Nation" ("MFN") policies. Amazon's policies forbid third-party sellers from offering lower prices off of Amazon, and punish them for violations, which in turn insulates Amazon from competition from low cost, alternative platforms.

16.    Economic literature has widely recognized that MFN policies often harm competition when employed by a platform with market power.[18] And that rings true here. An investigation by the House of Representatives Judiciary Committee's Subcommittee on Antitrust, Commercial, and Administrative Law (the "House subcommittee on antitrust") found that "Amazon has a history of using MFN clauses to ensure that none of its suppliers or third-party sellers can collaborate with an existing or potential competitor to make lower-priced or innovative product offerings available to consumers."[19]

17.    Amazon has implemented its MFN policies in different ways over time. Originally, Amazon's Business Solutions Agreement (BSA) included an explicit Price Parity Clause. Until

---

[18] *See, e.g.*, Jonathan B. Baker & Fiona Scott Morton, *Antitrust Enforcement Against Platform MFNs*, 127 YALE L.J. 2177 (2018), https://digitalcommons.law.yale.edu/cgi/viewcontent.cgi?article=9302&context=ylj; OECD DIRECTORATE FIN. & ENTER. AFF'S COMPETITION COMM., SUMMARY RECORD: ANNEX TO THE SUMMARY RECORD OF THE 124TH MEETING OF THE COMPETITION COMMITTEE HELD ON 27-28 OCTOBER 2015 (2015), https://www.oecd.org/officialdocuments/publicdisplaydocumentpdf/?cote=DAF/COMP/M(2015)2/ANN2/FINAL&doclanguage=en; Benjamin Edelman & Julian Wright, *Price Restrictions in Multi-sided Platforms: Practices and Responses*, 10 COMPETITION POL'Y INT'L 86 (2014); Andre Boik & Kenneth S. Corts, *The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry*, 59 J.L. & ECON. 105, 113–29 (2016).

[19] House Report at 295.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1   March 2019, Amazon enforced this "Price Parity Clause,"[20] which expressly prohibited third-party

2   merchants from listing goods on other online retail platforms—whether marketplaces or single-

3   merchant websites—at prices lower than their Amazon list prices. This version of Amazon's MFN

4   policies, introduced in the U.S. in 2004, drew international scrutiny from antitrust regulators.[21] In

5   particular, regulators in the U.K. and Germany concurrently launched investigations into the

6   anticompetitive effects of Amazon's Price Parity Clause. The German competition authority

7   ultimately concluded that Amazon's MFN policies had anticompetitive effects stemming from

8   restraints on competition between both (1) Amazon and third-party merchants listing goods on

9   Amazon's marketplace, and (2) Amazon and other online retail marketplaces.

10          18.     Specifically, the German competition authority "found that the [Amazon]

11  Marketplace constitutes a horizontal trade cooperation between Amazon and third-party sellers that

12  has as its object and effect various restrictions of competition" and that the "horizonal price-fixing"

13  agreement "resulted in significant price increases in e-commerce."[22] It further concluded that the

14  "price parity clause is a hardcore restriction which is not indispensable for Marketplace efficiencies

15  and [in violation of German and European competition laws] does not allow consumers a fair share

16  of the resulting benefit."[23] Furthermore, the German competition authority found that Amazon's

17  Price Parity Clauses "act as barriers to market entry for new competitors and hinder the expansion

18  of existing competitors in the market" by "neutrali[zing]" the "major competitive parameter—the

19  fees for platform services," such that "more favourable fees cannot be translated into more

20  favourable prices for final customers."[24] Unsurprisingly, "[a]ccording to a poll of 2,500 online

21  retailers carried out by the [German competition authority, the Price Parity Clause] has also resulted

22  in significant price increases in e-commerce."[25] In late 2013, because of proceedings by German

---

23

24          [20] Declaration of Ella Irwin, Director of Marketplace Abuse at Amazon (July 13, 2018) ("Irwin Decl."), *Kangaroo Mfg., Inc. v. Amazon.com*, No. 17-cv-1806SPL (D. Ariz.), Dkt. No. 75, Ex. A at 14 (definition) and 18 (section S-4 Parity with Your Sales Channel).

25          [21] CAAGLit-AMZ_03853422 (Aug. 24, 2010 letter from Amazon EU SARL to UK Office of Fair Trading) at p.21.

26          [22] *Id.* at 2-3.

27          [23] *Id.* at 2 (legal citations omitted).

            [24] *Id.* at 3.

28          [25] *Id.*

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

and U.K. antitrust regulators, Amazon voluntarily "abandoned its price parity clauses on an EU-wide basis."[26] The Japan Fair Trade Commission reached virtually the same conclusions about the Price Parity Clause, which resulted in Amazon removing the parity provisions in that market in June 2017. It found that Amazon's "price parity clauses . . . negatively affect competition" by "limiting [sellers'] reduction of prices . . . via other sales channels[;] distorting competition among online shopping mall operators by . . . imposing those parity clauses to achieve the lowest price . . . of goods sold in its online shopping mall without making any competitive effort;" reducing "online shopping mall operators' incentive for innovation;" and hindering "new entrants as the reduction of fees charged by an online shopping mall operator for sellers does not result in these sellers' reduction of prices[.]"[27]

19.     Despite those international rulings and the recognition by multiple regulators of the anticompetitive nature of Amazon's Price Parity Clause, Amazon continued to enforce that clause in the United States for six more years, until March 2019. Then, under threat of an investigation by the Federal Trade Commission (FTC), Amazon finally withdrew its Price Parity Clause in the United States.

20.     Despite making this particular change, Amazon has maintained without change its overarching policy of preventing sellers from offering lower prices elsewhere. As Amazon's documents make clear, the purpose of the change was to deflect potential antitrust liability. Amazon's decision to withdraw the Price Parity Clause led to "confusion over what the removal of the policy meant to our Selling Partners."[28] Some sellers "thought that the removal of the policy meant that there was no longer any price competitiveness requirements[.]"[29] Amazon's response

---

[26] *Id.* at 3.

[27] Japan Fair Trade Commission, "Closing the Investigation on the Suspected Violation of the Antimonopoly Acts by Amazon Japan G. K.", June 1, 2017 ("Japan Fair Trade Commission Press Release"), www.jftc.go.jp/en/pressreleases/yearly-2017/June/170601.html.

[28] CAAGLit-AMZ_01847634 (Brand Program PR Stress Test (April 2019)) at p.8; *see also* CAAGLit-AMZ_00210513 (IN 3P Pricing Affordability 2019 OP1) at p.10 (discussing SC-FOD and recognizing "that regulators may view" any corrective action that Amazon might take "when Sellers price higher on Amazon than other marketplaces" as "enforcing price parity," especially in EU and JP, where Amazon had already removed the Price Parity Clause).

[29] CAAGLit-AMZ_01847634 (Brand Program PR Stress Test (April 2019)) at p.8.

**HAGENS BERMAN**

was swift: "We worked with reporters on background to make clear that our expectations and policies have not changed, but did not go on record as we had competing strategic interests."[30]

21.     Those "competing strategic interests" were blunting the threat of regulatory action by the U.S. government, while simultaneously ensuring that Amazon's anticompetitive strategy continued. Even as Amazon "propose[d] to tighten [its] pricing rules" in order throttle competition from non-Amazon retailers, it recognized that both the "media and selling partners may claim that the removal of the clause was not only trivial but a trick and an attempt to garner goodwill with policymakers amid increasing competition concerns."[31]

22.     Neither backlash from the media nor third-party sellers deterred Amazon's plan. Instead of abandoning its price parity restrictions, Amazon quietly improved its Buy Box eligibility algorithm to further tighten pricing restrictions. "As planned, these action[s] will require [sellers] to match external prices in order to have their offers available through the Amazon store."[32] Although Amazon continued to communicate that it would require parity to sellers, it hid the method it planned to use to achieve that goal: "we do <u>not</u> recommend proactively communicating the tightening of our pricing rules."[33] That method was the "Select Competitor – Featured Offer Disqualification," or "SC-FOD" algorithm, which Amazon introduced in mid-2015 and which Amazon expanded as a tool for securing third-party sellers' price parity after it repealed the Price Parity Clause.

23.     Amazon uses an algorithm to disqualify a seller's offer from winning the "Buy Box" if Amazon detects a price that is lower—even by a penny—for that product on any online store that Amazon designates as a "Select Competitor."[34] The "Buy Box" is the display from which a shopper can "Add to Cart" or "Buy Now" an Amazon-selected offer for a product. Elimination of the "Buy Box" button from the third-party merchant's listing is devastating to the merchant's business because, as Amazon internally estimated, 99% of all new units purchased were sold by the Featured

---

[30] *Id.*

[31] *Id.*

[32] *Id.* The sellers at issue in this specific document are brand sellers—and the policy under discussion was the ASB policy—but the operation of the SC-FOD was and is broader.

[33] *Id.* (emphasis in original).

[34] *See* CAAGLit-AMZ_02289543.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Offer/Buy Box winners.[35] In fact, most buyers searching for a product on Amazon's marketplace will see a third-party merchant's product only if it has the Buy Box. By forcing third-party merchants that violate its MFN policies to try to sell their goods without the Buy Box, Amazon puts them at a significant competitive disadvantage.[36]

24.    Achieving price parity through the elimination of lower prices outside of Amazon Marketplace is the overarching goal of the SC-FOD, and Amazon punishes sellers if it finds lower prices off Amazon.[37]  As explained by Amazon: "Let's say I'm shopping for a three-pack of Clorox wipes, . . . And let's say the price available outside Amazon for this item is $9.00. If I search for the same wipes on Amazon, and they are priced at $10.00, we consider that price to be un-competitive. For the product to be competitively priced, it would have needed to be priced at $9.00 or below on Amazon. In fact, we consider a price to be un-competitive even if it is one cent above the price available outside Amazon!"[38] Once Amazon deems an offer "un-competitive," it punishes the seller by taking away Buy Box access.[39]

25.    When Amazon disqualifies a seller's offer from the Buy Box, it tells the seller that Amazon detected a lower price elsewhere and what that price is.[40] Amazon does not, however, tell the seller where it found the lower price. Amazon internally acknowledges, "we are deliberately providing limited information about how we generate competitor prices."[41] By keeping sellers in the dark about the source of the lower price, Amazon maintains a perpetual threat that—if the seller reduces their prices *anywhere* off of Amazon—Amazon will punish them.

26.    Amazon has continued to modify and expand its SC-FOD algorithm over time. Among other things, Amazon expanded the number of online stores that it monitored after it

---

[35] *See, e.g.,* AMZN_PPC_0000000956 at p.4.

[36] Spencer Soper, *Amazon Squeezes Sellers That Offer Better Prices on Walmart*, BLOOMBERG (Aug. 5, 2019) https://www.bloomberg.com/news/articles/2019-08-05/amazon-is-squeezing-sellers-that-offer-better-prices-on-walmart.

[37] *See* Andre Boik & Kenneth S. Corts, *The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry*, 59 J.L. & ECON. 105, 109 (analyzing the anticompetitive effects of product-level platform MFNs, i.e. restraints on "price-setting monopoly seller[s]" that eliminate lower-priced options for the same product on any other platform).

[38] CAAGLit-AMZ_02289543 at Slide 3 (notes).

[39] *Id.* at Slide 6 (notes).

[40] *Id*. at Slide 8.

[41] AMZN_PPC_0000003559 (Internal Press Release) at p.9.

SECOND AMENDED CONSOLIDATED COMPLAINT - 10
Case No. 2:21-cv-00693-JHC

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    eliminated the Price Parity Clause from its Business Solutions Agreement.[42] As of two years ago,

2    Amazon estimated that globally it regularly tracked nearly ▮▮▮▮ price comparison points for

3    purposes of implementing its MFN policies.[43]  This expansion increased the punitive aspects of the

4    SC-FOD algorithm, by ensuring that more products were monitored and more sellers were

5    penalized.

6        27.    Internally, Amazon acknowledges that the policy, while highly effective in

7    preventing competition outside of Amazon Marketplace, does not *actually* reduce prices on

8    Amazon: "Buy Box removal does not motivate Sellers to lower prices. And given that the lowest

9    [external competitor] SIC price is higher than [the cost of goods] COGS+ fees on ▮▮▮▮ of SIC

10   uncompetitive 3P unique ASINs, we shouldn't expect that it would[.]"[44] Put simply, Amazon's fees

11   are so high that sellers cannot reduce their prices on Amazon. Instead, they simply raise their prices

12   elsewhere.

13       28.    Therefore, just like its Price Parity Clause, Amazon's SC-FOD punishes sellers for

14   offering prices off Amazon that are lower than their prices on Amazon, even where their costs are

15   lower through other online sales channels. That, in turn, limits the ability of competing platforms

16   to offer retail prices lower than those on Amazon, hindering the growth of would-be rivals and

17   denying them the scale necessary to compete.

18       29.    But the SC-FOD is not Amazon's only current MFN policy. Although Amazon

19   removed the Price Parity Clause from the Business Service Agreement in March 2019, it retained

20   other MFN policies to further the same goals. For instance, the "Amazon's Standards for Brands"

21   ("ASB") program includes MFN policies. The ASB program, introduced in 2018, is incorporated

22   by reference in the BSA.[45] The program prevents brand owners and their seller representatives from

23   offering a lower price off of Amazon than they offer on Amazon or allowing their distributors to

24   do so.

---

25   [42] *See. e.g.*, CAAGLit-AMZ_03259346 ("In April, we reviewed and aligned on plan to improve price perception

26   by expanding SC-FOD to all [Image Competitors] [world wide] ▮▮▮▮▮▮▮▮▮▮▮▮[.]"); *see also* CAAGLit-
     AMZ_04000738 (historical list of external competitors).

27   [43] CAAGLit-AMZ_00213922 at p.2.

     [44] CAAGLit-AMZ_00213922 at p.2.

28   [45] *See, e.g.*, CAAGLit-AMZ_04282017 (BSA Version 13 (Apr 30-2018)) ("General Terms").

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

30.    For example, in June 2019, when Amazon realized that a third-party seller was ███████████████████████████ such as ██████████" and was "in violation of the Standards for Brand Selling," an Amazon Director suggested removing the seller's products not only from Buy Box eligibility but from the Offer Listings Page entirely, so "the selection for time being wouldn't be buyable" at all.  Amazon proceeded to do so and notified the seller that its offers had been suppressed due to its failure to comply with ASB. When Amazon called the seller to ask why it had not brought its prices off Amazon in-line with its on-Amazon prices, the seller assured Amazon that "the low price offered by the other Retailer" ████████████—"will be fixed by Monday."  Amazon informed the seller that its products were also offered for a lower price on ██████  In response, the seller assured him that "they would discuss with their wholesale team and get the price updated on ██████ and any other Retailers as well (by Monday)."  Amazon was pleased "to see the Brand was actively engaged/interested in correcting the issue"—which the brand accomplished by causing other retailers to raise their prices for its products.[46]

31.    The penalties for violating this program are dire. Like the SC-FOD, sellers receive "price alerts" with a warning from Amazon that show the product, the price on Amazon and the price found elsewhere on the web without identifying the competing website.[47] Brand owners and their third-party seller representatives also face the further risk of losing "the opportunity to operate as a seller in the Amazon store altogether" if they do not maintain price competitiveness.[48] Amazon sets a price competitiveness and selection availability target of 95% for ██████ of well-known brands and has removed selling privileges for ██████ of brands that failed to meet these targets.[49] Sellers that sell at least ████ of the applicable brand's total sales on Amazon and generate at least ██████ in GMS, are required to meet Amazon's 95% price competitiveness requirement. While ██████ of such third-party sellers have met this criterium and continued to sell the brand products, there are also ██████ who fail to meet that standard. This loss of selling privileges is in addition to

---

[46] AMZN_PPC_0000002582 (email chain, ending Jun. 23, 2019) at pp.2-6.

[47] *Supra* Soper.

[48] AMZN_PPC_0000001386 (Standards for Brands Selling in the Amazon Store).

[49] AMZN_PPC_0000001099 (data responsive to California Attorney General Interrogatory No. 33); CAAGLit-AMZ_00043698 (Amazon Standards for Brands Program Update—3/10/2021) at p.1; CAAGLit-AMZ_02037765 (Amazon Standards for Brands Program Update-10/20/2020) at p.2.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

losing the Buy Box. Amazon has internally recognized that its brand "Sellers live in constant fear that their accounts will be suspended, or that top selling products will be removed, putting their businesses and livelihoods at risk."[50]

32.    Similarly, Amazon's current clarification of its Seller Code of Conduct reflects its MFN policy. Like the ASB program, the Seller Code of Conduct is incorporated by reference into Amazon's Business Solutions Agreement.[51] The former Price Parity Clause provided that "any 'low price' guarantee, rebate or discount, any free or discounted products or other benefit available as a result of purchasing one or more other products" must be "at least as favorable to Amazon Site users as the most favorable terms upon which a product is offered or sold via Your Sales Channels[.]"[52] Likewise, despite removing the Price Parity Clause in March 2019, Amazon's current "clarification" to sellers (first posted in 2021) is that it "consider[s] it a violation of the Amazon Seller Code of Conduct if off-Amazon rebates, discounts, and other schemes are designed to drive customers to products that are listed and sold without those incentives on Amazon."[53]

33.    Further, Amazon's Marketplace Fair Pricing Policy (introduced in November 2017 and incorporated by reference in the BSA) reflects its MFN policy. The Marketplace Fair Pricing Policy states that, if a third-party merchant engages in pricing practices with regard to "a marketplace offer that harms customer trust," Amazon may impose sanctions.[54] According to the policy, a third-party merchant commits a "pricing practice that harms customer trust" if that merchant lists goods on a competing online retail platform at prices that are significantly below its Amazon list prices.[55]

---

[50] CAAGLit-AMZ_01150094 (Empowering Brands Direct) at p.9.

[51] *See, e.g.*, CAAGLit-AMZ_04282017 (BSA Version 13 (Apr 30-2018)) ("General Terms").

[52] CAAGLit-AMZ_04282017 (BSA Version 13 (Apr 30-2018)), S-4.

[53] AMZN_PPC_0000000313 (Seller Code Conduct-Clarification of Amazon Policy on Rebates, Coupons, other Marketing Incentives 2021-11).

[54] Amazon Seller Central, *Amazon Marketplace Fair Pricing Policy*, https://sellercentral.amazon.com/gp/help/external/G5TUVJKZHUVMN77V?language=en_US&ref=efph_G5TUVJKZHUVMN77V_cont_521.

[55] *Id.* (stating that "[s]etting a price on a product or service [on Amazon] that is significantly higher than recent prices offered on *or off* Amazon" violates the "Fair Pricing" Policy. This is an MFN policy because the third-party merchant is out of compliance with Amazon's policy if it competes with Amazon's platform by setting prices on competing platforms at a price lower than the price it sets on Amazon).

34.     Amazon's MFN policies have a clear overarching goal: ensure price parity. Since the advent of the Price Parity Clause and continuing today, Amazon requires sellers to keep prices off Amazon as high or higher than prices on Amazon. It does so by making the merchant's product ineligible for a feature (the "Buy Box" button) that would make the product the most visible and easiest to purchase among similar goods; removing the third-party merchant's goods from Amazon's marketplace; suspending shipping options for the merchant's goods; and terminating or suspending the merchant's ability to have any goods sold on Amazon's marketplace.[56]

35.     Amazon uses the sanctions under its MFN policies "as a way to penalize sellers that offer products at a lower price on competing sites."[57] For example, the suspension of a third-party merchant's account has "dire consequences for the seller" and was cited by the Congressional Investigation as an "egregious example[]" of Amazon's bullying of third-party merchants.[58]

36.     The outcome is the same both under the Price Parity Clause and its current MFN policies: sellers cannot freely price their goods according to their costs unless they want to forego sales on Amazon Marketplace. Those MFN policies have two major anticompetitive effects.

37.     *First*, Amazon's MFN policies restrain competition—lower prices—outside of Amazon Marketplace by punishing sellers who sell their products or allow their products to be sold for less off of Amazon.[59] Amazon has thereby insulated itself from horizontal price competition for the goods it sells as a retailer on its marketplace, allowing it to maintain supra-competitive prices for its goods. As the German competition authority found in its investigation of Amazon's marketplace, the point of Amazon's MFN policies is to safeguard its significant market share of retail sales as a first-party merchant against competition by third-party merchants. Specifically, the German competition authority concluded that Amazon's Price Parity Clause "cannot be seen" as "an indispensable restriction" on its third-party merchants, but rather, as a restriction to protect

---

[56] *Id.*

[57] House Report at 296.

[58] *Id.* at 270.

[59] In its 2013 report on Amazon's marketplace rules in Germany, BKartA determined that Amazon's price parity clause was a "hardcore restriction" on the third-party merchants' competition "in all product categories" sold in Amazon's marketplace. A "poll of 2,500 online retailers" conducted by BKartA further demonstrated that the price parity clause caused "significant price increases in e-commerce." BKartA Decision at 3.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

"Amazon's large own-account [*i.e.*, first-party] share of sales as a competitor."[60] But for Amazon's MFN policies, third-party merchants would list their goods at lower prices on other platforms that charged lower (or no) fees,[61] and—facing price competition from third-party merchants—Amazon would also have to lower prices for its own goods to compete with the lower-priced, third-party-merchant goods.

38.    *Second*, despite Amazon's own overpriced marketplace fees, its MFN policies prevent Amazon Marketplace third-party sellers from diverting to consumers on other online retailers because Amazon compels third-party sellers to sell on Amazon at prices that meet or beat the prices available on other online retailers.

39.    *Third*, Amazon's MFN policies neutralize Amazon's competition from other online retail marketplace operators (like eBay), allowing Amazon to continue to charge supra-competitive fees for the use of its marketplace even if its platform competitors offer lower marketplace fees. That is because third-party merchants incorporate fees into their list prices. Normally, competing marketplaces therefore would have an incentive to lower fees so that third-party merchants would post lower list prices and thereby attract more customers. But Amazon's MFN policies prohibit or disincentivize lower list prices on competing marketplaces. These policies thus allow Amazon to avoid price competition from marketplaces with lower commissions, which protects Amazon's inflated fees. Competing marketplaces cannot expand to attract more business—and new marketplaces cannot enter the market to compete—by lowering fees and prices. This is consistent with the Germany authority's findings: It concluded that Amazon's Price Parity Clause had a direct anticompetitive "effect on [competing] Internet marketplace operators."[62] The "major competitive parameter—the fees for platform services—[was] neutralised by the price parity clause, since more favourable fees [could] not be translated into more favourable prices for final customers."[63] Amazon's Price Parity Clause therefore created a "barrier[] to market entry for new competitors

---

[60] *Id.*

[61] *Supra* Hart.

[62] BKartA Decision at 3.

[63] *Id.*

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

and hinder[ed] the expansion of existing competitors in the [online retail marketplace] market," preventing competing marketplaces "from establishing a greater reach."[64]

40.    Amazon's MFN policies act both as a restraint on the prices of third-party-merchant goods to protect the supra-competitive prices of Amazon's retail goods, and also as a restraint on the fees of competing marketplaces to protect the supra-competitive fees of Amazon's own marketplace. Amazon's MFN policies therefore cause Amazon customers to pay more for goods purchased on its marketplace than they would pay in a competitive market. Amazon's conduct has resulted in supra-competitive prices for all goods offered on Amazon's marketplace: those of third-party merchants and those of Amazon—prices that could not be maintained in the absence of Amazon's illegal MFN policies.

41.    Amazon's MFN policies are not mere policies on paper. Amazon's massive price-surveillance group, the Competitive Monitoring Team, constantly crawls the internet, globally providing "█████████ price comparisons" and "█████████ price comparisons."[65] This allows Amazon to regularly and aggressively enforce its MFN policies against its sellers to ensure that they are not listing their goods at lower prices on other retail sites.

42.    Though Amazon's MFN policies are burdensome, third-party merchants cannot afford to disobey them because Amazon has massive and durable market power, as discussed above. And, as the House subcommittee on antitrust found, Amazon's "market power is at its height in its dealings with third-party sellers"[66]; they feel "forced to be on Amazon" and believe that they "don't have a choice but to sell through Amazon."[67] In other words, in their view, it is a "must have" marketplace. And Amazon's customers have no incentive to flee Amazon because they typically cannot find better prices on rival marketplaces, even when those marketplaces' lower fees would suggest that their prices would be lower.

43.    As a result of the above, Amazon's MFN policies harm competition and cause consumers to pay higher prices than they would in a competitive market (1) for goods listed by

---

[64] *Id.*

[65] CAAGLit-AMZ_00213922 at p.2.

[66] House Report at 15.

[67] *Id.* at 87, 270.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

third-party merchants on Amazon's marketplace; (2) for goods listed by third-party merchants on other platforms, including marketplaces and single-merchant websites;[68] and (3) for goods listed by Amazon itself, as a retailer, on its marketplace. The loss of competition also represents the loss of quality and innovation that a competitive market fosters. Existing marketplaces cannot expand by competing on price and new marketplaces cannot enter the market to compete on price.

## II.    JURISDICTION

44.    This Court has subject matter jurisdiction over Plaintiffs' Sherman Act and Clayton Antitrust Act claims because they arise under federal law. *See* 28 U.S.C. §§ 1331, 1337; 15 U.S.C. §§ 1, 2, 15(a).

45.    This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from Amazon, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

46.    Plaintiffs are residents of Maryland, Washington, D.C., Illinois, Texas, and Tennessee. As described in this Complaint, Plaintiffs purchased consumer goods online through Amazon's marketplace and suffered financial harm because of Amazon's conduct in violation of the Sherman Act.

47.    This Court has personal jurisdiction over Amazon because Amazon has its principal headquarters in Washington, does business in Washington, and has registered with the Washington Secretary of State.

## III.    VENUE

48.    Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Amazon's principal place of business is in this judicial district, and a substantial part of the events giving rise to the claims occurred in this judicial district. There is also a venue provision, specifying this judicial district under the terms of use for all Amazon customers.[69]

---

[68] *See Frame-Wilson v. Amazon.com, Inc.*, No. 2:20-CV-00424-RAJ (W.D. Wash. filed Mar. 19, 2020).

[69]    *Conditions of Use*, AMAZON HELP & CUSTOMER SERVICE (last updated Sept. 14, 2022), https://www.amazon.com/gp/help/customer/display.html%3FnodeId%3DGLSBYFE9MGKKQXXM.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

## IV.    PARTIES

2

**A.    Plaintiffs**

3      49.    Plaintiff Elizabeth De Coster is a resident of Maryland. Ms. De Coster has purchased

4    numerous goods from Amazon's marketplace, including those listed by third-party merchants.

5      50.    Plaintiff Maya Gold is a resident of Washington, D.C. Ms. Gold has purchased

6    numerous goods from Amazon's marketplace, including those listed by third-party merchants.

7      51.    Plaintiff John Mariane is a resident of Illinois. Mr. Mariane has purchased numerous

8    goods from Amazon's marketplace, including those listed by third-party merchants.

9      52.    Plaintiff Osahon Ojeaga is a resident of Texas. Ms. Ojeaga has purchased numerous

10    goods from Amazon's marketplace, including those listed by third-party merchants.

11      53.    Plaintiff Megan Smith is a resident of Tennessee. Ms. Smith has purchased

12    numerous goods from Amazon's marketplace, including those listed by third-party.

13      54.    Kenneth David West is a resident of Illinois. Mr. West has purchased numerous

14    goods from Amazon's marketplace, including those listed by third-party merchants.

15      55.    Plaintiff Emma Zaballos is a resident of Washington, D.C. Ms. Zaballos has

16    purchased numerous goods from Amazon's marketplace, including those listed by third-party

17    merchants.

18

**B.    Defendant**

19      56.    Amazon is an online retail giant with its principal headquarters in Seattle,

20    Washington. Amazon sells its own goods directly to retail customers in its online retail marketplace.

21    Amazon also sells third-party merchants' goods on its marketplace.

22

## V.    STATEMENT OF FACTS

23

**A.    Amazon Is the Gatekeeper for Retail Ecommerce.**

24      57.    Amazon operates the largest online retail marketplace in the United States. As

25    recognized by the House subcommittee on antitrust, Amazon is the undisputed "gatekeeper for

26    ecommerce." [70] On average, more than 200 million consumers shop on Amazon's marketplace each

27

28      ─────────────────
       [70] House Report at 256.

SECOND AMENDED CONSOLIDATED COMPLAINT - 18
Case No. 2:21-cv-00693-JHC

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

month.[71] And sales on its marketplace make up between 65% and 70% of all online marketplace sales in the United States.[72]

58.    Amazon operates as a retailer on its own marketplace by selling directly to its customers. In this role, Amazon sells approximately 12 million items, encompassing a wide range of consumer goods.

59.    Amazon also designed its marketplace to be a platform where Amazon customers can buy goods listed by third-party merchants. Third-party merchants register with Amazon for Amazon to sell their goods on Amazon's marketplace, and Amazon manages those sales, largely prohibiting third-party merchants from communicating directly with Amazon's customers.[73]

60.    Amazon therefore competes both with third-party merchants that list their goods on Amazon's marketplace, and with other online retail marketplaces—such as eBay and Walmart—including for the business of third-party merchants. As noted, Amazon hosts 2.3 million active third-party merchants, about 45 times more than the 52,000 third-party sellers that Walmart hosts on its competing marketplace. This allows Amazon's marketplace to offer consumers an unparalleled range of goods and choices in a single virtual marketplace.

61.    Amazon's marketplace is integrated with an expanse of products and services that is staggering in its breadth and reinforces Amazon's position as the "gatekeeper for ecommerce."[74] Amazon's truck fleet consists of more than 10,000 trailers.[75] It also has its own freight airline, Amazon Air, which has about 50 leased aircraft and plans to expand its fleet to 70 this year.[76] Amazon has also built hundreds of package-sorting and delivery centers across the United States and has established its own network of contracted delivery providers exclusively dedicated to delivering packages for Amazon.[77]

---

[71] Jillian Hufford, *Amazon Statistics: Need To Know Numbers about Amazon [Infographic]*, NCHANNEL Blog (Feb. 20, 2020), https://www.nchannel.com/blog/amazon-statistics/.

[72] House Report at 255.

[73] *Supra* Hart; Irwin Decl., Ex. A at 6 (¶ 14).

[74] House Report at 256.

[75] *Id.* at 302.

[76] *Id.*

[77] *Id.* at 302-03.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

62.     Parcel volume handled by Amazon's delivery service now rivals the top carriers, including UPS, FedEx, and the U.S. Postal Service. In 2019, Amazon delivered 2.5 billion parcels. An analysis by Morgan Stanley concluded that Amazon will overtake UPS and FedEx in market share for parcel delivery by 2022; it has already surpassed the U.S. Postal Service.[78]

63.     Amazon has also made extensive investments in an Internet of Things ecosystem to attract more customers to its marketplace and maintain its status as the hub of ecommerce. This includes the development of Amazon's voice assistant, Alexa, and numerous devices that employ it. These devices—like many of Amazon's products and services—provide Amazon with unique data about consumer habits and allow Amazon to individualize the targeting of consumers and keep their purchases on Amazon's marketplace. Another way in which Amazon has expanded both its reach and its consumer-data trove is by acquiring Whole Foods. With Whole Foods, Amazon broadened its range of products for first-party sales on its marketplace and enabled Amazon to monitor and compile even more data on how consumers shop.[79] These investments by Amazon reinforce other aspects of Amazon's business model. Notably, Amazon's voice assistants increase the importance of the Buy Box to third-party merchants because consumers who rely on voice assistants to make purchases on Amazon do not ever see that alternatives to the Buy Box goods exist. With the increasing reliance by consumers on voice assistants, it is even more critical for third-party merchants to abide by Amazon's MFN policies to avoid losing the Buy Box and, as a result, sales.

1.     **Amazon's marketplace both creates` and benefits from strong network effects.**

64.     Amazon's marketplace both feeds and benefits from strong network effects. A network effect is the phenomenon by which increased engagement with a good or service increases the value or utility that a user derives from that good or service. Network effects may be either direct or indirect. Direct network effects arise when a product or service becomes more valuable to a group of users as additional participants use the same product or service. For example, having a

---

[78] *Id.* at 303.

[79] Lauren Hirsch, *A Year After Amazon Announced Its Acquisition of Whole Foods, Here's Where We Stand*, CNBC (June 15, 2018), https://www.cnbc.com/2018/06/15/a-year-after-amazon-announced-whole-foods-deal-heres-where-we-stand.html.

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1  telephone becomes more useful to a person the more other people also have telephones.[80] Indirect

2  network effects exist when a product or service becomes more valuable to one group of users as

3  additional users in *another* group also engage with that product or service. For example, the more

4  riders use the Uber platform, the more valuable it becomes to drivers, because they have more

5  business opportunities. The reverse is also true: the more drivers who use the Uber platform, the

6  more valuable it becomes to riders.[81]

7      65.    Amazon's marketplace generates strong *indirect* network effects. The combination

8  on Amazon's marketplace of hundreds of millions of online shoppers and 2.3 million third-party

9  merchants creates powerful indirect network effects because the value of Amazon's marketplace to

10  consumers goes up as the number of third-party merchants on the marketplace increases, and,

11  conversely, the value to third-party merchants goes up as the number of consumers on the

12  marketplace increases. Consumers can search for products across Amazon and its millions of third-

13  party merchants simultaneously, making Amazon the preferred marketplace among consumers.

14  Because far more consumers begin (and usually end) their search on Amazon's marketplace,

15  merchants who want consumers to see their product offerings generally must list their products on

16  Amazon's marketplace.

17        **a.    Amazon retains the vast majority of its customer base through Prime membership, which creates high switching costs.**

18

19      66.    To further hook in consumers, Amazon created and aggressively promotes Amazon

20  Prime ("Prime"). Amazon Prime is a paid membership that gives members "free" shipping on

21  "Prime Eligible" goods on Amazon's marketplace. A Prime membership also includes access to

22  Prime Video, Amazon's library of digital video content, and Amazon Music, its music streaming

23  service.[82]

24      67.    Amazon has operated Prime as a loss leader for years, which has resulted in a

25  staggering 147 million Prime members in the United States. These Prime members are

26

---

27  [80] Nicholas L. Johnson, *What are Network Effects?*, APPLICO, https://www.applicoinc.com/blog/network-effects/.
   [81] *Id.*

28  [82] *About Amazon Prime Insider & Prime Membership Benefits*, AMAZON.COM, https://www.amazon.com/primeinsider/about/ (last visited July 21, 2021).

overwhelmingly (96%) more likely to buy from Amazon's marketplace than any other online retail site.[83] To put the number of Prime members into perspective, more Americans have Amazon Prime accounts than go to church regularly or have a landline phone.[84] According to a survey, an estimated 20% of Prime members shopped on Amazon a few times per week, and 7% did so almost daily.[85] Another survey found that Prime members in the United States spend an average of $1,400 per year on Amazon's marketplace.[86]

68.    Many industry analysts have estimated Amazon Prime's losses over the years, finding that it is unprofitable, and that Amazon is willing to spend significant amounts of money to prop up the program.[87] In 2016, a Forrester Research analysis estimated that free shipping on Prime costs Amazon $1 billion per year.[88] In 2018, J.P. Morgan estimated the value of a Prime subscription at $784 of which Amazon recouped only $119 through customer fees.[89]

69.    Amazon offers Prime membership at a loss to entice consumers to bind themselves to its marketplace. Once consumers have paid the subscription fee and are entitled to free shipping for many goods on Amazon's marketplace, they want to feel that they are recouping their sunk costs by making further purchases on Amazon's marketplace.

**b.    Amazon uses Prime to pressure third-party merchants to enroll in Amazon's fee-based shipping service, which allows Amazon to extract an even greater share of each transaction.**

70.    Another service integrated into Amazon's marketplace—and marketed aggressively to third-party merchants—is Fulfillment by Amazon (FBA), Amazon's paid logistics service.[90]

---

[83] *Supra* Masters.

[84] Margot Whitney, *Complete Beginner's Guide to Advertising on Amazon*, WORDSTREAM (Jan. 27, 2021), https://www.wordstream.com/blog/ws/2017/09/11/amazon-advertising.

[85] *Number of Amazon Prime members in the United States as of June 2019*, Statista, https://www.statista.com/statistics/546894/number-of-amazon-prime-paying-members/.

[86] *Average Annual Amount Spent on Amazon According to U.S. Amazon Prime and non-Prime Members as of March 2019*, Statista, https://www.statista.com/statistics/304938/amazon-prime-and-non-prime-members-average-sales-spend/.

[87] Stu Woo, *Amazon 'Primes' Pump for Loyalty*, WALL ST. J. (Nov. 14, 2011), http://www.wsj.com/articles/SB10001424052970203503204577036102353359784.

[88] Nanette Byrnes, *How Amazon Loses on Prime and Still Wins*, MIT TECH. REV. (July 12, 2016), https://www.technologyreview.com/2016/07/12/158869/how-amazon-loses-on-prime-and-still-wins/.

[89] Gregory Magana, *Here's the actual dollar value of Amazon Prime*, BUSINESS INSIDER (May 22, 2018), https://www.businessinsider.com/amazon-prime-dollar-value-2018-5.

[90] House Report at 287.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Amazon's FBA program combines warehousing, packing, and shipping services and relies on Amazon's massive infrastructure. While third-party merchants are not obligated to use FBA to list their products on Amazon's marketplace, it is difficult if not impossible to become "Prime Eligible" if a merchant does not pay Amazon for FBA. As the House Report concluded, "FBA is functionally the only way" that third-party merchants can "get the Prime badge for their product listings."[91] Because most of Amazon customers are Prime members, the vast majority (75%) search only for goods that are Prime-eligible, and therefore third-party merchants are at a competitive disadvantage if their goods are not Prime-eligible.[92]

71.    Paying for FBA services also greatly increases the likelihood that the third-party merchants' goods will be selected for the coveted Amazon Buy Box, which makes goods most visible on the product-detail page and the easiest for consumers to purchase.[93] Conversely, the volume of purchases by Prime customers supports the extensive infrastructure Amazon uses to operate FBA at scale. Amazon thus "uses its dominance in each of these markets to strengthen and reinforce its position in the other."[94]

**2.    Having firmly established itself as the gateway to online sales, Amazon today extracts supra-competitive fees and prices from sales on its marketplace.**

72.    For access to this expansive marketplace, Amazon imposes significant fees on transactions made on its marketplace.

73.    When an Amazon customer buys an item listed by a third-party merchant, the customer pays Amazon directly and Amazon retains a significant percentage of the payment as the referral fee; after deducting that and other fees, Amazon remits the remainder to the third-party merchant.

74.    On the third-party merchant side, to list an item on Amazon's marketplace, third-party merchants must pay Amazon a flat monthly fee of $39.99 or a per-sale fee of $0.99. And they must pay the lesser of $5 or 20% of their list price as a fee for any refunds when a shopper returns

---

[91] *Id.*

[92] *Id.* at 287-88.

[93] Leanna Zeibak, *How to Win the Amazon Buy Box in 2021*, TINUITI (Mar. 25, 2021), https://tinuiti.com/blog/amazon/win-amazon-buy-box/.

[94] House Report at 287.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

a product.[95] Amazon also charges $1,600 per month plus 0.3% of total sales on Amazon (capped at $5,000) if a third-party merchant wants to have an account manager.[96] Amazon added this service, and the additional fee, to address the often-cited complaint from its third-party merchants that Amazon's largely faceless organization makes it impossible to navigate glitches and changing rules.[97] These cumulative fees are the highest of any online retail marketplace.

75.    As noted, most third-party merchants also pay Amazon to fulfill orders for them, and in fact face significant pressure to do so in order to become eligible for Prime shipping.[98] Amazon charges third-party merchants enrolled in FBA shipping and storage fees, which may run higher than alternative shipping and storage options.[99] Amazon also charges FBA third-party merchants $0.20 per unit to provide individual SKU stickers. If a third-party merchant opts not to purchase SKU stickers, that merchant's goods will be comingled with the inventory of other merchants without SKU stickers, and any counterfeit or flawed goods among the comingled inventory may be attributed to the third-party merchant. As a result, that third-party merchant can be sanctioned even though it did not actually provide the defective item.[100]

76.    Amazon also regularly extracts payments from third-party merchants in exchange for advertising on its marketplace. In other words, Amazon charges third-party merchants for more prominent product placement on its marketplace and relegates merchants that refuse to pay a premium to a correspondingly less prominent location. Amazon is the third-largest provider of

---

[95] *Pricing: Let's Talk Numbers*, AMAZON.COM, https://sell.amazon.com/pricing.html (last visited July 21, 2021).

[96] *Strategic Account Services*, AMAZON.COM, https://sell.amazon.com/programs/paid-services.html?ref_=asus_soa_rd& (last visited July 21, 2021).

[97] Hillary Milnes, *Amazon Is Chasing Growth and Shifting Resources to Third-Party Sellers*, Digiday (Jan. 31, 2019), https://digiday.com/marketing/amazon-chasing-growth-shifting-resources-third-party-sellers/.

[98] House Report at 287.

[99] Brian Connolly, *How to Sell & Ship Your Own Products with Amazon FBM*, JUNGLE SCOUT (Nov. 8, 2022), https://www.junglescout.com/blog/how-to-sell-on-amazon-fbm/.

[100] James Thompson, *Amazon Selling Pitfalls Even the Savviest Sellers Forget*, Big Commerce, https://www.bigcommerce.com/blog/amazon-selling-pitfalls-problems/#fulfillment-by-amazon. (last visited Jul. 27, 2021).

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1  digital advertising.[101] Investors expect its $10 billion advertising sales[102] to jump $28.4 billion over

2  the next five years.[103]

3       77.    All of these fees and costs—which are largely unavoidable if a third-party merchant

4  wants to reach the majority of Amazon's customers—add to the total price of the listed goods.

5  **B.    Amazon Has Monopoly Power in the Market for U.S. Online Retail Marketplaces and the Broader Market for U.S. Online Retail Sales.**

6  

7       78.    Amazon dominates the market for U.S. online retail marketplaces ("Online Retail

8  Marketplace Market"). As used in this complaint, the Online Retail Marketplace Market is

9  composed of online platforms that enable consumers to buy retail goods listed by multiple

10  independent sellers. As the House Report found, Amazon is the "dominant marketplace in the

11  United States for online shopping" and "has significant and durable market power in the U.S. online

12  retail market."[104]

13       **1.    The Online Retail Marketplace Market does not include brick and mortar retailers or single-merchant online sites.**

14       79.    Led primarily by Amazon, online retail platforms have become the digital

15  equivalent of shopping malls, which enable consumers to shop seamlessly for a wide range of goods

16  and services from their homes, smart phones, and a variety of internet-enabled devices. And they

17  can do so without limitations based on their individual geographic markets, the time of day, or the

18  day of the week. Online shopping also minimizes the risk that a product is out of stock because

19  online retailers typically store larger volumes of goods and stock a more diverse inventory than

20  physical stores.

21       80.    In addition to avoiding the need to travel to a physical location, online retail

22  marketplaces such as Amazon's offer other significant conveniences when compared to

23  conventional "brick and mortar" retailers. Once a consumer creates an account with an online retail

---

[101] Eugene Kim, *Amazon Quietly Removes Promotions of Its Own Products as Calls for Tech Regulation Escalate*, NBC (Apr. 3, 2019), https://www.nbcnews.com/tech/tech-news/amazon-quietly-removes-promotions-its-own-products-calls-tech-regulation-n990666?cid=public-rss_20190410.

[102] Nicole Perrin, *Amazon Advertising 2019. Growth and Performance Are Strong at the No. 3 US Digital Ad Seller*, EMARKETER (Nov. 7, 2019), https://www.emarketer.com/content/amazon-advertising-2019.

[103] Lara O'Reilly & Laura Stevens, *Amazon, With Little Fanfare, Emerges as Advertising Giant*, WALL ST. J. (Nov. 27, 2018), https://www.wsj.com/articles/amazon-with-little-fanfare-emerges-as-an-advertising-giant-1543248561.

[104] House Report at 15.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

platform, the platform stores a host of details such as payment information, delivery addresses, and past purchases. This information allows consumers to order or re-order items with minimal transaction costs, sometimes with a single click. And through a customer's repeated engagement with the platform, the platform acquires a wealth of consumer data, allowing it to individualize its product sorting and display goods that are most relevant to the individual customer.

81.     As FTC Chair Lina Khan wrote in a seminal article: "The degree to which a firm can tailor and personalize an online shopping experience is different in kind from the methods available to a brick-and-mortar store—precisely because the type of behavior that online firms can track is far more detailed and nuanced."[105] Tellingly, Amazon's MFN policies dictate what third-party merchants can do only on other *online* retail platforms, and do not apply to physical retail sites.

82.     For all of the above reasons, "brick and mortar" retail locations are not reasonably interchangeable with online retail platforms. That is, there is little cross-elasticity of demand between the use of online retail platforms and the use of brick-and-mortar venues. A hypothetical monopolist in the Online Retail Marketplace Market could profitably impose a small but significant and non-transitory increase in price ("SSNIP") in the form of an increased commission. (Such an increase—say, a 5% increase—would, for example, increase Amazon's already high average referral fee from 15% to 15.75%.) In light of the numerous distinctions described above, a SSNIP would not cause a sufficient number of third-party merchants to delist their products from the monopolist platform, would not cause a sufficient number of consumers to make their purchases elsewhere, and ultimately would not cause a sufficient number of transactions to switch to brick-and-mortar stores so as to render the SSNIP unprofitable for the hypothetical monopolist. Amazon's 147 million Prime members, who represent the majority of its customers, also have significant switching costs, making them unlikely to leave its platform in response to a SSNIP.

---

[105] Lina M. Khan, *Amazon's Antitrust Paradox*, 126 YALE L.J. 710, 764 (2017), https://www.yalelawjournal.org/pdf/e.710.Khan.805_zuvfyyeh.pdf.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

83.    Similarly, single-merchant online stores are not reasonably interchangeable with online retail marketplaces.[106] Because these stores do not offer the breadth and diversity of goods that can be offered by an online retail marketplace, any consumer who switched from purchasing from an online retail marketplace in response to a SSNIP would (a) be unable to obtain the same variety of merchandise and (b) face dramatically higher transaction costs as a result of having to identify, search product lists, and manage accounts and transactions at dozens if not hundreds of different online stores.

84.    There is accordingly little cross-elasticity of demand between the use of online retail marketplaces and the use of single-merchant online stores. A hypothetical monopolist in the Online Retail Marketplace Market could profitably impose a SSNIP in the form of an increased commission. Because single-merchant online stores are not open to multiple sellers and these sellers must continue to use online retail marketplaces to reach their customers, the third-party merchants could not (and therefore would not) switch away from the market in response to a SSNIP. And because of the significant differences to consumers between the two platforms, a SSNIP would not cause consumers to make a sufficient number of purchases away from online retail marketplaces to render the SSNIP unprofitable to the hypothetical monopolist.

85.    Market participants—including Amazon itself, retailers, and consumers—recognize a distinct market for online retail marketplaces.

**2.    Amazon dominates the Online Retail Marketplace Market.**

86.    Aided by its anticompetitive conduct, Amazon has increased its market share in the Online Retail Marketplace Market to "65% to 70% of all U.S. online marketplace sales."[107]

87.    Those increases have largely been driven by third-party merchant sales, which account for the majority of sales on Amazon's marketplace.[108]

---

[106] Competition with single-merchant online stores might be asymmetric: even if prices on those sites are constrained by prices on online retail platforms, prices on online retail platforms still may not be constrained by prices on single-merchant online sites. That is the case, for example, when prices at individual bakeries are constrained by prices at supermarkets, but the bakeries' prices do not constrain supermarket prices, because individual bakeries lack the supermarkets' scope of products.

[107] House Report at 255.

[108] Lauren Thomas & Courtney Reagan, *Watch Out, Retailers. This Is Just How Big Amazon Is Becoming*, CNBC (July 13, 2018), www.cnbc.com/2018/07/12/amazon-to-take-almost-50-percent-of-us-e-commerce-market-by-years-end.html.

88.     Amazon's market power is reinforced by several features that allow the company to exert even greater control than is indicated by its platform's already dominant share of online marketplace sales. In particular, Amazon's platform creates strong network effects and high barriers to entry, is tied with Amazon's fulfillment services, which further increase barriers to entry, and is aided by a massive data advantage.

89.     Leading economists have observed that "[d]igital platforms combine economies of scale, low marginal costs, economies of scope through data and an installed base of users, network effects, multi-sidedness, and sometimes a global reach."[109] The combination of these attributes "tend[s] to generate concentrated markets, or market structures containing few firms," and, "[w]ith the addition of inertial (or 'sticky') consumers these markets feature high entry barriers which make it difficult for new firms to enter the market to create competition."[110]

90.     Moreover, "large technology firms" like Amazon "can maintain market power in part because it is not easy for users to switch away from the incumbent's technology."[111] For example, a third-party merchant who has received hundreds of reviews and ratings on Amazon's marketplace cannot easily download and migrate this data to one of Amazon's competitors but, instead, would have to start from scratch on a new platform.[112] These switching costs are sufficiently high that the Online Retail Marketplace Market exhibits "lock-in" effects: Buyers and merchants stick with Amazon even though they may prefer one of Amazon's rivals.[113]

91.     Even more significantly, Amazon benefits from powerful network effects because Amazon's large customer base of hundreds of millions of regular customers, including over 140 million Prime users, makes Amazon's platform more valuable—and, in fact, indispensable—for most third-party merchants. Likewise, Amazon's ability to attract an unparalleled variety of third-party merchants helps lock in customers, who cannot find the breadth of options available on Amazon's marketplace on any other platform.

---

[109]  Testimony of Fiona M. Scott Morton, Ph.D., House Judiciary Committee (Mar. 7, 2019), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-ScottMortonF-20190716.pdf.

[110] *Id.*

[111] House Report at 41.

[112] *Id.* at 42.

[113] *Id.* at 41-42.

**HAGENS BERMAN**

92.    These network effects create a significant barrier to entry. A nascent online retail platform with only a small number of customers will not be able to attract a large number of third-party merchants. And a platform that hosts only a small number of third-party merchants will not be able to attract a large number of customers. Of course, this effect is even more powerful because Amazon uses its MFN policies to block other platforms from competing with it by offering lower platform fees.

93.    Amazon is willing to incur substantial losses on Prime because "many of the 64% of American households that have Prime memberships are effectively locked into Amazon for their online shopping," as they think they are recouping the sunk costs of their Prime membership when they make additional purchases on Amazon's marketplace.[114] "Prime members will continue to use Amazon and not switch to competing platforms, despite higher prices and lower-quality items on Amazon compared to other marketplaces, and despite recent increases in the price of a Prime membership."[115]

94.    As described above, Amazon has also tied its fulfillment infrastructure—which represents an extremely high fixed cost—to access to Prime customers, which "strengthen[s] and reinforce[s] its position" as the dominant online retail platform.[116]

95.    Amazon further bolsters its market power through a significant data advantage. Amazon compiles a massive set of consumer data based on its retail customers' shopping information, including minutiae such as how long a consumer considers a product.[117] Former Amazon employees have reported that the internal data Amazon compiles is much more sophisticated than the information available in the public domain or any third-party tools built for third-party merchants.[118] This massive data collection apparatus has helped Amazon evolve into a

---

[114] *Id.* at 256.

[115] *Id.* at 260.

[116] *Id.* at 287.

[117] *See Amazon.com Privacy Notice*, AMAZON.COM, https://www.amazon.com/gp/help/customer/display.html?nodeId=201909010#GUID-1B2BDAD4-7ACF-4D7A-8608-CBA6EA897FD3__SECTION_87C837F9CCD84769B4AE2BEB14AF4F01 (last visited July 21, 2021).

[118] Krystal Hu, *Revealed: How Amazon Uses Third-Party Seller Data to Build a Private Label Juggernaut*, YAHOO FINANCE (Sept. 27, 2019), https://www.yahoo.com/lifestyle/amazon-uses-thirdparty-sellers-data-to-build-private-labels-145813238.html.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

giant among online retail platforms by collecting, storing, processing, and analyzing personal information from its retail customers to determine how they are spending their money.[119]

96.     Amazon's trove of data gives the company far greater insight into consumer behavior and preferences than any other competitor. As explained by a former Amazon employee, "It's important to understand that Amazon has access to every piece of data on what products each customer has searched and purchased [or] not purchased. . . . With information about what customers have searched, Amazon is able to create customized marketing [and] targeting of products for the individual customer."[120]

97.     Amazon is careful to maximize the extent of its data advantage. Indeed, Amazon generally forbids third-party merchants from contacting customers who buy the goods they list.[121] The packaging and even the order confirmation email for the sale of third-party goods feature the Amazon brand prominently and do not reference the merchant.[122] A typical Amazon customer is unaware of the source of the product. According to the Online Merchants Guild, "Many Amazon sellers use websites such as Shopify to try and establish their own eCommerce presence, but without the ability to market to their supposed core customer base, their Amazon customers, it's pretty futile."[123] And, of course, Amazon's MFN policies do not permit third-party merchants to lower their prices on other platforms to encourage consumers to seek them out.[124]

98.     Amazon has also used data gained by monitoring the sale of third-party goods to its own advantage as a retailer. As found by the House Report, "contrary to [Amazon's] own internal policy and testimony before Congress, Amazon routinely appropriates seller data to benefit its own private-label and retail businesses."[125]

---

[119] Jennifer Wills, *7 Ways Amazon Uses Big Data to Stalk You* (AMZN), INVESTOPEDIA (Oct. 20, 2018), https://www.investopedia.com.cach3.com/articles/insights/090716/7-ways-amazon-uses-big-data-stalk-you-amzn.asp.html.

[120] House Report at 283.

[121] *Supra* Hart; Irwin Decl., Ex. A at 6 (¶ 14).

[122] House Report at 258.

[123] *Id.*

[124] *Id.* at 296.

[125] *Id.* at 277.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

99.     Extensive direct evidence confirms Amazon's monopoly power in the Online Retail Marketplace Market. In light of the volume of sales that takes place on Amazon's marketplace, third-party merchants consistently report that market realities "force[ them] to be on Amazon" and that they "don't have a choice but to sell through Amazon."[126] For example, Molson Hart, who lists toys on Amazon, reports: "Were we to be suspended from selling on Amazon.com, it would probably take 3 – 6 months before we'd be bankrupt. We are not alone. This is typical for small to medium sized businesses which sell online today. In fact, most companies like our own, would probably go bust even faster."[127]

100.     "Virtually every manufacturer and retailer of consumer goods in America faces [the] same predicament," explains Stacy Mitchell, co-director of Institute for Local Self-Reliance, in recent testimony to the House subcommittee on antitrust.[128] In order to reach a sufficient number of potential customers in the U.S., they *must* list through Amazon.

101.     Amazon has been able to exercise its market power to extract a higher percentage of every transaction on its marketplace than other platforms, while still retaining and growing its market share. Between 2015 and 2018, Amazon's revenue from third-party-sale fees grew from $16 billion to $43 billion, outpacing both the overall growth of Amazon's retail sales, and the growth of sales made by third-party merchants on the Amazon platform.[129] And yet, "[a]n internal Amazon document suggests the company can increase fees to third-party sellers without concern for them switching to another marketplace. The document notes that the amount of 'seller attrition as a result of [2018] fee increases' for its Fulfillment by Amazon program was '[n]othing significant.'"[130]

102.     "Amazon collects 27 cents of each dollar customers spend buying things its merchants sell, a 42 percent jump from five years ago, according to Instinet, a financial research

---

[126] *Id.* at 87, 270.

[127] *Supra* Hart.

[128] Testimony of Stacy F. Mitchell, Co-Director Institute for Local Self-Reliance, House Judiciary Committee (Jul. 16, 2019), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-MitchellS-20190716.pdf.

[129] *Id.*

[130] House Report at 274.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

firm. That does not include what companies pay to place ads on Amazon, a business that Wall Street considers as valuable as Nike."[131]

103.    At the same time, Amazon's hefty fees raise overall prices and suppress output below what would prevail in a competitive world, absent its MFN policies. Absent those restraints, fees for merchants would be lower, enabling them to make more sales to consumers at lower prices. Absent Amazon's MFN policies, American consumers would have purchased more goods at lower prices over the past four years.

104.    Amazon's ability to unilaterally restrict output is also evidence of its market power. For example, given the high likelihood that only the offer that wins the Buy Box will make the sale, withholding that right from an otherwise viable candidate as a sanction for violating Amazon's MFN policies can be expected to limit consumers' choices and reduce output. Furthermore, Amazon's ability to enforce its MFN policies—enforcing the Price Parity Clause until pressured by authorities to withdraw it, and continuing to enforce it through other MFN policies, as evidenced by the experiences of individual third-party merchants—and thereby to impose Amazon list prices across all online retail platforms, is itself direct evidence of Amazon's market power. A platform without market power could not credibly enforce such a restriction against the will of third-party merchants, which could simply threaten to delist from Amazon when asked to bring prices into line.

105.    Finally, Amazon's size is direct evidence of its market power.  Amazon's market capitalization is currently $1.8 trillion.  By that measure, Amazon is the world's fourth-biggest company, setting fees against small businesses and individual consumers.

**3.    Amazon's control over the Online Retail Marketplace Market has given it market power in the broader Online Retail Sales Market, which is a distinct market from brick-and-mortal retail sites.**

106.    Amazon's stranglehold over the Online Retail Marketplace Market has enabled it to also gain market power in the broader market for U.S. online retail sales ("Online Retail Sales

---

[131] *Supra* Weise.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

Market"). In fact, the House Report concluded that "Amazon has significant and durable market power in the U.S. online retail [sales] market."[132]

107.    As multiple authorities have recognized, there is widespread industry recognition that the Online Retail Sales Market is separate and distinct from the physical, brick-and-mortar retail sales market. The FTC has concluded that "a relevant market may be divided by channel of sale resulting in separate markets for brick-and-mortar sales and online sales."[133] The House Report found, based on extensive industry interviews and economic analysis, that the Online Retail Sales Market was a distinct market and that Amazon controlled over 50% of it.[134] And the U.S. Department of Commerce has acknowledged—again, based on industry research—the distinction between online retail sales and physical retail sales, tracking online retail sales as a separate category.[135]

108.    The fact that many prominent retailers routinely offer different prices in their physical locations from those offered online supports the conclusion that online sales represent a distinct market. According to the FTC/DOJ horizontal merger guidelines, differential pricing is a good indicator of the existence of a price-discrimination market. A price-discrimination market, in turn, is a relevant marker of market boundaries; it represents the market in which a hypothetical monopolist would have the ability and incentive to apply a SSNIP to the good because it knows that only an insignificant number of customers will switch to another seller. Because retailers typically price goods sold in-store at a higher price than online, the market already demonstrates that in-store retail prices are not constrained by online retail prices, and this indicates online retail prices are also not constrained by in-store retail prices.

---

[132] House Report at 15.

[133] *Id.* at 255 (quoting Complaint at 4, *In the Matter of Edgewell Personal Care Co. & Harry's Inc.*, No. 9390 (FTC Feb. 2, 2020)).

[134] *Id.*

[135] *See, e.g.*, U.S. DEP'T OF COM., ECON. & STAT. ADMIN., NEW INSIGHTS ON RETAIL E-COMMERCE (2017), https://www.commerce.gov/sites/default/files/migrated/reports/new-insights-retail-e-commerce.pdf (collecting data on ecommerce sales since 1998).

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

109.    Economists agree that the "[i]nternet represents a fundamentally different environment for retailing from traditional retailing."[136] An online channel has distinct characteristics from a physical channel.[137] Yale economist Fiona Scott Morton notes that "[d]igital platforms combine economies of scale, low marginal costs, economies of scope through data and an installed base of users, network effects, multi-sidedness, and sometimes a global reach."[138] The combination of these attributes "tend to generate concentrated markets, or market structures containing few firms," and, "with the addition of inertial (or 'sticky') consumers these markets feature high entry barriers which make it difficult for new firms to enter the market to create competition."[139]

110.    Furthermore, U.S. retailers also agree that the Online Retail Sales Market is separate from the physical, brick-and-mortar retail sales market. Only 28% of small businesses sell online.[140] Established large brick-and-mortar retailers, *e.g.*, Walmart, Target, and Costco, have online presences, but focus their efforts overwhelmingly on their physical stores. For example, in 2017, ecommerce accounted for only 5.5% of revenue for Target,[141] 4% for Costco,[142] and 3% for Walmart.[143] Online retailers commonly advertise only online, whereas store retailers advertise both on and offline.[144] Unlike brick-and-mortar stores, online retailers do not have a way to take payment

---

[136] Forsythe, S.M., & Shi, B., *Consumer Patronage and Risk Perceptions in Internet Shopping*, 56 J. BUS. RSCH. 867, 874 (2003).

[137] Katawetawaraks, C. & Wang, C. H., *Online Shopper Behavior: Influences of Online Shopping Decision*, 1 ASIAN J. BUS. RSCH. 66 (2011).

[138] *Supra* Morton.

[139] *Id.*

[140] Jia Wertz, *How Brick-And-Mortar Stores Can Compete with E-Commerce Giants*, FORBES (May 17, 2018), https://www.forbes.com/sites/jiawertz/2018/05/17/how-brick-and-mortar-stores-can-compete-with-e-commerce-giants/#4be14a943cc0.

[141] Nat Levy, *Target's Digital Sales Grew 10X Faster than In-Store Sales in 2018, as Retailer Adjusts to Battle Amazon*, GEEKWIRE (Mar. 5, 2019), https://www.geekwire.com/2019/targets-digital-sales-grew-10x-faster-than-store-sales-2018-retailer-adjusts-battle-amazon/.

[142] Tracy Maple, *E-commerce Accounts for 4% of Costco's Sales and Is Growing 12%*, DIGITAL COM. 360 (Mar. 6, 2017), https://www.digitalcommerce360.com/2017/03/06/e-commerce-accounts-4-costcos-sales-growing-12/. Costco's e-commerce sales are growing 12% per annum. *Id.*

[143] Trefis Team, *How Much of Wal-Mart's Revenue Will Come from E-Commerce in 2020?*, FORBES (Nov. 27, 2017), https://www.forbes.com/sites/greatspeculations/2017/11/27/how-much-of-wal-marts-revenue-will-come-from-e-commerce-in-2020/#454ed14359f2.

[144] Anna Johansson, *6 Fundamental Differences Between E-Commerce & Brick-and-Mortar Stores*, RETAILNEXT, https://retailnext.net/en/blog/6-fundamental-differences-between-e-commerce-brick-and-mortar-stores/.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

by cash or checks.[145] Brick-and-mortar stores typically provide customer service in-store to respond to questions about product offerings, whereas customer service for online retail sales is typically less comprehensive or effective.[146]

111.    By controlling the Online Retail Marketplace Market, Amazon has secured its position as the gateway to online retail sales. Amazon sales on Amazon's marketplace account for over half of all online retail sales in the United States. And its market share has been increasing over the past five years, as shown by the growth of its sales.[147]



112.    Amazon's nine closest competitors have a distant 1.1% to 6.6% share of the Online Retail Sales Market.[148] None has comparable infrastructure, inventory, customer bases, search advantages, or data advantages to challenge Amazon in this market.

113.    The House Report found that as "the dominant marketplace in the United States for online shopping, Amazon's market power is at its height in its dealings with third-party sellers,"

---

[145] *Id.*

[146] *Id.*

[147] J. Clement, *U.S. Amazon Marketplace Sales 2016-2019*, STATISTA (June 12, 2019), https://www.statista.com/statistics/882919/amazon-marketplace-sales-usa/.

[148] *Amazon Now Has Nearly 50% of US Ecommerce Market*, EMARKETER (July 16, 2018), https://www.insiderintelligence.com/content/amazon-now-has-nearly-50-of-us-ecommerce-market.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

where it "has monopoly power over many small- and medium-sized businesses that do not have a viable alternative to Amazon for reaching online consumers."[149] The Report also noted that over one third of Amazon's third-party merchants rely on Amazon's marketplace as their sole source of income.[150] "[C]ompanies that once drew sufficient consumer traffic from search engines to their own sites are now compelled to become vendors or sellers on Amazon's platform—or forego access to a majority of online shopping traffic."[151] This "gives it an unprecedented degree of structural power in the economy."[152] A recent survey conducted by Feedvisor found that 66% of consumers start their search for new products on Amazon's marketplace and 74% start there when they are ready to buy a specific product.[153]

---

[149] House Report at 15.

[150] *Id.*

[151] *Supra* Mitchell.

[152] *Id.*

[153] FEEDVISOR, THE 2019 AMAZON CONSUMER BEHAVIOR REPORT 14 (2019), https://fv.feedvisor.com/rs/656-BMZ-780/images/Feedvisor-Consumer-Survey-2019.pdf.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX



Amazon's dominance in consumer-product searches also permits it to exercise a significant level of control over the flow of available information to consumers on the internet. FTC Chair Lina Khan explains that this "affords Amazon a lot of power and control."[154] In a written statement, David Cicilline, Chair of the House subcommittee on antitrust likewise recently concluded that Amazon's platform "is a bottleneck for a key channel of distribution," evidently referring to "online marketplace sales."[155]

---

[154] Robinson Meyer, *When Does Amazon Become a Monopoly?*, Atlantic Monthly (June 16, 2017), https://www.theatlantic.com/technology/archive/2017/06/when-exactly-does-amazon-become-a-monopoly/530616/.

[155] Antitrust Subcommittee Chair Cicilline Statement for Hearing on "Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google," U.S. House of Representatives Judiciary Committee Democrats, Press Release (Jul. 29, 2020), https://democrats-judiciary.house.gov/news/documentsingle.aspx?DocumentID=3199.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

**C.    Amazon Harms Competition by Imposing Most Favored Nation Requirements on Third-Party Merchants.**

114.    Amazon has achieved and maintains market dominance through the contractual controls it exercises over the prices its third-party merchants can charge on other online retail platforms. Amazon's MFN policies restrict and suppress price competition in two ways:

115.    *First*, by eliminating horizontal price competition between its own goods and the directly competing goods of third-party merchants that would otherwise have been sold at lower prices, Amazon broadly raised online prices—not only on other online platforms, but also on Amazon's own platform. Without its MFN policies, Amazon would have had to offer lower fees and lower prices for its own goods to compete with the lower-priced third-party-merchant goods. Instead, Amazon's own first-party sales are immense, accounting for a stunning 22% of all online retail sales revenue in the United States.[156]

116.    *Second*, the MFN policies nullified competition by other online retail marketplaces on the basis of fees, allowing Amazon to continue to charge supra-competitive fees for the use of its marketplace. But for Amazon's MFN policies, third-party merchants would rationally have set lower prices for their goods on their own websites and on competing online retail marketplaces with lower fees. In turn, competing online retail marketplaces would have lowered their fees to compete with Amazon on price, or—if their fees were already lower—better succeeded at driving marketplace-level competition by attracting more third-party merchants and more consumers. These market forces would have resulted in competitive pressure that would have forced Amazon to lower its fees, and to lower the prices for its own goods. However, Amazon's MFN policies have prevented third-party merchants from setting lower prices on competing marketplaces and, in turn, have blocked competing marketplaces from attracting consumers with lower prices. By eliminating price competition across marketplaces, Amazon has protected its ability to charge supra-competitive fees for the use of its marketplace and supra-competitive prices for the goods Amazon

---

[156] Daniela Coppola, *U.S. Amazon First-Party and Third-Party E-commerce Sales Share 2012-2017*, Statista (July 7, 2021), https://www.statista.com/statistics/917414/amazon-first-party-third-party-ecommerce-total-online-retail-sales-share/.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  itself sells on its marketplace. These restraints have kept overall prices high on its marketplace and,

2  therefore, across all online retail marketplaces.

3      117.    As discussed, the German antitrust regulatory authority found that Amazon's MFN

4  clause had direct anticompetitive effects on competing third-party merchants and on competing

5  marketplace operators, and caused consumers to pay supra-competitive prices. Economic literature

6  teaches that MFN policies typically result in supra-competitive fees because they discourage fee

7  discounting by rival marketplaces and discourage the entry of new marketplaces that would

8  otherwise challenge the incumbents by offering sellers lower fees.[157] Walmart, Amazon's closest

9  direct competitor, charges referral fees similar to Amazon's across the same product categories. In

10  a normal competitive market, a seller can increase its sales by reducing its prices. But Walmart

11  cannot gain sales from Amazon by charging lower fees than Amazon because third-party merchants

12  cannot offer lower prices on Walmart's marketplace even if Walmart costs the merchants less than

13  Amazon. Because Walmart cannot grow by charging lower fees, it has no reason to do so and

14  instead simply mimics Amazon's high fees. This synchronization of referral fees between Amazon

15  and Walmart suggests that the higher-price structure imposed by Amazon has spread to competing

16  online marketplaces:

17

18

19

20

21

22

23

24

25

26

---

27  [157] Andre Boik & Kenneth S. Corts, *The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry*, 59 J. L. & ECON. 105 (2016); https://www.journals.uchicago.edu/doi/pdf/10.1086/686971; U.K. OFF. FAIR TRADING, CAN "FAIR" PRICES BE UNFAIR? A REVIEW OF PRICE RELATIONSHIP AGREEMENTS, Paper No. 1438 (Sept.

28  2012),    https://www.jura.uni-wuerzburg.de/fileadmin/02140600/Aktuelles/2012-10-24_-_brit._Kartellbehoerde/OFT1438.pdf.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

| Item Category | Amazon | Walmart |
|---|---|---|
| Men's athletic shoes (Shoes) | 15% < $75.00, 18% > $75.00 | 15% |
| Kitchen and Dining | 15% | 15% |
| Home Improvement Tools | 15%, 12% for base equipment | 15% |
| Apparel and Accessories | 17% | 15% |
| Electronics | 8% | 8% |
| Beauty Products | 8% < $10.00, 15% > $10.00 | 15% |
| Books | 15% | 15% |
| Furniture & Décor | 15% < $200.00, 10% > $200.00 | 15% |
| Grocery & Gourmet Food | 8% < $15.00, 15% > $15.00 | 15% |
| Personal Computers | 6% | 6% |
| Camera and Photos | 8% | 8% |
| Automotive & Powersports | 12% | 12% |
| Baby Products | 8% < $10.00, 15% > $10.00 | 15% |
| Jewelry and Watches | 20% < $250.00, 5% > $250.00 | 20% |
| Toys and Games | 15% | 15% |
| Everything Else | 15% | 15% |

118.    Market analyst Simeon Siegel notes that "although every unit sold through [third-party merchants]. . . comes at lower reported revenue[,] . . . the collected fees flow through at much higher margin rates," meaning that Amazon's gross margin continues to grow through the sale of higher-margin, third-party goods even when selling fewer of its own goods through lower-margin, first-party sales.[158] For example, Amazon generated $80 billion in third-party merchant service revenues in 2020, which accounted for the second-largest revenue segment of the online retail marketplace, after Amazon's own retail product sales.[159]

119.    Collectively, the third-party merchant fees Amazon charges are substantial and built into the prices customers pay for third-party goods on Amazon's marketplace. Because Amazon's pricing policies do not permit third-party merchants to offer lower prices on other platforms, these fees are also baked into the prices they offer throughout the Online Retail Sales Market.

---

[158]    Daphne Howland, *Amazon Drives Sales from Service Fees*, RETAIL DIVE (Nov. 13, 2018), https://www.retaildive.com/news/amazon-drives-sales-from-service-fees/542097/.

[159]    Ravpreet Kaur, *Amazon Statistics: Usage, Revenue, & Key Facts* (May 22, 2023), https://www.feedough.com/amazon-statistics-usage-revenue-key-facts/.

1    120.    For example, retailer Molson Hart reports that a $150 item sold on Amazon would

2    make his company the same profit as an item sold for approximately $40 less on his company

3    website:

> We designed, manufactured, imported, stored, shipped the item, and
> then we did customer service. Amazon hosted some images, swiped
> a credit card, and got $40 [for a $150 toy].
>
> This is the core problem. Were it not for Amazon, this item would be
> $40 cheaper. And this is how Amazon's dominance of the industry
> hurts consumers.[160]

8    121.    This is a direct consequence of Amazon's MFN policies. And these policies are not

9    merely theoretical; they have been aggressively enforced by Amazon. It was reported that "Amazon

10   even checks [the third-party merchant's] listings for similar products that are differently

11   described—by color or size, for example. In other words, there's no hiding place."[161] Jarvin

12   Karnani, who has been selling on Amazon's marketplace for two years, told the FTC, "[I]f Amazon

13   suspends you, it's like a death knell . . . [W]hen Amazon shuts you off, they sit on your money for

14   90 days and there's nothing you can do."[162] To ensure that they are in compliance with Amazon's

15   price policies, some third-party merchants have come to rely on an external service to replicate

16   their prices across multiple marketplaces.[163]

17   122.    "A staggering number (82%) of consumers cited price as a very important factor

18   when buying a product on Amazon."[164] But Amazon's MFN policies have the effect of reducing

19   price competition. Third-party merchants who would offer their goods for less, including on their

---

[160] *Supra* Hart.

[161] *Id.*

[162] Spencer Soper & Ben Brody, *Amazon Probed by U.S. Antitrust Officials Over Marketplace*, Bloomberg (Sept. 11, 2019), https://www.bloomberg.com/news/articles/2019-09-11/amazon-antitrust-probe-ftc-investigators-interview-merchants.

[163] Rupert Heather, *The Little-Known Amazon Pricing Rule that Would Burn Your Business,* XSELLCO, https://www.xsellco.com/resources/amazon-pricing-rule-burn-business/.

[164] Catie Grasso, *Amazon Pricing Strategy: How Much Should You Sell a Product For?* FEEDVISOR (Jan. 31, 2020), https://feedvisor.com/resources/marketplace-fees-policies/amazon-pricing-strategy/.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

own websites (e.g., by avoiding Amazon's estimated 15% referral fee),[165] are prevented from

setting lower prices anywhere else.[166]

123.    Amazon came under fire for its Price Parity Clause in December 2018, when Senator

Blumenthal called for an FTC investigation of the practice.[167] Years earlier, Amazon withdrew this

very practice in Europe under pressure from British and German regulators.[168] In response to the

Blumenthal letter, Amazon also quietly withdrew its Price Parity Clause in the United States in

March 2019.[169] At the time, Dani Nadel, president of Feedvisor, a company that advises Amazon

third-party merchants, expected it to be a watershed moment that would lead "the greater e-

commerce landscape" to be "much more dynamic."[170] Likewise, when he learned that Amazon was

revoking its Price Parity Clause, David Simnick, co-founder and CEO of Soapbox, a Washington,

D.C.-based soap and shampoo maker that sells on Amazon, reported: "I almost did a back flip in

the hotel gym."[171]

124.    But the watershed moment never came. Instead, Amazon continues to punish

retailers who sell at lower online prices outside of Amazon Marketplace.[172] While Amazon

withdrew its Price Parity Clause, it continues to enforce its other MFN policies, which have the

same anticompetitive effect.[173] Whereas the Price Parity Clause specifically prohibited third-party

merchants from offering cheaper deals through other online retail platforms and Amazon interprets

its Seller Code of Conduct to require the same discounts on and off Amazon Marketplace, other

---

[165] *Supra* Hart ("Amazon takes a 15% commission on every product we sell on their website. We don't have this fee when we sell toys on our own website, so we could sell our products for 15% less and make roughly the same amount of money as we do on Amazon.").

[166] *See* Letter from Senator Richard Blumenthal to Josephs Simons, Federal Trade Commission Chair (Dec. 19, 2018), https://www.blumenthal.senate.gov/imo/media/doc/12.19.18%20-%20DOJ%20-%20Price%20Parity.pdf.

[167] *Id.*

[168] *Id.*

[169] Catherine Shu, *Amazon Reportedly Nixes Its Price Parity Requirement for Third-Party Sellers in the U.S.*, TECHCRUNCH (Mar. 11, 2019), https://techcrunch.com/2019/03/11/amazon-reportedly-nixes-its-price-parity-requirement-for-third-party-sellers-in-the-u-s/.

[170] *Supra* Howland.

[171] Guadalupe Gonzalez, *You're No Longer Required to Sell Products for Less on Amazon. The Problem? If You Don't, You've Got Another Penalty Coming*, INC. (Mar. 13, 2019), https://www.inc.com/guadalupe-gonzalez/amazon-removes-price-parity-not-fair-price-rule-third-party-sellers-antitrust-violations.html.

[172] *Supra* Hart; *supra* Gonzalez.

[173] *Supra* Gonzalez.

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

MFN policies, like the Brand Standards policy and Buy Box Suppression policy impose even more stringent demands, punishing sellers if their products are offered for less off-Amazon. Failure to comply with this provision results in stiff penalties, such as Amazon's removing the "Buy Box" from the relevant product page, suspending shipping options, and even terminating third-party merchants' selling privileges.

125.    The "Buy Box" is the white box on the right side of the product details page where shoppers can click "Add to Cart" or "Buy Now." It is a critical listing benefit for third-party merchants: Buy Box goods are the most visible to consumers and the easiest for them to purchase. Virtually all Amazon purchases made on desktops are done via the Buy Box, and due to the smaller screen size of mobile devices, an even higher percentage of mobile Amazon purchases are made through the Buy Box.[174] Voice assisted purchases, such as those made with Alexa, are all made using the Buy Box because consumers have no product-listing page to view other options.



126.    Eligibility for the Buy Box depends on a number of factors, including the third-party merchant's reputation, price, efficiency, and whether the merchant is selling its product for a lower

---

[174] House Report at 250.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

price through other online retail platforms.[175] When users click the "Add to Cart" button on Amazon's marketplace, they are buying from one merchant and one merchant only—the Buy Box winner.[176] Similarly, when a user selects the "Buy Now" button, that will also lead to the Buy Box owner.[177] Over 90% of sales occur using the Buy Box.[178]

127.    Having the Buy Box provides tremendous value to third-party merchants. For example, retailer David Simnick reports that his sales plunge as much as 40 or 50 percent in a single day when his listings lose the Buy Box because of pricing goods for less on alternative platforms. He is able to reclaim the Buy Box only if he changes product pricing so that he is no longer offering a lower price on online retail platforms other than on Amazon.[179] Despite the official withdrawal of Amazon's Price Parity Clause, through enforcement of other MFN policies, Amazon continues to strip his listing of the Buy Box if goods are sold elsewhere for even $1 less than on Amazon.[180]

128.    Molson Hart, whose company Viahart sells toys online, says that 98% of its sales come from Amazon's marketplace and that other marketplaces like eBay and Walmart account for less than 2% of his company's revenue.[181] He also found that even after Amazon officially ended its first MFN policy, it continues to use other MFN policies to punish third-party merchants that list lower prices on other marketplaces: "If we sell our products for less on channels outside Amazon and Amazon detects this, our products will not appear as prominently in search and, if you do find them, they will lose their prime check mark and with that, their sales."[182]

129.    Amazon regularly uses its massive data-aggregation capabilities to monitor the prices on and off Amazon Marketplace,[183] and it regularly enforces its MFN policies against third-party merchants, often within 15 minutes of discovering a price differential.[184] The enforcement

---

[175] *Supra* Zeibak.

[176] *Id.*

[177] *Id.*

[178] *Id.*

[179] *Supra* Gonzalez.

[180] *See id.*

[181] *Supra* Hart.

[182] *Id.*

[183] *Supra* Heather.

[184] *Id.*

1    and threat of enforcement has regularly prevented third-party merchants from setting lower online

2    prices.[185]

3        130.    Amazon's MFN policies have an anticompetitive effect because they eliminate price

4    competition from third-party merchants across the U.S. online retail sales market. Amazon's

5    platform is not cheap, so to make up for the fees, third-party merchants must increase prices on

6    Amazon's marketplace.[186] And because of Amazon's MFN policies, third-party merchants list

7    goods at elevated prices on other online retail platforms as well, which eliminates price competition

8    and results in higher online prices for consumers throughout the market. This means that output is

9    reduced: there are fewer transactions because some consumers who would buy at lower prices are

10    cut out of the market at the higher price. And there are fewer online retail marketplaces because

11    would-be competitors have no incentive to enter the Online Retail Marketplace Market if they

12    cannot compete against Amazon on price to incentivize consumers to use the new marketplace.

13        131.    Absent Amazon's anticompetitive MFN policies, third-party merchants would set

14    lower prices on marketplaces with lower fees than Amazon's. Price is a highly material factor for

15    consumers shopping on online retail marketplaces. In a competitive market, Amazon would be

16    forced to charge competitive fees—including the referral fee it charges consumers—rather than

17    supra-competitive fees. If Amazon charges a competitive referral fee rather than a supra-

18    competitive referral fee, consumers would be offered lower prices for the products listed by third-

19    party merchants. Market forces would also compel Amazon to lower the prices it charges for its

20    own goods in response to the lower prices being charged by competing retailers. And consumers

21    would pay lower prices both on and off the Amazon marketplace.

22        132.    Consumers who purchased goods offered by Amazon's third-party merchants

23    outside of Amazon Marketplace—either on other marketplaces or on merchants' own websites—

24    were also injured because they purchased the goods at prices artificially inflated by Amazon's

25    anticompetitive price policies. For example, a customer, who purchased a toy on Viahart.com for

26    $150 (the same price concurrently offered on Amazon's marketplace) paid approximately $40 more

27    _____

28    [185] *Id.*

    [186] *See, e.g.*, *supra* Hart.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  for the toy than if the third-party merchant had not had to abide by Amazon's MFN policies; the

2  third-party merchant could have sold the product for $40 less on its own website while making the

3  same profit as on Amazon.[187] Amazon's MFN policies have a broad reach, encompassing virtually

4  all consumer goods.

5       133.    Eliminating Amazon's anticompetitive pricing policies would not lead to any

6  discernible negative effects on either third-party merchants or consumers. For example, unlike

7  credit-card transaction platforms, allowing third-party merchants to compete on price through

8  competing online retail marketplaces would not reduce the money available to pay rebates or

9  rewards to consumers because Amazon does not pay rebates or rewards to its retail customers.

10       134.    Amazon's price policies are also not needed to prevent free-riding by third-party

11  merchants; Amazon already collects substantial fees from these merchants and prohibits them from

12  directing Amazon customers to other sites.[188]

13       135.    Nor are Amazon's price policies needed to combat free-riding by consumers, who

14  rely on Amazon's marketplace to get information about goods and pricing. Amazon actively seeks

15  to—and does—dominate consumers' online searches for goods, creating an "information

16  bottleneck" that prevents many consumers from ever receiving competitive price information from

17  other sources. If Amazon were truly worried about providing product and pricing information to

18  consumers for free (a service merchants routinely provide), it would have several options short of

19  forcing its supra-competitive prices onto its platform and other online retail platforms. It could, for

20  example, choose a different business model, such as subjecting consumers to advertising if they

21  conduct product searches on Amazon's marketplace.

22  **D.**    **Government Authorities Have Repeatedly Concluded That Amazon Has Harmed Competition Through the Use of Most Favored Nation Pricing Policies.**

23

24       136.    Beginning in 2019, the House subcommittee on antitrust conducted an extensive

25  investigation of Amazon's pricing policies governing third-party merchants. The resulting House

26  Report, initially issued in October 2020, concluded that "Amazon has a history of using MFN

27  _____

28     [187] *Id.*

   [188] *Supra* Hart; Irwin Decl., Ex. A at 6 (¶ 14).

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

clauses to ensure that none of its suppliers or third-party merchants can collaborate with an existing or potential competitor to make lower-priced or innovative product offerings available to consumers."[189]

137.    The House Report rejected Amazon's claims that it competes with brick-and-mortar retailers, outside the Online Retail Sales Market, explaining that "[t]his approach is inconsistent with evidence gathered by Subcommittee staff, conventional antitrust analysis of relevant product markets, and common sense."[190] The House Report further highlighted the FTC's recent conclusion that a "relevant market may be divided by channel of sale, resulting in separate markets for brick-and-mortar sales and online sales."[191]

138.    Referring to the Online Retail Sales Market, the House Report also concluded that "Amazon functions as a gatekeeper for ecommerce."[192] Further, "Amazon has monopoly power" over most third-party merchants that feel they "cannot turn to alternative marketplaces, regardless of how much Amazon may increase their costs of doing business or how badly they are treated."[193]

139.    Additionally, the House Report found that "Amazon also enjoys significant market power over online consumers" that "is durable and unlikely to erode in the foreseeable future."[194] This durable market power reflects significant barriers to entry that include: "(1) network effects, which make it difficult for another marketplace to achieve a comparable number of buyers and sellers; (2) switching costs associated with consumers shopping outside of the Amazon ecosystem; and (3) the steep costs of building a logistics network comparable in size and scope to Amazon's massive international footprint in fulfillment and delivery."[195]

140.    The German antitrust authority has already concluded that Amazon's MFN policies harm consumers with anticompetitive overcharges.

---

[189] House Report at 295.

[190] House Report at 255.

[191] *Id.*

[192] *Id.* at 256.

[193] *Id.* at 257.

[194] *Id.* at 259-60.

[195] *Id.* at 260.

**HAGENS BERMAN**

141.    With a 30-40% share of the market for the online sales of goods in Germany at the time of the enforcement action, Amazon's marketplace had a lower market share than it currently has in the United States. Nevertheless, the German antitrust authority took action against Amazon for the MFN policies at issue here: "the so-called price parity clause," which "largely prevented sellers on Amazon's Marketplace platform from offering their goods elsewhere online at a lower price," whether on "other e-commerce platforms" or on their "own online shops."[196]

142.    Upon investigation, the German competition authority concluded that "Amazon and the third-party retailers are direct competitors" in e-commerce, and that "[t]he agreement of a price parity clause constitutes horizontal price-fixing."[197]  The German competition authority explained that the agreement between Amazon and third-party merchants was "not based on purely vertical agreements" precisely because "Amazon and the third-party retailers are direct competitors in the trading markets concerned," and "[t]he content of the agreement is precisely not the use by retailers of the platform service of a neutral online service provider in exchange for a fee. Rather, the aim of participating in the [Amazon] Marketplace is to make a joint integrated presentation of an entire product range, including the Amazon product range, with a single address and the resulting simplified navigation. It is therefore a horizontal trade cooperation."[198]

143.    The German competition authority further concluded that the scope of that horizontal price-fixing agreement was market-wide: because "[a] general competitive relationship exists between Amazon and the third-party sellers in the retail markets in all product categories," "the price parity clause is a hardcore restriction in all product categories."[199]

144.    The German competition authority also explained that the agreement between Amazon and third-party merchants amounted to "horizontal price-fixing" even though it was only the third-party merchants who committed to listing their goods at a particular price (the Amazon price) across all online retail channels: "The agreement of a price parity clause constitutes

---

[196] BKartA Decision at 1-2.
[197] *Id.* at 2-3.
[198] *Id.*
[199] *Id.* at 3.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  horizontal price-fixing for which an understanding on the pricing of just one part of an agreement

2  (here of the third-party retailer) is sufficient if that retailer is a direct competitor."[200]

3      145.    The German antitrust authority found that Amazon's MFN policies had the stark

4  anticompetitive effect that economic literature predicts: reduced competition and higher prices.

5  Because Amazon's MFN policies ensure a uniform, all-in price to the end consumer, the "[p]rice

6  parity clauses thus act as barriers to market entry for new competitors and hinder the expansion of

7  existing competitors in the market" by "neutrali[zing]" the "major competitive parameter – the fees

8  for platform services – . . . more favourable fees cannot be translated into more favourable prices

9  for final customers."[201]   The inevitable result is higher prices, fewer consumers, and fewer

10  marketplaces entering the market to compete against Amazon. "According to a poll of 2,500 online

11  retailers carried out by" the German competition authority, the Price Parity Clause "has also

12  resulted in significant price increases to e-commerce."[202]

13      146.    As a result of the German competition authority's findings, as well as coordinated

14  efforts by the U.K.'s Office of Fair Trading, Amazon ultimately abandoned its Price Parity Clause

15  on an EU-wide basis. Amazon also revoked its Price Parity Clause in Japan in response to an

16  investigation by the Japan Fair Trade Commission that concluded in June 2017. But Amazon

17  continued to enforce this provision in the U.S. market until March 2019, when it withdrew the

18  provision in response to the threat of an investigation by the FTC

19      147.    Relatedly, after a two-year investigation into Amazon's method of awarding Buy

20  Box winners on its marketplace, the Italian competition authority imposed a €1.1-billion fine, based

21  on its conclusion that Amazon abused its dominant position in the Online Retail Marketplaces

22  Market.[203] Amazon also entered into a consent decree with the Washington Attorney General and

23  agreed to a penalty in connection with the Washington Attorney General's investigation into

24

---

25  [200] *Id.* This is consistent with *Palmer v. BRG*, where the Supreme Court implicitly rejected the notion that horizontal price restraints are necessarily reciprocal, when it held that rival bar review providers' exclusive licensing agreement—which increased only one company's price—was a *per se* illegal price-fixing agreement. 498 U.S. 46 (1990).

26

27  [201] BKartA Decision at 3.

    [202] *Id.*

28  [203] Steve Dent, *Italian regulator fines Amazon $1.28 billion for abusing its market dominance*, Engadget (Dec. 9, 2021), https://www.engadget.com/italy-fines-amazon-for-abuse-of-dominant-position-085244332-085736675.html.

**HAGENS BERMAN**

horizontal price-fixing under the "Sold by Amazon" program, which allowed Amazon to agree on price with third-party sellers, rather than compete with them.[204]

148.    Then after a two-year investigation, the California Attorney General sued Amazon on September 15, 2022, alleging that Amazon used the same MFN policies that Plaintiffs challenge in this lawsuit to unreasonably restrain trade and monopolize online markets in violation of California's antitrust laws. The California Court denied Amazon's motion to dismiss, holding that the California Attorney General "adequately state[d] a claim that Amazon's agreements and policies have had the anticompetitive effect of raising prices on competing retail marketplaces as well as on third-party seller's own websites."

149.    Following a four-year investigation, the FTC sued Amazon on September 26, 2023, alleging that Amazon uses a set of interlocking anticompetitive and unfair strategies to illegally maintain its monopoly power in online markets, including MFN policies that Plaintiffs challenge here, like the Price Parity Clause and SC-FOD, which the FTC describes as "anti-discounting" measures that punish third-party sellers from offering prices lower than Amazon off of Amazon and which the FTC alleges keep prices higher for products across the internet.

## VI.    INTERSTATE TRADE AND COMMERCE

150.    Amazon's activities as alleged in this complaint were within the flow of, and substantially affected, interstate commerce. Amazon sells goods on its own behalf and as a marketplace for its third-party merchants across, and without regard to, state lines.

## VII.    CLASS ACTION ALLEGATIONS

151.    Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and injunctive relief pursuant to federal law on behalf of the members of the following Class:

> All persons who on or after May 26, 2017, purchased one or more new, physical goods from third-party sellers on Amazon's marketplace.

---

[204]Press Release, *AG Ferguson investigation shuts down Amazon price-fixing program nationwide*, Washington State Attorney General's Office (Jan. 26, 2022), https://www.atg.wa.gov/news/news-releases/ag-ferguson-investigation-shuts-down-amazon-price-fixing-program-nationwide.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

152.    Excluded from the Class are the Defendant and its officers, directors, management, employees, subsidiaries, or affiliates. Also excluded from the Class are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities. Further excluded from the class are individuals who are already pursuing antitrust claims based on Amazon's MFN policies on their individual behalf in arbitration before the American Arbitration Association. For avoidance of doubt, persons are not included in the class by reason of their purchases of used products, digital products, or purchases made through a prescription.

153.    The identities of all Class members are readily identifiable from information and records maintained by Defendant.

154.    **Numerosity:** Class Members are so numerous that joinder is impracticable. Plaintiffs believe that there are more than two hundred million members of the Class, geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

155.    **Typicality:** Plaintiffs' claims are typical of the claims of the other Class members. The factual and legal bases of Defendant's liability are the same and resulted in injury to Plaintiffs and all other members of the proposed Class.

156.    **Adequate representation:** Plaintiffs will represent and protect the interests of the proposed Classes both fairly and adequately. They have retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed Class, and their interests do not conflict with the interests of the proposed Class members they seek to represent.

157.    **Commonality:** Questions of law and fact common to the members of the proposed Class predominate over questions that may affect only individual Class members because Defendant has acted on grounds generally applicable to the Class and because Class members share a common injury. Thus, determining damages with respect to the Class as a whole is appropriate. The common applicability of the relevant facts to claims of Plaintiffs and the proposed Class are

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

inherent in Defendant's wrongful conduct because the overcharge injuries incurred by Plaintiffs and each member of the proposed Class arose from the same conduct alleged herein.

158.    There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

(a)    Whether Defendant and third-party merchants unlawfully contracted, combined, or conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act by agreeing to refrain from competing outside of Amazon at prices lower than on Amazon Marketplace;

(b)    Whether Defendant has unlawfully monopolized, or attempted to monopolize, the Online Retail Marketplace Market or the Online Retail Sales Market, including by way of the contractual terms, policies, practices, mandates, and restraints described herein;

(c)    Whether competition in the Online Retail Marketplace Market or the Online Retail Sales Market has been restrained and harmed by Amazon's monopolization, or attempted monopolization, of these markets;

(d)    Whether consumers and Class members have been damaged by Defendant's conduct;

(e)    The amount of any damages; and

(f)    The nature and scope of injunctive relief necessary to restore a competitive market.

159.    **Injunctive relief:** By way of its conduct described in this complaint, Defendant has acted on grounds that apply generally to the proposed Class. Accordingly, final injunctive relief is appropriate respecting the Class as a whole.

160.    **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on behalf of the Class members are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Resolution of the Class members' claims through the class action device will



present fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court.

## VIII.   ANTITRUST INJURY AND STANDING

161.    During the Class Period, Plaintiffs and Class members directly made purchases on Amazon's marketplace. Because of Defendant's anticompetitive conduct, Plaintiffs and Class members were forced to pay more for those purchases than they would have if Amazon had permitted its third-party merchants to engage in price competition outside Amazon's marketplace. Defendant therefore has caused Plaintiffs and Class members to suffer overcharge damages. Because Defendant continues to enforce its anticompetitive MFN policies, Plaintiffs and Class members are reasonably likely to incur future overcharges when they make additional purchases on Amazon's marketplace. Plaintiffs and Class members have standing as direct purchasers of goods sold on Amazon's marketplace at an inflated price. Both the actual harm and the threat of future harm are cognizable antitrust injuries directly caused by Defendant's violations of federal antitrust laws, including its anticompetitive agreement with third-party merchants, and its monopolization, or its attempted monopolization of the relevant markets, as alleged herein. The full amount of such overcharge damages will be calculated after discovery and upon proof at trial.

## IX.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF THE SHERMAN ACT
#### (15 U.S.C. § 1)

162.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

163.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed Class described above.

164.    Defendant and its 2.3 million third-party merchants are horizontal competitors.

165.    Defendant, the online retail giant, directly competes with its third-party merchants in online retail sales. Through first-party sales on its marketplace, Amazon directly offers online customers a broad range of goods for sale. Amazon's first-party sales account for 22% of all online retail sales in the United States. Each good Amazon sells on its marketplace competes with goods

that third-party merchants list for sale on Amazon's marketplace. Amazon's goods are therefore reasonably interchangeable with its third-party merchants' goods, such that there is cross-elasticity of demand between the goods Defendant sells and the ones that its third-party merchants list on Amazon's marketplace.  Amazon's internal documents refer to its third-party merchants as its "internal competitors."[205]

166.    In violation of Section 1 of the Sherman Antitrust Act, Defendant and its 2.3 million third-party merchants unlawfully agreed under Amazon's MFN policies to refrain from competing with Amazon Marketplace at prices lower than prices on Amazon Marketplace. These unlawful agreements have unreasonably restrained price competition among retailers for online sales of consumer goods and had the effect of establishing a price floor for goods listed on Amazon's marketplace.

167.    Defendant is liable for the creation, maintenance, and enforcement of the agreements under a "quick look" or rule-of-reason standard.

168.    For purposes of Plaintiffs and Class members' quick-look or rule-of-reason claims, the relevant geographic market is the United States. The relevant product markets are one or both of the following markets: the Online Retail Marketplace Market and the Online Retail Sales Market.

169.    **Online Retail Marketplace Market**: Defendant's MFN policies have an open and obvious adverse effect on competition in the in the Online Retail Marketplace Market, where Defendant's MFN policies act as barriers to market entry for new marketplace competitors and hinder the expansion of existing competitors in that market. This is because the MFN policies prevent competitor marketplaces from competing on the most significant parameter—the fees for platform services. Competitor marketplaces cannot translate lower fees into lower prices for consumers. Amazon's MFN policies therefore raise prices above a competitive level, prevent competing marketplaces from entering the market, and restrict the expansion of existing competitors in the market. They also decrease innovation and consumer choice in the relevant market. Defendant also possesses market power in the Online Retail Marketplace Market, where Amazon accounts for 65% to 70% of all online marketplace purchases.

---

[205] House Report at 16.

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

170.   **Online Retail Sales Market**: Defendant's MFN policies also have an open and obvious adverse effect on competition in the Online Retail Sales Market, where they raise prices, by shielding Amazon's first-party sales from price competition from its third-party merchants. In a competitive market, Amazon would have to lower its first-party prices to compete with lower prices offered by online retail merchants that compete with Amazon's marketplace. Defendant and its co-conspirators possess dominant market power. Retail sales on Amazon's marketplace represent well over 50% of all sales in the Online Retail Sales Market. Amazon's nearest competitor (eBay) has a distant 6.6% of the market. That Amazon has dominant market power is evident from its power to raise prices above those that would be charged in a competitive market. Amazon also has unique advantages that allow it to exercise market power. It controls 66% of all online product searches for first-time purchases and 74% for goods previously purchased. It has a much larger inventory than any of its competitors. It has a vast digital advantage over its competitors, having amassed detailed consumer preferences and behavior over decades from its 200 million unique monthly customers.

171.   A straightforward application of fundamental economic principles shows that the arrangements in question would have an anticompetitive effect on customers and the relevant markets.

172.   Defendant and its co-conspirator, third-party merchants did not act unilaterally or independently when entering into the agreements. The agreements and their enforcement substantially, unreasonably, and unduly restrain trade in the relevant markets, and harmed Plaintiffs and the Class thereby.

173.   Amazon's relationship with its co-conspirator, third-party merchants is further evidence of its market power in both markets. Amazon charges exorbitant fees that give Amazon a competitive advantage over its co-conspirator, third-party merchants and uses their supplier information to contract directly with suppliers and their customer information to decide on what areas to focus its retail or product developments. It has the power to dictate and arbitrarily change the rules by which its co-conspirator, third-party merchants have access to Amazon's marketplace—for example, by extending the amount of time business buyers have to pay its co-

conspirator, third-party merchants and by deciding what goods they can sell and whether they can participate as vendors or third-party merchants—and bends the rules to give itself advantages in battles for the Buy Box and for the best placement of sponsored advertising.

174.    There is no legitimate, pro-competitive business justification for Amazon's MFN policies or any justification that outweighs their harmful effect. Even if there were some conceivable justification, the agreements are broader than necessary to achieve such a purpose.

175.    Plaintiffs and members of the Class were injured in their business or property by paying higher prices for purchases on Amazon's marketplace than they would have paid in the absence of Defendant's unlawful conduct. They are entitled to overcharge damages and an injunction that terminates the ongoing violations alleged in this Complaint.

## SECOND CAUSE OF ACTION

## VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION
### (15 U.S.C. § 2)

176.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

177.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

178.    The relevant geographic market is the United States. The relevant product markets are one or both of the following markets: the Online Retail Marketplace Market and the Online Retail Sales Market.

179.    Defendant obtained monopoly power in the applicable markets, as demonstrated by its power to set the price of platform services and goods. Defendant, inclusive of its co-conspirator third-party merchants, already accounts for 65% to 70% of sales in the Online Retail Marketplace Market and over 50% of the revenue generated in the Online Retail Sales Market.

180.    Amazon has gained and maintains monopoly power in the applicable markets by improper and unlawful means.

181.    Defendant has willfully acquired its monopoly power in the applicable markets in part through its enforcement of its MFN policies. These provisions establish a price floor based on third-party merchants' price listings on Amazon's marketplace. By requiring its 2.3 million third-

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

party merchants to apply a price floor on all other online retail platforms—both on marketplaces and on their own websites—Defendant has largely immunized its goods from competitive pricing in the Online Retail Sales Market and caused goods sold on Amazon's marketplace to be listed at supra-competitive prices. Amazon has likewise largely immunized its marketplace services from more competitive fees in the Online Retail Marketplace Market because Amazon's MFN policies do not allow its 2.3 million third-party merchants to capitalize on the more favorable fees, *i.e.*, by lowering list prices for consumers on marketplaces that compete with Amazon's marketplace. This, in turn, causes higher prices in competing online retail marketplaces, and the absence of price competition compels consumers to shop on Amazon, where they pay supra-competitive prices.

182.    Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for goods on Amazon's marketplace than they would have paid or would pay in the future in the absence of Defendant's unlawful acts. They are entitled to overcharge damages and an injunction that terminates the ongoing violations alleged in this Complaint.

## THIRD CAUSE OF ACTION

## VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION
### (15 U.S.C. § 2)

183.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

184.    Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

185.    If Defendant does not already have a monopoly in the applicable markets described above, it has attempted to monopolize these markets.

186.    Amazon's MFN policies demonstrate Amazon's intent to control online prices of virtually every consumer good offered in the relevant market.

187.    Through its enforcement of its MFN policies, Defendant has furthered its goal of controlling the prices of virtually every consumer good offered for sale and immunizing itself from significant competition in the applicable markets.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

188.   There is a dangerous probability that Defendant will succeed in monopolizing the applicable markets. Defendant, inclusive of its co-conspirator, third-party merchants, already accounts for 65% to 70% of sales in the Online Retail Marketplace Market and over 50% of the revenue generated in the Online Retail Sales Market.

189.   Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for goods on Amazon's marketplace than they would have paid or would pay in the future in the absence of Defendant's unlawful acts. They are entitled to overcharge damages and an injunction that terminates the ongoing violations alleged in this Complaint.

## X.   JURY TRIAL DEMANDED

190.   Plaintiffs hereby demand a trial by jury of all the claims asserted in this Complaint.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

A.   The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representative and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.   Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C.   Adjudication that the acts alleged herein constitute monopolization or attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

D.   Actual damages, treble damages, and such other relief as provided by the statutes cited herein;

E.   Pre-judgment and post-judgment interest on such monetary relief;

F.   Equitable relief requiring that Amazon cease the abusive, unlawful, and anticompetitive practices described herein (including pursuant to federal antitrust law: *see, e.g.*, 15 U.S.C. § 26);

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    G.    The costs of bringing this suit, including reasonable attorneys' fees; and

2    H.    All other relief to which Plaintiffs and members of the Class may be entitled at law

3  or in equity.

4

5    DATED: April 22, 2024    HAGENS BERMAN SOBOL SHAPIRO LLP

6    By /s/ *Steve W. Berman*
     Steve W. Berman (WSBA No. 12536)

7    By /s/ *Barbara A. Mahoney*
     Barbara A. Mahoney (WSBA No. 31845)

8    1301 Second Avenue, Suite 2000
     Seattle, WA 98101

9    Telephone: (206) 623-7292
     Facsimile: (206) 623-0594

10   E-mail:   steve@hbsslaw.com

11                barbaram@hbsslaw.com

12   Anne F. Johnson (*pro hac vice*)
     68 3rd Street, Suite 249

13   Brooklyn, NY 11231
     Telephone: (718) 916-3520

14   E-mail:   annej@hbsslaw.com

15   KELLER POSTMAN LLC

16

17   Zina G. Bash (*pro hac vice*)
     111 Congress Avenue, Suite 500

18   Austin, TX, 78701
     Telephone: (512) 690-0990

19   E-mail:   zina.bash@kellerpostman.com

20   Jessica Beringer (*pro hac vice*)
     Shane Kelly (*pro hac vice*)

21   150 North Riverside Plaza, Suite 4100

22   Chicago, Illinois 60606
     Telephone: (312) 741-5220

23   E-mail: Jessica.Beringer@kellerpostman.com
     E-mail: shane.kelly@kellerpostman.com

24

25   Daniel Backman (*pro hac vice*)
     1101 Connecticut Avenue, N.W., Suite 1100

26   Washington, D.C., 20036
     Telephone: 202-918-1123

27   E-mail: Daniel.Backman@kellerpostman.com

28

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1

2

*Interim Co-Lead Counsel for Plaintiffs and the proposed Class*

3

KELLER ROHRBACK L.L.P.

4

By: /s/ *Derek W. Loeser*

5

      Derek W. Loeser (WSBA No. 24274)
1201 Third Avenue, Suite 3200

6

Seattle, WA 98101-3052
Telephone: (206) 623-1900

7

Facsimile:  (206) 623-3384
E-mail:   Dloeser@kellerrohrback.com

8

9

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

10

By: /s/ *Alicia Cobb*

11

      Alicia Cobb, WSBA # 48685
1109 First Avenue, Suite 210

12

Seattle, WA 98101
Telephone: (206) 905-7000

13

E-mail:   aliciacobb@quinnemanuel.com

14

Steig D. Olson (*pro hac vice*)

15

David D. LeRay (*pro hac vice*)
Nic V. Siebert (*pro hac vice*)

16

Maxwell P. Deabler-Meadows (*pro hac vice*)
51 Madison Avenue, 22nd Floor

17

New York, NY 10010
Telephone: (212) 849-7000

18

E-mail:   steigolson@quinnemanuel.com

19

      davidleray@quinnemanuel.com

20

      nicolassiebert@quinnemanuel.com
      maxmeadows@quinnemanuel.com

21

Adam B. Wolfson (pro hac vice)

22

865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543

23

Telephone: (213) 443-3000
E-mail:   adamwolfson@quinnemanuel.com

24

25

*Interim Executive Committee for Plaintiffs and the proposed Class*

26

27

28

**HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
Peggy J. Wedgworth*
Elizabeth McKenna*
Robert A. Wallner*
Blake Hunter Yagman*
100 Garden City Plaza, Suite 500
Garden City, New York 11530
Telephone: (212) 594-5300
E-mail:   pwedgworth@milberg.com
              emckenna@milberg.com
              rwallner@milberg.com
              byagman@milberg.com

*_Pro Hac Vice_ Forthcoming

_Attorneys for Megan Smith_

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000, SEATTLE, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX