The Honorable John H. Chun

1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

8

9  | ELIZABETH DE COSTER *et al.,* on behalf of themselves and all others similarly situated,

No. 2:21-cv-00693-JHC

10 |            Plaintiff,

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

11

12 |     v.

**NOTE ON MOTION CALENDAR:**
January 24, 2025

13 | AMAZON.COM, INC., a Delaware corporation,

14 |            Defendant.

**FILED UNDER SEAL**

15

16

**[REDACTED VERSION]**

17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 2:21-cv-00693-JHC

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   LEGAL STANDARD.............................................................................................4

III.  ARGUMENT .........................................................................................................5

    A.   Each of the Rule 23(a) Prerequisites Are Met. ...........................................5

        1.   The numerosity requirement is easily satisfied.............................5

        2.   The commonality requirement is also easily satisfied. ................5

        3.   The Proposed Class Representatives are typical of the class......................6

        4.   The Proposed Class Representatives will adequately
            represent the class. .......................................................................6

    B.   Common Questions of Law and Fact Predominate Over Individual
       Issues as Required by Rule 23(b)(3)...........................................................7

        1.   Common evidence exists to determine the relevant market
            and Amazon's power in that market. ...........................................8

        2.   Common evidence exists to determine whether Amazon
            and its merchants acted in concert. .............................................10

            a.   Amazon and each merchant, from whom Class
                members purchased, contractually agreed to four anti-
                discounting pricing rules that Plaintiffs challenge........................10

                (1)   Under the PPP and the Seller Code of Conduct,
                    merchants agreed not to sell at a lower online
                    price outside of Amazon. ....................................12

                (2)   Under the MFPP and the ASB, sellers agree to
                      prevent lower online prices outside of Amazon
                      by price-matching the lowest external prices
                      Amazon finds for their merchandise.................13

            b.   By agreeing to the BSA, merchants also agree to
                  Amazon's enforcement of these cross-platform anti-
                  discounting rules. ..........................................................15

3. Common evidence exists to determine whether through platform pricing restraints, Amazon engaged in anticompetitive conduct, unlawfully restrained trade, and affected Interstate Commerce. ................................................. 18

a. Plaintiffs establish the Interstate Commerce requirement. ................................................. 18

b. Anticompetitive effects or conduct can be determined based on common evidence. ........................................... 18

c. Common evidence provides indirect proof of anticompetitive conduct. ............................................ 28

4. Common evidence exists to show whether Amazon intended to monopolize and, if it did not achieve a monopoly, came dangerously close to monopolizing through the challenged conduct. ............................................ 30

5. Plaintiffs provide a reliable common method to establish antitrust injury on a class-wide basis (impact) ........................................... 31

6. Plaintiffs provide a reliable common method to calculate damages class-wide ................................................. 39

C. A Class Action Is Superior to Other Means of Resolving the Case, as Required by Rule 23(b)(3) ................................................. 40

D. Rule 23(g) Factors Support Appointing Interim Co-Lead Counsel as Co-Lead Class Counsel and Executive Committee Member as Executive Class Counsel ................................................. 41

IV.  CONCLUSION ................................................. 42

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A.B. v. Haw. State Dep't of Educ.*,
  30 F.4th 828 (9th Cir. 2022) ...................................................................................6

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013)...........................................................................................4, 32

*Arandell Corp. v. CenterPoint Energy Servs.*,
  900 F.3d 623 (9th Cir. 2018) ...............................................................................17

*In re Broiler Chicken Grower Antitrust Litig. (No. II)*,
  2024 WL 2117359 (E.D. Okla. May 8, 2024) ......................................................37

*In re Capacitors Antitrust Litig. (No. III)*,
  2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ...............................................15, 16

*Castro v. Sanofi Pasteur Inc.*,
  134 F. Supp. 3d 820 (D.N.J. 2015) .......................................................................31

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013).................................................................................................39

*In re Dynamic Random Access Memory Antitrust Litig.*,
  2006 WL 1530166 (N.D. Cal. June 5, 2006) ........................................................36

*Edwards v. Nat'l Milk Producers Fed'n*,
  2014 WL 4643639 (N.D. Cal. Sep. 16, 2014) ......................................................40

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ........................................................................ *passim*

*Frame-Wilson v. Amazon.com, Inc.*,
  591 F. Supp. 3d 975 (W.D. Wash. 2022)................................................................8

*Giuliano v. Sandisk Corp.*,
  2015 WL 10890654 (N.D. Cal. May 14, 2015) ......................................................9

*In re Glumetza Antitrust Litig.*,
  336 F.R.D. 468 (N.D. Cal. 2020)....................................................................19, 39

*In re High-Tech Emp. Antitrust Litig.*,
  289 F.R.D. 555 (N.D. Cal. 2013).........................................................................31

*In re High-Tech Emp. Antitrust Litig.*,
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) ...........................................................5, 19

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

*Iowa Pub. Emps. Ret. Sys. v. Bank of Am. Corp.*,
2022 WL 2829880 (S.D.N.Y. June 30, 2022) ........................................................35

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981) ................................................................................................39

*Just Film, Inc. v. Buono*,
847 F.3d 1108 (9th Cir. 2017) ..................................................................................6

*In re Live Concert Antitrust Litig.*,
247 F.R.D. 98 (C.D. Cal. 2007) .........................................................................8, 35

*Lytle v. Nutramax Labs., Inc.*,
99 F.4th 557 (9th Cir. 2024) ................................................................4, 8, 32, 39

*Markson v. CRST Int'l, Inc.*,
2022 WL 790960 (C.D. Cal. Feb. 24, 2022)............................................................11

*McDonough v. Toys "R" Us, Inc.*,
638 F. Supp. 2d 461 (E.D. Pa. 2009) ......................................................................19

*McLain v. Real Estate Bd.*,
444 U.S. 232 (1980) ................................................................................................18

*Nat'l ATM Council, Inc. v. Visa Inc.*,
2021 WL 4099451 (D.D.C. Aug. 4, 2021) .............................................................41

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
2023 WL 1813530 (C.D. Cal. Feb. 7, 2023)............................................................7

*Nicolosi Distrib. v. FinishMaster, Inc.*,
2018 WL 4904918 (N.D. Cal. Oct. 9, 2018)...........................................................10

*Nitsch v. Dreamworks Animation SKG Inc.*,
315 F.R.D. 270 (N.D. Cal. 2016).......................................................................6, 35

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)......................................................................................9, 19, 28

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ......................................................................... *passim*

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
20 F.4th 466 (9th Cir. 2021) ......................................................................10, 30, 31

*Paladin Assocs. v. Montana Power Co.*,
328 F.3d 1145 (9th Cir. 2003) ................................................................................11

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2024 WL 278565 (E.D.N.Y. Jan. 25, 2024) ...........................................................28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

*Reichert v. Keefe Commissary Network, L.L.C.*,
    331 F.R.D. 541 (W.D. Wash. 2019) ...................................................................40

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
    335 F.R.D. 1 (E.D.N.Y. 2020) ...........................................................................36

*Sali v. Corona Reg'l Med. Ctr.*,
    909 F.3d 996 (9th Cir. 2018) ...............................................................................7

*Sidibe v. Sutter Health*,
    333 F.R.D. 463 (N.D. Cal. 2019) .........................................................................6

*In re Suboxone*,
    421 F. Supp. 3d 12 (E.D. Pa. 2019), *aff'd*, 867 F.3d 264 (3d Cir. 2020) .........19, 30

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    2012 WL 555090 (N.D. Cal. Feb. 21, 2012) ......................................................35

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    267 F.R.D. 583 (N.D. Cal. 2010) .........................................................................7

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019) .................................................................................28

*In re Visa Check/Mastermoney Antitrust Litig.*,
    192 F.R.D. 68 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001) ...................40

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).............................................................................................5

*White v. Symetra Assigned Bens. Serv.*,
    104 F.4th 1182 (9th Cir. 2024) ........................................................................7, 8

*Wolin v. Jaguar Land Rover N. Am., LLC*,
    617 F.3d 1168 (9th Cir. 2010) ......................................................................40, 41

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
    2023 WL 3440399 (N.D. Cal. May 12, 2023) ......................................................5

*In re Zillow Grp., Inc. Secs. Litig.*,
    2020 WL 6318692 (W.D. Wash. Oct. 28, 2020) ...................................................5

*In re Zoom Video Commuc'ns, Inc. Privacy Litig.*,
    2022 WL 1593389 (N.D. Cal. Apr. 21, 2022) ....................................................41

**OTHER AUTHORITIES**

Andre Boik & Kenneth S. Corts, *The Effects of Most-Favored-Nation Clauses on
    Competition and Entry*, 59 J.L. & Econ. 105 (2016)............................................34

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Fed. R. Civ. P. 23(a) ................................................................................................4

Fed. R. Civ. P. 23(a)(1) ..........................................................................................5

Fed. R. Civ. P. 23(a)(3) ..........................................................................................6

Fed. R. Civ. P. 23(a)(4) ..........................................................................................6

Fed. R. Civ. P. 23(b)(3) ..........................................................................................4

Fed. R. Civ. P. 23(b)(3)(A)-(D) ............................................................................40



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

**Glossary**

| | |
|---|---|
| 3P | Third-party |
| ASB | Amazon Standards for Brands |
| ASIN | Amazon Standard Identification Number |
| BSA | Business Service Agreement |
| CA AG PMQ | Witness designated as the "person most qualified" to provide testimony requested by the California Attorney General on behalf of the corporation |
| CMT | Competitive Monitoring Team |
| FTC Specification | FTC's requests for information |
| MFPP | Marketplace Fair Pricing Policy |
| PMFNs | Platform most favored nations |
| PPP | Price Parity Provision |
| SC-FOD | Select Competitor Featured Offer Disqualification |
| Seller Central | Amazon's website hub for third-party sellers |

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

# I.    INTRODUCTION

This case concerns Amazon's restraint of trade and abuse of its market power in the Online Retail Marketplaces Market. This is a distinctive, two-sided online market, where companies (like Amazon, Walmart, and eBay) operate competing ecommerce platforms that connect a large block of consumers with vast numbers of competing, independent merchants (a.k.a. "third-party sellers" or "3Ps"). This arrangement allows consumers to compare offers and transact sales directly with these merchants without ever leaving the platform. For over a decade, Amazon has dominated this lucrative market, and now controls about 72% of the gross merchandise value of US marketplace sales, whereas its closest competitors—eBay with 10% and Walmart with 2%—lag far behind.[1] Although most consumers are unaware of this, Amazon charges its merchants a referral fee each time a consumer transacts sales with a merchant, which is then included in the price the consumer pays at checkout. As demonstrated by Plaintiffs' expert's report, this fee is significantly above the rates Amazon could charge in a competitive market; and in fact, in more competitive markets, like Australia and Japan, Amazon charges a much lower fee.

If Amazon did not restrain competition in the US Online Retail Marketplaces Market, it would have to lower its referral fees to compete with other marketplace operators to attract low prices to its platform. But Amazon chooses coercion over competition. Amazon's contract with its merchants *prohibits* them from offering lower prices to consumers outside of Amazon; and it even penalizes merchants by obscuring their listings on Amazon—preventing sales—if some other online retailer sells the same goods outside of Amazon at a lower price.

Amazon's cross-platform, price-matching rules (a.k.a. "platform most favored nations," "PMFNs," or "parity rules") harm competition and increase consumer prices. First, they harm competition by restricting merchants' freedom to offer lower prices on other marketplace platforms (where it may be more profitable for them to do so because of lower referral fees on those platforms). This increases consumer prices. Second, Amazon's PMFNs restrain other

---

[1] Ex. 1, Expert Report of Parag Pathak, Ph.D., dated August 23, 2024 ("Pathak Rpt.") ¶33. All references to "Ex.__" are to exhibits to the Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Class Certification, unless otherwise indicated.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  marketplace operators' ability to attract merchants to sell on their platforms at lower prices.

2  Competing marketplace operators are disincentivized to lower their referral fees because doing

3  so won't entice Amazon merchants to sell at lower prices on their platforms. And even

4  merchants on other marketplaces who do not sell on Amazon, and are therefore not bound by

5  Amazon contracts, have little incentive to sell below the prices on Amazon Marketplace because

6  they know that Amazon merchants will match them. By restraining competition in the US Online

7  Retail Marketplaces Market, Amazon maintains its monopoly and continues to charge

8  supracompetitive referral fees, which means consumers who buy from Amazon merchants pay

9  more than they would in an unrestrained market.

10       Amazon's anticompetitive agreement with its merchants has therefore restrained price

11  competition, enabled Amazon to maintain its monopoly, and harmed over 200 million class

12  members by causing them to pay higher prices for merchandise than they would have absent

13  Amazon's restraints. Plaintiffs, who assert monopoly and restraint of trade claims under Sections

14  1 and 2 of the Sherman Act,[2] seek to certify a proposed class of:

>All persons [in the United States] who on or after May 26, 2017,
>purchased one or more new, physical goods from third-party
>sellers on Amazon's marketplace.

17  SCAC, ¶¶ 151, 154.

18       The Court should grant class certification because Plaintiffs have met their burden of

19  satisfying the requirements of Federal Rules of Civil Procedure 23(a) and b(3) by a

20  preponderance of the evidence.

21       First, as required under Rule 23(a), Plaintiffs demonstrate that (1) joinder of over 200

22  million members of the Class is impracticable; (2) a class-wide proceeding on class members'

23  antitrust claims raises multiple common questions with the capacity to generate common

24  answers, apt to drive the resolution of the litigation; (3) Plaintiffs' claims are typical of the Class

25  they seek to represent; and (4) Plaintiffs have no conflicts with the proposed Class, adequately

26  represent class members and should be appointed Class Representatives (Sect. III.A).

27

28  _____

[2] Second Consolidated Amended Complaint (SCAC) [ECF 138], Sect. IX.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    Under Rule 23(b)(3), Plaintiffs further demonstrate that resolution of the claims of over

2 200 million consumers in a single class action is far superior to individual lawsuits, that the

3 common questions of fact and law necessary to prove their restraint of trade and monopoly

4 claims can all be proved by common evidence, and that these common questions predominate

5 over individual issues (Sect. III.B). Plaintiffs support their motion with the report of esteemed

6 economic expert Prof. Parag Pathak, and with testimony and documentary evidence from

7 Amazon, its merchants, competing marketplace operators, and ecommerce consultants. This

8 common body of evidence demonstrates that Amazon has anti-discounting agreements with

9 every merchant from whom Plaintiffs and members of the class have purchased, shows how

10 these agreements harm consumers and competition, and demonstrates Amazon's monopoly

11 intent (Sect. III.B.2-4).

12    Further, Prof. Pathak's report analyzes the relevant market in which to assess Amazon's

13 conduct and whether Amazon has sufficient market power to support Plaintiffs' claims (Sect.

14 III.B.1). Prof. Pathak also explains the reliable methodologies available to (1) demonstrate that

15 Amazon's challenged price restraints led to higher prices paid by all or virtually all class

16 members and (2) calculate both class-wide and individual damages (Sect. III.B.5-6). As part of

17 his analysis, Prof. Pathak reviews and analyzes many terabytes of data, which reflect (a) sales

18 transactions on Amazon Marketplace from 2011 to 2023, (b) contemporaneous prices offered on

19 hundreds of competing sites monitored by Amazon's Competitor Monitoring Team of ▮▮▮

20 ▮▮▮ products sold by ▮▮▮▮▮ merchants on Amazon Marketplace, and (c) at least ▮▮▮

21 ▮▮▮ recorded penalties against merchants, whom Amazon also notified "every time" their

22 offers did not comply with the challenged pricing rules. (Sect. III.B.2.b and B.5.)

23    Collectively, this voluminous evidence tells a compelling story of restraint of trade and

24 monopoly abuse by one of the largest and most powerful companies in the world and the injuries

25 it has caused to over 200 million US consumers.

26    Finally, Plaintiffs' counsel satisfy the requirements under Rule 23(g). The Court should

27 appoint Interim Co-Lead Counsel, Hagens Berman Sobol Shapiro LLP and Keller Postman LLC,

28 as Co-Lead Class Counsel and Interim Executive Committee member Quinn Emanuel Urquhart

1  & Sullivan, LLP as Executive Class Counsel. Since their interim appointments, these firms have

2  demonstrated their commitment to vigorously and efficiently litigating these class claims (Sect.

3  III.D).

4                                    **II.    LEGAL STANDARD**

5          "Before a class may be certified, the district court must conduct a rigorous analysis to

6  determine if the prerequisites of FRCP 23 have been satisfied." *Lytle v. Nutramax Labs., Inc*., 99

7  F.4th 557, 569 (9th Cir. 2024) (cleaned up). This requires proof that "(1) the class is so numerous

8  that joinder of all members is impracticable; (2) there are questions of law or fact common to the

9  class; (3) the claims or defenses of the representative parties are typical of the claims or defenses

10  of the class; and (4) the representative parties will fairly and adequately protect the interests of

11  the class." Fed. R. Civ. P. 23(a). Under Rule 23(b)(3), Plaintiffs must also demonstrate "that the

12  questions of law or fact common to class members predominate over any questions affecting

13  only individual members, and that a class action is superior to other available methods for fairly

14  and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs "must prove the

15  facts necessary to" establish these requirements "by a preponderance of the evidence." *Olean*

16  *Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (*en*

17  *banc*). However, "strictly admissible evidence is not required," Plaintiffs "can meet their

18  evidentiary burden in part through allegations when the allegations are detailed and supported by

19  additional materials." *Lytle*, 99 F.4th at 570 (quotation omitted).

20          While the Court's review is rigorous, "it is critical to keep in mind that class certification

21  is different from summary judgment. A court is merely to decide whether a class action is a

22  suitable method of adjudicating the case." *Id.* at 569. Merits "questions may be considered to the

23  extent—but only to the extent—that they are relevant to determining whether the Rule 23

24  prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,

25  568 U.S. 455, 466 (2013) (quotations omitted). "Neither the possibility that" Plaintiffs "will be

26  unable to prove [their] allegations, nor the possibility that the later course of the suit might

27  unforeseeably prove the original decision to certify the class wrong, is a basis for declining to

28  certify a class which apparently satisfies Rule 23." *Lytle*, 99 F.4th at 571 (quotation omitted).

### III.    ARGUMENT

**A.    Each of the Rule 23(a) Prerequisites Are Met.**

**1.    The numerosity requirement is easily satisfied.**

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The numerosity requirement satisfied when a class includes at least 40 members. *In re Zillow Grp., Inc. Secs. Litig.*, 2020 WL 6318692, at *3 (W.D. Wash. Oct. 28, 2020). This requirement is easily met here, as the class includes every consumer who purchased new, physical goods sold by a third-party seller on Amazon marketplace on or after May 26, 2017 (SCAC ¶ 151), and Amazon transaction data shows there are at least 200 million class members.[3]

**2.    The commonality requirement is also easily satisfied.**

Rule 23(a)(2) requires at least one question of law or fact common to the class of "such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). "The commonality requirement is often met in antitrust cases[.]" *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 2023 WL 3440399, at *4 (N.D. Cal. May 12, 2023). "Antitrust liability alone constitutes a common question that 'will resolve an issue that is central to the validity' of each class member's claim 'in one stroke[.]'" *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) (quoting *Dukes*, 564 U.S. at 359). Plaintiffs meet this requirement because the appropriate market definition and market power, whether Amazon and its merchants agreed to restrain trade, whether Amazon monopolized or attempted to monopolize the relevant market, whether Amazon's conduct has harmed competition, and whether class members have been harmed, are several common core questions[4] "apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 359.

---

[3] Pathak Rpt. ¶450 & n.602.
[4] SCAC, ¶158.

### 3.    The Proposed Class Representatives are typical of the class.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *A.B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 839 (9th Cir. 2022) (quotation omitted). In general, differences in the damages claimed by representative parties and other class members will not defeat typicality: "To gain class certification, Plaintiffs need to be able to allege that their damages arise from a course of conduct that impacted the class[, but they] need not show that each members' damages from that conduct are identical." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017).

Here, Plaintiffs Elizabeth De Coster, Emma Zaballos, Maya Gold, Kenneth David West, and Osahon Ojeaga (collectively "Proposed Class Representatives" or "PCRs") are typical because they allege the same antitrust violations and, like all other proposed class members, they allegedly paid supracompetitive prices for goods purchased on Amazon Marketplace, and suffered an antitrust injury when they did so.[5] PCR Declarations ¶ 4[6]; *see also Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 284 (N.D. Cal. 2016) ("In antitrust cases, typicality usually will be established by plaintiffs and all class members alleging the same antitrust violations by defendants.") (cleaned up); *Sidibe v. Sutter Health*, 333 F.R.D. 463, 486-87 (N.D. Cal. 2019) (finding typicality in an antitrust case because "[t]he overarching gravamen of the plaintiffs' claims is [the defendant's] alleged anticompetitive" conduct).

### 4.    The Proposed Class Representatives will adequately represent the class.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is met if the PCRs do not

---

[5] Pathak Rpt. ¶450, Pathak Rpt. Exhibit 24.

[6] *See* Declarations of Elizabeth De Coster, Emma Zaballos, Maya Gold, Kenneth David West, and Osahon Ojeaga, filed concurrently with this motion.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

have conflicts of interest with class members and the PCRs' counsel will vigorously pursue the action on behalf of the class. *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018).

These requirements are satisfied here. First, the PCRs share the same interest with the absent class members in putting an end to Amazon's restraints and seeking compensation for the supracompetitive prices they paid for new, physical goods sold by third-party sellers on Amazon Marketplace on or after May 26, 2017. PCRs' Declarations ¶ 4; *see also, e.g., In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2023 WL 1813530, at *15-16 (C.D. Cal. Feb. 7, 2023) (finding named plaintiffs were adequate in antitrust class action because they "share a common interest in proving that Defendants' conduct resulted in [the] supracompetitive prices" they paid).

The PCRs are also represented by counsel "experienced in the areas of antitrust and class action litigation, and both Plaintiffs and their counsel have litigated this case competently and thoroughly[.]" *Id.* at *16. *See infra* Sect. III.D (discussing counsel's experience and vigorous pursuit of this action since its inception). Interim Co-Leads in conjunction with their Executive Committee have represented consumers challenging Amazon's MFN policies for many years. Hagens Berman initiated the first US legal challenge to Amazon's MFN policies over four years ago with the filing of *Frame-Wilson v. Amazon.com, Inc.*, 2:20-cv-00424-JHC. And Keller Postman's innovative arbitration practice is the reason class actions by Amazon's own customers, like this one, are even possible. *See infra* Sect. III.D. Each PCR has responded to Amazon's interrogatories and produced or is continuing to produce thousands of documents in response to its document requests, including their sensitive financial information and evidence of their retail purchases. PCR Declarations ¶ 5. The PCRs' commitment to the litigation and their discovery obligations demonstrates their adequacy. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 598 (N.D. Cal. 2010).

**B.     Common Questions of Law and Fact Predominate Over Individual Issues as Required by Rule 23(b)(3).**

"The commonality and predominance inquiries overlap." *White v. Symetra Assigned Bens. Serv.*, 104 F.4th 1182, 1191 (9th Cir. 2024). "Commonality means that there are questions

of law or fact common to the class," so that "the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof," as opposed to "individual question[s]," which requires "members of a proposed class … to present evidence that varies from member to member." *Id.* (quotations omitted). Commonality "tests the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation," whereas "the predominance inquiry goes further and asks whether" the common "issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Lytle*, 99 F.4th at 569 (quotations omitted; emphasis in original).

Analysis of the commonality and predominance requirements begins with the elements of Plaintiffs' three Sherman Act claims: "(i) the existence of an antitrust violation" (i.e., restraint of trade, monopolization, or attempted monopolization); "(ii) 'antitrust injury' or 'impact' flowing from that violation;" and "(iii) measurable damages." *Olean*, 31 F.4th at 665.

As set forth below, Plaintiffs satisfy the commonality and predominance requirements because each of the central questions of fact and law that address these essential elements is capable of class-wide resolution based on a common body of evidence.

### 1.  Common evidence exists to determine the relevant market and Amazon's power in that market.

Determining the relevant market in which to assess Amazon's conduct and market power are common questions necessary to determine Plaintiffs' Sherman Act claims. *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 988 (W.D. Wash. 2022). These inquiries are common to the class because analysis of the relevant market and market power "involves the same data, the same experts, the same industry analyses, and the same application of the same economic tests." *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 131 (C.D. Cal. 2007). Plaintiffs' primary evidence of the relevant market and Amazon's market power is the work of their economist, Prof. Pathak, an MIT professor whose main areas of research concern market design and

1    platforms.[7] In 2018, the American Economic Association awarded him the John Bates Clark

2    Medal as the best American economist under age 40.[8]

3        The Pathak Report explains why common economic principles warrant treating the US

4    Online Retail Marketplaces Market as a distinct relevant market, and the evidence supporting his

5    conclusions does not vary from class member to class member.[9] As alleged (SCAC, Sect. V.C.

6    and ¶¶168, 178) and demonstrated through data, economic tests, and expert analysis, the relevant

7    geographic market in which to assess Amazon's conduct is the United States, and the relevant

8    product market is the Online Retail Marketplaces Market. Amazon competes in this market with

9    other US online marketplace operators to provide platform intermediation services that connect

10   merchants and consumers and enable them to simultaneously transact sales on marketplace

11   platforms.[10] Online retail marketplaces are "two-sided platform[s]" because they "offer[]

12   different products or services to two different groups who both depend on the platform to

13   intermediate between them." *Ohio v. Am. Express Co*., 585 U.S. 529, 534 (2018) ("*Amex*"). In

14   the case of two-sided platforms, where there is a "simultaneous transaction" by different market

15   participants, here platform sales transactions between online merchants and consumers, "[o]nly

16   other two-sided platforms can compete with a two-sided platform for transactions." *Id*. at 546. In

17   other words, Amazon's only other competitors in this simultaneous transaction market are other

18   online retail marketplaces (like Walmart and eBay) that provide the same service.

19       Determining whether Amazon has sufficient market power in this market to support

20   Plaintiffs' claims is likewise "capable of being proved at trial through common evidence."

21   *Giuliano v. Sandisk Corp.*, 2015 WL 10890654, at *17 (N.D. Cal. May 14, 2015) (certifying

22   class in part because the market power inquiry was common to the class). "[M]arket power is the

23   ability to force a purchaser to do something that he [or she] would not do in a competitive

24   market." *Epic Games, Inc. v. Apple, Inc*., 67 F.4th 946, 983 (9th Cir. 2023) (quotation omitted).

25

26       [7] Pathak Rpt. ¶2.

         [8] *Id.* ¶3.

27       [9] *Id.* ¶¶128-131.

28       [10] *Id.* ¶¶90-96.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

It "is generally inferred from the defendant's possession of a high market share and the existence of significant barriers to entry." *Id.* at 984-985 (quotations omitted) (evidence of barriers to entry and defendant's 55% market share supported finding of market power).

Prof. Pathak provides evidence that Amazon has more than 70% market share in the Online Retail Marketplaces Market,[11] which surpasses the 65% market share that courts generally require to "establish a prima facie case of [market] power" for monopolization claims, and exceeds the lesser showing "required in an attempt case" or under Section 1. *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 484 (9th Cir. 2021); *Nicolosi Distrib. v. FinishMaster, Inc.*, 2018 WL 4904918, at *5 (N.D. Cal. Oct. 9, 2018). Prof. Pathak also demonstrates that there are substantial barriers to entry into this market.[12] These include strong cross-platform network effects (where the value of the platform to one group depends on how many members of another group participate) and a significant degree of "consumer inertia" or switching costs associated with third-party merchants and consumers.[13] Common evidence that no competitor has successfully challenged Amazon's dominance for over a decade also suggests high barriers to entry.[14] *Optronic Techs.,* 20 F.4th at 484 (evidence of lack of new market entrants for ten years corroborated expert's conclusion of high barriers to entry).

### 2. Common evidence exists to determine whether Amazon and its merchants acted in concert.

#### a. Amazon and each merchant, from whom Class members purchased, contractually agreed to four anti-discounting pricing rules that Plaintiffs challenge.

Plaintiffs' restraint of trade claim requires proof of concerted action, the existence of which "will overwhelmingly be proven (assuming it is proven) by classwide proof." *Markson v.*

---

[11] Pathak Rpt. ¶147, Pathak Rpt. Exhibit 3.

[12] *Id.* ¶¶149-155.

[13] *Id.*; *see also* Subcommittee on Antitrust, Commercial, and Administrative Law of the Committee on the Judiciary, 116th Cong., Investigation of Competition in Digital Markets, Majority Staff Report and Recommendations (2020) ("House Report") at 260, available at https://democrats-judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf (finding significant barriers to entry that include "(1) network effects, which make it difficult for another marketplace to achieve a comparable number of buyers and sellers; (2) switching costs associated with consumers shopping outside of the Amazon ecosystem; and (3) the steep costs of building a logistics network comparable in size and scope to Amazon's massive international footprint in fulfillment and delivery.").

[14] Pathak Rpt. ¶155.

**HAGENS BERMAN**

1  *CRST Int'l, Inc.*, 2022 WL 790960, at *13 (C.D. Cal. Feb. 24, 2022). Amazon's standard

2  contract, the Business Service Agreement (BSA), provides "'direct evidence of concerted

3  activity'" by Amazon and its merchants for four of the five anti-discounting rules Plaintiffs

4  challenge, even if it appears that most merchants only "reluctantly acquiesced" to these

5  provisions. *Epic Games*, 67 F.4th at 982 & n.13 (quoting *Paladin Assocs. v. Montana Power Co.*,

6  328 F.3d 1145, 1153 (9th Cir. 2003)). Whether the challenged agreements were "'unreasonable'

7  under § 1 of the Sherman Act," is a separate "question," not to be conflated with the element of

8  concerted action. *Paladin*, 328 F.3d at 1154.

9      There can be no dispute that this question will be decided by common evidence. Amazon

10  admits that its BSA "describes the terms and conditions under which third-party sellers may sell

11  their physical goods in Amazon's U.S. store."[15] The BSA recites that merchants agree to the

12  terms of the agreement "BY REGISTERING OR USING THE SERVICES"[16] and that

13  merchants "accept the applicable Service Terms and Program Policies, which Amazon may

14  modify from time to time."[17] The BSA specifies that "'Program Policies' means all terms,

15  conditions, policies, guidelines, rules and other information on the applicable Amazon Site or on

16  Seller Central, … including those shown on the 'Policies and Agreements' section of Seller

17  Central or elsewhere in the 'Help' section of Seller Central[.]"[18] And as Amazon has testified

18  that its "Selling Policies and Seller Code of Conduct, the Amazon Marketplace Fair Pricing

19  Policy ('MFPP'), and Amazon Standards for Brands ('ASB') are communicated to third-party

20  sellers by being published and publicly available on Seller Central,"[19] all these current policies

21  are thus contractually binding on sellers under the BSA.

---

[15] Answer to Consolidated Amended Complaint ("Answer") [ECF 68] ¶15.

[16] Ex. 2, CAAGLit-AMZ_04281891 (BSA Version 10 (May 22-2017)) at '91 (General Terms). These terms remain the same in subsequent versions.

[17] *Id.* at '97.

[18] *Id.* at '99. Seller Central is a site specifically for third-party sellers, https://sellercentral.amazon.com/.

[19] Ex. 3, AMZN_FW_00000863 at '78.

### (1) Under the PPP and the Seller Code of Conduct, merchants agreed not to sell at a lower online price outside of Amazon.

The BSA's former Price Parity Provision ("PPP"), which Plaintiffs also challenge, expressly prohibited merchants from selling at lower price on another online site: "You will maintain parity between the products you offer through Your Sales Channels [defined as "all sales channels … other than physical stores"] and the products you list on any Amazon Site by ensuring" that "the Purchase Price and every other term of offer or sale … is at least as favorable to Amazon Site users as the most favorable terms upon which a product is offered or sold via Your Sales Channels."[20] This requirement had been in place for US sellers since 2004.[21] The evidence shows that even as Amazon publicly removed the PPP in March 2019, it quietly communicated that ███████████████████████████[22] and it pointedly ████████ ██████████████████████████████████████████████████████████████████████ ████████.[23] In fact, Amazon later posted a "clarification" to its merchants in Seller Central that the same discounting conduct prohibited by the purportedly withdrawn PPP was a violation of Amazon's "Seller Code of Conduct," which "[a]ll sellers are expected to adhere to[.]"[24] The "clarification" warns that it is "a violation of the Amazon Seller Code of Conduct if off-Amazon rebates, discounts, and other schemes are designed to drive customers to products that are listed and sold without those incentives on Amazon."[25]

---

[20] Ex. 2, CAAGLit-AMZ_04281891 at '03 (S-4) and '00 (Definitions, "Your Sales Channel").

[21] Ex. 4, CAAGLit-AMZ_03853422 (Aug. 24, 2010 letter from Amazon EU SARL to UK Office of Fair Trading) at '42.

[22] Ex. 5, CAAGLit-AMZ_01847634 (Brand Program PR Stress Test (April 2019)) at '41 (emphasis added).

[23] Ex. 6, AMZN_PPC_0000002521 (Christa Glenn Jun. 23, 2022 CA AG PMO interview) at 142:6 -143:6. *See also* Ex. 7, CAAGLit-AMZ_03263140 at '54 (████████████████████████████████████████████ ██████████████████████████████████).

[24] Ex. 8, AMZN_FW_00000607 (Seller Code of Conduct 5-17-2017.docx). These terms remain the same in subsequent versions.

[25] Ex. 9, AMZN_PPC_0000000313 (Seller Code Conduct-Clarification of Amazon Policy on Rebates, Coupons, other Marketing Incentives 2021-11) at '13.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

**(2)    Under the MFPP and the ASB, sellers agree to prevent lower online prices outside of Amazon by price-matching the lowest external prices Amazon finds for their merchandise.**

Amazon's Marketplace Fair Pricing Policy ("MFPP") and Amazon Standards for Brands policy ("ASB") agreements are closely tied to the coveted Buy Box. By way of explanation, each item for sale on Amazon Marketplace has its own product page, through which every merchant's offer for that product is consolidated. Nearly all product pages include a default offer, where Amazon "include[s] 'Buy Now' and 'Add to Cart' buttons."[26] Amazon has referred to this as "winning" the Buy Box or becoming the "Featured Offer."[27] Amazon acknowledges that becoming ███████████████████████████████████████████[28] This is because most of Amazon's sales occur through the Buy Box. Amazon consistently estimated in Q4 2016, Q4 2017, and Q2 2018, that "in US, █████████ were bought" from the Buy Box.[29] Understandably, removing an offer from the Buy Box causes merchants' ████████[30]

"The MFPP was adopted in November 2017[.]"[31] Under the MFPP, "Amazon regularly monitors the prices of items on [its] marketplaces" and "compares them with other prices available to [Amazon] customers." [32] If Amazon sees a merchant "[s]etting a price on a product or service that is significantly higher than recent prices offered *on or off* Amazon," then to penalize the seller, Amazon can "remove the Buy Box, remove the offer, suspend the ship option, or, in serious or repeated cases, suspend or terminate selling privileges."[33] The MFPP does not define "significantly higher," but Amazon routinely tells sellers: "we consider a price to be uncompetitive" and not eligible for the Buy Box "even if it is one cent above the price

---

[26] Ex. 10, AMZN_PPC_0000003114 (Amazon Seller University, Featured Offer Eligibility and Strategies) at 0:01-0:38.

[27] Ex. 33, AMZN_PPC_0000002510 (Christa Glenn Nov. 10, 2021 CA AG interview) at 88:14-89:9.

[28] Ex. 11, AMZN_PPC_0000006852 (Christa Glenn Sept. 23, 2022 FTC interview) at 101:16.

[29] Ex. 12, CAAGLit-AMZ_02223639 (FMA QBR February 10, 2017) at '40; Ex. 13, AMZN_PPC_0000000956 (Mar. 17, 2018 email, attaching FMA QBR 4Q 2017) at '59; and Ex. 14, CAAGLit-AMZ_00803865 (Level 8 Promotion Form, Amit Jain) at '66.

[30] Ex. 15, AMZN_PPC_0000002731 (email chain ending Oct. 25, 2018) at '32.

[31] Answer, ¶19.

[32] Ex. 16, AMZN_FW_00000601 (Amazon Marketplace Fair Pricing Policy, 11-21-2017.docx. These terms remain the same in subsequent versions.

[33] *Id.* (emphasis added).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1   available outside Amazon! If you're wondering if this includes shipping, the answer is yes[.]"[34]

2   Many sellers interpret removal of their offers from the Buy Box due to a higher external price as

3   the operation of the MFPP.[35] Amazon has not produced any systemic communications to sellers

4   to counter this interpretation of the MFPP.[36]

5        Amazon launched ASB in 2018.[37] "[A]ll brands selling in Amazon's store are" subject to

6   ASB, "as described in the" BSA.[38] The ASB "applies to Brands and manufacturers, as well as

7   their agents, licensees, and other representatives selling on their behalf in the Amazon store" and

8   imposes a "price competitiveness" requirement.[39] Amazon notified brand sellers by email that

9   ASB ███████████████████████████████████ and it displays on brand

10  merchants' "dashboard" how their prices stack up against the ███████████[40] Amazon's

11  designated corporate witness on ASB testified that Amazon expects its brand sellers ███████

12  ████████████████████████████████████████████████████████████████

13  ███████[41] The ASB also requires brand sellers to match the lowest price of any other retailer

14  Amazon monitors, and Amazon's principal method of ensuring price competitiveness is by

15  removing the offer from the Buy Box if it is higher than the lowest external price Amazon finds,

16  on competing sites, for that product.[42]

17

18

---

19  [34] Ex. 17, CAAGLit-AMZ_02289543 (PowerPoint titled Pricing Competitively to Accelerate Sales) (notes accompanying slide 3).

20  [35] *See* House Report at 296 (quoting from submissions to the Subcommittee and concluding that the MFPP was a continuation of the PPP).

21  [36] ████████████████████████████████████████
22  ████████████████████████████████████

23  [37] Ex. 19, CAAGLit-AMZ_00043698 (Amazon Standards for Brands Program Update—3/10/2021) at '98.

    [38] Ex. 20, AMZN_FW_00001056 (interrogatory response) at '91.

24  [39] Ex. 21, AMZN_PPC_0000001386 (Standards for Brands Selling in the Amazon Store) at '87. *See also* Ex. 22, AMZN_FW_00001148 (interrogatory response) at '52 ████████████████████████████████

25  ████.

26  [40] Ex. 22, AMZN_FW_00001148 (interrogatory response) at '52; Ex. 23, CAAGLit-AMZ_02037765 (Amazon Standards for Brands Program Update-10/20/2020) at '66; Ex. 24, CAAGLit-AMZ_00056656 (Amazon Standards for Brands Program Update—12/07/2020) at '56.

27  [41] Ex. 25, AMZN_PPC_0000002520 (Raxit Kagalwala Jun. 1, 2022 CA AG PMQ interview) at 80:17-19.

28  [42] *Id.* at 89:4-17; Ex. 22, AMZN_FW_00001148 (interrogatory response).

### b. By agreeing to the BSA, merchants also agree to Amazon's enforcement of these cross-platform anti-discounting rules.

Plaintiffs "do not need to prove the fact of a conspiracy for certification, but only that the issue is common to the class and 'is capable of classwide resolution … in one stroke.'" *In re Capacitors Antitrust Litig. (No. III)*, 2018 WL 5980139, at *5 (N.D. Cal. Nov. 14, 2018) (quoting *Wal-Mart*, 564 U.S. at 350). Evidence demonstrating conduct consistent with an unlawful agreement satisfies the predominance requirement because it involves the defendant's conduct and does not require "individualized proof." *Id.*

Plaintiffs intend to rely on common evidence that Amazon engaged in overt acts in furtherance of its anti-discounting agreement with its merchants. That evidence includes Amazon's records and testimony, which show that it has engaged in the gargantuan task of monitoring current "competitive" prices for ▮▮▮▮▮▮ of merchandise sold by third-party sellers, representing, by revenue, around ▮▮▮▮▮ of all Amazon merchandise sold by third parties.[43] For this task, Amazon has relied globally on ▮▮▮▮▮▮ of the Competitor Monitoring Team ("CMT") who engaged in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,[44] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮"[45] In the US alone, this team scraped pricing information from ▮▮▮▮▮▮ online sites, including the prices of ▮▮▮▮ of merchants on ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮, including merchants who also sell on Amazon.[46]

Amazon uses this pricing information to notify its merchants "every time" they set a price on Amazon that is even "one cent" higher than the lowest price Amazon finds outside of its

---

[43] Pathak Rpt. ¶233, Pathak Rpt. Exhibit 11.

[44] Ex. 26, AMZN_FW_00001442 (Chakraborty May 26, 2022 CA AG PMQ interview) at 19:1-8 and 26:6-14; Ex. 27, AMZN_FW_00002169 (Sachin Jain Sept. 9, 2022 FTC interview) at 155:9-14.

[45] Ex. 28, CAAGLit-AMZ_00014516 at '23.

[46] Ex. 29, CAAGLit-AMZ_04000738 (spreadsheet with competitors monitored for SC-FOD from January 1, 2017 through October 31, 2022); Ex. 30, CAAGLit-AMZ_00889296 (Jun. 20, 2019 email) ("▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 6, AMZN_PPC_0000002521 (Christa Glenn Jun. 23, 2022 CA AG PMQ interview) at 58:22-61:20 (testifying that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

marketplace.[47] Amazon has automated its Buy Box removal through a filter, which discards

offers that don't satisfy its price-matching requirement.[48] Amazon tells merchants what price

they need to charge to match the lowest external price—by email,[49] and through their accounts at

Seller Central,[50] including from "the Pricing Health Page," where merchants "can hit the blue

update button on the right hand side" which "allows [them] to update [their] price to make [their]

offer Featured Offer eligible."[51] Merchants can also use pricing tools from Amazon or third-party

developers that allow them to automatically match the price eligible for the Buy Box (the lowest

external price).[52] Amazon warns merchants that if they do not meet this price, their offers will be

obscured on Amazon Marketplace, i.e., they will be removed from the Buy Box.[53] If no seller

meets the lowest external price then Amazon will remove the Buy Box from the product page

altogether, an event that Amazon recorded ▮▮▮▮▮▮▮ between 2018 (when Amazon first

began keeping records of this event) through early 2023.[54] Prof. Pathak opines that this conduct

demonstrates Amazon's willingness to suppress output marketwide.[55] "This record demonstrates

that" Plaintiffs have made a sufficient showing of the availability of "common evidence to

support classwide treatment" of Amazon's unlawful agreements with merchants. *In re

Capacitors*, 2018 WL 5980139, at *5.

       Similarly, common evidence will also determine whether Buy Box removal is not only

Amazon's method of enforcing restraints under the BSA, but is also an agreement in itself,

according to which, Amazon withholds its Buy Box unless merchants price-match the lowest

external prices, thereby preventing more competitive prices appearing outside of Amazon.

Notably, Section 1 does not require "an express agreement, either oral or written;" instead "it is

---

[47] Ex. 17, CAAGLit-AMZ_02289543 (PowerPoint titled Pricing Competitively to Accelerate Sales) (text accompanying slide 3 and 8).

[48] Ex. 33, AMZN_PPC_0000002510 (Nov. 10, 2021 Christa Glenn CA AG interview) at 41:5-41:16.

[49] *Id.* (notes accompanying slide 8 and 13).

[50] Ex. 31, AMZN_PPC_0000000986 (interrogatory responses) at '10.

[51] Ex. 17, CAAGLit-AMZ_02289543 (text accompanying slide 9).

[52] *Id.* (text accompanying slide 13).

[53] Ex. 32, AMZN_PPC_0000001389 (FTC specifications) at '97.

[54] Pathak Rpt. ¶28.

[55] Pathak Rpt. ¶28.

**HAGENS BERMAN**

1    sufficient that a concert of action be contemplated" and that the parties to the unlawful concerted

2    action "conform to the arrangement." *Arandell Corp. v. CenterPoint Energy Servs.*, 900 F.3d

3    623, 634 (9th Cir. 2018) (quotation omitted). Amazon's records of the introduction and

4    subsequent development of this policy since 2015, which Amazon has variously called "Buy Box

5    suppression," "Select Competitor Featured Offer Disqualification," or "SC-FOD," is common

6    evidence concerning whether Buy Box removal is an agreement.[56] For example, Mike Miller,

7    Amazon's former Director of Product Management, explains that SC-FOD is a ███████████

8    ████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████

11   ████████████████████████████████[57] He further explains that Buy Box

12   removal is ████████████████████████████████████████████

13   ████████████████████[58]

14        Other common evidence of concerted action are the testimony and internal documents

15   concerning SC-FOD's effectiveness at preventing competition from other online marketplaces or

16   retailers[59] and evidence of its effectiveness at getting merchants to comply with Amazon's

17   anti-discounting policy. For example, Amazon provided written testimony that each week it

18   ████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████.[60] The

21   evidence from Amazon's designated corporate witness and the document prepared by Amazon in

22   connection with that testimony shows that collectively, third-party seller product pages receive

23

24        [56] Ex. 34, AMZN_PPC_0000000914 (email chain, ending Jun. 22, 2016) at '14.

25        [57] Ex. 35, AMZN_PPC_0000000054 (email chain, ending Jan. 31, 2019) at '55.

         [58] *Id.*

26        [59] *See, e.g.,* Ex. 36, CAAGLit-AMZ_01794350 (Sample Article: Amazon vs. Jet – Who Wins on Price?) at '55
      (In addition to "price parity enforcement," Amazon had "multiple levers," like "removing BuyBox eligibility for

27   noncompetitive priced offers," which is "a faster mechanism to price parity[.]").

         [60] Ex. 31, AMZN_PPC_0000000986 (interrogatory responses) at '29; Ex. 32, AMZN_PPC_0000001389 (FTC

28   specifications) at '97 (defining "glance views").

1  ██████████████████ customer views a week.[61] Remarkably, only about ███ of the ████████

2  ████████████████████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████[62] That rate drops to an

4  astonishing ████ for ████████████████████████████████████████████████

5  ███.[63]

### 3.    Common evidence exists to determine whether through platform pricing restraints, Amazon engaged in anticompetitive conduct, unlawfully restrained trade, and affected Interstate Commerce.

### a.    Plaintiffs establish the Interstate Commerce requirement.

Plaintiffs satisfy the jurisdictional requirement that the alleged restraints Plaintiffs challenge is an "activity in interstate commerce." *McLain v. Real Estate Bd.*, 444 U.S. 232, 242 (1980). "Amazon admits that it sells goods in its U.S. store," "allows third-party sellers to sell specific physical goods in its U.S. store," "that its U.S. store is accessible to consumers throughout the United States who have Internet access," and that the agreement Plaintiffs challenge governs "the terms and conditions under which third-party sellers may sell their physical goods in Amazon's U.S. store."[64] This question of law and fact is common to the Class.

### b.    Anticompetitive effects or conduct can be determined based on common evidence.

Plaintiffs' prima facie burden under Section 1 to demonstrate "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market" is "essentially the same" burden required to establish "the anticompetitive-conduct requirement" under Plaintiffs' monopolization and attempted monopolization claims under Section 2. *Epic Games*, 67 F.4th at 983, 998 (quotations omitted). (This element is distinct from causal antitrust injury (impact) to members of the proposed class, discussed in a later section (Sect. III.B.5)).

---

[61] Ex. 37, AMZN_PPC_0000000485 (line 2).

[62] Ex. 37, AMZN_PPC_0000000485 (line 16); Ex. 6, AMZN_PPC_0000002521 (Jun. 23, 2022 Christa Glenn CA AG PMQ interview) at 207:11-14.

[63] Ex. 37, AMZN_PPC_0000000485 (line 23).

[64] Answer ¶¶15, 140.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    "[A]ntitrust cases 'readily' meet the predominance requirement because the "violation

2    turns on *defendants'* conduct and intent along with the effect on the market, *not* on individual

3    class members." *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020) (emphasis

4    in original) (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997)).

5        Evidence of anticompetitive effects can be proved directly or indirectly. "Direct evidence

6    of anticompetitive effects would be proof of actual detrimental effects on competition, such as

7    reduced output, increased prices, or decreased quality in the relevant market[.]" *Amex*, 585 U.S.

8    at 542 (cleaned up). This evidence is by its nature common and does not vary by class member.

9    For example, in *In re Suboxone*, the court held that plaintiffs' detailed citations to the record

10   concerning the defendant's alleged product-hopping strategy, including "efforts to undermine

11   tablet sales, raise false safety concerns about tablets, withdraw branded tablets, raise branded

12   tablet prices, and then ultimately switch the market to Suboxone film" provided common

13   evidence of increased prices. 421 F. Supp. 3d 12, 53 (E.D. Pa. 2019), *aff'd*, 867 F.3d 264 (3d Cir.

14   2020). Similarly, in *In re Glumetza Antitrust Litigation*, the plaintiffs satisfied the predominance

15   requirement concerning anticompetitive conduct through an evidentiary record that demonstrated

16   how the defendants preserved their monopoly from generic competition and hiked drug prices.

17   336 F.R.D. at 475; *see also In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d at 1193-1205

18   (relying on defendants' documents in concluding "that Defendants sought to enter into anti-

19   solicitation agreements in an effort to stifle increased competition for labor and rising wages,"

20   and certifying the class); *McDonough v. Toys "R" Us, Inc.*, 638 F. Supp. 2d 461, 482 (E.D. Pa.

21   2009) (common evidence predominated over individual questions to show anticompetitive

22   effects as the plaintiffs offered evidence that the defendant was a dominant retailer that coerced

23   vertical restraints to prevent internet discounting).

24       Whether Amazon's anti-discounting policy constitutes anticompetitive conduct will also

25   be determined by common direct proof. For example, Amazon transaction data and internal

26   estimates that Prof. Pathak used for his empirical assessment show that Amazon's anti-

27

28

**HAGENS BERMAN**

1  discounting policies cause supracompetitive prices.[65] In his report, Prof. Pathak also explains

2  how Amazon's anti-discounting policies have suppressed overall output in the Online Retail

3  Marketplaces Market.[66] Consistent with the general economic principle that quantity demanded

4  falls as price increases, Prof. Pathak concludes that "output will always be higher absent

5  Amazon's anti-discounting policy."[67] As discussed below, in addition to Prof. Pathak's analysis,

6  other common direct evidence includes testimony and internal documents from Amazon,

7  merchants, competing marketplace operators, and ecommerce consultants, who confirm that

8  Amazon's anti-discounting policy leads to lower output and higher consumer prices.

9      The record includes evidence of Amazon's awareness that its pricing restraints lead third-

10  party sellers to raise prices or remove merchandise from other sites. For example, Amazon

11  internally acknowledged that its PPP can be ████████████████████████████████

12  ████████████████████████████████████████████████████████████"[68] and that

13  as a result of its anti-discounting policies, its ████████████████████████████████

14  ████████████████████████████████████████████

15  ███████████████████[69] It also acknowledged internally that matching prices on other retail sites

16  ████████████████████████████████████████████████████████████ the

17  external competitor.[70] According to one internal report, ████████████████████████

18  ████  Amazon's Buy Box suppression ████████████████████████████████

19  ████████████████████[71] If Amazon ████████████████████████████████

20  ████████████████████████████████████████████

21  _____

22  [65] Pathak Rpt. ¶¶340-344 (Prof. Pathak's economic model shows that prices are higher when anti-discounting policies are present in a market), 352-387 (applying Prof. Pathak's economic model to Amazon's transactional data to show that all Amazon prices are higher than they would be absent the anti-discounting policies); *infra* Sect.

23  III.B.5.

    [66] *Id.* ¶¶345-351.

24  [67] *Id.* ¶350.

25  [68] Ex. 38, AMZN_PPC_0000003532 (email chain, ending Nov. 26, 2019) at '32; Ex. 84, AMZN_PPC_0000000059 (Amazon Internal Press Release) at '67.

26  [69] Ex. 39, CAAGLit-AMZ_01150094 (Empowering Brands Direct) at '02.

27  [70] Ex. 40, AMZN_PPC_0000002536 (Feb. 1, 2019 email attaching report titled Reducing Glance Views on Price Uncompetitive 3P Offers February 2019) at '38.

28  [71]Ex. 84, AMZN_PPC_0000000059 (Amazon Internal Press Release) at '67; *see also* Ex. 6, AMZN_PPC_0000002521 (Jun. 23, 2022 Christa Glenn CA AG PMQ interview) at 127:23-135:3.

1  ████████████████████[72] Amazon correspondence provides examples of merchants doing

2  precisely this.[73] Data produced by Amazon is also common direct evidence that can be used to

3  show that despite being less expensive platforms for merchants to sell on, consumer prices from

4  third-party sellers on eBay and Walmart were lower than Amazon in ██████████ of cases.[74]

5  ████████████████████████████████████████████████████████

6  ██████████████████████████████████████████████████████████████

7  ███████████████

8

9

10

11

12

13

14

15

16  [72] Ex. 15, AMZN_PPC_0000002731 (email chain, ending Oct. 25, 2018) at '32.

17  [73] *See, e.g.,* Ex. 15, AMZN_PPC_0000002731 (email chain, ending Oct. 25, 2018) at '35 ██████████

18  ██████████████████████████████); Ex. 35, AMZN_PPC_0000000054 (email chain, ending Jan. 31, 2019) at '54 (Rajiv Chopra, VP of Worldwide pricing and the CMT, ██████████████████████████████

19  ████.).

20  [74] Pathak Rpt., ¶255, Pathak Rpt. Exhibit 16.

21  [75]

(remaining lines 20–28 redacted)

1    Amazon's data also provides its own examples of sellers raising prices on other sites to

2  comply with Amazon's anti-discounting policy. For example, as illustrated below, a merchant

3  lowered its price on Walmart, Amazon removed the product listing from the Buy Box and

4  notified the merchant of the product's ineligibility due to the lower external price, and then the

5  merchant subsequently regained the Buy Box only after raising its price on Walmart:[76]



---

[76] Pathak Rpt., ¶31, Pathak Rpt. Exhibit 2.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    As shown in the table below, non-party documents and testimony also provide common

2    direct evidence of merchants' compliance with Amazon's anti-discounting policies by (i) raising

3    their prices off Amazon, (ii) lowering their price on Amazon (in some cases only temporarily,

4    until the lower off-Amazon price is eliminated), and (iii) withholding their products from sale

5    through other retailers (having the effect of reducing output):

| Method of Compliance | Merchant | Evidence |
|---|---|---|
| Raising off-Amazon prices | ███ | ████████████████████████ |
| | ViaHart | Ex. 50, AMZN_PPC_0000008981 (Molson Hart Sept. 12, 2023 deposition) at 244:20-246:1 (ViaHart's CEO testified that after he received the email from Amazon notifying him that his company had lost the Buy Box because of another lower price outside of Amazon, he raised the price of his product on Walmart to match his price on Amazon.). |
| | ███ | ████████████████████████ |
| | Feedvisor | Ex. 51, FEEDV-29938 (email chain, ending Jun. 15, 2017) at '39 (e-commerce consultant recommending that client abide by price parity to avoid Buy Box suppression: "[I]ts known that Amazon enforces parity across various ecommerce platforms, so we can (unofficially) recommend that you price to meet this best practice, OR – if anything have a lower price on Amazon than your site, up to 5%. Violating this parity on an ASIN can contribute to buy box suppression."). |
| | | Ex. 52, FEEDV-30629 (email chain, ending Jun. 2, 2020) at '52 and '30 (discussion of parity pricing settings for eBay – a "service to ensure that your prices match across the platforms" and to help "avoid the Amazon listings from being suppressed" as well as possible default eBay pricing of 10% above the Amazon price). |

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

| Method of Compliance | Merchant | Evidence |
|---|---|---|
| | ▅ | ▅ |
| | ▅ | ▅ |
| | Leveret | Ex. 55, PPC_CAAGTP_0002264 (Declaration of Mayer Handler, CEO of third-party seller Leveret) at '67, ¶18 ("Leveret keeps prices on our own website the same as the prices on Amazon specifically to avoid having the Amazon buy box suppressed."). |
| | ▅ | ▅ |
| Lowering Amazon prices | ▅ | ▅ |
| | ▅ | ▅ |
| | ▅ | ▅ |

| Method of Compliance | Merchant | Evidence |
|---|---|---|
| | | ■■■■■■■■■ |
| | | ■■■■■■■■■ |
| | Leveret | Ex. 61, PPC_CAAGTP_0174233 (email chain, ending Jan. 28, 2020) at '33-34 (Leveret states that it may have to "stop selling our best styles to Zulily" after merchant's buy box was suppressed because of lower prices on Zulily.). |
| Withholding products from sale through other retailers | ■ | ■■■■■■■■■ |
| | ■ | ■■■■■■■■■ |
| | ■ | ■■■■■■■■■ |
| | Western Outlets | Ex. 64, (Jerome Kavesh 2024 Deposition) at 107:15-108:5 (when Amazon suppresses the Buy Box for one of his products, he often "just no longer carr[ies] the product"). |

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1          Relatedly, common evidence exists to determine whether Amazon's anti-discounting

2  policies have caused sellers who would have sold on platforms other than Amazon ("multi-

3  homed") not to do so.[77]

4          As Prof. Pathak explains, by controlling the prices of sellers' merchandise on and off

5  Amazon through its cross-platform pricing restraints, Amazon restrains competition from other

6  marketplaces on price, allowing Amazon to maintain higher referral fees.[78] These anti-

7  discounting provisions simultaneously eliminate the incentive for competing marketplaces (like

8  eBay or Walmart) to lower their referral fees for two reasons: (1) Amazon's restraints remove

9  third party merchants' incentive to offer discounts on other platforms, even if referral fees are

10  lower off Amazon,[79] and (2) the restraints ensure that Amazon merchants will almost certainly

11  match those few online deals that competing marketplaces are able to offer at prices better than

12  Amazon.[80]

13          Multiple peer-reviewed articles and statements by competition regulators also provide

14  common evidence concerning Plaintiffs' allegations of the harmful effects of Amazon's

15  PMFNs.[81] These authorities demonstrate that absent a PMFN, merchants seeking to maximize

16  profits would typically set lower prices for the same merchandise on marketplaces with lower

17  marketplace fees and that PMFNs restrain this profit-maximizing strategy. PMFNs also restrain

18  marketplace operators' profit-maximizing strategy of lowering their marketplaces fees to attract

19  lower prices to their sites.[82]

20

---

21          [77] Pathak Rpt. ¶¶243-246; *see also, e.g.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 55, PPC_CAAGTP_0002264 (Declaration of Mayer

22  Handler, CEO of Leveret) at '68, ¶22 ("I am personally familiar with other Amazon third-party sellers who have
stopped selling products to competing discount retailers like Zulily in order to prevent a discounted price on these

23  competing sites from disqualifying their Amazon offers from the buy box.");
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25          [78] Pathak Rpt. ¶¶263-268.

26          [79] Pathak Rpt. ¶¶247-248, 263-268.

27          [80] *Id.* ¶¶249-257.

          [81] *Id.* ¶¶281-289.

28          [82] *Id.*

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Non-party evidence can also be used class-wide to address whether absent Amazon's PMFNs, merchants would price lower on platforms that charge lower marketplace fees. For example:

- ████████████████████████████████████████████████████

- **Leveret**: "Because we pay less in fees on our own and other websites, we could sell our products for lower prices on these websites. We do not do this, however, because if we do, Amazon will disqualify Leveret's offers from the buy box."[84]

- ████████████████████████████████████████████████████

- ████████████████████████████████████████████████████

- ████████████████████████████████████████████████████

- ████████████████████████████████████████████████████

- **Western Outlets**: "We could afford to sell items for less on eBay and Walmart and our own website, because fees are lower on these marketplaces, but because Amazon costs are higher, we need to price those costs into everywhere we sell."[90]

---

[83] ████████████████████████████████████████████

[84] Ex. 55, PPC_CAAGTP_0002264 (Declaration of Mayer Handler, CEO of Leveret) at '67, ¶19.

[85] Ex. 66, PPC_CAAGTP_0174118 (Molson Hart, ViaHart CEO, blog post titled Amazon's Pricing Policies Promote Inflation) at '18.

[86] ████████████████████████████████████████████

[87] ████████████████████████████████████

[88] ████████████████████████████████████

[89] ████████████████████████████

[90] Ex. 70, PPC_CAAGTP_0031636 (Declaration of Jerome Kavesh, CEO Western Outlets) at '37, ¶6.

Other common direct evidence of anticompetitive conduct includes Prof. Pathak's opinion, based on Amazon's internal documents, that Amazon's policies have degraded the quality of its online marketplace despite an *increase* in the marketplace's profitability.[91] Prof. Pathak opines that because Amazon faces virtually no competition from other marketplaces, it can maintain its market dominance while degrading quality by pushing unwanted ads and sponsored content and promoting its own first-party search results over quality-based recommendations.[92]

        **c.**    **Common evidence provides indirect proof of anticompetitive conduct.**

Plaintiffs can also show anticompetitive effects circumstantially through "proof of market power plus some evidence that the challenged restraint harms competition." *Amex*, 585 U.S. at 542. This inquiry need not be "extensive" or "highly technical." *Epic Games*, 67 F.4th at 983. "It is sufficient that the plaintiff prove the defendant's conduct, as [a] matter of economic theory, harms competition—for example that it increases barriers to entry or reduces consumer choice by excluding would-be competitors that would offer differentiated products." *Id.* at 983-84.

As previously described, there is common evidence both of Amazon's market power and the anticompetitive effects of its anti-discounting policies. *Supra* Sect. III.B.1 and B.3.b. Plaintiffs can also support the anticompetitive effects element indirectly with "evidence that potential competitors attempted to enter the market with innovative [methods] that were superior to those used by the defendant, but that the barriers to entry prevented the potential entrants from successfully doing so." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 278565, at *34-35 (E.D.N.Y. Jan. 25, 2024) (relying on *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 62-63 (2d Cir. 2019)).

For example, the record shows that although a new entrant into the market, Jet.com, charged similar referral fees as Amazon's (ranging from 8-15%),[93] it initially offered an

---

[91] Pathak Rpt. ¶¶416-421.

[92] *Id.*

[93] *See* Ex. 71, CAAGLit-AMZ_01868464 (Jet. com Summary) at '67; Ex. 72, Jason Del Rey, *Five Ways the Guy Behind Diapers.com Plans to Challenge Amazon–Again*, VOX (Jan. 9, 2015); Ex. 73, Kiri Masters, *Amazon VS Jet for Brands - Should Sellers Ditch Amazon??*, LINKEDIN (July 21, 2015).

innovative business model of charging consumer membership fees (which was Jet.com's only source of profit), using seller referral fees to pay for consumer discounts for the products merchants sold.[94] As a result, consumer prices on Jet.com were substantially lower than on Amazon around the time of its launch in 2015.[95]

Amazon's internal documents confirm that Amazon recognized that Jet.com's business model could reduce consumer prices on third-party merchants' products as much as █████, effectively eliminating the referral fees from the prices consumers paid.[96] Amazon noted that it ████████████████████████████████████████████████████████████████ ███████████████████████████████████████[97] Amazon stated that to crush Jet's innovative strategy and the threat it posed, its █████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████[98] One lever was SC-FOD, which Amazon described as ██████████████████████████████ because it prevented third-party sellers from selling at lower prices on Jet.com and thus hindered Jet.com's ability to compete as a marketplace.[99] By October 7, 2015, just months after it launched, Jet.com abandoned its innovative model; Jet.com dropped its subscription fees and began retaining seller referral fees comparable to Amazon's.[100] By 2016, Walmart acquired Jet.com.[101]

Common evidence also demonstrates Amazon's enforcement of SC-FOD as a barrier to Jet's competition. For example, in October 2018, a third-party brand seller expressed frustration to Amazon that ██████████████████████████████████████████████████████████ ██████████████████████████████ although the merchant was not selling directly on

---

[94] Ex. 72, Del Rey; *see* Ex. 71, CAAGLit-AMZ_01868464 (Jet. com Summary) at '67.

[95] *See* Ex. 74, CAAGLit-AMZ_01795181(email chain, ending Jul. 20, 2015) at '81 (Wells Fargo analyst note report finding that Jet.com's base prices were 9% lower than Amazon's).

[96] Ex. 75, CAAGLit-AMZ_01794303 (Project Blackbird-Prime Club Savings) at '07.

[97] *Id.*

[98] *Id.* at '08.

[99] Ex. 36, CAAGLit-AMZ_01794350 (Project Blackbird) at '55.

[100] Ex. 73, Masters; *see* Ex. 76, CAAGLit-AMZ_00152776 (email chain, ending Oct. 8, 2015) at '77-'80.

[101] Ex. 77, CAAGLit-AMZ_02840317(email chain, ending Sep. 28, 2016) at '18.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Jet.com.[102] Mike Miller, Amazon's former Director of Product Management, reiterated that pursuant to ASB, "Brand Owners always need to match the external prices" on designated competitor platforms and that the brand merchant here should ████████████████████

████████████████████████████████████████████████████████████████████████████████████

███████████████ this product.[103] Eventually, Walmart shut down Jet.com in 2020.

Jet.com's attempted entry, change in profit model from membership fee-based to referral fee-based, and failure, is precisely the competitive harm predicted by Plaintiffs' expert. This is a real-world demonstration of Amazon's anti-discounting policies stifling competition and is common evidence that supports a predominance finding. *See In re Suboxone*, 421 F. Supp. 3d at 32-33 (certifying class where theory of injury was that "[a]bsent [the defendant's] actions, the generic Suboxone tablets would theoretically have entered the market and competed with" the defendant).

### 4.    Common evidence exists to show whether Amazon intended to monopolize and, if it did not achieve a monopoly, came dangerously close to monopolizing through the challenged conduct.

Should Plaintiffs not prove their monopolization claim, common evidence also exists to determine each element of Plaintiffs' attempted monopolization claim. All evidence of Amazon's intent to monopolize is necessarily common to the class as it focuses on *Amazon's* state of mind and conduct rather than any plaintiff-specific evidence. An inference of specific intent to monopolize "may be drawn from conduct … with an unreasonable restraint of trade in violation of Section 1." *Optronic Techs.*, 20 F.4th at 483 (cleaned up); *see supra* Sect. III.B.2-3. "[E]vidence that [defendant] was aware that its conduct was[] or could be perceived as anticompetitive" also supports an intent to monopolize. *Optronic Tech.*, 20 F.4th at 484. Common evidence includes records of regulatory actions against Amazon's use of the PPP in Germany and the UK in 2013, and Japan in 2017, and subsequent investigations beginning around 2019 into the other restraints Plaintiffs challenge by the House Judiciary Subcommittee

---

[102] Ex. 78, AMZN_PPC_0000000415 (email chain, ending Oct. 25, 2018) at '19.

[103] *Id.* at '17.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

and FTC.[104] Other examples of common evidence Plaintiffs can rely on include an internal

Amazon document stating that ████████████████████████████████████

████████████████████████████████████████████████ has a better

price than Amazon's competition and that Amazon ████████████████████

████████████████████[105] In another document, Amazon ponders, ████████

████████████████████████ and explores various methods (principally

the anti-discounting policies) to cement its ability to set prices across the market.[106] In yet

another, Amazon notes that the ████████████████████████████

████████████████████[107] All similar evidence of Amazon's intent to

monopolize is common to the class and supports a predominance finding. *Castro v. Sanofi*

*Pasteur Inc.*, 134 F. Supp. 3d 820, 846 (D.N.J. 2015) (predominance satisfied on intent question

when plaintiffs provided defendant's internal documents "indicating intent to leverage its broad

product line to prevent head-to-head competition and to create a significant barrier to

competition by [its competitor]").

   Next, common evidence can be used to determine whether there is a "dangerous

probability" that Amazon will obtain monopoly power in the Online Retail Marketplaces Market.

For attempted monopolization claims, "the minimum showing of market share required … is a

lower quantum than the minimum showing required in an actual monopolization case," e.g.,

"forty-four percent," when barriers to entry were high and competitors could not expand their

short-run output." *Optronic Tech.*, 20 F.4th at 484. As explained above (Sect. III.B.1), common

evidence shows that Amazon has 70% market share, and that these other conditions exist here.

   **5.**  **Plaintiffs provide a reliable common method to establish antitrust injury on a class-wide basis (impact).**

   Antitrust impact "is the 'fact of damage' that results from a violation of the antitrust

laws." *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 565-66 (N.D. Cal. 2013)

---

[104] *See, e.g.*, SCAC, ¶¶19, 139-146, 149.

[105] Ex. 40, AMZN_PPC_0000002536 at '37.

[106] Ex. 79, AMZN_PPC_0000002751 at '51 (emphasis in original).

[107] Ex. 80, AMZN_PPC_0000002544 at '46.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    (quotation omitted). The question at class certification "is whether each member of the class can

2    rely on" common evidence "to show antitrust impact of any amount." *Olean*, 31 F.4th at 679.

3    When impact "is *capable* of class-wide resolution," the predominance requirement is met. *Id.* at

4    667 (emphasis in original). Plaintiffs need not "win the fray." *Amgen*, 568 U.S. at 460. Attacks

5    on a common impact methodology that reflect, at best, "a fatal similarity," should be resolved at

6    summary judgment, not class certification. *Lytle*, 99 F.4th at 572.

7         Plaintiffs' primary proof of impact is the work of their economist, Prof. Pathak.

8    Prof. Pathak's analysis begins with an assessment of Amazon's anti-discounting policies.[108] He

9    observes that they closely parallel "most favored nations" or price parity requirements—a type of

10   contractual restraint that forbids sellers from offering lower prices off of Amazon.[109] Indeed,

11   Amazon's PPP was an explicit, contractual parity requirement.[110] Ample economic literature

12   confirms that anti-discounting policies like Amazon's can cause supracompetitive consumer

13   prices, as Plaintiffs here claim.[111]

14        Prof. Pathak then discusses Amazon's specific policies—PPP, MFPP, ASB, Seller Code

15   of Conduct, and SC-FOD—with a special emphasis on how Amazon monitored and enforced

16   them.[112] His evaluation of the qualitative, economic evidence in this case is consistent with

17   Plaintiffs' case theory that the challenged restraints operated as an effective anti-discounting

18   policy during the relevant period.[113]

19        Prof. Pathak explains that these anti-discounting policies cause marketwide harm.[114] His

20   core insight is that they lead to merchant referral fees at Amazon, and across the entire market,

21   that are above levels they would be in a competitive market,[115] and that class members were

22   injured because these supracompetitive fees are a component of the retail prices that class

23   _____

     [108] Pathak Rpt. §6.

24   [109] *Id.* ¶¶269-272.

25   [110] *Id.* ¶166.

     [111] *Id.* ¶¶281-289.

26   [112] *Id.* ¶¶182-241.

27   [113] *Id.* ¶¶273-275.

     [114] *Id.* §7.

28   [115] *Id.* ¶334.

members paid.[116] In a competitive market, merchants set prices based on the fees that charged by the marketplaces through which they sell.[117] In that unrestrained market, marketplaces set fees to incentivize sellers to set lower prices.[118] But under Amazon's anti-discounting policies, merchants instead set prices based on the fees that both Amazon and other platforms charge.[119] In this market—the actual market—both Amazon and other marketplaces have less incentive to charge lower fees, and accordingly charge higher fees.[120] A comparison of the competitive and actual markets is shown below:[121]



Prof. Pathak compares these two worlds directly: "holding all else equal between the real world and the but-for world, marketplaces will always set higher fees when anti-discounting practices are in place."[122] "Because discount-constrained merchants do not have the ability to steer consumers to other marketplaces by setting lower prices on those marketplaces, the cross-

---

[116] *Id.* ¶343.

[117] *Id.* ¶¶307-313.

[118] *Id.* ¶¶320-329.

[119] *Id.* ¶¶314-319.

[120] *Id.* ¶¶330-339.

[121] *Id.* ¶30, Pathak Rpt. Exhibit 1.

[122] *Id.* ¶334.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

marketplace competitive constraint on fee setting no longer exists … [B]ecause merchants cannot discount prices, marketplaces have no reason to discount fees. Instead, the presence of the anti-discounting policy incentivizes the marketplaces to increase fees."[123] As a result, sellers in turn raise prices to consumers.[124] "In short, … absent Amazon's anti-discounting policies, consumers would have paid lower prices for all goods, on all marketplaces, including Amazon's."[125]

Prof. Pathak offers several independent analyses that demonstrate this class-wide impact:

**Analytical Model.** Prof. Pathak constructs an economic model of platform competition, derived from a peer-reviewed model found in the relevant economic literature, the Boik-Corts model.[126] Both the original Boik-Corts model and Prof. Pathak's adaptation are economic models that evaluate the incentives and pricing of platforms and sellers in markets with and without anti-discounting strategies. The model shows that, under the facts of this case, referral fees, a component of consumer prices, will *always* be lower in the absence of an anti-discounting strategy.[127] Modeling the impact of lower referral fees on consumer prices, Prof. Pathak demonstrates class member overpayment on a per-purchase basis.[128]

Prof. Pathak applies his model to this market by using Amazon's real world transactional data—████████████████████████████—to analyze quantitatively how platforms and sellers set prices in the actual world.[129] Then, holding all else constant, Prof. Pathak models the same world without Amazon's anti-discounting policies to demonstrate what consumers should have paid in the but-for world.[130] In total, the model ingests roughly 8.6 terabytes and provides but-for price calculations for 235 million items of merchandise (i.e., Amazon Standard

---

[123] *Id.* ¶339.

[124] *Id.* ¶¶340-344

[125] *Id.* ¶344.

[126] *Id.* ¶¶290-351; *see also* Ex. 81 (Andre Boik & Kenneth S. Corts, *The Effects of Most-Favored-Nation Clauses on Competition and Entry*, 59 J.L. & Econ. 105, 106 (2016)).

[127] Pathak Rpt. ¶¶338-339.

[128] *Id.* ¶344.

[129] *Id.* ¶¶361-378.

[130] *Id.* ¶¶379-380.

1   Identification Numbers (ASINs)).[131] The Pathak model is capable of calculating a but-for-price

2   for every purchase by every class member throughout the Class Period.[132] Prof. Pathak concludes

3   that even considering idiosyncratic pricing practices, all or virtually all class members are injured

4   because they would have paid lower prices on at least some of their purchases absent Amazon's

5   anti-discounting policies.[133]

6       Plaintiffs meet the predominance requirement because each class member can rely on

7   Prof. Pathak's "model as evidence of impact on similarly situated class members." *Olean*, 31

8   F.4th at 680-81. "[E]conomic theory, documentary evidence and statistical analyses" are

9   common methods of demonstrating that a defendant's antitrust violation "affected all or nearly

10  all class members." *Nitsch*, 315 F.R.D. at 297. However, "formal statistical technique" is not

11  always needed to prove class-wide impact. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012

12  WL 555090, at *7 (N.D. Cal. Feb. 21, 2012). For example, "courts have recognized the validity

13  of the yardstick analysis method for demonstrating class-wide impact." *In re Live Concert*

14  *Antitrust Litig.*, 247 F.R.D. at 145 (cleaned up). A model like Prof. Pathak's is particularly apt

15  for this case, where Amazon's continued anticompetitive conduct makes before-after and

16  benchmark regression modeling impossible. *See Iowa Pub. Emps. Ret. Sys. v. Bank of Am. Corp.*,

17  2022 WL 2829880, at *24-25 (S.D.N.Y. June 30, 2022) (non-regression economic model found

18  capable of proving class-wide impact, in a case where no "clean" data existed).

19      **Yardstick.**  Prof. Pathak examines several geographic markets in which Amazon lacks

20  the incumbency advantage that it holds in the US.[134] Specifically, Prof. Pathak analyzes

21  Amazon's fees in Australia, Belgium, Netherlands, Poland, Singapore, Sweden, and Japan.[135]

22  These markets are similar because they have a level of development roughly comparable to the

23  US.[136] But Amazon's share in these markets is lower than in the US, and it faces effective

24

25  [131] *Id.* ¶¶10, 352, Pathak Rpt. Appendix Sect. 1 ¶8.

    [132] *See id.* ¶¶352-387.

26  [133] *Id.* ¶387.

    [134] *Id.* ¶¶388-405.

27  [135] *Id.* ¶391, Pathak Rpt. Exhibit 4; *see also* Pathak Rpt. ¶¶43-44.

28  [136] *Id.* ¶¶43-44, Pathak Rpt. Exhibit 4.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1   competition.[137] Because Amazon lacks the dominance necessary to effectuate its anticompetitive

2   policies, Amazon offers lower referral fees.[138] Prof. Pathak's study provides further common

3   evidence to determine whether the combination of Amazon's market power and its

4   anticompetitive policies cause higher referral fees in the US.[139]

5       Yardstick analyses like Prof. Pathak's are regularly found to carry class plaintiffs' burden

6   on impact. *See, e.g.*, *In re Dynamic Random Access Memory Antitrust Litig.*, 2006 WL 1530166,

7   at *8-10 (N.D. Cal. June 5, 2006) (accepting "yardstick" approach for showing class-wide

8   impact); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 25

9   n.31 (E.D.N.Y. 2020) (accepting "use in this case of a market yardstick to show classwide

10  impact in the but-for world").

11      **Empirical Studies.** Prof. Pathak's economic model finds that higher referral fees will

12  lead to higher consumer prices (and lower fees lead to lower prices).[140] Prof. Pathak finds further

13  support for this conclusion in real world events and data. Prof. Pathak explains that Amazon's

14  anti-discounting policies either (1) deter and prevent effective entry by low-price platform

15  competitors, or (2) incentivize platforms to adopt Amazon's referral fees.[141] Both occurred in

16  this market. Prof. Pathak explains that at least one low-price platform attempted to enter:

17  Jet.com.[142] Amazon swiftly worked to punish sellers that discounted on Jet.com.[143] Shortly

18  thereafter, the platform was purchased by Walmart, and then shut down.[144] Today, Walmart

19  adopts the same, high-price strategy that Amazon does.[145]

20      Using Amazon's data, Prof. Pathak also conducts natural experiments—regression

21  testing—to empirically evaluate his model's predictions about consumer prices in the but-for

22

23  [137] *Id.* ¶391.

    [138] *Id.*

24  [139] *Id.* ¶¶388-405.

    [140] *Id.* ¶393.

25  [141] *Id.* ¶¶155, 188-207, 266, 299.

26  [142] *Id.* ¶¶188-207.

    [143] *Id.*

27  [144] *Id.* ¶266; *supra* Sect. III.B.3.c.

28  [145] Pathak Rpt. ¶267.

world when Amazon changes its referral fees (although rare, Amazon does occasionally change its referral fees).[146] The statistically significant results show that lower referral fees in fact lead to lower consumer prices.[147] Moreover, Prof. Pathak's empirical studies parallel Amazon's own assessment of how referral fees impact consumer prices.[148] Amazon's own economists conducted numerous studies on this topic, which confirm Prof. Pathak's conclusion.[149] Natural experiments such as these are regularly found sufficient to prove class-wide impact. *See In re Broiler Chicken Grower Antitrust Litig. (No. II)*, 2024 WL 2117359, at *17-20 (E.D. Okla. May 8, 2024) (rejecting *Daubert* challenge to natural experiment and finding it "capable of demonstrating the class-wide impact").

Prof. Pathak also evaluates potential counterarguments to his class-wide impact opinion:

*First*, Prof. Pathak opines that to achieve anticompetitive effect Amazon's anti-discounting policies need not be perfectly followed. Instead, they need only be sufficiently effective to deter meaningful platform competition.[150] Further, rival platforms will rationally not only consider what can be observed about Amazon's actual enforcement of its policy, but they will also consider the *potential* level of Amazon's enforcement.[151] Because rival platforms have to consider that Amazon could scale up its enforcement efforts to respond to competitive threats, their economic incentive to pursue a competitive strategy focused on low referral fees is diminished.[152] Indeed, Amazon *did* scale up its monitoring and enforcement efforts in response to Jet.com's entry.[153]

As Prof. Pathak observes, Amazon's monitoring and enforcement efforts are extensive. Amazon's Monitoring data[154] reflects that between 2015 and 2023 Amazon regularly monitored

---

[146] *Id.* ¶¶393-401.

[147] *Id.* ¶399, Pathak Rpt. Exhibit 21.

[148] *Id.* ¶¶402-405.

[149] *Id.* ¶403.

[150] *Id.* ¶¶242-257.

[151] *Id.* ¶40

[152] *Id*.

[153] *Infra* Sect. III.B.3.c

[154] Amazon's Monitoring data is 9.6 terabytes of data scrapped from the internet by Amazon, from Amazon's competitors, reflecting offers on non-Amazon competitor websites. Pathak Rpt. Appendix 1 ¶2.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  ████████████████████████ sold across hundreds of websites.[155] Over the Class Period,

2  Amazon's monitoring consistently covered between ██████████ of all third-party sellers'

3  merchandise by sales revenue.[156] Additionally, between 2018 and 2023, Amazon's Enforcement

4  data[157] reflects nearly ██████████ incidents in which Amazon removed the Buy Box for *all* sellers

5  of a given product, reflecting a purposeful choice by Amazon to decrease marketwide output.[158]

6  Moreover, Prof. Pathak opines that an "enforcement" incident is not necessary to achieve seller

7  compliance with Amazon's policy, because most do not dare to violate the policy in the first

8  place.[159] Prof. Pathak's opinion is supported by ample common evidence reflecting that both

9  rival platforms and merchants are aware of Amazon's anti-discounting policies and that

10  merchants' compliance is high.[160]

11      *Second*, Prof. Pathak evaluates Amazon's purported procompetitive justifications for its

12  anti-discounting policy and finds them lacking.[161] Any claim by Amazon that the policy leads to

13  lower consumer prices on Amazon is demonstrably false, given the extensive econometrics

14  analysis Prof. Pathak brings to bear. The typical justification for PMFNs is the elimination of

15  free-riding, which purportedly improves platform quality.[162] But free-riding is not a significant

16  concern in this market.[163] Amazon's immense profitability would allow it to invest in platform

17  improvement even without its supracompetitive referral fees, and real world evidence shows that

18  Amazon's platform is *declining* in quality, not improving, as an economist would expect if the

19  restraints at issue prevented free-riding.[164]

20

---

21  [155] *Id.* ¶233, Pathak Rpt. Exhibit 11.

   [156] *Id.*

22

23  [157] Amazon's Enforcement data is 9.3 terabytes of data reflecting instances in which Amazon compared seller's prices to off-Amazon pricing; it also reflects instances where Amazon enforces its anti-discounting policies against sellers. Pathak Rpt. Appendix Sect. 1 ¶5.

24  [158] *Id.* ¶28.

25  [159] *Id.* ¶162; *see also id.* ¶255, Pathak Rpt. Exhibit 16 (showing roughly ████ of prices are in compliance).

   [160] *See also supra* Sect. III.B.3.b.

26  [161] Pathak Rpt. ¶¶406-421.

   [162] *Id.* ¶¶406-409.

27  [163] *Id.* ¶¶410-415.

28  [164] *Id.* ¶¶135, 416-421, Rpt. Exhibit 8.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1      In sum, Prof. Pathak offers to prove class-wide impact through several recognized and

2  sufficient methods (Analytical Model, Yardstick, and Empirical Studies). His work satisfies

3  Plaintiffs' burden at this stage. *See Olean*, 31 F.4th at 667.

4        **6.     Plaintiffs provide a reliable common method to calculate damages class-wide.**

5      Plaintiffs' damages burden is light. "A putative class must 'establish that damages are

6  susceptible of measurement across the entire class.'" *In re Glumetza Antitrust Litig.*, 336 F.R.D.

7  at 479 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)). The Supreme Court

8  recognizes that "[t]he vagaries of the marketplace usually deny us sure knowledge of what

9  plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J.*

10  *Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981).

11      Prof. Pathak provides a reliable methodology for estimating class-wide damages.[165]

12  Using the same analytical model he uses to prove class-wide impact, Prof. Pathak calculates

13  Amazon's but-for referral fees.[166] He verifies his conclusion using the yardstick measure to

14  compare his model's output to referral fees in more competitive markets.[167] Then, using this but-

15  for referral fee estimate, Prof. Pathak uses his model to calculate but-for consumer prices.[168]

16  Finally, he compares but-for consumer prices to actual prices paid by class members,

17  demonstrating damages on a transaction basis, applicable for each class member.[169]

18      Prof. Pathak's methodology easily passes muster at this stage. *See Comcast*, 569 U.S. at

19  35 (Damages "calculations need not be exact.") Moreover, there is no "requirement that class

20  action plaintiffs actually prove that classwide damages exist in order to obtain class

21  certification." *Lytle*, 99 F.4th at 571. The Ninth Circuit has "repeatedly found class treatment to

22  be appropriate, in analogous contexts, based upon a showing that damages could be calculated on

23  a classwide basis, even where such calculations have not yet been performed." *Id.*

24

25       [165] *Id.* ¶¶429-450.

26       [166] *Id.* ¶448.

27       [167] *Id.* ¶432.

           [168] *Id.* ¶¶449-450.

28       [169] *Id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

**C.    A Class Action Is Superior to Other Means of Resolving the Case, as Required by Rule 23(b)(3).**

The "purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quotation omitted). To evaluate this requirement, courts weigh several factors outlined in Rule 23(b)(3): (1) class members' interests in individual actions, (2) the extent and nature of any litigation concerning the controversy, (3) the desirability of concentrating the litigation of the claims in the particular forum, and (4) manageability difficulties. Fed. R. Civ. P. 23(b)(3)(A)-(D).

With respect to the first factor, "[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." *Wolin*, 617 F.3d at 1175. Amazon's modification of its Conditions of Use agreement supports this factor: by permitting class members to proceed as a class, while removing their option to file individual, arbitration claims, Amazon made individual resolution of class claims prohibitively expensive, while making the class proceedings viable.[170]

Indeed, Amazon's May 2021 removal of the arbitration option has so disincentivized individual proceedings that Plaintiffs are not aware of any individual consumer antitrust claims asserted against Amazon since its removal. This supports the second factor. *See Reichert v. Keefe Commissary Network, L.L.C.*, 331 F.R.D. 541, 556 (W.D. Wash. 2019) (absence of individual actions supports superiority of class proceeding). And by requiring class members to file here in King County,[171] Amazon's agreement also demonstrates the third factor in support of proceeding as class action—the favorability of consolidating actions in this forum.

With respect to the final factor (manageability), "the size of the class militates in favor of, not against certification." *In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 88 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001) (certifying a class of approximately four million members); *Edwards v. Nat'l Milk Producers Fed'n*, 2014 WL 4643639 (N.D. Cal. Sep.

---

[170] Ex. 82, Conditions of Use - Amazon Customer Service, Disputes; Ex. 83, Amanda Robert, *Amazon drops arbitration requirement after facing over 75,000 demands* ABAjournal (Jun. 2, 2021).

[171] Ex. 82, Conditions of Use - Amazon Customer Service, Disputes.

16, 2014) (certifying estimated class of 46 million consumers); *In re Zoom Video Commuc'ns, Inc. Privacy Litig.*, 2022 WL 1593389, at *2, *13 (N.D. Cal. Apr. 21, 2022) (certifying settlement class of 150 million class members). Resolution of the claims of at least 200 million total class members in one class action is far superior to individual lawsuits because it promotes consistency and efficiency of adjudication. *See Wolin*, 617 F.3d at 1175; *see also Nat'l ATM Council, Inc. v. Visa Inc.*, 2021 WL 4099451 (D.D.C. Aug. 4, 2021) (certifying nationwide class of persons who were charged supracompetitive access fees at ATMs).

**D.    Rule 23(g) Factors Support Appointing Interim Co-Lead Counsel as Co-Lead Class Counsel and Executive Committee Member as Executive Class Counsel**

In appointing Hagens Berman Sobol Shapiro LLP and Keller Postman LLC (previously Keller Lenkner LLC) as Interim Co-lead Counsel and Quinn Emanuel Urquhart & Sullivan, LLP as Executive Committee member,[172] the Court evaluated their qualifications and abilities under Rule 23(g) and found them to be capable of fairly and adequately representing the interests of the Class. ECF 19 at 2. As discussed in the attached firm resumes, the firms have ably litigated and served as lead class counsel in many major antitrust actions nationwide, recovered billions of dollars in antitrust and other cases, and received awards recognizing the quality of their work.[173] Since their interim appointments, the three firms have demonstrated their commitment to vigorously and efficiently litigating class claims. They substantially defeated Amazon's initial motion to dismiss [ECF 59], and they successfully moved to: prevent discovery of prescriptions and limit discovery of brick-and-mortar purchases [ECF 93], compel production of Amazon's foreign transaction data [ECF 92], amend their complaint [ECF 123], and schedule class certification contrary to Amazon's request that it be deferred indefinitely [ECF 160].

In coordination with the related *Frame-Wilson* case, where they also serve as counsel, the three firms served five sets of requests for production, two sets of interrogatories and 17 subpoenas, reviewed documents and deposition transcripts, and analyzed and compiled the

---

[172] In exercising their discretion, Interim Co-Leads found it most efficient to work with just one member appointed to the Interim Executive Committee and are recommending that only Quinn Emanuel be appointed as Executive Class Counsel.

[173] Exs. 85, 86, 87.

1  evidence supporting class claims. And they retained an expert team, who likewise reviewed

2  discovery materials and academic literature, analyzed many terabytes of data, prepared

3  modeling, and drafted a report in support of class certification. The firms have also coordinated

4  with the California Attorney General and the FTC to take depositions jointly of several non-party

5  witnesses, and to begin laying the groundwork for coordinated depositions of Amazon witnesses.

6       The firms' work in prosecuting this action has been effective and efficient and supports

7  the appointment of Interim Co-leads Hagens Berman and Keller Postman as Co-lead Class

8  Counsel and the appointment of Executive Committee member Quinn Emanuel as Executive

9  Class Counsel.

10                    **IV.    CONCLUSION**

11      For the foregoing reasons, the Court should grant Plaintiffs' motion, appoint them as

12  Class representatives and their counsel as Class Counsel.

13  DATED: August 23, 2024               Respectfully submitted,

14                                       HAGENS BERMAN SOBOL SHAPIRO LLP

15                                       By  /s/ *Steve W. Berman*
16                                           Steve W. Berman (WSBA No. 12536)
                                         By  /s/ *Barbara A. Mahoney*
17                                           Barbara A. Mahoney (WSBA No. 31845)
                                         1301 Second Avenue, Suite 2000
18                                       Seattle, WA 98101
                                         Telephone: (206) 623-7292
19                                       Facsimile:  (206) 623-0594
                                         Email:  steve@hbsslaw.com
20                                               barbaram@hbsslaw.com

21
                                         Anne F. Johnson (*pro hac vice*)
22                                       68 3rd Street, Suite 249
                                         Brooklyn, NY 11231
23                                       Telephone: (718) 916-3520
                                         Email:  annej@hbsslaw.com
24
                                         KELLER POSTMAN LLC
25                                       Zina G. Bash (*pro hac vice*)
26                                       111 Congress Avenue, Suite 500
                                         Austin, TX, 78701
27                                       Telephone: (512) 690-0990
                                         Email:  zina.bash@kellerpostman.com
28

**HAGENS BERMAN**

1

2     Jessica Beringer (*pro hac vice*)
      Shane Kelly (*pro hac vice*)
3     150 North Riverside Plaza, Suite 4100
      Chicago, IL 60606
4     Telephone: (312) 741-5220
      Email:   Jessica.Beringer@kellerpostman.com
5               shane.kelly@kellerpostman.com

6     *Interim Co-Lead Counsel for Plaintiffs*
7     *and the proposed Class*

8     QUINN EMANUEL URQUHART &
      SULLIVAN, LLP
9

10    By: /s/ *Alicia Cobb*
            Alicia Cobb, WSBA # 48685
11    1109 First Avenue, Suite 210
      Seattle, WA 98101
12    Telephone: (206) 905-7000
      Email:   aliciacobb@quinnemanuel.com
13

14    Steig D. Olson (*pro hac vice*)
      David D. LeRay (*pro hac vice*)
15    Nic V. Siebert (*pro hac vice*)
      Maxwell P. Deabler-Meadows (*pro hac vice*)
16    Elle Mahdavi (*pro hac vice*)
      51 Madison Avenue, 22nd Floor
17    New York, NY 10010
      Telephone: (212) 849-7000
18    Email:   steigolson@quinnemanuel.com
19             davidleray@quinnemanuel.com
               nicolassiebert@quinnemanuel.com
20             maxmeadows@quinnemanuel.com
               ellemahdavi@quinnemanuel.com
21

22    Adam B. Wolfson (*pro hac vice*)
      865 South Figueroa Street, 10th Floor
23    Los Angeles, CA 90017-2543
      Telephone: (213) 443-3000
24    Email:   adamwolfson@quinnemanuel.com

25
      *Interim Executive Committee for Plaintiffs and the*
26    *Proposed Class*

27

28

1      I certify that this memorandum contains 14,487 words, in compliance with the Local

2   Civil Rules.

3                                              /s/ Steve W. Berman
                                               Steve W. Berman

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**HAGENS BERMAN**

1

## **<u>CERTIFICATE OF SERVICE</u>**

2      I hereby certify that on August 23, 2024, a true and correct copy of the foregoing was

3  served on all counsel of record via email.

4

5                          /s/ *Steve W. Berman*
                            Steve W. Berman
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

ELIZABETH DE COSTER *et al.,* on behalf of
themselves and all others similarly situated,

No. 2:21-cv-00693-JHC

11

**[PROPOSED] ORDER CERTIFYING**
**CLASS AND APPOINTING CLASS**
**COUNSEL**

Plaintiffs,

12

vs.

13

AMAZON.COM, INC., a Delaware
corporation,

14

15

Defendant.

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to Federal Rule of Civil Procedure 23(c)(1), and as discussed in a separate

Memorandum Opinion and Order issued _____, having reviewed all

relevant memoranda, supporting materials, and the criteria set forth in Rule 23, the Court hereby

**ORDERS** that:

**I.      Class Certification**

The above captioned action is certified as a class action pursuant to rules 23(b)(2) and

23(b)(3) for purposes of litigation and trial.  The Class is defined as follows:

> All persons in the United States who on or after May 26, 2017,
> purchased one or more new, physical goods from third-party
> sellers on Amazon's marketplace.

Plaintiffs' claims are hereby certified for class treatment.  *See* Fed. R. Civ. P. 23(c)(1)(B).

The Court further finds that the named Plaintiffs – Elizabeth De Coster, Maya Gold,

Osahon Ojeaga, David West and Emma Zaballos – have satisfied the requirements set forth in

Rule 23(a)(4) and are hereby designated Class representatives.

As soon as practicable after entry of this Order, all parties shall meet and confer

regarding a plan for dissemination of notice to the Class, pursuant to Fed. R. Civ. P. 23(c)(2),

and shall report to the Court by no later than _____.

**II.     Appointment of Co-Lead Class Counsel and Executive Class Counsel**

Pursuant to Rules 23(c)(1)(B) and (g)(3) of the Federal Rules of Civil Procedure, the

Court appoints Hagens Berman Sobol Shapiro LLP ("Hagens Berman") and Keller Postman

LLC ("Keller Postman") as Co-Lead Class Counsel and Quinn Emanuel Urquhart & Sullivan,

LLP ("Quinn Emanuel") as Executive Class Counsel.

The Court finds that the designation of Hagens Berman and Keller Postman as Co-Lead

Class Counsel and Quinn Emanuel as Executive Class Counsel is in the best interests of the

Class because Hagens Berman, Keller Postman and Quinn Emanuel:

(1)     have zealously represented the interests of the class in litigating this case while serving as Interim Co-Lead Class Counsel and Interim Executive Committee member;

(2)     have extensive relevant experience in complex antitrust litigation and knowledge of the law applicable to this action; and

(3)     are willing to commit the resources necessary to represent the class.


IT IS SO ORDERED.


Dated: _____          _____

HONORABLE JOHN H. CHUN
UNITED STATES DISTRICT JUDGE