1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

The Honorable John H. Chun

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ELIZABETH DE COSTER, *et al.*, on behalf
of themselves and all others similarly situated,

Plaintiffs,

v.

AMAZON.COM, INC., a corporation,

Defendant.

Case No. 2:21-cv-00693-JHC

**DEFENDANT AMAZON.COM, INC.'S
OPPOSITION TO PLAINTIFFS'
MOTION TO CERTIFY CLASS**

ORAL ARGUMENT REQUESTED

NOTE ON MOTION CALENDAR:
January 24, 2025

**FILED UNDER SEAL**

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ............................................................................................4

    A.    Shopping and Selling in Amazon's Store ....................................................4

    B.    Plaintiffs Challenge Conduct That Does Not Apply To All Sellers, Products, or Transactions in the Proposed Class. ......................................5

    C.    The Price Parity Provision Was Rarely Enforced and Sellers Were Informed of Amazon's Withdrawal of the Provision. ...............................7

    D.    The Remaining Challenged Conduct Does Not Establish a Class-wide *De Facto* Price Parity Requirement...................................................................8

        1.    The Featured Offer and Select Competitor—Featured Offer Disqualification..................................................................................8

        2.    Marketplace Fair Pricing Policy ....................................................12

        3.    Amazon Standards for Brands .......................................................13

        4.    Seller Code of Conduct..................................................................14

    E.    Amazon's Practices with Respect to Communications with Sellers Did Not Create a *De Facto* Parity Requirement. .........................................14

    F.    Sellers Differ In Terms of Their Interactions with Amazon Policies and Practices and Their Responses.................................................................15

LEGAL STANDARD.................................................................................................16

ARGUMENT ...........................................................................................................17

I.    Plaintiffs' Claims Depend on a *De Facto* Parity Requirement That Presents Numerous Individualized Issues—and Therefore Not a Common Question for Purposes of Rule 23(a)(2). .................................................................................17

    A.    Plaintiffs' *De Facto* Price Parity Theory Does Not Present a Common Question Resolvable by Common Evidence.........................................18

    B.    Even If A *De Facto* Policy Theory Could Satisfy the Requirements for Class Certification, Plaintiffs Have Failed to Establish a *De Facto* Policy Applicable to the Entire Class.................................................................21

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

II.    Plaintiffs Have Failed to Satisfy Rule 23(b)(3) by Establishing That Common
       Issues Predominate Over Individualized Issues..................................................22

       A.    Individualized Issues Predominate Concerning Whether a Common Policy
             Was Enforced...........................................................................................22

             1.    The Existence of a *De Facto* Policy Does Not Satisfy the
                   Predominance Requirement...................................................22

             2.    The Proposed Class Does Not Satisfy the Predominance
                   Requirement Because the Challenged Conduct Did Not Have a
                   Widespread Effect, with the Class Containing Countless Millions
                   of Uninjured Members...........................................................23

       B.    Injury, Damages, and Standing Are Not a Common Question Because
             Plaintiffs' Claims Depend on a Complex and Multi-Step Causal Chain,
             Causing Individual Inquiries to Predominate. ..........................................24

             1.    Step 1:  The challenged conduct must cause 3P sellers to raise their
                   off-Amazon prices or reduce their own-off Amazon selection. .............25

             2.    Step 2:  The *de facto* parity or anti-discounting requirement must
                   cause Amazon to face less competition and allow Amazon to
                   charge 3P sellers inflated referral fees. ....................................27

             3.    Step 3:  The inflated fees must cause 3P sellers to inflate on-
                   Amazon prices. .....................................................................29

             4.    Step 4:  These inflated prices must cause class-wide harm. ...................30

       C.    Plaintiffs' Cannot Satisfy Rule 23(b)(3) Because Pathak Fails to Offer A
             Reliable Model Demonstrating Common Injury, Damages, and Standing. ..........31

             1.    Pathak's model is unreliable because it is based on theoretical
                   assumptions that conflict with the challenged conduct...........................31

             2.    Pathak's model assumes that his "hypothetical" PMFN results in
                   higher fees and prices for every transaction as well as making other
                   false assumptions. ..................................................................32

             3.    Pathak's model generates a 100% false positive rate when applied
                   to other data sets...................................................................33

       D.    Because Pathak Identifies No Common Method for Identifying Unharmed
             Class Members from the Challenged Conduct, Individual Inquiries
             Predominate. .........................................................................................34

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

E.    Plaintiffs Fail to Satisfy 23(b)(3) Because They Have Presented No Common Method for Establishing Market Definition and Market Power Across ▉▉▉▉ Products. .................................................................36

    1.    Most customers do not choose Amazon because it is a "one-stop" shop and instead substitute across a multitude of retail options. ...............37

    2.    Pathak provided no common method for analyzing substitution across retail channels by sellers. ...................................................41

    3.    Pathak provided no common method for analyzing the competitive conditions of ▉▉▉▉ products and whether Amazon has market power. ............................................................................41

F.    Plaintiffs Have Not Satisfied Rule 23(b)(3)'s Superiority Requirement. ..............42

CONCLUSION................................................................................................43

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 7-Eleven Franchise Antitrust Litig.*,
    16 Fed. R. Serv. 2d 537 (N.D. Cal. 1972)..................................................................20

*In re Aluminum Warehousing Antitrust Litig.*,
    336 F.R.D. 5 (S.D.N.Y. 2020) ......................................................................................31

*In re Beer Distrib. Antitrust Litig.*,
    188 F.R.D. 549 (N.D. Cal. 1998)..................................................................................36

*Blades* v. *Monsanto Co.*,
    400 F.3d 562 (8th Cir. 2005) ........................................................................................42

*Cash* v. *Arctic Circle, Inc.*,
    85 F.R.D. 618 (E.D. Wash. 1979) .................................................................................20

*Castillo* v. *Bank of Am., NA*,
    980 F.3d 723 (9th Cir. 2020) ........................................................................................22

*Chicken Delight, Inc.* v. *Harris*,
    412 F.2d 830 (9th Cir. 1969) ........................................................................................20

*In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*,
    140 F. Supp. 3d 339 (D. Del. 2015), *aff'd in part, vacated in part on other
    grounds*, 679 F. App'x 135 (3d Cir. 2017) ..................................................................30

*Cokeley* v. *Tandy Corp.*,
    19 Fed. R. Serv. 2d 1054 (N.D. Cal. 1974)...................................................................20

*In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*,
    691 F.2d 1335 (9th Cir. 1982) ......................................................................................22

*In re Cox Enters., Inc. Set-Top Box Cable Television Box Antitrust Litig.*,
    2011 WL 6826813 (W.D. Okl. 2011) ...........................................................................37

*Delco LLC* v. *Giant of Md., LLC*,
    2007 WL 3307018 (D.N.J. 2007) .................................................................................39

*United States* v. *E.I. du Pont de Nemours and Co.*,
    351 U.S. 377 (1956) ......................................................................................................28

*Eastman Kodak Co.* v. *Image Technical Servs., Inc.*,
    504 U.S. 451 (1992) ......................................................................................................28

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

*Ellis* v. *Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ..................................................................21, 22

*Exhaust Unlimited, Inc.* v. *Cintas Corp.*,
   223 F.R.D. 506 (S.D. Ill. 2004) .......................................................................36

*Frausto* v. *Bank of Am. Nat'l Ass'n*,
   2021 WL 2476902 (N.D. Cal. 2021) ................................................................21

*Funeral Consumers All., Inc.* v. *Serv. Corp. Int'l*,
   695 F.3d 330 (5th Cir. 2012) ...........................................................................42

*Galvan* v. *First Student Management, LLC*,
   2022 WL 20016825 (N.D. Cal. 2022) ..............................................................19

*Garnica* v. *HomeTeam Pest Defense, Inc.*,
   230 F. Supp. 3d 1155 (N.D. Cal. 2017) ...........................................................38

*In re Glumetza Antitrust Litig.*,
   336 F.R.D. 468 (N.D. Cal. 2020) .....................................................................18

*Halliburton* v. *Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) .........................................................................................17

*Heerwagen* v. *Clear Channel Commc'ns*,
   435 F.3d 219 (2d Cir. 2006), *overruled on other grounds by Teamsters Loc.*
   *445 Freight Div. Pension Fund* v. *Bombardier Inc.*, 546 F.3d 196 (2d Cir.
   2008) ............................................................................................................37, 41

*Hicks* v. *PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018) .........................................................................38

*In re High-Tech Employee Antitrust Litigation*,
   985 F. Supp. 2d 1167 (N.D. Cal. 2013) ...........................................................18

*In re Hotel Tel. Charges*,
   500 F.2d 86 (9th Cir. 1974) .............................................................................42

*Kendler* v. *Federated Dep't Stores, Inc.*,
   88 F.R.D. 688 (S.D.N.Y. 1981) ......................................................................18

*Kilbourne* v. *Coca-Cola Co.*,
   2015 WL 5117080 (S.D. Cal. 2015) ................................................................20

*Kottaras* v. *Whole Foods Market, Inc.*,
   281 F.R.D. 16 (D.D.C. 2012) ................................................................. *passim*

AMAZON'S OPP TO CLASS CERTIFICATION
(2:21-CV-00693-JHC) - v

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

*In re Lithium Ion Batteries Antitrust Litig.*,
   2017 WL 1391491 (N.D. Cal. 2017) ...................................................30

*Los Angeles Mem'l Coliseum Comm'n* v. *Nat'l Football League*,
   791 F.2d 1356 (9th Cir. 1986) ...................................................36

*Lucas Auto. Eng'g, Inc.* v. *Bridgestone/Firestone, Inc.*,
   275 F.3d 762 (9th Cir. 2021) ...................................................38

*Manigo* v. *Time Warner Cable, Inc.*,
   2017 WL 5149225 (C.D. Cal. 2017)...................................................20

*Markson* v. *CRST Int'l, Inc.*,
   2022 WL 790960 (C.D. Cal. 2022)...................................................24

*Miles* v. *Kirkland's Stores, Inc.*,
   89 F.4th 1217 (9th Cir. 2024) ...................................................16, 17, 22

*Nevarez* v. *Costco Wholesale Corp.*,
   2019 WL 7421960 (C.D. Cal. 2019)...................................................19

*In re New Motor Vehicles Canadian Export Antitrust Litigation*,
   522 F.3d 6 (1st Cir. 2008)...................................................24, 25, 32

*Olean Wholesale Grocery Coop., Inc.* v. *Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) ................................................... *passim*

*In re Optical Disk Drive Antitrust Litig.*,
   303 F.R.D. 311 (N.D. Cal. 2014)...................................................33

*Parker* v. *Bank of Am., NA*,
   99 F. Supp. 3d 69 (D.D.C. 2015) ...................................................21

*In re Photochromic Lens Antitrust Litig.*,
   2014 WL 1338605 (M.D. Fla. 2014) ...................................................36

*Pioneer Valley Casket Co., Inc.* v. *Service Corp. Int'l*,
   2008 WL 11395528 (S.D. Tex. 2008), *report and recommendation adopted*,
   2009 WL 10695539 (S.D. Tex. 2009) ...................................................37

*In re Processed Egg Prods. Antitrust Litig.*,
   312 F.R.D. 124 (E.D. Pa. 2015)...................................................32

*FTC* v. *Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ...................................................36

*In re Rail Freight Surcharge Antitrust Litig.*,
   292 F. Supp. 3d 14 (D.D.C. 2017) ...................................................23

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

*Rodney* v. *Nw. Airlines, Inc.*,
    146 F. App'x 783 (6th Cir. 2005) ............................................................36, 37

*Rotec Indus., Inc.* v. *Mitsubishi Corp.*,
    348 F.3d 1116 (9th Cir. 2003) ...........................................................................39

*Sidibe* v. *Sutter Health*,
    333 F.R.D. 463 (N.D. Cal. 2019) ......................................................................33

*Smith* v. *Denney's Restaurants, Inc.*,
    62 F.R.D. 459 (N.D. Cal. 1974) ........................................................................20

*In re Steel Antitrust Litig.*,
    2015 WL 5304629 (N.D. Ill. 2015) ...................................................................30

*Thurman Indus., Inc.* v. *Pay 'N Pak Stores, Inc.*,
    709 F. Supp. 985 (W.D. Wash. 1987) ...............................................................39

*Thurman Indus., Inc.* v. *Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989) ...........................................................................39

*Tyson Foods, Inc.* v. *Bouaphakeo*,
    577 U.S. 442 (2016) ..........................................................................................17

*Ungar* v. *Dunkin' Donuts of Am., Inc.*,
    531 F.2d 1211 (3d Cir. 1976) ............................................................................20

*Wal-Mart Stores, Inc.* v. *Dukes*,
    564 U.S. 338 (2011) ..................................................................................*passim*

*Ward* v. *Apple Inc.*,
    2018 WL 934544 (N.D. Cal. 2018) *aff'd* 784 F. App'x 539 (9th Cir. 2019) .........................31

*Westman Commission Co.* v. *Hobart International, Inc.*,
    796 F.2d 1216 (10th Cir.1986) ..........................................................................38

*Zinser* v. *Accufix Rsch. Inst,. Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ...........................................................................43

**Other Authorities**

Fed. R. Civ. P. 23 .......................................................................................*passim*

Fed. R. Civ. P. 23(a) ....................................................................................1, 16

Fed. R. Civ. P. 23(a)(2) .........................................................................17, 19, 22

Fed. R. Civ. P. 23(b)(3)(D) ...........................................................................3, 42

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

2

Greg Bensinger, *Shopping Site Jet.com Abandons $50 Membership Fee*, Wall
  Street Journal (Oct. 7, 2015) ............................................................................................29

Marco della Cava, *Jet.com Grounds its $50 Annual Membership*, USA Today
  (Oct. 7, 2015) ................................................................................................................29

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

## PRELIMINARY STATEMENT

Plaintiffs propose a class of 288 million customers purchasing over ███████ different products from more than ████████ third-party sellers ("3P sellers) in tens of billions of transactions. The proposed class is 190 times larger than what the Supreme Court in *Wal-Mart Stores, Inc.* v. *Dukes* held could not be certified, calling it "one of the most expansive class actions ever." 564 U.S. 338, 342–43 (2011) (1.5 million members).[1] The proposed class, if certified, would likely be the largest, most complex, and most heterogeneous in the history of class actions in the United States.

For each of the following six independent reasons, Plaintiffs have failed to "affirmatively demonstrate" the requirements of Rule 23. *Dukes*, 564 U.S. at 350.

***First***, Plaintiffs' theory is that Amazon has a *de facto* price parity requirement that prohibits sellers from discounting prices outside of Amazon's store. Mot. 12; Pathak § 6.5.3 ("Amazon's anti-discounting policies acted as a *de facto* MFN"); Dkt. 113 at 5 ("These *de facto* parity restraints have the same anticompetitive effect as the express Price Parity Clause"). Plaintiffs and their expert, Dr. Parag Pathak, explain the anti-discounting policy means not only the policies memorialized in the Amazon Business Solutions Agreement, "but also the practices that Amazon used to deter discounting, the communications with merchants, and merchants' responsive conduct." Pathak ¶ 29.

Proving such a *de facto* policy will require endless individualized evidence regarding the behavior and beliefs of countless different individuals within Amazon, as well as ████████ third-party sellers. The Supreme Court made clear in *Dukes* that claims based on a *de facto* policy like the one Plaintiffs allege here fail to satisfy Rule 23(a)'s commonality and 23(b)(3)'s predominance requirements because their resolution entails countless individualized inquiries. 564 U.S. at 358.

This proposed class is vastly more complex than the then-unprecedented class sought in

---

[1] As to quoted material, unless indicated, all brackets, ellipses, footnote call numbers, internal quotations, and citations have been omitted for readability, and all emphasis is added.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

*Dukes*; determining liability would require individually analyzing how each of the different challenged policies, practices, and communications has been applied, to which sellers they have been applied, how they affected or did not affect different sellers and transactions at different times, and how they were (correctly or incorrectly) interpreted by more than ███████ sellers in Amazon's store, some of whom discussed them with any of tens of thousands of Amazon Associates and Customer Success Managers.

Even accepting at this stage that Plaintiffs have stated a claim of a *de facto* price parity policy, Plaintiffs have not come forward with "significant proof" of a unified policy applicable to the entire class. Plaintiffs offer allegations of a limited number of cases involving individual sellers supporting the existence of a *de facto* price parity policy, which only demonstrate the individualized evidence required to support their claim. And in any event, the Court in *Dukes* found "120 affidavits reporting experiences of discrimination—about one for every 12,500 class members" was insufficient to support certification. 564 U.S. at 358. Here, Plaintiffs anecdotes are even weaker—representing one for every 208,333 sellers.

**Second**, again accepting Plaintiffs' allegation of a *de facto* parity requirement, the challenged conduct that allegedly comprises it—the former Price Parity Provision ("PPP"), Select Competitor – Featured Offer Disqualification ("SC-FOD"), Amazon Standards for Brands ("ASB"), and the November 2021 Clarification to the Seller Code of Conduct ("SCC") together with Amazon practices, communications concerning these policies and practices, and seller responses—covers only a limited percentage of 3P sellers, transactions, and class members. For example, ████ of 3P sellers did not sell a product in the Amazon store while the PPP was in effect; Amazon did not collect an off-Amazon price relevant to SC-FOD for about ███ of transactions and sales; and ████████ of sellers were subject to an ASB policy application. Notwithstanding variation in which sellers were exposed to certain of the challenged conduct, to the extent they were at all, Plaintiffs have presented no class-wide evidence showing that any of the challenged conduct applied to each of the ████████ 3P sellers or each of the ████████████ they sold in Amazon's store in ████████ transactions over the seven-year proposed class

period.  The countless individualized inquiries necessary to evaluate the impact of a *de facto* parity requirement also precludes certification under Rule 23(b)(3).

**Third**, as Plaintiffs concede, their claims depend on a complex four-step causal chain. Even crediting Plaintiffs' multi-step theory, proving the links in the chain raises individual issues across the class, with uninjured class members at each step.  For example, with respect to one link in the chain, Plaintiffs present anecdotes that show some sellers lower their prices in Amazon's store in response to the challenged conduct, benefitting class members, Mot. 23–25—and that is exactly what the data show—demonstrating that there can be no class-wide injury or damages.

**Fourth,** Plaintiffs' expert fails to present a class-wide method for establishing injury-in-fact and damages, which means Plaintiffs cannot carry their burden of proof using his model.  His model assumes that the challenged conduct is a perfectly enforced Platform MFN ("PMFN") and it mechanically finds inflated fees and prices for *any* product to which that assumption is applied. Because the model assumes its conclusions, it always predicts uniformly higher referral fees and consumer prices—even when applied to random data with no relationship to this case.  Further, the model contains multiple assumptions that conflict with real-world facts and data, such as theorizing that  the PMFN constrains the pricing of all sellers of the product through all possible sales channels.   When Pathak's model is adjusted to account for some real-world facts, it demonstrates the opposite of what he asserts:  no class-wide injury or damages.

**Fifth**, Plaintiffs did not—and cannot—demonstrate that market definition or market power can be established by class-wide proof for ██████ products ranging from car seats to toothpaste to power tools to refrigerators to soap, which consumers shop for—and sellers sell—across hundreds of thousands of different online and offline channels, depending on the product and myriad other factors.  Where class members purchase vastly different products subject to demonstrably different competitive conditions at different prices, as Plaintiffs do here, they cannot satisfy Rule 23(b)(3)'s predominance requirement.

**Sixth**, given the predominance of individualized issues, and the size of the proposed class, the class Plaintiffs propose would be unmanageable under Rule 23(b)(3)(D).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**STATEMENT OF FACTS**

**A.      Shopping and Selling in Amazon's Store**

When the Amazon store opened, Amazon purchased goods at wholesale and resold them. In 2000, Amazon invited independent third-party ("3P") sellers to sell alongside it in a single store. That innovation benefited customers by expanding product selection and created value for sellers as a result of Amazon's investments both in its store and in growing the businesses of 3P sellers. 3P sellers became a majority of sales in Amazon's store.[2]

From May 2017 through March 2023, over ████████ 3P sellers sold one or more products in Amazon's store.  Ex. A (Hitt ¶ 234).[3]  These sellers offer a wide variety of products, have varying business strategies, and face different competitive conditions.  *Id.* ¶ 238.  For example, they include manufacturers of durable goods and non-perishable groceries under their own brand name (like Nestle); e-commerce accelerators (like Spreetail), which contract with brands to sell their products on ecommerce sites; resellers that purchase from wholesalers; and others that are both brand manufacturers and resellers (like Best Buy).  *Id.*  The variation in sellers' business strategies impacts the available channels for reaching customers, *id.* ¶ 240, with most using multiple channels, *id.* ¶¶ 242–49.

Consumers shop across multiple retail channels.  Hitt ¶¶ 282–84. For some purchases, consumers may want to interact with the product in a physical store. *E.g.*, Ex. B (West Dep.) 152:24–153:10 (███████████); Ex. C (Ojeaga Dep.) 116:21–117:12 (kitchenware and "bigger purchases"); Ex. D (Gold Dep.) 167:14–22 (apparel); Ex. E (De Coster Dep.) 163:12–20 (furniture); Ex. F (Zaballos Dep.) 68:2–10 (makeup), or for certain products they prefer a specific online retailer, *e.g.*, Zaballos Dep. 62:4–22 (chewy.com for pet food).  Other times consumers compare products across retail channels, searching for the best price.  *E.g.*, West Dep. 154:9–156:12; Zaballos Dep. 84:20–85:14.  And, where consumers want to obtain a product quickly, they

---

[2] Plaintiffs' case is limited to goods sold by 3P sellers in Amazon's store.  Mot. 2.

[3] All references to "Ex. _" are to exhibits to the Declaration of Amy J. Mauser in Support of Amazon's Opposition to Plaintiffs' Motion for Class Certification, unless indicated.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1    may be more inclined to purchase it in a physical store or through hybrid channels (*e.g.*, buy online,

2    pick-up in-store).    *E.g.*, West Dep. 134:3–135:1; 151:13–152:23; Ojeaga Dep. 74:16–24; De

3    Coster Dep. 159:14–160:7; Zaballos Dep. 74:6–21.

### B.    Plaintiffs Challenge Conduct That Does Not Apply To All Sellers, Products, or Transactions in the Proposed Class.

Plaintiffs challenge five distinct policies and practices, claiming that they—together with

Amazon's practices, Amazon's communications with sellers, and sellers' responses thereto—add

up to a *de facto* anti-discounting policy, or price parity requirement.    Mot. 10–28.

Plaintiffs first challenge the former Price Parity Provision ("PPP"), but admit that Amazon

discontinued it in March 2019.    Mot. 12.    Plaintiffs further theorize that Amazon surreptitiously

prohibited sellers from discounting their off-Amazon prices through a combination of other

policies and conduct, including: (1) a November 2021 clarification of the Seller Code of Conduct

("SCC"), Mot. 12; (2) the Marketplace Fair Pricing Policy ("MFPP"), *id*. 13–14; (3) Amazon

Standards for Brands ("ASB"), *id*.; (4) Amazon's so-called "method of enforcing" these policies,

Select Competitor – Featured Offer Disqualification ("SC-FOD"), *id*. 16–17; (5) communications

with sellers about these policies and practices, *id*. 15; and (6)  sellers' reactions, principally through

a small set of anecdotes, *id*. 20–28.    *See also* Pathak ¶¶ 168–81.

Amazon details the relevant text, enforcement, and effect of the challenged conduct, as

well as the inherent heterogeneity of that conduct and sellers' reactions, in the following sections.

At the outset, we note two points.

***First*,** Amazon's implementation of the challenged conduct was limited over the proposed

class period.    Before the PPP ended in 2019, enforcement was manual and infrequent, as Plaintiffs'

expert concedes.    Pathak ¶¶ 182–84, 187.    For almost ██ of the products in its store, Amazon

had no information about off-Amazon prices that would have allowed broad and systematic

enforcement of the PPP.    Hitt ¶ 197, Ex. 28; Brown Dec. ¶¶ 39–42.    As to SC-FOD, which makes

offers ineligible to be featured in Amazon's store when they are priced higher than those of certain

off-Amazon competitors, Amazon can only apply SC-FOD when it collects prices for that product

AMAZON'S OPP TO CLASS CERTIFICATION
(2:21-CV-00693-JHC) - 5

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

from certain Select Competitors, which it has for ▮▮ of products in its store. Hitt ¶ 220; *see also*
Brown Dec. ¶¶ 38–39. The MFPP, as relevant here, applies where a price is "significantly higher"
than recent prices on and off Amazon, Brown Dec. ¶¶ 43, 48, and even where Amazon notifies
sellers of violations of that policy, Amazon has an external competitor price for only about ▮▮
of ASINs[4]. Hitt ¶ 27e. Further, application of ASB has always been limited to only a narrow
subset of branded selection. Nickerson Dec. ¶ 13; Hitt ¶ 33c (less than ▮▮ of class transactions
were from sellers subject to ASB policy application). Finally, the November 2021 SCC
clarification related to search manipulation in Amazon's store, and in any event, it was never once
enforced against a 3P seller. Noggle Dec. ¶ 7.

　　　　**Second**, the challenged conduct does not apply to all sellers or all class transactions. There
is heterogeneity as to the policies' effective dates; for example, the PPP was in effect only until
March 2019, and the SCC was not published until November 2021. Hitt Ex. 36. For example,
▮▮ of 3P sellers never sold a product in Amazon's store while the PPP was in effect, and ▮▮
of the transactions for class products were not subject to the PPP. Hitt ¶ 33a.

　　　　The challenged conduct has not been implemented for a large majority of the millions of
sellers in Amazon's store—let alone affected all ▮▮▮ class transactions. Hitt ¶ 34. As

---

[4] An ASIN is an Amazon-specific product identifier like a SKU, applicable to a single product.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Amazon's expert, Dr. Lorin Hitt, summarizes:

> ***Different 3P sellers, class transactions, and corresponding sales are exposed to different combinations of the challenged policies, practices, and communications***



Hitt Ex. 2

### C.    The Price Parity Provision Was Rarely Enforced and Sellers Were Informed of Amazon's Withdrawal of the Provision.

The Business Solutions Agreement ("BSA") is a standard agreement that each 3P seller enters into to offer products in Amazon's store.  Before March 2019, the BSA contained the PPP. The PPP provided that 3P sellers should "maintain parity between the products [they] offer through" their "Sales Channels and the products [they] list on any Amazon Site" by ensuring that the purchase price and other terms of offer were at least as favorable to Amazon customers as to

AMAZON'S OPP TO CLASS CERTIFICATION
(2:21-CV-00693-JHC) - 7

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

customers on those other channels.  Ex. G (AMZN_FW_00000068) at -082.  The PPP provided that, in the event of a violation, the 3P seller was required to "promptly compensate adversely affected customers."  *Id.*

Amazon never had the data that would have enabled enforcement of the PPP on a class-wide basis.  In an average month, Amazon did not have data about *any* off-Amazon prices for ███████ of ASINs offered in Amazon's store by 3P sellers (representing about ███ of class transactions and revenue).  Hitt Ex. 29, ¶¶ 196–200.  As Plaintiffs' expert concedes, enforcement of the PPP was manual and infrequent.  Pathak ¶¶ 182–84, 187.  From the beginning of the putative class period through the PPP's removal, Amazon had no systematic way to monitor or enforce compliance.  Ex. H (CAAGLit-AMZ_00891556) at -568 (May 2017: ████████████████ ██████████████████████████████████████████████████████████████████████ ███████████████████████████); Ex. I (CAAGLit-AMZ_03321418) at -420 (2018: discussing Amazon's ██████████████████████████████).  By March 2019, Amazon had ████████████████████████████████████████████████████████████████████████ ██████████.  Ex. J (CAAGLit-AMZ_00212884) at -884.

Amazon removed the PPP from the BSA in March 2019.  On March 11, 2019, Amazon informed 3P sellers that the PPP had been discontinued, including through an article published on "the gateway of Seller Central."  Ex. K (Glenn Tr.  (June 23, 2022) 142:10-143:4).  Amazon also created a list of frequently asked questions for seller support representatives.  *Id*. at 143:16–19.

### D.    The Remaining Challenged Conduct Does Not Establish a Class-wide *De Facto* Price Parity Requirement.

#### 1.    The Featured Offer and Select Competitor—Featured Offer Disqualification

In order to help consumers evaluate whether to purchase a product, Amazon presents a "detail page" for each product offered in the Amazon store.  Brown Dec. ¶ 5.  The detail page compiles information that Amazon thinks is of interest to the customer, including price, shipping speed, seller ratings, product specifications, customer reviews, and information about similar products in Amazon's store (to facilitate comparison shopping).  *Id.*

AMAZON'S OPP TO CLASS CERTIFICATION
(2:21-CV-00693-JHC) - 8

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

When multiple sellers are offering the same product, Amazon usually combines those offers on a single product detail page, and displays one or more as the Featured Offer. Brown Dec. ¶ 6. The Featured Offer is intended to save customers time and effort by highlighting the offer(s) that Amazon believes customers would likely choose were they to compare all offers. *Id.* Featured Offer selection is based on multiple factors that customers value—not just price. *Id.* ¶ 7. In addition to the Featured Offer, Amazon displays other offers on the product detail page. *Id.* ¶¶ 10–11. The Featured Offer's determination is generally re-evaluated each time a customer opens a product detail page—what is called a "glance view"—and thus can change frequently. *Id.* ¶ 12.

With customers shopping across so many retail options, to effectively compete, Amazon believes that it is critical for customers to see competitively priced offers. Amazon developed and implemented Select Competitor-Featured Offer Disqualification ("SC-FOD"), which Amazon uses to assess whether a 3P seller's offer is priced higher than readily available prices for the same product from a limited group of reputable competitors outside of Amazon's store, called "Select Competitors." Brown Dec. ¶ 21. Where a 3P seller's offer is priced higher than the price offered for that product by a Select Competitor, SC-FOD disqualifies it from eligibility to be the Featured Offer, but it remains available for purchase on the "all-offers" display. *Id.* ¶¶ 17–19.

A seller's own off-Amazon price is *not* used to disqualify his/her offers from being featured in most instances. Brown Dec. ¶¶ 26, 32–37. The sources for the competitive prices are primarily large, national retailers that do not sell in Amazon's store (like ███████████████). Brown Dec. ¶¶ 22, 26, 32; Hitt ¶¶ 198-203, Exs.30, 31. Thus, when Amazon determines an offer is not competitive because of the presence of a Select Competitor's recent, lower price, in most instances it would be impossible for an Amazon seller to become eligible to be featured by raising its own prices outside of Amazon's store, because the seller does not control the price that Amazon is using to disqualify offers from being featured (*i.e.*, 3P sellers do not control the prices at ████████). ████████████████████ ). Brown Dec. ¶ 26. As Chris Brown of Amazon explains:

████████████████████████████████████

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

2

3

4

5

6

7

8

9 Brown Dec. ¶ 26.

10   In 2022, Amazon implemented "overlap removal," to avoid a 3P seller's own off-Amazon

11 price from being used for determinations of its own Featured Offer eligibility. Brown Dec. ¶¶ 33–

12 36. While there are exceptions, they are exceedingly rare. *Id.*

13   SC-FOD does not apply to the overwhelming majority of class transactions. *First*, SC-

14 FOD requires a match to an off-Amazon offer from a Select Competitor, and Amazon cannot and

15 does not collect that information for the majority of products in Amazon's store. Hitt Ex. 2

16 (Amazon had not collected a price from a Select Competitor for ▮▮▮ of class transactions).

17 *Second*, even for products for which Amazon does collect data, Amazon must be able to access a

18 sufficiently *recent* competitive reference price, which is highly variable. Brown Dec. ¶ 39.

19

20

21

22

23

24

25

26

27

AMAZON'S OPP TO CLASS CERTIFICATION
(2:21-CV-00693-JHC) - 10

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

Hitt Ex. 29

Amazon's priority with SC-FOD has always been to ensure that customers are seeing competitive prices when shopping in Amazon's store. When 3P sellers have set uncompetitive prices and their offers are ineligible to be featured, Amazon will sometimes pay for a customer-facing discount that will enable it to feature a competitive price on the detail page. As a result of these Amazon Funded Discounts ("AFD"), a 3P seller who sets an uncompetitive price will be eligible to be the Featured Offer; the customer will pay the competitive price, and Amazon will pay the difference. Amazon has funded these discounts for approximately █ of transactions for which it collected a Select Competitor's price that month. Hitt ¶¶ 45c, 316, Ex. 65.

Sometimes a consumer sees no Featured Offer because of SC-FOD. In those instances, the

most common reason why a consumer would see a Featured Offer for a future glance view is price decreases on Amazon; for example, in June 2022, ███ of SC-FOD resolutions coincided with a lower on-Amazon price. Hitt ¶¶ 45a, 301, Ex. 59. Moreover, when Amazon expands SC-FOD monitoring, SC-FOD has caused a *reduction* in prices on Amazon. Hitt ¶¶ 45, 303.

*Average 3P seller prices on the Amazon Marketplace for "HDE iPad Case," "Poetic Galaxy Samsung Phone Case," and "FiiO Digital to Analog Audio Converter" decreased after Amazon started collecting Select Competitor prices for them the week of July 29, 2019*



Hitt Ex. 61; *see also* Hitt ¶ 308; Exs. 62, 63.

### 2.    Marketplace Fair Pricing Policy

Amazon introduced the MFPP in November 2017. The policy prohibits practices that undermine customer trust, including setting a price in the Amazon store that is "significantly higher than recent prices offered on or off Amazon." Brown Dec. ¶ 43. This portion of the policy is intended to prevent price gouging. *Id*. ¶ 44; Ex. L (CAAGLit-AMZ_00212464) at -467 ("Fair

Pricing is a policy to prevent price gouging"); *see also* Ex. M (CAAGLit-AMZ_00811534) at - 540.

One of the mechanisms that Amazon uses to implement the MFPP is Atypical Pricing – Featured Offer Disqualification ("AP-FOD"). Brown Dec. ¶ 47. AP-FOD uses a calculated reference price to determine whether a price is "significantly higher." *Id.* ¶ 50; Hitt ¶ 209. Since 2021, ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████ *Id.* ¶ 51. Both because of the padding and because WCP rarely—if ever—is based on a 3P seller's own off-Amazon prices, the MFPP cannot operate as a parity requirement. *Id.* ¶ 50–53.

### 3. Amazon Standards for Brands

Amazon adopted ASB in 2018 to provide a high-quality shopping experience for customers shopping in Amazon's store. Nickerson Dec. ¶ 5. With respect to pricing, ASB says "Amazon obsesses over providing our customers the best possible shopping experience . . . . We measure customer experience in a number of ways, including high in-stock rates, delivery experience, price competitiveness, and selection completeness." *Id.* ¶ 4, Ex. A. ASB is applied to only a small number of customer *perception-shaping* brands that have the disproportionate power to shape customers' perceptions of the overall Amazon shopping experience, such as Pampers or Tide. *Id.* ¶¶ 6–8. If a customer has a negative experience with such a brand—including discovering that prices in Amazon's store are higher than other retail channels—that experience can particularly erode the customer's trust in Amazon. *Id.* ¶ 9. While there are over ██████ brands on Amazon, only ███ of those brands are in scope for a possible ASB policy application. *Id.* ¶ 12.

The way Amazon implements ASB varies depending on whether the seller is a brand owner or a representative, and the way it was implemented for both has varied over time. *Id.* ¶ 14. ASB is neither a parity requirement nor is its application automatic or mechanical. *Id.* ¶¶ 15–21.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

4.        **Seller Code of Conduct**

The SCC requires "that sellers act fairly and honestly in Amazon's store." Pls.' Ex. 8.  The SCC lists examples of "unfair activities"—including attempts to damage or abuse other sellers, or improperly influence customers' rating.  Nowhere does the SCC prohibit a seller from setting lower off-Amazon prices than a seller sets on-Amazon.  *Id.*

Plaintiffs focus on a November 2021 "clarification" to the SCC.  Mot. 12.  On its face, the clarification does not prohibit off-Amazon discounting compared to on-Amazon offers.  Pls.' Ex. 9.  When Amazon adopted the clarification, Amazon was encountering and responding to a specific practice that some sellers were using to manipulate search ranking by essentially paying customers to search for and purchase the product on Amazon.  Noggle Dec. ¶ 4.  The conduct gave customers the false impression that other customers purchased the product for the price listed in Amazon's store when, in reality, they did not, because the seller reimbursed the customer for all or some of the product price.  *Id.* ¶ 5.  This is why the clarification is aimed at 3P seller practices that "may inflate search ranking, incentivize product reviews, and generate artificial traffic and conversion behaviors."  Pls.' Ex. 9.

The November 2021 clarification does not address off-Amazon prices in any respect, much less represent a price parity requirement.  Noggle Dec. ¶ 7.

E.        **Amazon's Practices with Respect to Communications with Sellers Did Not Create a *De Facto* Parity Requirement.**

The alleged *de facto* parity policy also includes unspecified "practices that Amazon used to deter discounting and its communications with merchants."  Pathak ¶ 29.  Amazon has many thousands of personnel providing support to sellers.  One such team is Selling Partner Support.  Owens Dec. ¶ 3.  Today the Seller Partner Support team consists of approximately 19,000 associates worldwide.  *Id.* ¶ 2.  Sellers are able to raise issues to the Seller Support Team through Amazon seller portals and tools, including Seller Central.  *Id.* ¶ 4.  Associates are trained, and are provided structured workflows with pre-approved language, to respond to sellers.  *Id.* 5–6.  10,327 associates are trained to respond to questions concerning Featured Offer eligibility.  *Id.* ¶ 9.

When a seller has a question about a product which was disqualified from Featured Offer eligibility because of SC-FOD, Amazon's associates are trained to explain that a seller's offer was not priced competitively, and not to comment on a seller's off-Amazon prices. Owens Dec. ¶¶ 11–13. Associates are provided *approved* workflows and language for responding to questions concerning Featured Offer eligibility. *Id.* These approved workflows do not ever suggest that a 3P seller should raise their off-Amazon prices. The Seller Partner Support Team's compliance rate in using these approved workflows is very high, ranging from ███████ % in the past four years. Owens Dec. ¶ 13.

There is also a Strategic Seller Management and Account Services team, which is a program that sellers pay to enroll in to receive a dedicated account manager, referred to as a Customer Success Manager (CSM). Rallanka Dec. ¶ 2. There are 500 CSMs, who interface with ████ sellers in the U.S. *Id.* ¶ 3. CSMs are trained to answer questions concerning, among other things, Featured Offer eligibility. Needham Dec. ¶ 5. That training includes the following points: (1) 3P sellers control their prices in Amazon's store; (2) Amazon shares only the current competitive price—not where that price is offered; and (3) Amazon offers optional automated pricing tools and 3P sellers who elect to use them can set minimum and maximum prices. Needham Dec. ¶¶ 6–8; Rallanka Dec. ¶¶ 7–10.

CSMs do not advise sellers how to price their products, and they are trained not to discuss sellers' off-Amazon pricing. Hunt Dec. ¶ 7; Sung Dec. ¶ 7; Hinnaoui Dec. ¶ 6; Barth Dec.¶ 9; Rallanka Dec. ¶ 5. Instead, the pre-approved language for responding to seller questions concerning Featured Offer eligibility suggests that the seller consider lowering its price in Amazon's store. Rallanka ¶ 13. Training materials also inform CSMs that Amazon does not want 3P sellers to "misunderstand that we are requesting them to apply price parity (which we no longer require in EU or the U.S.)." Rallanka ¶ 12.

### F. Sellers Differ In Terms of Their Interactions with Amazon Policies and Practices and Their Responses.

A significant number of sellers have never interacted with any of the challenged policies

1   or practices and therefore, even as Plaintiffs construe it, they would not have reason to believe,

2   based on their experiences, that Amazon has a parity requirement.  For example, █████ of sellers

3   did not sell a product while the PPP was in effect; █████████ 3P sellers offer the ███ of

4   brands that could potentially be subject to ASB application; ██████ sellers have not received a SC-

5   FOD notice informing them that their price is ineligible for the Featured Offer; and █████ of sellers

6   have never received an AP-FOD notice.  Hitt Exs. 2, 39; Nickerson ¶ 13.

7       For sellers who have had exposure to the challenged conduct, there is variation in response.

8   Many sellers lower prices in Amazon's store.  Hitt ¶¶ 292–293, 301, Ex. 59; Ex. N (CAAGLit-

9   AMZ_00122463) at -463 ("█████████████████████████████████████████

10  ████████████████████████████████████████████").  Others do not.  Ex. O (CAAGLit-

11  AMZ_03049354 (████████████████████████████████████████████████████

12  ████));  Hitt ¶ 301, Ex. 59.

### LEGAL STANDARD

13

14      Rule 23(a) of the Federal Rules of Civil Procedure requires Plaintiffs to satisfy four

15  elements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.  Fed.

16  R. Civ. P. 23(a).  Where, as here, Plaintiffs seek certification under Rule 23(b)(3), the class may

17  be certified only if "questions of law or fact common to class members predominate over any

18  questions affecting only individual members," and if "a class action is superior to other available

19  methods for fairly and efficiently adjudicating the controversy."   Fed. R. Civ. P. 23(b)(3).

20  Plaintiffs bear the burden of proof as to each element.  *Olean Wholesale Grocery Coop.*, *Inc.* v.

21  *Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (en banc).

22      "Importantly, a party cannot plead or speculate her way to class certification.  She must

23  marshal facts showing, by a preponderance of the evidence, that class issues predominate." *Miles*

24  v. *Kirkland's Stores, Inc.*, 89 F.4th 1217, 1222 (9th Cir. 2024); *see also Halliburton* v. *Erica P.*

25  *John Fund, Inc.*, 573 U.S. 258, 275 (2014) ("plaintiffs wishing to proceed through a class action

26  must actually *prove*—not simply plead—that their proposed class satisfies each requirement of

27  Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)" (emphasis in

AMAZON'S OPP TO CLASS CERTIFICATION
(2:21-CV-00693-JHC) - 16

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

original)).  A "district court must engage in a 'rigorous analysis' of all the evidence," including—where a company's policies are at issue—"how the policies were enforced, implemented and followed."  *Kirkland's*, 89 F.4th at 1222.  "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim."  *Dukes*, 564 U.S. at 351.  That overlap includes issues of "historical fact" such as whether a defendant's "challenged [] conduct could affect a class as a whole."  *Olean*, 31 F.4th at 681.

## ARGUMENT

### I.    Plaintiffs' Claims Depend on a *De Facto* Parity Requirement That Presents Numerous Individualized Issues—and Therefore Not a Common Question for Purposes of Rule 23(a)(2).

Rule 23(a)(2), which requires a plaintiff to show that there are questions of law or fact common to the class, "is easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.'"  *Dukes*, 564 U.S. at 349.  A common question under 23(a)(2) must concern an issue "central to the validity" of all members of the proposed class and be capable of resolution "in one stroke."  *Id.* at 350; *id.* ("What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation").  A common issue is one where "the same evidence will suffice for each member to make a prima facie showing," whereas an individual issue is one where "members of a proposed class will need to present evidence that varies from member to member."  *Tyson Foods, Inc.* v. *Bouaphakeo*, 577 U.S. 442, 453 (2016).

Plaintiffs admit that Amazon removed the PPP from the BSA in 2019, and that prior to its removal it was rarely enforced.  *Supra* 8.  Thereafter, their claim depends not on an *express* parity requirement, but on the theory that other Amazon conduct amounts to a *de facto* continuation of the PPP.  Mot. 12; Pathak ¶ 29, § 6.5.3.  Plaintiffs acknowledge their theory depends on the understanding (or, more accurately, misunderstandings) and responses of ██████ sellers to this alleged *de facto* policy.  Mot. 14 ("Many sellers *interpret* removal of their offers from the Buy Box due to a higher external prices as the operation of the MFPP"); Pathak ¶¶ 271–72 ("the specific wording of policies and practices over time are less important than their effect . . . .  Throughout

the period, third-party merchants made decisions about what prices to set, and which marketplaces to use, *in the knowledge* that Amazon could and would sanction them if Amazon found they had set discounted prices elsewhere."). Plaintiffs even acknowledge that their theory depends on the subjective beliefs of rival marketplaces. Pathak ¶ 272 ("Rival marketplaces were aware if they set lower fees, merchants concerned about Amazon's anti-discounting policies would not price these lower fees into their offers"). These individualized inquiries concerning the existence of a *de facto* parity policy defeat commonality.

Plaintiffs appear to claim that antitrust liability *always* presents a common question. Mot. 5, 19.[5] That is wrong. This is not an antitrust price-fixing case for which the anticompetitive conduct that Plaintiffs must prove is just one agreement between defendants. Instead, Plaintiffs' theory of liability depends on their ability to prove a *de facto* MFN policy made up of communications and interactions that ████ 3P sellers had with thousands of CSMs, as well as the "knowledge" and interpretation of each of these sellers, raising millions of individualized issues. *E.g.*, *Kendler* v. *Federated Dep't Stores, Inc.*, 88 F.R.D. 688, 693 (S.D.N.Y. 1981) (denying certification where conspiracy between Bloomingdale's and each of its suppliers would depend on plaintiffs establishing "16,000 mini-conspiracies between Bloomingdale's," which "would soon deteriorate into multitudinous lawsuits"). These innumerable individualized inquiries defeat the requirements for certification.

### A.    Plaintiffs' *De Facto* Price Parity Theory Does Not Present a Common Question Resolvable by Common Evidence.

Even accepting that Plaintiffs may proceed with a claim of a *de facto* price parity policy, the evidence supporting that claim raises individualized issues, not a central common issue. Under *Dukes*, the Court cannot certify a class where proof of the existence of a policy will require

---

[5] *In re High-Tech Employee Antitrust Litigation* does not stand for the proposition that all antitrust cases present common questions of liability. 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013). Instead, **on the facts of that case**, antitrust liability presented a common question. *Id.* Plaintiffs' other cited cases are price-fixing cases, *e.g.*, *Olean*, 31 F.4th at 661 and *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020), where, unlike here, the existence of a price-fixing agreement was not predicated on heterogeneous understandings of millions of non-parties.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.757.3350 main · 206.757.7700 fax

1    individualized consideration of the conduct of thousands of Amazon employees' interactions with

2    millions of third-party sellers for billions of transactions.  In *Dukes*, the Supreme Court held that

3    the liberal standard of commonality under Rule 23(a)(2) was not met for a class action alleging a

4    pattern and practice of sex discrimination.  564 U.S. 338.  Plaintiffs alleged that their local

5    managers' discretion over pay and promotion, informed by Wal-Mart's basic "corporate culture,"

6    was exercised disproportionately in favor of men.  *Id.* at 345–46.  This was not sufficient to show

7    a class-wide common issue in the absence of an actual company-wide discriminatory policy.

8    While the plaintiffs in *Dukes* pointed to 120 affidavits from class members with specific accounts

9    of discrimination, those individual experiences could not show that discrimination was typical of

10   the company's practices, and thus were insufficient to warrant class treatment.  *Id.* at 358.  As the

11   Court wrote, even "if every single one of these accounts is true, that would not demonstrate that

12   the entire company 'operates under a general policy of discrimination.'"  *Id.* at 358.

13          The commonality standard in *Dukes* applies to all cases, including antitrust cases.  *E.g.*,

14   *Olean*, 31 F.4th at 663.  While we are unaware of an antitrust class action based on a *de facto*

15   policy, after *Dukes,* many courts have denied certification of classes alleging unlawful *de facto*

16   policies that are premised not on the express text of policies but claims of an unwritten policy, or

17   a common tacit "understanding."   The same principles apply here.  *E.g.*, *Nevarez* v. *Costco*

18   *Wholesale Corp.*, 2019 WL 7421960, at *8 (C.D. Cal. 2019) (denying class certification where

19   plaintiffs could not produce "substantial evidence" of a "systematic unwritten policy"); *Galvan* v.

20   *First Student Management, LLC*, 2022 WL 20016825, at *8 (N.D. Cal. 2022) (evidence

21   insufficient to demonstrate common questions of fact where claim did not "describe a uniform

22   unofficial policy" but "a variety of experiences that differed from employee to employee");

23   *Manigo* v. *Time Warner Cable, Inc.*, 2017 WL 5149225, at *4  (C.D. Cal. 2017) (certification

24   denied based on plaintiffs' "*de facto* policy argument"); *Kilbourne* v. *Coca-Cola Co.*, 2015 WL

25   5117080, at *12 (S.D. Cal. 2015) ("the only evidence that Plaintiff offers with respect to Coca-

26   Cola's purported *de facto* policy" consists of "identical putative class member declarations, which

27   is not 'significant proof' of a common policy or practice"); *Cash* v. *Arctic Circle, Inc.*, 85 F.R.D.

AMAZON'S OPP TO CLASS CERTIFICATION
(2:21-CV-00693-JHC) - 19

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

618, 620 (E.D. Wash. 1979) ("In the absence of an express agreement, a Rule 23(b)(3) class action is rarely appropriate in illegal tying cases because the questions of the existence of the tie and of coercion would require individualized fact-finding, and common questions of fact and law could not be said to predominate."); *In re 7-Eleven Franchise Antitrust Litig.*, 16 Fed. R. Serv. 2d 537 (N.D. Cal. 1972) (where antitrust claims depend on defendant's "methods of operation" beyond what was in the franchise agreement, compliance "must be decided on a case-by-case basis and does not justify class treatment").

Similarly, courts have denied class certification based on theories of coercion or an asserted understanding of coercion as raising individualized issues. *E.g.*, *Chicken Delight, Inc.* v. *Harris*, 412 F.2d 830, 831 (9th Cir. 1969) (granting mandamus; holding that whether defendant "unlawfully exercised control over the retail prices of all members of the class" "would involve significantly different evidence and separate factual determinations as to each separate franchisee and that to impose such a burden in this case would be inconsistent with the basic salutary purpose of Rule 23"); *Cokeley* v. *Tandy Corp.*, 19 Fed. R. Serv. 2d 1054 (N.D. Cal. 1974) ("individual claims of coercion would overshadow any common question thereof, consequently making the required proof of coercion an inappropriate issue for class treatment"); *Smith* v. *Denney's Restaurants, Inc.*, 62 F.R.D. 459, 460–61 (N.D. Cal. 1974) (denying certification where proof that "Defendants coerced them to enter into their anticompetitive scheme" required "individual testimony" from each franchise); *Ungar* v. *Dunkin' Donuts of Am., Inc.*, 531 F.2d 1211, 1225 (3d Cir. 1976) (reversing grant of class certification because "What is sufficient to coerce one buyer's choice may not be sufficient to coerce another buyer's choice").

As their declarations demonstrate, Amazon employees who communicate with 3P sellers (or who supervise those that do) are trained to emphasize that sellers set their own prices, and to offer sellers access to tools and resources that may assist them in setting competitive prices, but they do not direct how the seller should price either on or off Amazon. Owens Dec. ¶¶ 5–6; Rallanka Dec. ¶¶ 4–18; Needham Dec. ¶¶ 4–8; Sung Dec. ¶ 7; Hinnaoui Dec. ¶ 6; Hunt Dec. ¶ 6; Barth Dec. ¶ 8. This evidence is not offered for the Court to judge the merits of Plaintiffs' claims

AMAZON'S OPP TO CLASS CERTIFICATION
(2:21-CV-00693-JHC) - 20

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1  at this stage, but to show, by way of example, that for each of ███████ sellers, the Court will

2  have to examine individualized evidence in order to determine whether a *de facto* price parity

3  policy exists.   And even if some sellers incorrectly believed (contrary to the policies' plain

4  language and Amazon's regular practice in communications with sellers) that they had to maintain

5  price parity, this anecdotal misperception is insufficient to carry Plaintiffs' burden to demonstrate

6  that 2.5 million sellers shared the same mistaken belief.  "Class certification requires a common

7  policy, not a question regarding whether a common policy existed . . . .  If there is no common

8  policy, the case is not a class action."  *Frausto* v. *Bank of Am. Nat'l Ass'n*, 2021 WL 2476902, at

9  *3 (N.D. Cal. 2021).

10       **B.**    **Even If A *De Facto* Policy Theory Could Satisfy the Requirements for Class Certification, Plaintiffs Have Failed to Establish a *De Facto* Policy Applicable**

11              **to the Entire Class.**

12        Even accepting that Plaintiffs could proceed with a claim premised on a *de facto* price

13  parity policy (which they cannot), Plaintiffs have not satisfied their burden to establish that such a

14  policy exists.  Where a plaintiff fails to present "significant proof" of a policy or practice applicable

15  to the entire class, certification cannot be granted.  *Ellis* v. *Costco Wholesale Corp.*, 657 F.3d 970,

16  983 (9th Cir. 2011) (reversing certification:  "If there is no evidence that the entire class was subject

17  to the same allegedly discriminatory practice, there is no question common to the class"); *see also*

18  *Parker* v. *Bank of Am., NA*, 99 F. Supp. 3d 69, 81 (D.D.C. 2015) (Brown Jackson, J.) ("significant

19  proof" standard applies whenever "a movant seeks class certification based on classwide injuries

20  allegedly caused by a general policy or practice," not just cases alleging a general policy of

21  discrimination).

22        Plaintiffs have not come close to meeting their burden of presenting "significant proof" of

23  a common policy.  **First**, Plaintiffs admit that Amazon removed the PPP from the BSA in 2019

24  and, even before that, enforced it rarely.  **Second**, even if a *de facto* policy theory could be

25  substantiated and did not involve individualized evidence, *supra* 17–19, the entire class was not

26  subject to such policy and therefore there is no issue that is common to the class.  *Ellis*, 657 F.3d

27  at 982–84.

AMAZON'S OPP TO CLASS CERTIFICATION
(2:21-CV-00693-JHC) - 21

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

As the Ninth Circuit recently held, a "company's policy by itself—even if it remains constant during the class period—is not an elixir that turns canned allegations in a complaint into a pot of class action gold. We still need to look at evidence of whether the company consistently implemented and enforced the policy across all employees during the class period." *Kirkland's*, 89 F.4th at 1223; *see also id.* at 1221 n.1 (class could not extend past date when the company "stopped enforcing" the policy "uniformly" even if it was still in effect). Here, as explained *supra* 21–22, the vast majority of sellers had no exposure to any of the challenged conduct, and Plaintiffs have come forward with no common evidence that these sellers could have believed or understood that these policies and practices required price parity.

## II.    Plaintiffs Have Failed to Satisfy Rule 23(b)(3) by Establishing That Common Issues Predominate Over Individualized Issues.

### A.    Individualized Issues Predominate Concerning Whether a Common Policy Was Enforced.

#### 1.    The Existence of a *De Facto* Policy Does Not Satisfy the Predominance Requirement.

Even if the Court were to conclude that a common issue under Rule 23(a)(2) exists, establishing that ███████ sellers were subject to and understood there was a *de facto* price parity policy for ████████████ causes individualized issues to predominate, requiring rejection of the proposed class under Rule 23(b)(3). *E.g.*, *Castillo* v. *Bank of Am., NA*, 980 F.3d 723, 733 (9th Cir. 2020) (affirming denial of class certification where there were "complicated" individualized questions about "who was ever exposed to one or both policies, and whether those who were exposed were harmed in a way giving rise to liability"); *In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1343 (9th Cir. 1982) ("Absent common evidence of standard contracts that demonstrate control over the retail dealers' pricing decisions or some other readily demonstrable and equally convincing evidence, individual issues will predominate and render class treatment inappropriate").

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

### 2. The Proposed Class Does Not Satisfy the Predominance Requirement Because the Challenged Conduct Did Not Have a Widespread Effect, with the Class Containing Countless Millions of Uninjured Members.

The Ninth Circuit has held that, when a "class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's unlawful conduct, the class is defined too broadly to permit certification." *Olean*, 31 F.4th at 669 n.14. The Ninth Circuit has not defined what a "great number" is for this purpose, but other courts have held that 5–6% constitutes the outer bounds of permissible uninjured class members. *In re Rail Freight Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 137–38 (D.D.C. 2017) (collecting cases).

Plaintiffs' expert, Dr. Pathak, admits that there are likely unharmed transactions for the proposed class: "it might be possible to identify particular incidents in which a sale could be plausibly argued to have had the same price in the but-for world as it did in the real world, despite the lower referral fee in the latter." Pathak ¶ 387. But Pathak fails to propose a common method for identifying unharmed class transactions or class members.

Pathak tries to sidestep the problem of uninjured class members by resorting to a hypothetical. Pathak *assumes* that 50% of transactions were not harmed because there was no pass through of increased fees, Pathak ¶ 387, and then further *assumes* that any class member who made at least five purchases would have a greater than 95% chance of being harmed. *Id.* ¶ 47.

Pathak's assumptions bear no relationship to the real world. Even accepting Pathak's assumption that 50% of transactions are unharmed, Pathak does not calculate the actual number of class members having five or fewer transactions using Amazon's transactions data, relying on a Feedvisor report instead. Amazon data show that 36.8% of class members have fewer than five transactions during the class period so even with a *hypothetical* 50% injury rate, over 12.7% of the class would not be injured on that basis alone. Hitt ¶ 518, Ex. 101. Pathak's hypothetical also fails to take into account that the challenged conduct benefited class members by lowering the prices they paid. *Id.* § 4; *infra* 34–36. Individual issues will predominate because of the presence of widespread uninjured class members.

**B.     Injury, Damages, and Standing Are Not a Common Question Because Plaintiffs' Claims Depend on a Complex and Multi-Step Causal Chain, Causing Individual Inquiries to Predominate.**

Rule 23(b)(3) requires that a Court determine whether individualized inquiries are required to determine the injury status of class members.  *Olean*, 31 F.4th at 670.  Antitrust injury is "the causal link between the antitrust violation and the damages sought."  *Markson* v. *CRST Int'l, Inc.*, 2022 WL 790960, at *14 (C.D. Cal. 2022).  With respect to both individual injury and damages, Plaintiffs must prove, by a preponderance of the evidence, that antitrust injury and damages can be resolved "in one stroke."  *Olean*, 31 F.4th at 670; *id.* at 682.  In addition, because every class member must have Article III standing to recover individual damages, standing is part of the predominance inquiry.  *Id* at 668 n.12.

Plaintiffs' theory of causation involves a complex multi-step theory that raises extensive individual issues in demonstrating injury and damages, and accordingly the standing, of individual class members.  In *Olean*, the plaintiffs' theory of causation depended on "a simple one-step theory."  31 F.4th at 679.  In granting certification, the Ninth Circuit distinguished that simple causal chain from the "novel and complex" two-step theory the court rejected in *In re New Motor Vehicles Canadian Export Antitrust Litigation*, 522 F.3d 6 (1st Cir. 2008).  *Olean*, 31 F.4th at 678–79.  The Ninth Circuit described the *New Motor Vehicles* causal chain—which was too complex to allow class certification—as requiring that: (1) "but for the defendants' [conspiracy], manufacturers would have set lower prices to compete with Canadian imports"; and (2) as a result, plaintiffs "paid higher retail prices."  *Id*.

Plaintiffs here advance a more complicated and attenuated theory of injury than the theory rejected in *New Motor Vehicles*.  Plaintiffs assert that Amazon maintains policies and practices that create *de facto* parity requirements for 3P sellers' on- and off-Amazon prices (1) resulting in higher prices off-Amazon, (2) which caused (or permitted) Amazon and other marketplaces to inflate their referral fees, which in turn (3) caused 3P sellers to pass on those inflated fees to their customers on Amazon, (4) resulting in higher class-wide prices paid by customers.  Mot. 34.

When antitrust injury depends on a multi-step causal chain, it is insufficient to assume that

"any price increase or decrease will always have the same magnitude of effect on the final price paid." *Olean*, 31 F.4th at 678–79. Courts must engage in a "searching inquiry into the viability of that theory and the existence of the facts necessary for the theory to succeed" at the class certification stage. *New Motor Vehicles*, 522 F.3d at 26. Because of variation at each step in the chain, Plaintiffs cannot show that the challenged conduct had *consistently* affected purchase prices, thus raising individual issues.

### 1.   Step 1:  The challenged conduct must cause 3P sellers to raise their off-Amazon prices or reduce their own off-Amazon selection.

Plaintiffs' theory requires that that the challenged conduct caused 3P sellers to raise prices off Amazon for the same product(s) the sellers were selling in Amazon's store or remove merchandise from other retail channels. Mot. 20; SCAC ¶ 15. Plaintiffs must further show that it was the challenged conduct that caused each seller to set higher off-Amazon prices or reduce their off-Amazon selection—not independent factor(s)— which requires individualized inquiry.

Fundamental to Plaintiffs' case and their expert's opinions is the assumption that 3P sellers raise off-Amazon prices to match their on-Amazon prices in response to the challenged conduct. To show that the challenged conduct caused sellers to raise off-Amazon prices, Plaintiffs have submitted a chart identifying eight examples discussing off-Amazon price increases. But that chart demonstrates *varied* seller responses, including that some sellers—contrary to Plaintiffs' theory— *reduced* their on-Amazon prices, benefitting class members. Mot. 23–25. "Even if every single one of these accounts is true, that would not demonstrate that" 2.5 million sellers raised their off-Amazon prices or reduced their off-Amazon selection over a seven-year period. *Dukes*, 564 U.S. at 358. Plaintiffs' examples of price increases do not come close to the 140 cases of alleged discrimination in *Dukes* that were insufficient to support certification. *Id.*

As further support, Pathak plots the prices for a cream offered by seller Mr. Medical on the Amazon and Walmart marketplaces from May 25, 2022, to July 5, 2022, which he claims "shows how the anti-discounting policies operated when merchants attempted to break with Amazon's policy and set lower prices on other platforms." Pathak ¶ 31. His incorrect conclusions as to what

1    happened and why show that individual analysis for each alleged instance of price increases would

2    be required.

3        *First*, Pathak incorrectly states that ███████ lost Featured Offer eligibility on Amazon

4    by reducing its price on the Walmart Marketplace.  Amazon did not use ███████ price on

5    the Walmart Marketplace for determining a competitive reference price for most glance views—

6    it used the price that Target set as a first-party seller.  Hitt ¶ 367.

7        *Second*, ███████ offer continued to be the Featured Offer during the alleged

8    suppression event; for example, on June 20, 2022, ███████ won the Featured Offer for ███

9    of glance views.  *Id.* ¶ 368.

10       *Third*, Pathak claims that, after the suppression event, a "day later," ███████

11   "abandoned its discount," Pathak ¶ 31, but again this is incorrect—███████ discount on

12   Walmart lasted for 13 days (which is consistent with the end of a two-week sale).

13       *Fourth*, Pathak ignores that Amazon provided Amazon Funded Discounts to customers

14   during ███████ Walmart promotion.  Hitt ¶ 370.

15       All the mistakes that Plaintiffs and Pathak made concerning this single ███████

16   example underscore that they cannot show that "the challenged conduct had *consistently* affected

17   purchase prices," *Olean*, 31 F.4th at 679, and that an individualized inquiry will be required into

18   each alleged instance of a price increase.

19       In an attempt to show that 3P sellers raise their own off-Amazon prices when their Amazon

20   offers are disqualified from Featured Offer eligibility, Pathak says that prices "on other platforms"

21   on average "increased by around 4% by the end of the week following" a customer seeing a detail

22   page with no Featured Offer because of SC-FOD.  Pathak ¶ 256.  Pathak concedes that the 4%

23   average is merely "illustrative" and "masks significant variations in individual price movements"

24   given that "Some prices decline" while "others remain the same."  *Id.* ¶ 256 n.456.  The data

25   underlying his "average" reveal that for ███ of the suppression events he studies, there is no

26   change or even a *decrease* in the external competitor's price following the suppression event.  Hitt

27   ¶ 359, Ex. 75.  This is expected, because the Select Competitors Amazon references for SC-FOD

are only in rare circumstances a 3P seller selling in Amazon's store. *Supra* 6–7.

Pathak's analysis also does not show causality because it fails to distinguish between Select Competitors increasing prices after an SC-FOD suppression event and temporary sales that invariably end. Hitt ¶ 329. As Hitt explains, Pathak misattributes several price increases to SC-FOD rather than to the end of a temporary sale by an external competitor like Ulta. *Id.* ¶ 353. When Hitt analyzed the prices at Select Competitors before an SC-FOD event, he found that the average price decreased before the SC-FOD event, suggesting that off-Amazon sales channels reduced prices for a temporary sale which triggered the SC-FOD event. Hitt Ex. 73. Pathak's analysis therefore measures the end of a temporary discount, not any effect from the challenged conduct. Hitt ¶¶ 351-57.

### 2. Step 2: The *de facto* parity or anti-discounting requirement must cause Amazon to face less competition and allow Amazon to charge 3P sellers inflated referral fees.

Plaintiffs assert that the *de facto* parity requirement results in reduced competition for marketplace seller services between Amazon and other online marketplaces. Mot. 26; SCAC ¶¶ 14–15. Pathak's focus on the impact of the challenged conduct on ASIN-level competition is unmoored from an analysis of competitive conditions because it fails to take into account that products that are reasonable substitutes compete against one another, even if they have different ASIN numbers (*e.g.*, Chiquita and Dole bananas or Nike and Reebok sneakers). *United States* v. *E.I. du Pont de Nemours and Co.*, 351 U.S. 377, 404 (1956) (competition is based on reasonable interchangeability of products); *Eastman Kodak Co.* v. *Image Technical Servs., Inc.,* 504 U.S. 451, 469 (1992) (same). Here, Amazon faces different competitive constraints across products, constraining its ability to raise fees.

AMAZON'S OPP TO CLASS CERTIFICATION
(2:21-CV-00693-JHC) - 27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax



*Amazon captures different shares of all retail sales across products*

Plaintiffs have come forward with no common method for showing that the challenged conduct caused Amazon to face materially less competition for all ▮▮▮▮ products sold in its store, which requires individualized inquiry.[6]

Further, Amazon charges sellers a referral fee for products sold that varies by product

---

[6] Plaintiffs theorize that Amazon's purported *de facto* parity requirement caused Jet.com to change its business model and shut down. Jet.com's own statements refute Plaintiffs' theory: it removed its $50 membership fee because of an "unexpectedly high adoption rate" of its Smart Cart feature. Ex. P (Marco della Cava, *Jet.com Grounds its $50 Annual Membership*, USA TODAY (Oct. 7, 2015).) Afterwards, Jet.com continued to undercut competitors with prices "at least 4% to 5% lower than competitors." Ex. Q (Greg Bensinger, *Shopping Site Jet.com Abandons $50 Membership Fee*, WALL STREET JOURNAL (Oct. 7, 2015).) Walmart ultimately discontinued Jet.com because of the "continued strength of the Walmart.com brand" and "accelerating our omni strategy." Ex. R (Walmart Earning Release at 1 (May 19, 2020).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

category.  Hitt  ¶¶ 253–54, Ex. 49; Pathak Ex. 6.[7]  Hitt explains:  "While different referral fees indicate differing competitive conditions, the converse is not true.  Amazon can face varied competitive conditions based on, *e.g.*, the identity of its competitors even though it sets the same referral fee." Hitt ¶ 36e n.28.  The ability of 3P sellers to switch to other distribution channels— which varies by seller and product—imposes competitive constraints on Amazon's ability to raise fees.  *Id.* ¶ 231–32.

### 3.    Step 3:   The inflated fees must cause 3P sellers to inflate on-Amazon prices.

Plaintiffs allege that 3P sellers pass on purportedly inflated referral fees to their customers when 3P sellers set their prices, SCAC ¶ 13, which requires further individualized inquiry.  To support this step, Pathak performs regressions for four product categories to show an average relationship between fees and consumer prices for four product categories.  Since 2019, Amazon has adjusted fees several times, often lowering fees by ██.  Pathak studied four of these fee reductions. The average relationship in the regressions obscures extensive variation, again pointing to the need for individual analysis of transactions.  For example, his regressions show no decrease in prices for five out of nine categories under the "Beauty" category.   Hitt ¶ 583a.  Moreover, Pathak's limited regressions only analyze fee decreases—not any referral fee increases.  But applying the regression formula to two fee increases—which more closely correspond with Plaintiff's fee inflation theory—no statistically significant price increase is found.  *Id.* ¶¶ 601–06. There are many reasons why a seller on Amazon would not increase prices in response to referral fee increases, including competition from major retailers and focal point pricing (the practice of a seller setting prices ending in $0.99).  *Id.* ¶¶ 256–68.

Pathak's regressions also analyze only four out of the 128 product categories on Amazon's marketplace.  Hitt ¶ 598.  And of this limited subset, Pathak looks at an even smaller percentage

---

[7] Plaintiffs argue that the challenged conduct gives other marketplaces "less incentive to charge lower fees," Mot. 33, but then say that eBay and Walmart are "less expensive platforms for merchants to sell on," and already have lower fees, showing that marketplaces *do* compete on fees.  *Id*. 21.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

of available data. Pathak analyzes ASINs representing sales of only $39.1 *million* of the more than

███████ in sales in the "Beauty" category during the relevant period ███). *Id.* ¶ 596. This

minuscule dataset cannot support Plaintiffs' claim that they have reliable, common evidence to

prove class-wide impact. *E.g.*, *In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*, 140

F. Supp. 3d 339, 353, 356 (D. Del. 2015), *vacated in part on other grounds*, 679 F. App'x 135 (3d

Cir. 2017) (denying certification where expert's overcharge analysis was "based on a modicum of

data not fully representative" of sales and the expert's pass-through analysis utilized "less than one

percent of the relevant" data).

Neither Pathak nor Plaintiffs claim this small subset of data is representative. In total,

Pathak analyzes ████ ASINs across four categories. Hitt ¶ 597. This dataset represents ███

percent of the nearly ████████ ASINs sold in Amazon's store during the class period. *Id.* A

small, unrepresentative dataset cannot support a showing of common impact. *In re Lithium Ion

Batteries Antitrust Litig.*, 2017 WL 1391491, at *18–19 (N.D. Cal. 2017) (denying certification

where plaintiffs' expert attempted to extrapolate his analysis of one product to all products

included in the class); *In re Steel Antitrust Litig.*, 2015 WL 5304629, at *11 (N.D. Ill. 2015)

(denying in part certification where the "broad range of products and producers represented in the

class" made it "unlikely that class members were either impacted at the same levels or suffered the

same damages").

### 4.    Step 4:  These inflated prices must cause class-wide harm.

As discussed above, *supra* § II.A.2, Pathak recognizes that—even assuming inflated fees

and prices—there are unharmed transactions. Pathak ¶ 387. But neither Plaintiffs not Pathak

provide any method for identifying those transactions.

\*\*\*

At each of the causal chain's four steps, Plaintiffs' purported "common" method falls short,

necessitating individualized inquiry to determine whether any of the 288 million class members

were harmed.

AMAZON'S OPP TO CLASS CERTIFICATION
(2:21-CV-00693-JHC) - 30

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1
2
**C.      Plaintiffs' Cannot Satisfy Rule 23(b)(3) Because Pathak Fails to Offer A Reliable Model Demonstrating Common Injury, Damages, and Standing.**

3
4
5
6
7
The "primary proof" that Plaintiffs have offered to establish class-wide injury, damages, and standing is Pathak's model.  Mot. 32.  Amazon has concurrently filed a *Daubert* motion to exclude Pathak's opinions.  But even if the Court denies that motion, Plaintiffs' class-certification motion still fails because Pathak fails to offer a valid or reliable way of proving class-wide antitrust injury and damages.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
The model Pathak uses is drawn from a single article and has never been validated empirically, much less to billions of transactions.  Hitt ¶ 378.  The model uses assumptions that are inconsistent with real-world facts.  "Courts have frequently found that expert evidence, while otherwise admissible under *Daubert*, was inadequate to satisfy the prerequisites of Rule 23." *Olean*, 31 F.4th at 666 n.9.  An expert's "failure to provide properly analyzed, reliable *evidence that a common method of proof exists to prove impact on a class-wide basis is fatal*" to a plaintiff's motion for class certification.  *Ward* v. *Apple Inc.*, 2018 WL 934544, at *3 (N.D. Cal. 2018) *aff'd* 784 F. App'x 539, 540 (9th Cir. 2019).  When the model is applied to data that do not involve a PMFN—even random data—it generates the same result: predicting higher referral fees and higher customer prices.  A class does not meet Rule 23's standards where it relies on evidence that generates "nonsensical results such as false positives, *i.e.*, injury to class members who could not logically have been injured by a defendant's conduct."  *Olean*, 31 F.4th at 666 n.9 (citing *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 254–55  (D.C. Cir. 2013) (vacating class certification in light of "damages model's propensity toward false positives")); *see also In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 49 (S.D.N.Y. 2020) ("A flawed model may result in denial of class certification . . . because the model . . . yields false positives").

24
**1.      Pathak's model is unreliable because it is based on theoretical assumptions that conflict with the challenged conduct.**

25
26
Rather than analyze the challenged conduct, Pathak analyzes a hypothetical PMFN with perfect compliance where the 3P seller in his model *always* sets the same price on the only two

27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

sales channels.  As Hitt explains:  "Because there are no other sellers or sales channels for the single product in the model, this hypothetical PMFN constrains pricing for *all possible sellers through all possible sales channels*."  Hitt ¶ 70 (emphasis in original).  Because Amazon's policies and programs do not match these assumptions, Pathak's model does not measure what it purports to measure and cannot provide evidence of common impact.  *New Motor Vehicles*, 522 F.3d at 29 (denying certification where expert's model rested on unsupported assumptions about but-for world).  Not one of the challenged policies or practices share all the features of Pathak's PMFN:

| | Perfect Compliance | Requires Seller's Price Be the Same Across Channels | Applies to All Sellers and Sales Channels |
|---|---|---|---|
| PPP | No | Yes | No |
| SC-FOD | No | No | No |
| MFPP | No | No | No |
| ASB | No | No | No |
| SCC | No | No | No |

Pathak's decision to aggregate all the policies and treat them as a single *de facto* PMFN masks numerous individualized issues such as time period, scope, enforcement, and compliance. *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 159 (E.D. Pa. 2015) (aggregations are permissible "only if the court is convinced that the averages and aggregations are not masking individualized issues that are likely to predominate should the class action move forward").  For example, as Plaintiffs concede, not every seller responds to these policies or practices, when enforced, in the same way.  Mot. 22–25; *supra* 27.

> **2.  Pathak's model assumes that his "hypothetical" PMFN results in higher fees and prices for every transaction as well as making other false assumptions.**

Pathak's model is not sufficient to support class certification—and cannot satisfy the predominance requirement—because it assumes the thing it purports to prove: that a hypothetical market-wide PMFN raises referral fees and customer prices for every transaction.  Hitt ¶¶ 379, 405, 449; *see also Sidibe* v. *Sutter Health*, 333 F.R.D. 463, 496 (N.D. Cal. 2019) (denying certification of 23(b)(3) class where plaintiff's expert "began by assuming what she needs to

AMAZON'S OPP TO CLASS CERTIFICATION
(2:21-CV-00693-JHC) - 32

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1   prove"); *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 321 (N.D. Cal. 2014) (denying

2   certification where model offered by plaintiffs' expert "assumes the very proposition that the

3   [plaintiffs] are now offering it, in part, to show" and made "no attempt to establish, but instead

4   simply assumes, class-wide impact").

5       Pathak's model also makes other unrealistic assumptions such as that customers must

6   purchase the single product considered in the model on *both* of the marketplaces considered in the

7   model (*i.e.*, it assumes that customers "will always purchase the identical product considered in

8   the model on both of the two identical marketplaces from the single seller even when the price is

9   different across marketplaces"). Hitt ¶ 432. In reality, many consumers, including Plaintiffs, are

10  price- sensitive and will shop across sales channels to find the best price before making a purchase.

11  *E.g.*, West Dep. 146:16–150:18, 154:4–156:5; Ojeaga Dep. 70:21–73:2. And unlike Pathak's

12  model—where all of the available stores have prices that are constrained by the hypothetical

13  PMFN—real-world customers are generally able to find the exact same products sold by sellers

14  not subject to the challenged conduct. When these assumptions are relaxed to better reflect the

15  real world, Pathak's model finds no effect on fees or prices. Hitt ¶¶ 437–38.

16          3.    **Pathak's model generates a 100% false positive rate when applied to
              other data sets.**

17

18      The Ninth Circuit has made clear that expert evidence is not "capable of resolving a class-

19  wide issue in one stroke" "where the evidence demonstrated nonsensical results such as false

20  positives, *i.e.,* injury to class members who could not logically have been injured by a defendant's

21  conduct." *Olean*, 31 F.4th at 666 n.9. Hitt performed three such placebo tests on Pathak's model

22  using datasets not subject to a PMFN. Those tests produced *a 100% false positive rate*.

23      For example, Hitt re-ran Pathak's model using, as inputs, Pathak's own predictions for

24  competitive outcomes without a PMFN. If Pathak's model were reliable, it would recognize the

25  inputs as competitive. But Pathak's model does not recognize them as competitive outcomes,

26  instead finding that 100% of prices are inflated by the non-existent PMFN and predicting that all

27  ASINs would have been priced *even lower* if the non-existent PMFN were removed. Hitt ¶¶ 456–

AMAZON'S OPP TO CLASS CERTIFICATION
(2:21-CV-00693-JHC) - 33

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

57, Ex. 84.  Similarly, Plaintiffs contend that changes in Amazon prices following the removal of the PPP in the U.K. and Germany in 2013 are an important "benchmark" to "prove the impact" of the challenged conduct in the United States.  Dkt. 83 at 2; *see also* Dkt. 73 at 5–7.  But when Amazon's U.K. and German transaction data from when none of the challenged conduct was in effect are run through the model, it generates another false positive, finding 100% of prices are inflated even though there was no possible PMFN.  Hitt ¶ 458–60.

There is more:  Hitt used self-created randomized data (not from real transactions) that could not have been caused by a PMFN.  Because Pathak's model always assumes a PMFN that always raises all fees and prices is in place, Pathak's model again wrongly finds that 100% of prices are inflated by the non-existent hypothetical PMFN.  Hitt ¶¶ 454–55.

**D.**    **Because Pathak Identifies No Common Method for Identifying Unharmed Class Members from the Challenged Conduct, Individual Inquiries Predominate.**

The empirical data demonstrate that Amazon's challenged conduct reduces—rather than increases—prices in Amazon's store for many millions of class members.  As Hitt summarizes in

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

the below chart, several pieces of the challenged conduct reduced prices in Amazon's store:

| *The challenged conduct often leads to lower prices on the Amazon Marketplace* |
|---|
|  |
| Hitt Ex. 58. |

Moreover, economic literature has recognized what is called the "Amazon effect," with competition from Amazon leading to lower retail prices for consumers both in online and brick-and-mortar stores. Hitt ¶ 290. Pathak has identified no method for determining class members who experienced price decreases from the challenged conduct: even if the empirical data show Amazon prices fell, Pathak's model says that they increased. The individualized inquiries to determine whether the challenged conduct benefits consumers—lowering prices and providing an improved customer experience in Amazon's store—for any given transaction will predominate over any common questions.

And even if there are some price increases and some reductions, it is also necessary to consider "any benefits that plaintiff would not have received had there been no anticompetitive

AMAZON'S OPP TO CLASS CERTIFICATION
(2:21-CV-00693-JHC) - 35

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

conduct by the defendant." *Los Angeles Mem'l Coliseum Comm'n* v. *Nat'l Football League*, 791 F.2d 1356, 1366 (9th Cir. 1986). For example, in *Kottaras* v. *Whole Foods Market, Inc.*, the court denied certification of a class challenging a merger for failure to satisfy Rule 23(b)'s predominance requirement; while some "shoppers may have paid more for their baskets of products than they would have without the merger," "others may have paid less—depending upon what mix of products each purchased." 281 F.R.D. 16, 25 (D.D.C. 2012); *see also In re Photochromic Lens Antitrust Litig.*, 2014 WL 1338605, at *14 (M.D. Fla. 2014) (denying certification where "some members" of proposed class benefited from challenged conduct). Pathak's model fails to take into account Amazon Funded Discounts, such as the discount Amazon provided to Mr. Medical, described above. *Supra* 26. *E.g.*, *Exhaust Unlimited, Inc.* v. *Cintas Corp.*, 223 F.R.D. 506, 513–14 (S.D. Ill. 2004) (denying certification where some customers "received compensating discounts").

### E. Plaintiffs Fail to Satisfy 23(b)(3) Because They Have Presented No Common Method for Establishing Market Definition and Market Power Across ███████ Products.

"A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'" *FTC* v. *Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020). At the class certification stage, Plaintiffs need to demonstrate that the alleged relevant market and defendant's alleged market power are issues that are common to the class, and that they can be established by class-wide proof, requiring the Court to "inquire into the proof relevant" to these issues. *E.g.*, *In re Beer Distrib. Antitrust Litig.*, 188 F.R.D. 549, 556 (N.D. Cal. 1998); *see also Rodney* v. *Nw. Airlines, Inc.*, 146 F. App'x 783, 788 (6th Cir. 2005) (a court "may consider an antitrust plaintiff's failure to define the market as part of its class certification analysis").

To attempt to meet this standard, Pathak opines that "a reliable methodology is available to define the relevant antitrust market" and, "based on a preliminary assessment," finds that there is a market of "e-commerce retail platforms" for ████████ products. Pathak ¶¶ 13–14. Pathak's opinion is inadequate to establish one overarching market definition that includes nearly every consumer product sold. He provides no empirical evidence—or common method for analyzing—

whether consumers for ▓▓▓▓ products shop for those products in online marketplaces because they are, what he contends, a one-stop shop, or whether other retail channels are reasonably interchangeable. This market definition not only disregards bedrock antitrust precedent that antitrust markets must include reasonable substitutes; it is contradicted by Plaintiffs' own shopping habits, purchasing from specialty websites and brick-and-mortar stores for the same products that are available on Amazon. *Infra* 40. Pathak analyzed no substitution patterns or competitive conditions for the disparate products at issue, and provided no common method for doing so.

Courts have denied certification for failure to satisfy predominance in cases involving markets that were far less complex. *E.g.*, *Heerwagen* v. *Clear Channel Commc'ns*, 435 F.3d 219, 229 (2d Cir. 2006) ("substantial non-common issues regarding market power" when plaintiff would "have to rely on market specific evidence of [defendant's] power in particular markets that will vary from one putative class member to another"), *overruled on other grounds by Teamsters Loc. 445 Freight Div. Pension Fund* v. *Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008); *Rodney*, 146 F. App'x at 787–88 ("Because market definition will involve an analysis of the alternatives available in each of the 74 different [airline] routes, this factor weights against certification.").[8] The number of products at issue in those cases pale in comparison to the ▓▓▓▓ products here.

      **1.**     **Most customers do not choose Amazon because it is a "one-stop" shop and instead substitute across a multitude of retail options.**

According to Pathak, a single market for ▓▓▓▓ products may be defined here because consumers view Amazon's and a small number of other marketplaces as offering "one-stop" shopping. Pathak ¶¶ 88, 93. Plaintiffs exclude from their relevant market single category online retail sites, department store websites, brick-and-mortar stores, and all other retail channels where

---

[8] *See also In re Cox Enters., Inc. Set-Top Box Cable Television Box Antitrust Litig.*, 2011 WL 6826813, at *12 (W.D. Okl. 2011) ("the determination of Cox's market power is not amenable to proof on a classwide basis"); *Pioneer Valley Casket Co., Inc.* v. *Service Corp. Int'l*, 2008 WL 11395528 (S.D. Tex. 2008) ("Plaintiffs' attempt to certify a nationwide class of ICSs [independent casket distributors] is dependent on their allegation that there is a single, nationwide market for the sale of caskets"), *report and recommendation adopted*, 2009 WL 10695539 (S.D. Tex. 2009).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

these very same products are available.  *Id.* ¶ 100.

A relevant market hinges "on a determination of those products to which consumers will turn, given reasonable variations in price."  *Lucas Auto. Eng'g, Inc.* v. *Bridgestone/Firestone, Inc.*, 275 F.3d 762, 767 (9th Cir. 2021).  This analysis ensures that the relevant market "encompasses the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business."  *Hicks* v. *PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018).  But Pathak assumes all consumers only consider buying products from a few "one-stop" online marketplaces for each of ███████ products offered in Amazon's store, ranging from diapers to TVs to cereal to mattresses to sneakers, with no common method for empirically analyzing substitution by customers or sellers across retail channels.  Without empirical analysis or a proposed methodology for performing that analysis that is susceptible to common class-wide proof, Plaintiffs cannot meet their burden of establishing that common issues predominate. *Garnica* v. *HomeTeam Pest Defense, Inc.*, 230 F. Supp. 3d 1155, 1159 (N.D. Cal. 2017) ("the failure by the plaintiffs to consider variance among markets (not to mention within individual markets), combined with the evidence HomeTeam has submitted to suggest that such variance exists, has prevented the plaintiffs from meeting their burden to show that common issues predominate").

As Hitt explains: "For the Amazon Marketplace to be a one-stop shop, it is necessary that many consumers purchase multiple products in the same purchase event or in close succession when using the store."  Hitt ¶ 129.  Pathak points to the number of products sold by Amazon and compares the characteristics of Amazon to other online "one-stop" marketplaces.  Pathak ¶¶ 88, 99, 118–19.  Pathak does no analysis of buyers in this alleged market—customers shopping on Amazon or other online marketplaces—to support his assumed one-stop shopping marketplace. Pathak ¶¶ 128–31.  In *Westman Commission Co.* v. *Hobart International, Inc.,* in rejecting a one-stop market, the court stated: "Any definition of line of commerce which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful."  796 F.2d 1216, 1221 (10th Cir.1986); *accord Thurman Indus., Inc.* v. *Pay 'N Pak Stores, Inc.*, 709 F. Supp. 985, 989

AMAZON'S OPP TO CLASS CERTIFICATION
(2:21-CV-00693-JHC) - 38

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

(W.D. Wash. 1987) (quoting *Westman* and rejecting one-stop distribution market where "plaintiff's expert does not consider consumer preference in drawing his product market conclusion"); *abrogated on other grounds Rotec Indus., Inc.* v. *Mitsubishi Corp.*, 348 F.3d 1116 (9th Cir. 2003); *Thurman Indus., Inc.* v. *Pay 'N Pak Stores, Inc.*, 875 F.2d 1369 (9th Cir. 1989) (expert testimony provided "an inadequate basis for concluding that home centers and other retailers lack the ability to attract substantial amounts of business away from each other"); *Delco LLC* v. *Giant of Md., LLC*, 2007 WL 3307018, at *16 (D.N.J. 2007) (failure to define a one-stop market due to evidence of cross-shopping with other stores and failure of Plaintiff's expert to offer "quantitative data or qualitative information such as customer views on product interchangeability to justify the exclusion of potential competitors").

Plaintiffs' testimony also demonstrates that consumer shopping habits and preferences vary across the ███████ products in the alleged market. *Supra* 4–5, 34. But Pathak failed to do any analysis of consumer preferences or substitution, or offer any method for doing so.

Hitt, by contrast, *does* look at the empirical data and finds that the evidence does not support that Amazon is a one-stop-shop for *all* products for *all* consumers at *all* times. First, Professor Hitt identifies the empirical evidence that an economist would consider in defining a market this way: "Consumer behavior consistent with Amazon being a one-stop shop includes a large share of consumers who typically purchase multiple items each time they visit Amazon (as typically occurs when consumers visit grocery stores) or purchase a large selection of different products within a short time span on Amazon." Hitt ¶ 636a.

Next, Professor Hitt analyzed how customers transact on Amazon, and the results of that

AMAZON'S OPP TO CLASS CERTIFICATION
(2:21-CV-00693-JHC) - 39

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1    analysis are inconsistent with customers choosing Amazon because it offers "one-stop" shopping:

2    *Most putative class members do not act as though Amazon is a one-stop shop*



17   Hitt Ex. 20.

18          Consistent with the data, Plaintiffs themselves do not make their purchasing decisions

19   based on Amazon being a "one-stop shop."  Instead, depending on what they are shopping for,

20   they comparison shop across online and brick-and-mortar stores.  Ojeaga Dep. 67:25–68:5, 73:17–

21   75:25; West Dep. 126:13–127:13; 144:1–146:6; De Coster Dep. 99:5–101:10, 179:1–8; Zaballos

22   Dep. 68:2–75:16.  For certain purchases, they prefer physical stores over online stores, such as for

23   "bigger purchases" where they want to see the product before making a purchase decision, or for

24   products that they want to "try" first.  Ojeaga Dep. 71:23–73:2; West Dep. 97:10–99:4; De Coster

25   Dep. 179:10-180:1.  Plaintiffs also buy the same products that they buy in Amazon's store in brick-

26   and-mortar stores.  Ojeaga Dep. 116:21–117:12; West Dep. 155:23–156:12; Gold Dep. 167:6–22;

27   De Coster Dep. 180:2-7; Zaballos Dep. 83:13–20.  Plaintiffs also buy the same products that they

1    buy in Amazon's store in brick-and-mortar stores.  Ojeaga Dep. 133:23–135:1 (████████);

2    West Dep. 158:20–159:13 (████████); Gold Dep. 177:7–18 (████); De Coster Dep.

3    180:2–7 (████████); Zaballos Dep. 84:20–86:5 (████████).  For certain product

4    categories, even though they are offered on Amazon, Plaintiffs prefer—or at least consider—

5    specialty retailers as options.  Ojeaga Dep. 135:16–18 (████████); West Dep. 156:13–

6    157:24 (████████████); De Coster Dep. 131:13–

7    133:3 (████████); Zaballos Dep. 67:21–71:3 (████████

8    ████████).



9    ### 2.    Pathak provided no common method for analyzing substitution across retail channels by sellers.

10

11    Pathak neither defines—nor proposes a methodology for defining—the markets in which

12    237 million products are offered.  This is a critical omission given Plaintiffs' theory.  In order to

13    show that sellers inflate their on-Amazon and off-Amazon prices in response to the challenged

14    conduct, Plaintiffs must show that 3P sellers have the ability to do so, which requires pricing power

15    in the markets in which they compete.  Hitt ¶ 113.  As Hitt explains: "3P sellers would not raise

16    consumer prices in response to allegedly inflated Amazon fees if they face sufficient competition

17    from rivals that do not themselves face allegedly inflated Amazon fees.  That is because such rivals

18    would be able to undercut a 3P seller if it were to raise prices, allowing the rival to increase its sale

19    volume."  *Id.* ¶ 258; *see also id.* ¶¶ 259–64.  Because the Court must analyze the product market

20    for each product on Amazon to determine the degree of substitution from rival retailers and thus

21    the pricing power 3P sellers in Amazon's store have for those products, a proper merits analysis

22    in this case will require individualized assessment of substitution for hundreds of millions of

23    products—the antithesis of a common issue.  *Heerwagen*, 435 F.3d at 228–29.

24    ### 3.    Pathak provided no common method for analyzing the competitive conditions of ████████ products and whether Amazon has market power.

25

26    The competitive conditions for different product categories sold in Amazon's store widely

27    vary, with Amazon competing against different specialty retailers, direct-to-consumer websites,

AMAZON'S OPP TO CLASS CERTIFICATION
(2:21-CV-00693-JHC) - 41

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

and brick-and-mortar stores based on product. Hitt Ex. 47 (providing examples). "Amazon charges different referral fees for different groups of products, demonstrating that the Amazon Marketplace faces different competitive constraints for different groups of products." Hitt ¶ 253, Ex. 49. "In turn, these constraints indicate that whether Amazon has the ability to inflate fees in response to the challenged conduct likewise varies across products." *Id.* ¶ 255.

Consistent with this evidence, the stores that Plaintiffs purchase from, other than Amazon, vary by product; for example, Plaintiff Zaballos purchased the same cosmetic from Amazon and Hero Cosmetics; Plaintiff De Coster purchased children's products from Amazon, Manhattan Toy, and Hanna Andersson, and Plaintiff West purchased children's pajamas from Amazon and Old Navy. Hitt ¶ 250 nn.267–70.

Again, in the absence of a common method to analyze hundreds of millions of products with different competitive conditions, Plaintiffs have failed to carry their burden of establishing that market definition is capable of class-wide proof. *Blades* v. *Monsanto Co.*, 400 F.3d 562, 572 (8th Cir. 2005) (denying class certification where the "wide variation in list prices" would require some class members to prove injury through evidence that would "vary according to individualized market conditions and thus would not be shared in common with the rest of the proposed classes"); *Funeral Consumers All., Inc.* v. *Serv. Corp. Int'l*, 695 F.3d 330, 348–50 (5th Cir. 2012) (upholding certification denial of a national class when evidence showed local markets).

### F.       Plaintiffs Have Not Satisfied Rule 23(b)(3)'s Superiority Requirement.

Rule 23 specifically mandates that courts consider "the likely difficulties in managing a class action" when analyzing the superiority of a class proceeding. Fed. R. Civ. P. 23(b)(3)(D). It is appropriate to deny certification "on the basis of manageability problems alone, particularly in cases involving large numbers of plaintiff class members." *In re Hotel Tel. Charges*, 500 F.2d 86, 89–90 (9th Cir. 1974) (reversing certification in antitrust case of 40 million class members, estimating that if adjudicating a disputed claim took 10 minutes, it would take 100 years to resolve 10% of claims). Where "each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class is not 'superior.'" *Zinser* v.

AMAZON'S OPP TO CLASS CERTIFICATION
(2:21-CV-00693-JHC) - 42

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

*Accufix Rsch. Inst,. Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001) (affirming denial of certification in class consisting of 66,000 individuals where "it may be difficult to establish a common cause of injury because many factors may contribute" to the claimed injury).  Given the unprecedented size of the proposed class consisting of 288 million members, the individualized issues on which their claims depend, and the overwhelming evidence that the challenged conduct resulted in lower prices in Amazon's store, Plaintiffs have not—and cannot—demonstrate that a class action would be manageable.

## CONCLUSION

Plaintiffs' Motion for Class Certification should be denied.

DATED this 25th day of November, 2024.


DAVIS WRIGHT TREMAINE LLP

*/s/ John A. Goldmark*
John A. Goldmark, WSBA #40980
MaryAnn Almeida, WSBA #49086
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
Telephone: (206) 757-8136
Email: JohnGoldmark@dwt.com
Email: MaryAnnAlmeida@dwt.com


PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Karen L. Dunn (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Amy J. Mauser (*pro hac vice*)
Kyle Smith (*pro hac vice*)
2001 K Street, NW
Washington, D.C.  20006-1047
Telephone: (202) 223-7300
E-mail: kdunn@paulweiss.com
E-mail: wisaacson@paulweiss.com
E-mail: amauser@paulweiss.com
E-mail: ksmith@paulweiss.com

Meredith Dearborn (*pro hac vice*)
535 Mission St., 24th Floor
San Francisco, CA  94105-6064
Telephone: (628) 432-5100
E-mail: mdearborn@paulweiss.com

Yotam Barkai (*pro hac vice*)
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone: (212) 373-3000
E-mail: ybarkai@paulweiss.com

*Attorneys for Amazon.com, Inc.*

*I certify that this memorandum contains 14,481 words in compliance with the Court's Order. Dkt. 175.*

Amazon's Opp to Class Certification
(2:21-cv-00693-JHC) - 44

Davis Wright Tremaine LLP
Law Offices
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax