1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ELIZABETH DE COSTER *et al.*, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMAZON.COM, INC., a Delaware corporation,<br><br>Defendant. | CASE NO. 2:21-cv-00693-JHC<br><br>~~SEALED~~ ORDER DENYING MOTION TO EXCLUDE EXPERT TESTIMONY |

**I**

**INTRODUCTION**

This matter comes before the Court on Defendant Amazon.com, Inc.'s Motion to Exclude Testimony of Parag Pathak, Ph.D.  Dkt. # 230 (sealed).  The Court has considered the materials filed in support of and in opposition to the motion, the rest of the file, and the governing law. The Court finds oral argument unnecessary.  Being fully advised, for the reasons below, the Court DENIES the motion.

1

2

## II

### Background

Plaintiffs sued Amazon.com, Inc., claiming that the company violated Sections One and Two of the Sherman Act.  Dkt. ## 125 (sealed), 126 (redacted).  They contend that Amazon denies customers the "benefits of lower prices and fees" that would arise in a competitive market; and they say Amazon does so by imposing on third-party sellers "Most Favored Nation" policies that cause customers to pay supra-competitive prices.  Dkt. # 126 at 9 ¶ 15.  Plaintiffs allege that Amazon's pricing policies prevent "third-party sellers from offering lower prices off of Amazon, and punish them for violations, which in turn insulates Amazon from competition from low cost, alternative platforms."  *Id.*

Plaintiffs' economics expert Dr. Parag Pathak, Ph.D. is the Class of 1922 Professor of Economics at Massachusetts Institute of Technology.  Dkt. # 262 (sealed) at 14 ¶ 1.[1]  He is also a Research Associate at the National Bureau of Economic Research (NBER) and is the founding Director of the NBER's working group on market design.  *Id.*  Market design is a branch of microeconomics that focuses on the design and performance of market clearing institutions.  *Id.* at 14 ¶ 2.

Dr. Pathak concludes that Amazon's anti-discounting policies and practices collectively function as a Platform Most Favored Nation (PMFN) restraint.  Dkt. ## 262 (sealed) at 18–19 ¶ 30; 307-1 at 20 ¶¶ 44–54.[2]  In his report, he says that Amazon's conduct prevents price competition with other online retailers, which in turn allows Amazon to charge "monopoly referral fees—i.e., the price of connecting merchants and consumers to each other and

---

[1] Plaintiffs submitted two praecipes to correct typographical errors in Dr. Pathak's report.  Dkt. ## 192, 262.  This Order cites the second revised report at Dkt. # 262.

[2] In his report, Dr. Pathak refers to the policies and practices Plaintiffs are challenging as Amazon's "anti-discounting policy" and "anti-discounting policies."  Dkt. # 262 at 18 ¶ 29.

1    completing the sales transaction between them." Dkt. # 262 at 22 ¶ 36.  Dr. Pathak says that

2    Amazon is the largest online marketplace in the United States, with a market share of around

3    72% in the Online Retail Marketplaces Market.  *Id.* at 64 ¶ 146.  He explains that microeconomic

4    modeling shows that, "all else equal, a marketplace with market power (like Amazon) sets higher

5    fees when merchants are constrained by an anti-discounting policy than when they are not." *Id.*

6    at 23 ¶ 41.  He says that in this situation, "because merchants cannot discount prices,

7    marketplaces have no reason to discount fees. Instead, the presence of the anti-discounting policy

8    incentives the marketplace to increase fees." *Id.* at 132 ¶ 339.

9        Dr. Pathak determines that the higher fees charged by Amazon results in higher prices for

10   products purchased on Amazon.  *Id.* at 25 ¶ 45.  He also applies the model to transactional data

11   provided by Amazon to empirically assess the impact of the anti-discounting policies.  *Id.* at 17

12   ¶ 42.  Dr. Pathak asserts that in a counterfactual world without Amazon's anti-discounting

13   policies, increased competition between companies in the Online Retail Marketplaces Market

14   would have resulted 12-20% lower fees, depending on the product category.  *Id.* at 24 ¶ 42.

15   According to Dr. Pathak, Amazon's anti-discounting policies have thus harmed the class

16   members.  *Id.* at 26 ¶ 48.

17       Amazon moves to exclude Dr. Pathak's expert testimony.  Dkt. # 230.  The company

18   challenges Dr. Pathak's methodology, arguing that (1) the model Dr. Pathak used is not generally

19   accepted in the field of economics; (2) the model has an extraordinary error rate; (3) the model

20   rests upon unreliable and unfounded assumptions; and (4) the model ignores heterogeneity in

21   sellers' business strategies.  *Id.* at 8–16.  Amazon also contends that Dr. Pathak's regression

22

23

24

~~SEALED~~ ORDER DENYING MOTION TO
EXCLUDE EXPERT TESTIMONY - 3

analyses are unreliable because the data sample is too small, and that his regressions do not show a relationship between fees and prices.  *Id.* at 16–18.[3]

### III

### DISCUSSION

A.    Legal Standards

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  Under Rule 702, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" provided that

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

---

[3] Plaintiffs filed a Surreply asking the Court to strike arguments Amazon raised for the first time in its Reply.  Dkt. # 337.  They also requested leave to respond to arguments based on Dr. Pathak's deposition testimony that Amazon cited for the first time in its Reply brief.  *Id.* at 2.

Plaintiffs request that the Court strike (1) Amazon's argument about pass-through rates in Dr. Pathak's formulas, (2) Amazon's contention that the outcome of a theoretical model is always predetermined, and (3) Amazon's argument that an ABA treatise rejects Dr. Pathak's approach because his model cannot account for heterogeneity.  *Id.* at 2–3.  Because these arguments were raised for the first time in a reply brief and the Order does not rely on any of these arguments, it need not rule on the request to strike.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."); *United States v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006) ("[A]rguments not raised by a party in its opening brief are deemed waived.").

Regarding Plaintiffs' second request, they say that Amazon's Reply repeatedly cites Dr. Pathak's deposition that was taken after Amazon filed its Motion.  Dkt. # 337 at 3.  Plaintiffs contend that Amazon's Reply mischaracterizes Dr. Pathak's testimony, and they seek leave to submit excerpts from the deposition.  Given that Amazon's Reply cites this new material, Plaintiffs did not have an opportunity to respond, the Court grants Plaintiffs' request and considers the deposition excerpts attached as Exhibit A to the Declaration of Steve Berman.  Dkt. # 338; *cf. Veritas Operating Corp. v. Microsoft Corp.*, No. C06-0703-JCC, 2008 WL 7404617, at *5 (W.D. Wash. Feb. 26, 2008) ("The Court is not persuaded to exclude Mr. Wagner's testimony on grounds of snippets of deposition testimony presented for the first time in a Reply, and to which Veritas has not had an opportunity to respond."); *Micromet AG v. Cell Therapeutics, Inc.*, No. C04-0290-RSM, 2006 WL 8454650, at *2 n.1 (W.D. Wash. Feb. 17, 2006) (in reaching its conclusion, "the Court did not consider the deposition testimony of Peggy Hawkins, as that was improperly raised for the first time in plaintiff's Reply brief").

~~SEALED~~ ORDER DENYING MOTION TO
EXCLUDE EXPERT TESTIMONY - 4

1  Fed. R. Evid. 702.  Rule 702 was amended in 2023.  *See* Notes of Advisory Committee on 2023

2  Amendment to Rule 702.  The Advisory Committee Notes to the 2023 amendment state that the

3  changes were intended to "clarify and emphasize" the plain language of Rule 702.  *Id.*  And

4  "[n]othing in the amendment imposes any new, specific procedures."  *Id.*  Thus, cases

5  interpreting Rule 702 that predate the 2023 amendment still apply.  *See Reflex Media, Inc. v.*

6  *SuccessfulMatch.com*, 758 F. Supp. 3d 1046, 1049 (N.D. Cal. 2024).

7         Courts must ensure "that an expert's testimony both rests on a reliable foundation and is

8  relevant to the task at hand."  *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1055 (9th Cir.

9  2024) (quoting *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022)).  They have

10  "broad discretion" in making such evidentiary rulings.  *Id.* (citing *City of Pomona v. SQM N. Am.*

11  *Corp.*, 866 F.3d 1060, 1065 (9th Cir. 2017)).

12         Expert testimony is relevant if it "will assist the trier of fact to understand the evidence or

13  to determine a fact in issue."  *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert I*"), 509 U.S.

14  579, 589 (1993) (citing Fed. R. Evid. 702(a)).  "The relevancy bar [for expert testimony] is low,

15  demanding only that the evidence 'logically advances a material aspect of the proposing party's

16  case.'"  *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting

17  *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir. 1995)).

18  "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and

19  attention to the burden of proof, not exclusion."  *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir.

20  2010).

21         Courts apply four factors in determining whether expert testimony is reliable.  These

22  include "1) whether a theory or technique can be tested; 2) whether it has been subjected to peer

23  review and publication; 3) the known or potential error rate of the theory or technique; and 4)

24

whether the theory or technique enjoys general acceptance within the relevant scientific community." *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000) (citing *Daubert I*, 509 U.S. at 592–94). But this list of factors is neither exhaustive nor intended to be applied in every case. *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). A court "not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (internal quotations omitted). And "[w]hile evidence that suffer[s] from serious methodological flaws . . . can be excluded, courts are not permitted to determine the veracity of the expert's conclusions at the admissibility stage." *Teradata Corp. v. SAP SE*, 124 F.4th 555, 566 (9th Cir. 2024) (internal quotations and citations omitted) (second alteration in original).

The proponent of the expert testimony bears the burden of establishing admissibility by a preponderance of the evidence. *See Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also Qualey v. Pierce Cnty.*, No. 3:23-CV-05679-TMC, 2025 WL 254810, at *3 (W.D. Wash. Jan. 21, 2025). And courts liberally construe Rule 702 in favor of admissibility. *See Daubert I*, 509 U.S. at 588; *see also Chinn v. Whidbey Pub. Hosp. Dist.*, No. C20-995 TSZ, 2021 WL 5200171 (W.D. Wash. Nov. 9, 2021).

B.    General Acceptance of Economic Model

Amazon contends that Dr. Pathak's methodology, derived from a 2016 paper by Andre Boik and Kenneth S. Corts, is unreliable because the model used is not widely accepted in the field of economics. Dkt. # 230 at 8.[4] The company asserts that there are no standards for

---

[4] *See* Andre Boik & Kenneth S. Corts, *The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry*, 59 J.L. & Econ. 105 (2016). *See also* Dkt. # 231 at 4–34. This Order refers to the economic model outlined in this paper as the Boik-Corts model.

applying the model beyond simplified assumptions and it does not reflect a generally accepted consensus in the field of economics. *Id.* It also says that Dr. Pathak has not offered a scientifically valid basis for projecting the findings of the model to this case, and his opinions should thus be excluded. *Id.* at 9 (internal citations omitted).

Plaintiffs respond that Dr. Pathak's impact and damages methodology derives from the Boik-Corts model, which methodology shows that PMFNs restrain competition from rival platforms and ultimately raise platform fees and retail prices. Dkt. ## 182-6; 308 at 7. They say that Amazon's own expert, Dr. Lorin Hitt, undermines the company's argument that the Boik-Corts model is not widely accepted. Dkt. # 308 at 7. They note that Dr. Hitt testified that he reviewed 82 papers and did not know of any that criticized the Boiks-Corts model or suggested that the model contained errors. *Id.* (citation omitted). As to Amazon's argument that the model lacks an "established error rate," Plaintiffs respond that the Boiks-Corts model is a mathematical model (as opposed to a regression model with a statistical error rate) and that any errors would derive from the model itself. *Id.* at 9. They underscore that the Boiks-Corts model has been subject to peer-review and no economists have identified errors therein. *Id.*

In forming his opinion, Dr. Pathak examined the "competition softening and fee-inflating effects of prohibiting merchants from setting lower off-platform prices than prices on Amazon." Dkt. # 262 a 113 ¶ 284. In his rebuttal report, Dr. Pathak mentions that he selected the Boik-Corts model, as opposed to another economic model, because "it is a robust and widely-used model that aligns closely with the real-world setting in which the conduct [at issue] took place." Dkt. # 307-1 at 15 ¶ 22. He explains that the model "starts from certain economic axioms (assumptions) and derives results, such as PMFNs have an inflationary effect on prices." *Id.* at 15 ¶ 23. Dr. Hitt testified that the 2016 Boik-Corts paper is "one of the papers that you would normally cite if you [were] studying a platform MFN." *Id.* at 31 (citing Hitt Tr. 243:13–18).

Furthermore, in response to the argument that the model is a "simplified representation of reality," Dr. Pathak points out that "[m]odelling assumptions are, by definition, simplified representations of reality and therefore clearly imperfect in the literal sense." *Id.* at 16 ¶ 25.  He stresses that such a critique "does not address whether the model is reliable or useful." *Id.* Moreover, in response to Dr. Hitt's contention that there is "no generally accepted consensus that PMFNs necessarily result in higher prices," Dr. Pathak says that the third-party research papers that Dr. Hitt relies on to support this argument are either support Dr. Pathak's finding or are "statistically inconclusive." *Id.* at 15–16 ¶ 24.  And he says that "all three of the theoretical papers that Dr. Hitt highlights model situations that are very different from the challenged conduct." *Id.*

The reliability inquiry focuses on "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert I*, 509 U.S. at 592–93.  As describe above, several factors may bear on the reliability analysis including, "whether the theory or technique enjoys general acceptance within the relevant scientific community." *Hankey*, 203 F.3d at 1167 (citing *Daubert I*, 509 U.S. at 592–94).  But as discussed above, "the *Daubert* factors are exemplary, not constraining." *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017) (citing *Kumho Tire Co.*, 526 U.S. at 150, 159) (Scalia, J., concurring) ("[T]he *Daubert* factors are not holy writ[.]").

Dr. Pathak's application of the Boik-Corts model to Amazon's transactional data does not render his expert opinion unreliable.  The Boik-Corts paper was first published in a peer-reviewed journal in 2016 and, in the words of Amazon's expert, has become "one of the papers that you would normally cite if you [were] studying a platform MFN." Dkt. # 307-1 at 15 (citations omitted).  And Amazon does not point the Court to any economic literature describing flaws or errors in the model.  *See* Dkt. # 308; *see also* Dkt. # 307-1 at 15 n.29 (During his

deposition, Dr. Hitt stated that he looked at 82 research papers focused on PMFNs and could not recall any of these papers critiquing the Boik-Corts model).

And Amazon's contention that Dr. Pathak improperly extended the Boik-Corts model to the facts of this case is unavailing. Dr. Pathak says that he applied the Boik-Corts model to transactional data provided by Amazon to assess the impact of the company's anti-discounting policies. Dkt. # 262 at 24 ¶ 42. He analyzed about 236 million individual items sold on Amazon from May 2017 to July 2023 across 30 different categories. *Id.* And he explains that although the Boik-Corts model assumes that a merchant is a "monopoly seller" and controls prices across all platforms, he extended the model to consider other economic conditions, including a variant that included "perfectly competitive" assumptions—i.e., the seller faces so much competition for its products that prices are driven down to costs. *Id.* at 126 ¶ 316; *see also* App'x at 276–79 ¶¶ 196–217. Dr. Pathak states that his conclusion was the same regardless of the competitive conditions imposed on the model—anti-discounting policies result in higher prices. Dkt. # 262 at 126 ¶ 316. In sum, Dr. Pathak took a peer-reviewed economic model and applied that model to transactional data provided by Amazon.[5]

As other courts have noted, "[d]isputes about the . . . faults in an expert's decision to use a particular methodology . . . or the lack of textual authority for an expert's opinion go to the weight, not the admissibility, of his testimony." *Clarke v. LR Sys.*, 219 F. Supp. 2d 323, 333

---

[5] Other courts in this Circuit, including one in this District, have found non-statistical modeling sufficiently reliable. *See In re Valve Antitrust Litig.*, No. 2:21-CV-00563-JNW, 2024 WL 4893373, at *4–5 (W.D. Wash. Nov. 26, 2024) (rejecting the defendant's reliability challenges to the expert's use of non-statistical modeling); *In re Coll. Athlete NIL Litig.*, No. 20-CV-03919-CW, 2023 WL 8372788, at *3 (N.D. Cal. Nov. 3, 2023) (permitting the expert's non-statistical modeling given the expert's explanation of his experience and review of relevant data) (citing *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-CV-06370-EJD, 2019 WL 4780183, at *3 (N.D. Cal. Sept. 30, 2019), *aff'd*, 20 F.4th 466 (9th Cir. 2021) (rejecting the argument that an expert's opinions that were "not subject to peer review or exact replication" were "unsupported" and determining that the opinions were sufficiently reliable because they were based on the expert's experience and the expert "provide[d] a sufficient basis for understanding how he reached his opinions and to show that they are supported").

(E.D.N.Y. 2002) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)). And "[w]hile one of the *Daubert* factors suggests that the reliability of expert testimony can be judged by whether that expert's technique or theory can be and has been empirically tested . . . such testing is not required." *Linares v. Crown Equip. Corp.*, No. EDCV 16-1637 JGB (KKx), 2017 WL 10403454, at *12 (C.D. Cal. Sept. 13, 2017) (internal citation omitted); *Brown v. Google, LLC*, No. 20-CV-3664-YGR, 2022 WL 17961497, at *13 (N.D. Cal. Dec. 12, 2022) (same). At this gatekeeping stage of the litigation, it would be improper for the Court to "evaluate the quality of an expert's data, inputs, or conclusions." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1054 (N.D. Ill. 2022) (quoting *In re Zimmer Nexgen Knee Implant Products Liability Litig.*, No. 11 C 5468, 2015 WL 3669933, at *25 (N.D. Ill. June 12, 2015)).

And the cases Amazon relies on are distinguishable. For example, in *United States v. Cordoba*, 194 F.3d 1053, 1060–61 (9th Cir. 1999), in reviewing the district court's decision to exclude polygraph evidence under Rule 702, the Ninth Circuit determined that the district court did not abuse it discretion in determining that the "relevant scientific community did not generally accept polygraph exams as being sufficiently reliable to be used as evidence in a trial." *Id.* at 1061. In that case, the court noted that the district court relied on evidence, including a scholarly treatise and testimony from an FBI agent, calling into question the validity and scientific soundness of polygraph exams. *Id.* Here, there is no such scholarship or testimony.

And the reliability issue in *Great American Alliance Insurance Co. v. Sir Columbia Knoll Associates Limited Partnership*, 484 F. Supp. 3d 946, 956 (D. Or. 2020), involved a wood scientist providing expert testimony about the rate of wood decay in an apartment building following water damage. *Id.* The court noted that Columbia Knoll conceded that its expert witness's application of the model at issue "ha[d] not been tested for proof of accuracy and there

is no known or potential error rate." *Id.* at 956.  In excluding the expert's opinion as unreliable, the court focused on the fact that the expert applied a forward-looking prediction model to retroactively determine when the wood decay occurred.  *Id.*  As the court observed, Columbia Knoll failed to respond to the insurers' argument that it was not a generally accepted scientific practice to apply the prediction model retroactively.  *Id.*  The court also noted that Columbia Knoll did not "cite any external support for the reliability of [the expert's] application."  *Id.*

Last, *Otto v. Refacciones Neumaticas La Paz, S.A., DE C.V.*, No. :16-cv-00451-MMD-WGC, 2020 WL 907560, at *4 (D. Nev. Feb. 25, 2020), involved a *Daubert* motion to exclude an expert's proposed safer, alternative jackleg drill design.  *Id.*  There, the plaintiff brought a strict liability claim against the defendant alleging that a design defect in a jackleg drill caused her husband's death.  *Id.* at *1.  The court, in determining that the expert's opinion on a safer, alternative jackleg drill design was unreliable, noted that the expert's proposed design had never been peer-reviewed or tested and lacked general acceptance within the relevant mining community.  *Id.* at *4.

Unlike the opinions in the cases discussed above, Dr. Pathak's opinion derives from an application of a well-known, peer-reviewed economic model.

C.    Error Rate

Amazon contends that Dr. Hitt performed validation tests that demonstrate that Dr. Pathak's model "gets it wrong more often than not" with error rates ranging from 60% to 100%. Dkt. # 230 at 9.  The company asserts that Dr. Pathak's model has a 100% false positive rate because it always concludes that a PMFN is inflating all fees and prices even when analyzing data when no PMFN was in effect.  *Id.* at 11.  It also asserts that Dr. Hitt compared the model's predictions to real world data following Amazon's removal of its Price Parity Policy (PPP) in the United Kingdom and Germany.  *Id.*  Amazon says that real-world data shows that consumer

prices did not decrease for nearly ██% of products following the removal.  According to

Amazon, Dr. Pathak's model predicted the prices for 100% of the products would decrease.  *Id.*

at 12.  Lastly, the company asserts that Dr. Pathak's model predicts "incorrect and nonsensical

marginal costs."  *Id.*

Plaintiffs respond that Amazon's assertion that the model has a 100% false positive rate

is misleading.  Dkt. # 308 at 10.  They explain that contrary to Amazon's assertion that the

model predicts 100% of the time that a PMFN is responsible for inflated fees and prices, the

model is not designed to detect the existence of a PMFN.  *Id.*  Instead, the model demonstrates

how a PMFN increases platform and retail fees and measures whether prices would have been

lower absent the PMFN.  *Id.*  As to Amazon's argument about the model's failure to detect real-

world changes, Plaintiffs counter that Amazon did not remove the PPP until late August 2013 in

Germany and late November 2013 in the United Kingdom, and Dr. Hitt compared prices in

September 2013.  *Id.* at 11.  Plaintiffs say that Dr. Hitt's price comparison is "senseless" because

the removal of the PPP in the United Kingdom had not yet occurred, and German sellers had

only days or weeks to respond to the changes.  *Id.*[6]  In response to Amazon's argument about

marginal costs, Plaintiffs say that because marginal costs were not directly observed in the

available data, Dr. Pathak used an "inverse optimization to approximate marginal costs."  *Id.* at

11–12.  Plaintiffs say that, at most, Amazon's argument presents an argument that goes to the

weight of Dr. Pathak's testimony, not its admissibility.  *Id.*

---

[6] Plaintiffs also assert that there is reason to doubt that the German and United Kingdom
marketplaces were at any time free from anti-discounting policies.  In his rebuttal report, Dr. Pathak notes
that months before removing the PPP in the United Kingdom and Germany, Amazon introduced
Manufacturers on Amazon, an anti-discounting policy for brand sellers and a precursor to Amazon's
Standard for Brands. Dkt. # 307-1 at 84.

In his rebuttal report, Dr. Pathak explains that the Boiks-Corts model "is not a test of whether a PMFN exists, and it does not return 'positive' or 'negative' results." Dkt. # 307-1 at 16 ¶ 26. He also states that, contrary to Dr. Hitt's assertion, the model does not "assume its conclusion." *Id.* at 73 ¶ 204. Dr. Pathak explains,

> Dr. Hitt mischaracterizes the Boik and Corts model and criticizes the very concept of mathematical reasoning from stated premises, even though he acknowledges that a model "that was proven based on fundamental math axioms" does not "assume its conclusion." The conclusions of the Boik and Corts model are not "assumed" -- they follow logically from principles and interactions set out at the outset.

*Id.* Dr. Pathak states that he reviewed the record, and the facts support his conclusion that Amazon's anti-discounting policies constitute a class-wide PMFN. Dkt. #307-1 at 19 ¶ 37. In his report, Dr. Pathak explains the facts that lead him to reach this conclusion. Dkt. # 262 at 16–22 ¶¶ 20–35. And in response to Dr. Hitt's argument that he did not perform calibration tests, Dr. Pathak explains that he compared "Amazon's US fees against those in other more competitive international markets." Dkt. # 307-1 at 17 ¶ 27.

That Dr. Pathak's model assumes the existence of a PMFN does not automatically render it unreliable. As noted above, Dr. Pathak reviewed the facts and explained his basis for concluding that Amazon's anti-discounting policies act as a PMFN. Thus, Amazon's argument does not show that the economic model Dr. Pathak used is unreliable. *See, e.g.*, *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1048 (9th Cir. 2014) ("[O]nly a faulty methodology or theory, as opposed to imperfect execution of laboratory techniques, is a valid basis to exclude expert testimony."). And Amazon can cross examine Dr. Pathak and present contrary evidence regarding the factual basis for his opinion. *See Hangarter*, 373 F.3d at 1017 n.14.

As to Amazon's arguments about real-world data and marginal costs, the Court is not persuaded that this contest between economic experts is best resolved here. Dr. Pathak states in his report that he compared the predicted United States fee outcomes to fee outcomes in

SEALED ORDER DENYING MOTION TO
EXCLUDE EXPERT TESTIMONY - 13

countries in which Amazon has less market power and lower referral fees.  Dkt. # 262 at 146–150 ¶¶ 388–401.  He says in some of these other countries in which Amazon lacks the market power it currently possesses in the United States, the company appears to have charged lower referral fees.  *Id.*  He also describes the empirical evidence he relied on to reach his conclusion. *Id.*  As to marginal costs, Dr. Pathak states that the marginal costs he used in his model "reflect the incremental costs that firms in the real world considered when setting prices and output, but it does not specify what categories of costs firms considered."  Dkt. # 307-1 at 88 ¶ 252.  To the extent that Amazon disagrees with the way Dr. Pathak approximates marginal costs in his model, this disagreement is more appropriately addressed at trial.  *See Emblaze Ltd. v. Apple Inc.*, 52 F. Supp. 3d 949, 954 (N.D. Cal. 2014) ("The inquiry into admissibility of expert opinion is a 'flexible one,' where shaky 'but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.'") (quoting *Primiano*, 598 F.3d at 564); *see also In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 969 (N.D. Cal. 2018) ("Though Ford criticizes Mr. Boedeker's decision not to analyze used car sales data, that objection goes to the weight of his opinion, not its admissibility.").

The *Daubert* inquiry is flexible, and the listed factors do not apply equally to every type of expert testimony.  Here, Dr. Pathak's conclusions are capable of being tested.  And his opinions "are supported by rational explanations which [a] reasonable [person] might accept, and none of his methods strike the court as novel or extreme." *Lappe v. Am. Honda Motor Co., Inc.*, 857 F. Supp. 222, 228 (N.D.N.Y. 1994).  Thus, Amazon raises issues that go to the weight a factfinder should afford Dr. Pathak's expert opinion, not its admissibility.

D.    The Model's Underlying Assumptions

Dr. Pathak's opinion assumes the existence of a PMFN.  Dkt. # 262 at 15 ¶ 10.  Amazon asserts that Dr. Pathak "assumes without justification" that Amazon's policies and practices

constitute a PMFN.  Dkt. # 230 at 13.  According to Amazon, there "is too great an analytical gap between the data and the opinion preferred."  *Id.* at 12 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  The company also says that Dr. Pathak's opinion of class-wide injury and damages contains too many assumptions and is not supported by real-world evidence.  *Id.* at 15.  The company explains that Dr. Hitt introduced three modifications to Dr. Pathak's model to reflect commercial realities and the class-wide injury and damages disappeared.  *Id.*

Plaintiffs counter that Dr. Pathak's report describes the facts that support his opinion that Amazon's anti-discounting policies act as a PMFN.  Dkt. # 308 at 12.  As for Amazon's argument that Dr. Pathak's model does not reflect market realities, Plaintiffs point out that economic models necessarily simplify market complexities, and Dr. Pathak has explained why simplifying these assumptions does not undermine the model's conclusions.  *Id.* at 13.  And Plaintiffs say that Dr. Pathak has provided reasons to reject Dr. Hitt's modifications to the model. *Id.* at 14.

In his report, Dr. Pathak evaluates (1) the Price Parity Clause, (2) the Select Competitor Featured Offer Disqualification program, (3) the Marketplace Fair Pricing Provision, (4) Amazon's Standard for Brands, and (5) the Seller Code of Conduct.  Dkt. # 262 at 68–95 ¶¶ 159–241.  He discusses these policies, describes how Amazon enforces these policies, and assesses their impact on merchant and consumer conduct.  *Id.*

Rule 702(b) requires that expert testimony be based on "sufficient facts or data"; the rule "is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."  *Bosley v. DePuy Synthes Sales Inc.*, No. C21-1683-MLP, 2023 WL 6038010, at *4 (W.D. Wash. Sept. 15, 2023).  Amazon may disagree with the conclusions Dr. Pathak arrived at based on his review of the record, but such a disagreement does not render Dr. Pathak's opinion unreliable.  *See In re Valve Antitrust Litig.*,

2024 WL 4893373, at *4 ("Valve may disagree with the conclusions Dr. Schwartz's derived from this information and it may even offer countervailing evidence, but Valve cannot render Dr. Schwartz's opinion unsound under Rule 702 simply by advancing a contrary position.").

And Amazon's contention that Dr. Pathak's model is unreliable because the underlying assumptions do not reflect reality is unpersuasive. To be sure, economic "models must be tethered to theories of liability, fit the case, have a reliable basis, and avoid guesswork. But they will, as any economic model inevitably will, simplify the world." *Maldonado v. Apple, Inc*, No. 3:16-CV-04067-WHO, 2021 WL 1947512, at *22 (N.D. Cal. May 14, 2021) (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)). As other courts have noted "every model relies on assumptions and no model can account for every conceivably relevant factor." *In re Folgers Coffee, Mktg. Litig.*, No. 21-00828-CV-W-BP, 2024 WL 4068851, at *5 (W.D. Mo. July 31, 2024) (quoting *S&H Farm Supply, Inc. v. Bad Boy, Inc.*, 25 F.4th 541, 552 (8th Cir. 2022) (analyzing an expert's model on lost wages and noting that the defendant "was free to challenge—in fact, did challenge—[the plaintiff's] assumptions during cross-examination")). Amazon's critiques of the model's assumptions go to the weight that should be afforded to Dr. Pathak's opinion, not its admissibility.

Furthermore, Dr. Pathak reasonably explains why Dr. Hitt's adjustments to the model do not affect his conclusions regarding class-wide injury and damages. In his rebuttal report, Dr. Pathak examines each of Dr. Hitt's critiques and says that

> these arguments miss [his] model's purpose: to examine how a PMFN affects competition between marketplaces. When a dominant marketplace prevents merchants from offering discounts on other marketplaces, merchants have two rational responses. First, they might set identical prices across all platforms. Second, as . . . discussed in [his] opening report, they might abandon multi-homing entirely and sell exclusively through the dominant platform, even if they would have used multiple platforms without the anti-discounting policy. Both imperfect enforcement and merchants' decisions to use only one platform are consistent with

1

[his] central thesis: the PMFN affected merchant incentives, which in turn distorted
marketplace competition.

Dkt. # 307-2 at 61 ¶ 169.  Amazon asserts that Dr. Pathak's analysis is unreliable, but it has not

shown how, considering Dr. Pathak's explanations, this disagreement between Dr. Hitt and Dr.

Pathak should lead to the exclusion of the latter's testimony.  *See In re Vitamin C Antitrust Litig.*,

No. 05-CV-0453, 2012 WL 6675117, at *5 (E.D.N.Y. Dec. 21, 2012); *see also Deutsch v.*

*Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 456 (E.D.N.Y. 2011) (determining that the expert

"satisfied his burden under *Daubert* by identifying the alternative causes and providing a

reasonable explanation for dismissing specific alternate factors identified by Novartis. . .

Novartis' contention that [the expert] should have controlled for these factors goes to the weight

that ought to be afforded to [the expert's] findings, not the reliability of his methodology")

(cleaned up).

Amazon appears to ask the Court to take a side in a dispute between experts about

complex economic modeling.  This is not the proper function of a *Daubert* motion.  This is not a

case in which an expert cannot articulate a rationale for his methodology; nor is it a case where

the expert's rationale is obviously flawed or unreasonable.  As demonstrated above, Dr. Pathak

has provided explanations for his methodological decisions that are grounded in economic

literature.  *See In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL 1282293, at

*25 (S.D.N.Y. Mar. 28, 2014) ("A minor flaw in an expert's reasoning or a slight modification of

an otherwise reliable method does not itself require exclusion; exclusion is only warranted if the

flaw is large enough that the expert lacks good grounds for his or her conclusions.") (internal

quotation and citation omitted); *In re Vitamin C Antitrust Litig.*, 2012 WL 6675117, at *4 (in

rejecting the plaintiff's *Daubert* challenge to the defendant's economics expert, the court noted

~~SEALED~~ ORDER DENYING MOTION TO
EXCLUDE EXPERT TESTIMONY - 17

that the expert's "analysis [and] the explanations that he offers appear reasonable and supported by both economic theory and historical facts").

And Amazon has not shown that Dr. Pathak's choices are unsound or so flawed as to make his opinion unreliable. *See In re Valve Antitrust Litig.*, 2024 WL 4893373, at *5 ("Valve, in making its analytical gap argument, takes an overly exacting view of Rule 702's requirements. Dr. Schwartz provides common evidence of the varied ways in which Valve establishes its PMFN expectation. Whether that evidence and Dr. Schwartz's conclusions deserve credence is an inquiry for a different day.").

E.    Heterogeneity in Sellers' Business Practices

Amazon contends that Dr. Pathak's model ignores that "sellers price their products using different strategies and face different economic constraints." Dkt. # 230 at 15. The company says that Dr. Pathak's methodology does not account for "focal point" pricing—i.e., a practice in which sellers commonly set prices ending with certain values such as $0.99. *Id.* Amazon explains that Dr. Pathak's model predicts that consumer prices for about 20% of class products change by less than 15 cents. *Id.* at 16. Thus, according to Amazon, if a seller prefers to set prices ending in 99 cents or $9.99, they will likely not increase their prices based on a small increase in fees. *Id.*

Plaintiffs counter that Dr. Pathak accounts for focal point pricing in his analysis. Dkt. # 308 at 14. They say that Dr. Pathak explains in his report why the chance of any class member being uninjured due to focal point pricing is trivial, given that most of the products are not focal point priced and most consumers bought multiple products on Amazon. *Id.*

Focal point pricing occurs when retailers set prices at "focal points," such as prices ending in 99 cents or a round number. *See* Dkt. # 262 at 145 ¶ 383; *see also Sidibe v. Sutter Health*, 333 F.R.D. 463, 495 (N.D. Cal. 2019) (describing focal point pricing as "the practice of

retailers setting prices at certain 'focal points,' such as prices ending with 9, and not adjusting

such prices based on small differences in costs").  In his report, Dr. Pathak explains,

> Given an assumption of focal-point bias, it might be possible to identify particular
> incidents in which a sale could be plausibly argued to have had the same price in
> the but-for world as it did in the real world, despite the lower referral fee in the
> latter. But this possibility does not affect [his] conclusion that all or virtually all
> class members [were] harmed by the conduct because virtually all class members
> made enough purchases to have overpaid on at least some of them.

Dkt. # 262 at 145–46 ¶ 387.  In his rebuttal report, Dr. Pathak makes clear that

> The possibility of focal point pricing behavior does not affect [his] conclusion that
> all or virtually all class members were harmed by the conduct. This is because
> virtually all class members made enough purchases to have overpaid on at least one
> of them, even if they were not harmed on purchases of focally-priced items of
> merchandise. For example, under the conservative assumption that all items ending
> in 99 cents in the real world would have also been priced at the same 99-cent
> increment in the counterfactual world, less than 1% of class members under the
> modified class definition would have escaped injury.

Dkt. # 307-1 at 93 ¶ 266.  Thus, Dr. Pathak accounts for focal point pricing and reasonably

explains why focal point pricing does not impact his determinations.

And the cases Amazon relies on are distinguishable.  For example, in *In re Apple iPhone Antitrust Litigation*, No. 11-CV-6714-YGR, 2022 WL 1284104, at *8 (N.D. Cal. Mar. 29, 2022), the court, in excluding the expert's opinion, observed that the expert's "pricing model ignore[d] Apple's focal-point pricing and pricing tiers in calibrating but-for pricing." *Id.* at *8.  As the court noted, the expert "failed to use or address the issue" and "the model d[id] not provide a reliable method for determining but-for pricing in the presence of focal pricing." *Id.*  And in *In re Lithium Ion Batteries Antitrust Litigation*, No. 13-MD-2420 YGR, 2018 WL 1156797, at *1 (N.D. Cal. Mar. 5, 2018), the court noted that the expert acknowledged that his analysis could be impacted by focal point pricing strategies "but his analysis did not explain how they would affect his analysis of pass-through or his calculation of damages." *Id.*  As stated above, Dr. Pathak addresses focal point pricing.

F.    Reliability of Dr. Pathak's Regressions Analyses

Dr. Pathak also studies how Amazon's fees affect merchandise prices by analyzing price changes following Amazon's partial fee reduction in 2019 for four product categories: Baby, Health & Personal Care, Beauty, and Furniture.  Dkt. # 307-1 at 99 ¶ 284.  Dr. Pathak states that the results from his analyses confirmed the model's predictions: lower fees lead to lower prices. *Id.*

Amazon contends that Dr. Pathak's regression analyses are unreliable because they rely on a small, unrepresentative data sample.  Dkt. # 230 at 16.  The company says that Dr. Pathak analyzed only a small percentage of products affected by the fee reductions, amounting to only 0.0001% of the class products.  *Id.*  It also argues that Dr. Pathak's regressions do not show a relationship between fees and prices.  *Id.* at 17.  Amazon says that the regression is unreliable because it assumes that all 2.5 million third-party sellers on Amazon act uniformly in adjusting prices for all products subject to a fee change.  *Id.*

Plaintiffs respond that a difference-in-difference regression analysis is a widely accepted econometric tool that courts routinely allow in antitrust cases.  Dkt. # 308 at 16 (citations omitted).  And as to Amazon's argument that the size of the data sample is too small, Plaintiffs say that Dr. Pathak analyzed all the data available across the four product categories.  *Id.*  They also assert that Amazon's argument about sample size goes to the weight rather than the admissibility of Dr. Pathak's testimony.  *Id.*  Plaintiffs also state that Dr. Pathak's regression analyses do not assume that all sellers decrease prices when fees decease; instead, they say, the tests confirm this prediction across different product categories.  *Id.* at 17.

Dr. Pathak used a difference-in-difference econometric model to compare the prices of individual goods sold on Amazon to other online marketplaces like Walmart.  Dkt. # 262 at 148 ¶ 396.  He says that his analysis "supplements and supports the findings of the economic model."

~~SEALED~~ ORDER DENYING MOTION TO
EXCLUDE EXPERT TESTIMONY - 20

*Id.* at 148 ¶ 394.  In 2019, Amazon lowered its fees in four categories of products: Baby, Health & Personal Care, Beauty, and Furniture.  *Id.* at 148 ¶ 395.  Dr. Pathak says that this change applied to a subset of goods within these categories.  *Id.*  He explains that he analyzed these fee changes, separately and collectively, to empirically assess whether the change in fees had an impact on product pricing.  *Id.*  Using transactional data provided by Amazon, he divided products into a treatment group (products in categories that experienced a fee change) and a control group (products in categories that did not experience a fee change).  *Id.* at 148 ¶ 396.  Dr. Pathak states that his analysis compares the movements of prices in the treatment group to prices in the control group to isolate the impact of the treatment.  *Id.*

In his rebuttal report, Dr. Pathak emphasizes that he did not "cherry-pick subsets of the data." Dkt. # 307-1 at 99 ¶ 285.  He says that he "analyzed all available prices in every category where a fee reduction occurred."  *Id.*  Dr. Pathak says that Dr. Hitt's observation that the regression model accounts for "0.001 percent of the nearly 240 million unique ASINs sold by 3P sellers on the Amazon Marketplace" is misleading because

> [t]he millions of items that Dr. Hitt highlights in these comparisons are not included in [Dr. Pathak's] analysis for a simple reason: they did not experience any fee reduction. They are therefore uninformative about whether drops in fees were passed through to prices. [Dr. Pathak] . . . used all of the available data, between 109,056 and 166,656 observations, for which a fee reduction occurred. This dataset has been sufficient to establish, with high statistical confidence, that the predicted relationship between fee reduction and price decreases does exist.

Dkt. # 307-1 at 114 ¶ 332.

As one court stated in ruling on a *Daubert* motion to exclude, so long "as a sample is representative—that is, it was not selected in a biased manner—sample size will not skew the results of the analysis."  *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 232 (S.D.N.Y. 2004); *see also In re Countrywide Financial Corp. Mortgage-Backed Securities Litig.*, 984 F. Supp. 2d 1021, 1034 (C.D. Cal. 2013) ("[A]

100 item sample size comprises sufficient data for a sample of a large population"); *Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547, 572 (E.D. Mich. 2022) ("[I]ssues with sample size go to the weight, not the admissibility, of expert evidence."); *Shupe v. Rocket Cos., Inc.*, 752 F. Supp. 3d 689, 722 (E.D. Mich. 2024) (same).  Sample size "will have an effect on whether the results are significant, i.e., whether the analyst can be confident that a perceived difference is due to the factor being studied rather than to chance." *U.S. Info. Sys., Inc.*, 313 F. Supp. 2d at 232.

Moreover, whether the results are statistically significant is testable.  Dr. Pathak notes that he tested for statistical significance using measures such as the t-statistic.  *See* Dkt. # 307-1 (App'x A) at 138 ¶ 8.[7]  There is nothing to suggest that Dr. Pathak selected the data in a biased manner; instead, he appears to have analyzed all the data available to him.  And Dr. Pathak performed these regression analyses on available empirical data to corroborate the conclusion of his economic modeling.  *See Teradata Corp.*, 124 F.4th at 568 (in determining that a district court abused its discretion in excluding an expert witness's qualitative analyses, the Ninth Circuit noted that "those analyses were merely confirmatory, any flaws they might have would not be a sufficient basis to exclude his tying-market testimony"); *Obrey v. Johnson*, 400 F.3d 691, 695 (9th Cir. 2005) ("[O]bjections to a study's completeness generally go to the weight, not the admissibility of the statistical evidence and should be addressed by rebuttal, not exclusion.") (cleaned up).

And as to Amazon's second argument, Dr. Pathak explains that his regression model does not assume that all sellers decrease prices when fees decrease.  Dkt. # 307-1 at 101–02 ¶ 293.  He says that the

---

[7] Dr. Pathak notes that "[r]esearchers use t-tests to determine whether a sample meaningfully differs from a larger group, given the distribution of values in that group."  Dkt. # 307-1 (App'x A) at 138 ¶ 8.

> empirical model must analyze many items of merchandise together to isolate a price effect precisely because of the variation that Dr. Hitt mentions. Each individual item of merchandise is affected by idiosyncratic pricing effects unrelated to the conduct, in addition to the effect of the fee change itself. [His] model acknowledges that prices are driven by many factors unconnected to fee changes.

Dkt. # 307-1 at 102 ¶ 296. Dr. Pathak also addresses each of Dr. Hitt's critiques of his regression analyses and explains why these criticisms do not impact his findings. Dkt. # 307-1 at 99–117 ¶¶ 284–342. And Amazon has not shown that Dr. Pathak's methodological decisions are so flawed as to make his opinion unreliable. *See In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 75 (S.D.N.Y. 2017) ("As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.") (quoting *Ruiz–Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

And the cases Amazon relies on are distinguishable. For example, in *In re Graphics Processing Units Antitrust Litigation*, 253 F.R.D. 478, 494 (N.D. Cal. 2008), an expert's correlation and regression models used the average prices paid by consumers. *Id.* at 493–95. As the court noted, the expert's report did not say how "specific product pricing was correlated across buyers or whether prices paid for multiple products by particular direct purchasers were correlated." *Id.* at 493. It further reasoned that "[i]f data points are lumped together and averaged before the analysis, the averaging compromises the ability to tease meaningful relationships out of the data." *Id.* And in *In re Pharmacy Benefit Managers Antitrust Litigation*, No. CV 03-4730, 2017 WL 275398, at *20 (E.D. Pa. Jan. 18, 2017), the court rejected an expert's use of national averages in his regression model because "averages cannot demonstrate antitrust impact for individual class members." *Id.* The court noted that the regression model was unreliable because by analyzing only average prices the model found damages for class

members who have suffered no damage. *Id.* Unlike in these cases, Dr. Pathak's inputs include available prices in the categories in which fee reduction occurred. Dkt. # 307-1 at 99 ¶ 285. And he analyzes prices across and within the various product categories. Dkt. # 262 at 148–49 ¶ 396 (stating that his analysis "compares the movements of prices in the treatment group to prices in the control group, in order to isolate the impact of the treatment"); *see also* Dkt. # 307-1 at 101–03 ¶¶ 293–97.

Thus, again, Amazon's concerns thus go to the weight that should be afforded to Dr. Pathak's opinion, not its admissibility. Dr. Pathak's methodology can be tested through the adversary process—competing expert testimony, other contrary evidence, and the "crucible of cross-examination." *See Encompass Ins. Co. v. Norcold, Inc.*, No. 2:23-CV-231, 2025 WL 36025, at *3 (W.D. Wash. Jan. 6, 2025) (reasoning that any alleged shakiness in the expert witness's opinion "should be addressed through the crucible of cross-examination and the adversarial process").

## IV

### CONCLUSION

Based on the above, the Court DENIES Amazon's motion to exclude testimony of Dr. Parag Pathak, Ph.D. ~~The Court provisionally files this Order under seal. The Court DIRECTS the parties to file a joint statement, on or before July 11, 2025, indicating what redactions, if any, should be included in the public version of the Order.~~

Dated this 1st day of July, 2025.

John H. Chun
John H. Chun
United States District Judge

~~SEALED~~ ORDER DENYING MOTION TO
EXCLUDE EXPERT TESTIMONY - 24