1

The Honorable John H. Chun

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON
9                      AT SEATTLE

10   ELIZABETH DE COSTER, *et al.*,        Case No. 2:21-cv-00693-JHC

11              Plaintiffs,               **JOINT STATEMENT AND**
                                          **UNOPPOSED REQUEST**
12        v.                              **CONCERNING REDACTIONS TO**
                                          **ORDER ON CLASS CERTIFICATION**
13   AMAZON.COM, INC.,

14              Defendant.

15

16

17

18

19

20

21

22

23

24

25

26

27

## I.    INTRODUCTION

On August 6, 2025, the Court issued a decision granting Plaintiffs' motion for class certification and directed the parties "to file a joint statement on or before August 29, 2025, indicating what redactions, if any, should be included in the public version of the Order."  Dkt. 408 at 50 ("Class Certification Order").

The parties conferred in good faith regarding potential redactions.  As a result of those discussions, Amazon requests that the Court maintain under seal the following narrow references from the Class Certification Order:  Page 13: lines 12-13; Page 15: line 19; Page 16: line 3; Page 17: lines 7, 9-12, 13-14, 16; and Page 29: lines 20, 21. Plaintiffs do not oppose this request.

Plaintiffs conferred with non-parties regarding additional potential redactions to references from the Class Certification Order reflecting non-party confidential information: Page 19: lines 5-14, 19-23; Page 20: 14-24; Page 21: 1-2.  The Parties do not oppose this request.

## II.    AMAZON'S POSITION

While Amazon does not necessarily agree with the accuracy of the information contained in the material to remain under seal or Plaintiffs' characterizations of the material, the information refers to and involves non-public and competitively sensitive business information which merits sealing.  Amazon therefore respectfully requests that the Court grant this limited sealing request, which Plaintiffs do not oppose.  The Class Certification Order, with the requested redactions, is attached as **Exhibit 1**.

Pursuant to Rule 26(c), a party need only show "good cause"—as opposed to "compelling reasons"—to seal material related to a nondispositive issue, like the Class Certification Order.  *See Ctr. For Auto Safety* v. *Chrysler Grp., LLC*, 809 F.3d 1092, 1097–99 (9th Cir. 2016); *see also PUMA SE* v. *Brooks Sports, Inc.*, 2024 WL 4495309, at *3 (W.D. Wash. Oct. 15, 2024) (applying the "good cause" standard to documents "submitted as part of PUMA's non-dispositive motion").  "The vast majority of courts within this circuit treat motions for class certification as non-dispositive motions to which the good cause sealing standard applies."  *Nichols* v. *GEICO Gen. Ins. Co.*, 2020 WL 5105442, at *2 (W.D. Wash. Aug. 31,

2020) (internal quotation marks and citation omitted).  "[T]he public interest in accessing

nondispositive motions is not as strong as dispositive motions . . . because nondispositive

motions are often unrelated, or only tangentially related, to the underlying cause of action." *Ctr.*

*For Auto Safety,* 809 F.3d at 1098 (cleaned up).  Even under the "compelling reasons" standard,

the requesting party must simply show that the reasons for sealing "outweigh the general history

of access and the public policies favoring disclosure." *Kamakana* v. *City & County of Honolulu*,

447 F.3d 1172, 1178–79 (9th Cir. 2006).

Amazon is seeking to maintain under seal only two categories of competitively sensitive

information: (1) business and marketing strategy documents, competitive intelligence efforts, and

other competitively sensitive information (pages 13, 16, and 17); and (2) nonpublic, proprietary

pricing information and data derived from that information (pages 15 and 29), all of which is of

minimal importance to understanding either the underlying motion or the Court's ruling.

There are both good cause and compelling reasons to seal the references to this

information.  As an initial matter, the Court already held this is so in granting a motion to seal

this information in the parties' briefing on the underlying motion.  *See* Dkt. 342 (granting

unopposed motion to seal for compelling reasons shown).

First, the references to Amazon's business and marketing strategy documents,

competitive intelligence efforts and other competitively sensitive information are precisely the

kind of information that courts in this Circuit regularly seal under both standards.  *See Bold Ltd.*

v. *Rocket Resume, Inc.*, 2024 WL 54692, at *2 (N.D. Cal. Jan. 4, 2024) ("Good cause exists to

seal confidential business information, including non-public information about a company's

business strategy, business transactions, and corporate structure."); *WAG Acquisition, LLC* v.

*Flying Crocodile, Inc.*, 2021 WL 2778578, at *9–10 (W.D. Wash. July 2, 2021) (finding a

compelling reason to maintain two documents entirely under seal to protect trade secrets from

disclosure); *In Re Lidoderm Antitrust Litig.,* 2016 WL 4191612 (N.D. Cal. 2016) (granting

request to seal information that reveals "competitive intelligence strategies" and other

"confidential business strategies.").  If this information were to become public, Amazon's

competitors could gain insight into Amazon's business, how it analyzes competitive and business metrics, and how it plans its marketing strategies.  This internal research regarding proprietary metrics, and competitive intelligence is precisely the kind of information Amazon's competitors could gain undue competitive advantage from, which would cause harm to Amazon. *Id.*; *see also Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006) ("In general, 'compelling reasons' sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when such 'court files might have become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets."); *Simplot Co. v. Wash. Potato Co.,* 2016 WL 11066581, at *1 (W.D. Wash. 2016) (compelling reasons supported sealing terms that would put defendant "at a competitive disadvantage").

Second, courts routinely seal the kinds of proprietary pricing and sales information referenced in the Class Certification Order.  *See Eko Brands, LLC* v. *Adrian Rivera Maynez Enters., Inc.,* 2018 WL 11433938, at *1 (W.D. Wash. Oct. 12, 2018) (sealing is appropriate when the information consists of "nonpublic information regarding litigants' sales, cost, profit, and market share data").  Amazon does not make its pricing data, or analyses based on that data, public in the ordinary course of business because doing so could unfairly advantage Amazon's competitors or invite unwarranted media or other attention.  The Court should maintain this information under seal because disclosure of this information risks competitive harm to Amazon. *Id.*; *see In re Elec. Arts, Inc.,* 298 F. App'x 568, 569 (9th Cir. 2008) (finding "clear error" when a trial court did not seal "confidential and commercially sensitive information").  Because Amazon is a large, innovative company that attracts substantial attention from the news media, there is a substantial probability that such information would be disseminated widely.

There is no less-restrictive alternative to Amazon's proposed redactions.  *See* LCR 5(g)(3)(B).  Amazon has proposed redactions impacting only 14 lines of the Court's 50-page order—the minimum amount necessary to protect its legitimate business interests—while leaving the vast majority of the Court's decision unsealed to become part of the public record.

1    Amazon therefore respectfully requests that the following references in the Class

2    Certification Order to remain under seal:  Page 13: lines 12-13; Page 15: line 19; Page 16: line 3;

3    Page 17: lines 7, 9-12, 13-14, 16; and Page 29: lines 20, 21; and that the Court enter a public

4    version of the Order redacting that information, as reflected in **Exhibit 1.**

**III.    PLAINTIFFS' POSITION**

6    Plaintiffs do not oppose the redactions reflected in Exhibit 1, including those of Amazon

7    and non-parties, at this time.  With respect to non-parties' competitively sensitive information

8    contained in the Class Certification Order, there is both good cause and compelling reasons to

9    redact the identified information.  Plaintiffs conferred with non-parties regarding additional

10    potential redactions to references from the Class Certification Order reflecting non-party

11    confidential information.  Those non-parties requested that the following information remain

12    under seal: Page 19: lines 5-14, 19-23; Page 20: 14-24; Page 21: 1-2, and that the Court enter a

13    public version of the Order redacting that information, as reflected in **Exhibit 1**.  The Parties do

14    not oppose this request.

15    The Court has found compelling reasons and granted the parties' joint motion to seal the

16    cited information in the class certification briefing. ECF No. 342.

17    Compelling reasons support maintaining the highlighted portions of the class certification

18    order under seal. According to the non-parties, disclosure of this information could harm the

19    non-parties' position against their competitors and otherwise cause significant competitive harm.

20    *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978) (recognizing that courts have

21    "refused to permit their files to serve . . . as sources of business information that might harm a

22    litigant's competitive standing"); *J.R. Simplot Co. v. Wash. Potato Co.*, No. C16-1851RSM,

23    2016 WL 11066581, at *1 (W.D. Wash. Dec. 29, 2016) (finding compelling reasons to seal a

24    document containing "confidential financial, pricing, and strategic planning information"

25    because "public disclosure of this information would competitively harm [the litigants'] business

26    and the businesses which they manage"); *Wild Fish Conservancy v. Cooke Aquaculture Pac.,*

27    *LLC*, No. C17-1708-JCC, 2019 WL 2616640, at *12 (W.D. Wash. June 26, 2019) (same); *Healy*

1  *v. Milliman, Inc.*, No. C20-1473-JCC, 2022 WL 1061921, at \*4 (W.D. Wash. Apr. 8, 2022)

2  (same); *Zunum Aero, Inc. v. Boeing Co.*, No. C21-0896JLR, 2024 WL 492228, at \*4 (W.D.

3  Wash. Feb. 8, 2024) (same). The parties previously supported their Joint Motion to Seal Portions

4  of Class Certification Briefing with declarations from the non-parties to satisfy LCR 5(g)(3)(B).

5  ECF Nos. 323, 325. However, if the Court requires further support as to why the non-parties'

6  confidential information should continue to be sealed, the parties request that the Court grant the

7  non-parties seven days to file additional statements under Local Rule 5(g)(3)(B).

8      DATED this 29th day of August, 2025.

9                    DAVIS WRIGHT TREMAINE LLP

10                   By: */s/ John A. Goldmark*
11                       John A. Goldmark, WSBA #40980
                         MaryAnn Almeida, WSBA #49086
12                       Emily Parsons, WSBA #57061

13                       920 Fifth Avenue, Suite 3300
14                       Seattle, WA 98104-1610
                         Telephone: (206) 622-3150
15                       Email: johngoldmark@dwt.com
                         Email: maryannalmeida@dwt.com
16                       Email: emilyparsons@dwt.com

17                   DUNN ISAACSON RHEE LLP

18                   By: */s/ Karen L. Dunn*
19                       Karen L. Dunn (*pro hac vice*)
                         William A. Isaacson (*pro hac vice*)
20                       Amy J. Mauser (*pro hac vice*)
                         Kyle Smith (*pro hac vice*)
21                       401 Ninth Street, NW
                         Washington, DC 20004-2637
22                       Telephone: (202) 240-2900
                         Email: kdunn@dirllp.com
23                       Email: wisaacson@dirllp.com
                         Email: amauser@dirllp.com
24                       Email: ksmith@dirllp.com

25
                         Meredith Dearborn (*pro hac vice*)
26                       345 California Street
                         Suite 600
27                       San Francisco, CA 94104-2671

Telephone: (202) 240-2900
Email: mdearborn@dirllp.com

*Attorneys for Amazon.com, Inc.*

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Steve W. Berman*
    Steve W. Berman, WSBA #12536
By: */s/ Barbara A. Mahoney*
    Barbara A. Mahoney, WSBA #31845
By: */s/ Kelly Fan*
    Kelly Fan, WSBA #56703
    1301 Second Avenue, Suite 2000
    Seattle, WA 98101
    Telephone: (206) 623-7292
    Email: steve@hbsslaw.com
    Email: barbaram@hbsslaw.com

    Anne F. Johnson (*pro hac vice*)
    594 Dean Street, Suite 24
    Brooklyn, NY 11238

    Telephone: (718) 916-3520
    Email: annej@hbsslaw.com

KELLER POSTMAN LLC

    Zina G. Bash (*pro hac vice*)
    111 Congress Avenue, Suite 500
    Austin, TX 78701
    Telephone: (512) 690-0990
    Email: zina.bash@kellerpostman.com

    Jessica Beringer (*pro hac vice*)
    Alex Dravillas (*pro hac vice*)
    Shane Kelly (*pro hac vice*)
    150 North Riverside Plaza, Suite 4100
    Chicago, IL 60606
    Telephone: (312) 741-5220
    Email: jessica.beringer@kellerpostman.com
    Email: ajd@kellerpostman.com
    Email: shane.kelly@kellerpostman.com

*Co-Lead Counsel for Plaintiffs and the Class*

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Steig D. Olson (*pro hac vice*)
David D. LeRay (*pro hac vice*)
Nic V. Siebert (*pro hac vice*)
Maxwell P. Deabler-Meadows (*pro hac vice*)
Elle Mahdavi (*pro hac vice*)
295 Fifth Ave.
New York, NY 10016
Telephone: (212) 849-7000
Email: steigolson@quinnemanuel.com
Email: davidleray@quinnemanuel.com
Email: nicolassiebert@quinnemanuel.com
Email: maxmeadows@quinnemanuel.com

Adam B. Wolfson (*pro hac vice*)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443-3000
Email: adamwolfson@quinnemanuel.com

*Executive Committee for Plaintiffs and the Class*

# EXHIBIT 1

## (REDACTED)

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ELIZABETH DE COSTER *et al.*, on behalf of themselves and all others similarly situated, | CASE NO. 2:21-cv-00693-JHC |
| Plaintiffs, | SEALED ORDER GRANTING MOTION FOR CLASS CERTIFICATION |
| v. | |
| AMAZON.COM, INC., a Delaware corporation, | |
| Defendant. | |

# I

## INTRODUCTION

This matter comes before the Court on Plaintiffs' Motion for Class Certification. Dkt. # 180 (sealed). Plaintiffs, who are consumers, claim that Defendant, Amazon.com, Inc., uses its significant market power in the Online Retail Marketplaces Market to impose inflated fees on third-party sellers. Dkt. # 126 at 58 ¶ 170. Plaintiffs say that third-party sellers increase the prices of their goods on Amazon to offset these high fees. *Id.* at 8–9 ¶¶ 13–14. And they allege that Amazon can maintain these inflated fees because the company has implemented and actively enforced certain policies that prevent third-party sellers from offering lower prices for their

SEALED ORDER GRANTING MOTION FOR
CLASS CERTIFICATION - 1

goods on competing platforms. *Id.* at 9 ¶ 15. They say that these policies have anticompetitive effects because they eliminate price competition across United States online retail platforms. *Id.* at 48 ¶ 130. They also say that these policies lead third-party sellers to list their products at inflated prices on other online platforms as well; thus resulting in higher prices throughout the market. *Id.* Plaintiffs contend that they, and the class of consumers they seek to represent, have been harmed by Amazon's actions because they paid more for goods on Amazon's Marketplace that they would have paid absent Amazon's allegedly anticompetitive conduct. *Id.* at 61 ¶ 189.

The Court has considered the materials filed in support of and in opposition to the motion, the rest of the file, and the governing law. The Court has also considered the presentations of counsel at oral argument on August 1, 2025. As reflected below, the core of this class certification dispute concerns commonality and predominance. Being fully advised, upon engaging in the rigorous analysis Rule 23 requires, the Court finds that Plaintiffs have met their burden, by a preponderance of the evidence, regarding commonality, predominance, and the rule's other requirements. For these reasons, which are explained in detail below, the Court GRANTS the motion.

## II
### BACKGROUND[1]

Amazon operates an online retail marketplace and sells around 237 million products[2] on its platform. *See* Dkt. ## 125 (sealed), 126 (redacted) at 5 ¶¶ 3–5; 232 at 37. Third-party sellers can register with Amazon and list their goods for sale on the Amazon Marketplace. Dkt. # 126 at 5 ¶¶ 3–5. Sellers "post their products on the platform, which Amazon presents to users together

---

[1] Unless otherwise indicated, the information in this section derives from Plaintiffs' Second Consolidated Amended Complaint. *See* Dkt. ## 125 (sealed), 126 (redacted). Except as noted, the Court cites the public version of the document.
[2] In its Opposition brief, Amazon notes that it sells around 237 million products. *See* Dkt. # 232 at 37.

with its own goods according to a certain algorithm that takes the form of a ranking list." *Id.* at 5
¶ 5. Many third-party sellers that list their products on Amazon also sell the same products on
other platforms, including their own websites and other competing online marketplaces, such as
eBay or Walmart Marketplace. *Id.* at 6 ¶ 7. According to Plaintiffs, however, Amazon surpasses
these competing marketplaces in breadth and size: for example, Amazon hosts about 2.3 million
active third-party sellers, about 45 times more than the 52,000 sellers that Walmart hosts on its
online platform. *Id.*

Plaintiffs assert that Amazon uses its market power in the Online Retail Marketplaces
Market "to impose significant fees on customers and on third-party merchants for the use of its
marketplace." *Id.* at 7 ¶ 10. They say that for third-party sellers to list their goods on Amazon,
they must select one of the selling plans the company offers. *Id.* They must either pay a flat
monthly fee of $39.99 or a per-sale fee of $0.99. *Id.* Amazon also retains a portion of each
completed sale as a "referral fee." [3] *Id.* Rival online marketplaces, like eBay, impose
"significantly lower" fees on third-party sellers. *Id.* Plaintiffs assert that third-party sellers
inflate the prices of their goods on Amazon to offset Amazon's fees. *Id.* at 8 ¶ 13.

Plaintiffs contend that Amazon denies customers the "benefits of lower prices and fees"
that would arise in a competitive market. Dkt. # 126 at 9 ¶ 15. They say Amazon does so by
imposing on third-party sellers an anti-discounting policy that causes customers to pay supra-
competitive prices. [4] *Id.* Plaintiffs allege that Amazon's pricing restraints prevent "third-party

---

[3] Plaintiffs' economics expert, Dr. Parag Pathak, Ph.D., notes that Amazon charges a referral fee
for each completed transaction between a third-party seller and Amazon customer. Dkt. # 262 at 32 ¶ 64.
He says that Amazon sets this referral fee by product category, but that generally the fee is around 15% of
the "transaction value," i.e., the value of the sale on Amazon. *Id.* He also says that Amazon charges a
fixed minimum referral fee per transaction for "very low-priced goods (less than $2.00)." *Id.*
[4] Plaintiffs refer to the challenged pricing restraints collectively as an "anti-discounting policy."
*See* Dkt. ## 126 at 53 ¶ 149; 262 at 18 ¶ 29. They say that Amazon's practices function as a Platform
Most Favored Nation (PMFN) restraint. *See* Dkt. ## 126 at 9 ¶ 15; 262 at 18–19 ¶ 30.

sellers from offering lower prices off of Amazon, and punish them for violations, which in turn insulates Amazon from competition from low cost, alternative platforms." *Id.* They say that these restraints "require sellers to keep prices off Amazon as high or higher than prices on Amazon" or (1) a seller's goods will be ineligible for the "Buy Box"; [5] (2) their goods will be removed from the Amazon Marketplace; (3) shipping options for the seller's products will be suspended; or (4) "the third-party seller's ability to have any goods sold on Amazon's marketplace" will be terminated or suspended. *Id.* at 17 ¶ 34.

Plaintiffs assert that Amazon has implemented its anti-discounting policy in various ways over time. *Id.* at 9 ¶ 17. These policies and practices are (1) the Price Parity Clause (PPC), (2) the Select Competitor Featured Offer Disqualification program (SC-FOD), (3) Amazon's Standards for Brands (ASB), (4) the Seller Code of Conduct (SCC), and (5) the Marketplace Fair Pricing Provision (MFPP). *Id.* at 9–16.

Until March 2019, Amazon's Business Solutions Agreement (BSA) included the PPC. *Id.* at 9–10 ¶ 17. The PPC prohibited third-party sellers "from listing goods on other online retail platforms—whether marketplace or single-merchant websites—at prices lower than their Amazon list prices." *Id.*

In mid-2015, Amazon introduced the SC-FOD algorithm. Dkt. ## 125 at 12 ¶ 22 (sealed); 126 at 12 ¶ 22 (redacted). Plaintiffs say that Amazon "expanded [SC-FOD] as a tool for securing third-party sellers' price parity after it repealed" the PPC in 2019. *Id.* They also say

---

[5] The "Buy Box" is the white box on the right side of the product details page in which shoppers can click "Add to Cart" or "Buy Now." Dkt. # 126 at 46 ¶ 125. Plaintiffs describe the "Buy Box" as a "critical listing benefit for third-party merchants: Buy Box goods are the most visible to consumers and the easiest for them to purchase." *Id.* And whether a third-party seller's product is sold via the "Buy Box" depends on factors such as their "reputation, price, efficiency, and whether the merchant is selling its product for a lower price through other online retail platforms. When users click the 'Add to Cart' button on Amazon's marketplace, they are buying from one merchant and one merchant only—the Buy Box winner." *Id.* at 46–47 ¶ 126.

that Amazon currently uses SC-FOD "to disqualify a seller's offer from winning the 'Buy Box' if it detects a price that is lower—even by a penny—for that product on any online store that the company designates as a 'Select Competitor.'"  Dkt. ## 125 at 12 ¶ 23 (sealed); 126 at 12 ¶ 23 (redacted).

Plaintiffs also allege that the ASB program, introduced in 2018, "prevents brand owners and their seller representatives from offering a lower price off of Amazon than they offer on Amazon or allowing their distributors to do so." Dkt. # 126 at 14 ¶ 29.

Plaintiffs say that Amazon's 2021 clarification to its SCC states that third-party sellers violate the policy "if off-Amazon rebates, discounts, and other schemes are designed to drive customers to products that are listed and sold without those incentives on Amazon." Dkt. ## 125 at 16 ¶ 32 (sealed); 126 at 16 ¶ 32 (redacted).

Last, the MFPP, incorporated by reference in the BSA, states that if a third-party seller's pricing practices "harms customer trust," then Amazon can sanction the seller.  Dkt. # 126 at 16 ¶ 33.  Under the MFPP, a pricing practice "harms customer trust" when a seller "lists goods on a competing online retail platform at prices that are significantly below its Amazon list prices." *Id.* at 16 ¶ 33.

In May 2021, Plaintiffs sued Amazon, claiming that the company violated Sections One and Two of the Sherman Act, 15 U.S.C. § 1 *et seq.*  Dkt. ## 1, 125 (sealed), 126 (redacted). They now move for class certification.  Dkt. # 180 (sealed).[6]

---

[6] Plaintiffs' motion for class certification relies in significant part on the work of their economics expert, Dr. Pathak.  On July 1, 2025, the Court denied Amazon's motion to exclude Dr. Pathak's testimony.  Dkt. # 388 (redacted).

SEALED ORDER GRANTING MOTION FOR
CLASS CERTIFICATION - 5

## III

### DISCUSSION

A.    Class Definition

Plaintiffs seek to certify the following class: "All persons in the United States who on or after May 26, 2017, purchased five or more new, physical goods from third-party sellers on Amazon's marketplace." Dkt. # 306-1 at 2.  This proposed class is narrower than the class described in the Second Consolidated Amended Complaint (SCAC). [7]  Dkt. # 126 at 53 ¶ 151. District courts in this Circuit allow plaintiffs to narrow the class definition without seeking leave to amend.  *See Howard v. Aetna Life Ins. Co.*, No. CV 22-01505-CJC (MRWx), 2024 WL 1098789, at *5 (C.D. Cal. Feb. 27, 2024) (noting that "[t]here is near-consensus that the plaintiff may narrow the class definition during the class certification process without seeking leave to amend") (quotation omitted).

"[T]he basic responsibility for determining the extent of a class membership falls upon the trial judge, and a plaintiff's own narrowing of a class definition helps the judge ensure the class feature of the litigation is within reasonably manageable proportions and bounds." *Gold v. Lumber Liquidators Inc.*, No. 14-CV-05373-TEH, 2017 WL 2688077, at *3 (N.D. Cal. June 22, 2017) (cleaned up).  This Order assesses the amended class definition as defined in Plaintiffs' Reply brief. *See United Farm Workers v. Noem*, No. 1:25-CV-00246 JLT CDB, 2025 WL 1235525, at *28 (E.D. Cal. Apr. 29, 2025) ("The [c]ourt may also consider proposals to change a class definition first raised in a reply brief on a motion for class certification.") (collecting cases).

---

[7] The SCAC defined the class as "All persons who on or after May 26, 2017, purchased one or more new, physical goods from third-party sellers on Amazon's marketplace." Dkt. # 126 at 53 ¶ 151.

B.    Class Certification

    1.    Legal Standards

    Federal Rule of Civil Procedure 23, which concerns class actions, allows "a federal court to adjudicate claims of multiple parties at once, instead of in separate suits." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010)). Generally, a district court has broad discretion in deciding whether to certify a class. *See Hawkins v. Kroger Co.*, 337 F.R.D. 518, 525 (S.D. Cal. 2020) (citing *Bouman v. Block*, 940 F.2d 1211, 1232 (9th Cir. 1991)); *see also Bailey v. Rocky Mountain Holdings, LLC*, 309 F.R.D. 675, 678 (S.D. Fla. 2015) ("As a general proposition, a district court has broad discretion in deciding whether to certify a class."). To certify a class, plaintiffs must satisfy each of the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy. *See Van v. LLR, Inc.*, 61 F.4th 1053, 1062 (9th Cir. 2023). They must also satisfy at least one requirement of Rule 23(b). *Id.* Plaintiffs seek class certification under Rule 23(b)(3) only. *See* Dkt. # 180. Rule 23(b)(3) requires that plaintiffs show that (1) questions of law or fact common to class members predominate over any questions affecting only individual members, and (2) that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. *See* Fed. R. Civ. P. 23(b)(3).

    "Rule 23 does not impose a mere pleading standard; plaintiffs cannot plead their way to class certification through just allegations and assertions." *Black Lives Matter Los Angeles v. City of Los Angeles*, 113 F.4th 1249, 1258 (9th Cir. 2024) (citation omitted). Instead, plaintiffs "must 'affirmatively demonstrate' by a preponderance of actual evidence that they satisfy all the Rule 23 prerequisites." *Id.* (quoting *White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1192 (9th Cir. 2024)). A court may certify a class only if it concludes, "after a rigorous

1    analysis, that the prerequisites of Rule 23 have been met." *White*, 104 F.4th at 1192 (citation

2    omitted).

3         Still, Rule 23 does not grant a court the "license to engage in free-ranging merits inquiries

4    at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66

5    (2013). "Merits questions may be considered to the extent—but only to the extent—that they are

6    relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."

7    *Id.* The court "is merely to decide a suitable method of adjudicating the case" and "should not

8    turn class certification into a mini-trial on the merits." *Edwards v. First Am. Corp.*, 798 F.3d

9    1172, 1178 (9th Cir. 2015); *Miles v. Kirkland's Stores Inc.*, 89 F.4th 1217, 1224 n.2 (9th Cir.

10   2024) (same). "Neither the possibility that a plaintiff will be unable to prove his allegations, nor

11   the possibility that the later course of the suit might unforeseeably prove the original decision to

12   certify the class wrong, is a basis for declining to certify a class which apparently satisfies Rule

13   23."[8] *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004–05 (9th Cir. 2018) (quoting *Blackie v.*

14   *Barrack*, 524 F.2d 891, 901 (9th Cir. 1975)). And "a district court cannot decline certification

15   merely because it considers plaintiffs' evidence relating to the common question to be

16   unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue."

17   *Olean*, 31 F.4th at 667.

18        2.    Numerosity under Rule 23(a)

19        Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is

20   impracticable." Fed. R. Civ. P. 23(a)(1). "Impracticable" does not mean impossible; instead, it

---

22   [8] As to Rule 23(a), Amazon bases its challenge only on the commonality requirement. Dkt. # 232
     at 26–31. Nevertheless, this Order assesses each of the Rule 23(a) requirements and determines whether
23   Plaintiffs' evidence meets them by a preponderance of the evidence. *See In re Telescopes Antitrust Litig.*,
     348 F.R.D. 455, 467 (N.D. Cal. 2025) (while noting that the defendants conceded the Rule 23(a) factors
     in their opposition briefing, the court independently analyzed each of Rule 23(a)'s requirements); *In re*
24   *High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) (same).

SEALED ORDER GRANTING MOTION FOR
CLASS CERTIFICATION - 8

refers to the difficulty of joining all members of the class. *Juarez v. Jani-King of Cal., Inc.*, 273 F.R.D. 571, 578 (N.D. Cal. 2011) (citing *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913–14 (9th Cir. 1964)). Generally, "courts find the numerosity requirement satisfied when a class includes at least 40 members." *In re Zillow Grp., Inc. Sec. Litig.*, No. C17-1387-JCC, 2020 WL 6318692, at *3 (W.D. Wash. Oct. 28, 2020) (quoting *Rannis v. Recchia*, 380 Fed. App'x 646, 651 (9th Cir. 2010)). And "[w]here the exact size of the class is unknown, but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied." *Id.* (quotation omitted); *see also West v. Cal. Servs. Bureau, Inc.*, 323 F.R.D. 295, 303 (N.D. Cal. 2017) ("In analyzing numerosity a court may make common-sense assumptions and reasonable inferences.") (quotation omitted).

Plaintiffs seek to represent all persons in the United States who on or after May 26, 2017, purchased five or more new, physical goods from third-party sellers on Amazon's marketplace. Dkt. # 306-1 at 2. Plaintiffs' economics expert, Dr. Pathak, Ph.D., using transactional data provided by Amazon, estimates that around 34 billion third-party transactions and around 300 million consumers across the United States have been "affected by Amazon's conduct." *See* Dkt. # 262 at 164 ¶ 450. As noted above, Rule 23(a)(1)'s numerosity requirement is satisfied when a class includes at least 40 members. *See In re Zillow Grp., Inc. Sec. Litig.*, 2020 WL 6318692, at *3. Based on Dr. Pathak's analysis of Amazon's transactional data, there is sufficient evidence to reasonably infer that more than 40 people have been affected by Amazon's alleged conduct. *See Anti Police-Terror Project v. City of Oakland*, No. 20-CV-03866-JCS, 2021 WL 4846958, at *4 (N.D. Cal. Oct. 18, 2021) (relying on a "common sense" evaluation of the available evidence to determine that the "proposed class [was] sufficiently numerous that joinder would be impracticable").

1    Thus, Plaintiffs satisfy the numerosity requirement because the proposed class is

2    sufficiently numerous that joinder would be impracticable.

3        3.    Commonality under Rule 23(a) and Predominance under Rule 23(b)

4        Under Rule 23(a)(2), plaintiffs must show that "there are questions of law or fact

5    common to the class." Fed. R. Civ. P. 23(a)(2).  The plaintiffs' claims must "depend upon a

6    common contention" that is "capable of class-wide resolution." *Wal-Mart Stores, Inc. v. Dukes*,

7    564 U.S. 338, 350 (2011).  The issue is whether "class treatment will generate common *answers*

8    apt to drive the resolution of the litigation." *Abdullah v. United States Sec. Assocs., Inc.*, 731

9    F.3d 952, 957 (9th Cir. 2013) (emphasis in original) (internal citation omitted).  "The existence

10   of shared legal issues with divergent factual predicates is sufficient, as is a common core of

11   salient facts coupled with disparate legal remedies within the class." *Meyer v. Portfolio*

12   *Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012) (quoting *Hanlon v. Chrysler Corp.*,

13   150 F.3d 1011, 1019 (9th Cir. 1998)).

14       But the commonality requirement is often "subsumed under, or superseded by, the more

15   stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other

16   questions." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 609 (1997).  Likewise, this Order

17   addresses both requirements here.  *See In re Valve Antitrust Litig.*, No. 2:21-CV-00563-JNW,

18   2024 WL 4893373, at *10 (W.D. Wash. Nov. 26, 2024) (combining the analysis concerning

19   commonality and predominance); *Cole v. Keystone RV Co.*, No. C18-5182RBL, 2020 WL

20   3969993, at *4 (W.D. Wash. July 14, 2020) (same); *Stewart v. Quest Diagnostics Clinical*

21   *Lab'ys, Inc.*, No. 3:19-CV-02043-RBM-KSC, 2022 WL 5236821, at *11 (S.D. Cal. Oct. 5, 2022)

22   ("For efficiency purposes, the Court will consider commonality under Rule 23(a) in connection

23   with predominance under Rule 23(b)(3).") (citing *Collins v. ITT Educ. Servs., Inc.*, No.

24   12CV1395 DMS BGS, 2013 WL 6925827, at *3 (S.D. Cal. July 30, 2013)).

SEALED ORDER GRANTING MOTION FOR
CLASS CERTIFICATION - 10

The Rule 23(b)(3) predominance requirement focuses on "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting *Amchem*, 521 U.S. at 623). The inquiry considers "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (quotation and citation omitted). And if "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* (quotation and citation omitted). And "[w]ith respect to the predominance inquiry specifically, a district court must evaluate the method or methods by which plaintiffs propose to use the class-wide evidence to prove the common question in one stroke." *Noohi v. Johnson & Johnson Consumer Inc.*, No. 23-55190, 2025 WL 2089582, at *4 (9th Cir. July 25, 2025) (quotation and citation omitted).

In disputing commonality and predominance, Amazon makes these arguments: (1) Plaintiffs cannot establish the existence of a Platform Most Favored Nation (PMFN) policy by common evidence; (2) the challenged conduct did not have a widespread effect on the entire class; (3) the alleged antitrust standing, injury, and damages are too complex and particularized for class treatment; (4) Plaintiffs' expert fails to offer a reliable model demonstrating common injury and damages; (5) Plaintiffs' expert fails to demonstrate a common method for identifying unharmed class members; and (6) Plaintiffs have not provided a common method for establishing the market definition and market power. Dkt. # 232 at 26–51.

    a.    Existence of a PMFN Policy

Amazon asserts that Plaintiffs' theory of liability depends on their ability to prove a de facto PMFN policy. Dkt. # 232 at 26. It further contends that Plaintiffs' claims depend on the

1   responses of millions of sellers to such a policy. *Id.* Thus, according to Amazon, this raises

2   millions of individualized issues. *Id.* at 26–27. The company also says that Plaintiffs' "theory

3   depends on the subjective beliefs of rival marketplaces." *Id.* at 27. Amazon argues that these

4   "individualized inquiries" defeat class certification. *Id.* And the company says that even if

5   Plaintiffs could proceed on a claim of a de facto PMFN policy, the evidence supporting this

6   claim raises individualized issues, not a common issue. The company explains that Plaintiffs

7   have not shown common evidence of a PMFN policy that applies to the entire class. *Id.* at 30.

8        Plaintiffs counter that a robust body of common evidence shows that Amazon's PMFN

9   policy existed and that there is no need for individualized evidence from third-party sellers about

10  their understanding of Amazon's policies and practices. Dkt. # 306 at 10. They explain that

11  "[b]eyond Amazon's admissions that the BSA applied to every third-party seller, and for years

12  contained the explicit written PP[C], Amazon's testimony, reports, and internal communications

13  show that Amazon intended policies like its [MFPP], [ASB], and the [SCC] to serve as a

14  common, binding, anti-discounting policy on its sellers throughout the Class Period—even after

15  the removal of the PP[C]." *Id.* They contend that Amazon is taking an "extreme position" that

16  Plaintiffs must establish that every Amazon seller was subject to and understood there was a de

17  facto price parity policy for 30 billion transactions "and that doing so involves individual issues

18  that predominate over common issues." *Id.* at 9 (quotations omitted). They say that such a view

19  "would make any antitrust case impossible to certify." *Id.* (citing *In re Valve*, 2024 WL 4893373,

20  at *10).

21        After reviewing the evidence, the Court concludes that Plaintiffs have presented common

22  proof, by a preponderance of the evidence, that Amazon has implemented certain policies and

23  practices concerning third-party sellers that function as a PMFN policy.

24

Amazon included the PPC in the BSA beginning in 2009.[9]  *See* Dkt. # 262 at 70 ¶ 166. The PPC required third-party sellers to "maintain parity between the products you offer through Your Sales Channels and the products you list on any Amazon Site by ensuring that . . . the Purchase Price and every term of offer or sale of Your Product . . . is at least as favorable to Amazon site users as the most favorable terms upon which a product is offered or sold via Your Sales Channels." Dkt. # 181-2 at 14.  And while Amazon removed the PPC from its BSA in March 2019, the company noted in an internal memorandum dated June 2020 that its "expectations and policies have not changed" and flagged that some third-party sellers have "had SC-FOD applied to them" and "express[ed] confusion over [Amazon's] actions because they thought that the removal of the [PPC] meant that there [were] no longer any price competitiveness requirements." Dkt. # 181-5 at 9.  In that same memorandum, Amazon stated that "███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████" *Id.*

In 2021, Amazon issued a "clarification" to its SCC, which all third-party sellers are required to adhere to, stating that sellers violate the SCC "if off-Amazon rebates, discounts, and other schemes are designed to drive customers to products that are listed and sold without these incentives on Amazon." Dkt. # 181-8.  Amazon stated that "[s]ellers who may not have understood this policy previously should end these practices immediately." *Id.*  Amazon contends that this clarification was aimed at third-party sellers who were manipulating search rankings for their products. Dkt. # 232 at 23 (citation omitted).  But Dr. Pathak notes that Jeff Wilke, Amazon's former CEO of Worldwide Consumer, testified that the clarification to the

---

[9] In his report, Dr. Pathak notes that Amazon required U.S. merchants to agree to price parity since around 2004.  *See* Dkt. # 262 at 70 ¶ 166 (citation omitted).  The PPC was not incorporated into the BSA until around 2009.  *Id.*

SCC was consistent with the expectation that third-party sellers could not offer discounts on other sites unless they also offer those discounts on Amazon. Dkt. # 262 at 71 ¶ 168 (citing Wilke Dep. at 67:17–68:4).

In November 2017, Amazon adopted the MFPP, which prohibits third-party sellers from engaging in "pricing practices" that "harm[ ] customer trust." Dkt. # 182-2 at 2. Such practices include setting a price on Amazon for "a product or service that is significantly higher than recent prices offered on or off Amazon." *Id.* In an internal document, Amazon stated that it "regularly monitors the prices of items on [its] marketplaces, including shipping costs, and compares them with other prices available to [its] customers." *Id.* The document also says that if the company detects practices that "harm customer trust, Amazon may remove the Buy Box, remove the offer, or in serious or repeated cases, suspend or terminate selling privileges." *Id.* The MFPP does not say what constitutes a "significantly higher" off-Amazon price. *Id.* But Plaintiffs' evidence suggests that Amazon considers a price uncompetitive if the product is priced one cent higher on Amazon than the price of the product off Amazon. Dkt. # 181-15 at 5. For example, one of Amazon's product managers explained in a presentation about "Pricing Competitively to Accelerate Sales" that Amazon views "competitive pricing" as follows:

> Let's say I'm shopping for a three-pack of Clorox wipes, which, by the way has been a particularly popular product recently[.] And let's say the price available outside Amazon for this item is $9.00. If I search for the same wipes on Amazon, and they are priced at $10.00, we consider that price to be un-competitive. For the product to be competitively priced, it would have needed to be priced at $9.00 or below on Amazon. In fact, we consider a price to be un-competitive even if it is one cent above the price available outside Amazon! If you're wondering if this includes shipping, the answer is yes[.]

*Id.*

And in 2018, Amazon launched the ASB, which requires "price competitiveness" for products offered on Amazon. Dkt. #181-19 at 2. The ASB imposes this "price competitiveness

requirement on "Brands and manufacturers, as well as their agents, licensees, and other representatives selling on their behalf in the Amazon store." *Id.* Dr. Pathak notes that Amazon's designated witness on the ASB testified that "Amazon expects merchants' prices on Amazon 'to be competitive relative to . . . what they may be providing elsewhere in other stores.'" Dkt. # 262 at 73 ¶ 178 (quoting Raxit Kagalwala Dep. at 80:17–19). In an interrogatory response, Amazon stated that ASB's price competitiveness is derived from the "competitive signals used in SC-FOD." Dkt. # 181-20 at 6. The company said that it imposes a "95% price competitiveness guideline" that reflects the "percentage of glance views on a seller's branded offers where the seller's offer is priced at or below the competitive signal price." [10] *Id.* Dr. Pathak explains that the 95% guideline means that, at least 95% of the time, the seller's offer for the product must be "Buy Box" eligible (i.e., the seller's product on Amazon is priced at or below the competitor price). Dkt. # 262 at 71 ¶ 180 (citations omitted). He notes that an Amazon employee explained that this metric "does not refer to the number of items of merchandise a seller may have that are priced as low as external competitors' prices, but the proportion of customer views where the seller's offer is priced at or below the competitor price." *Id.* at 71 ¶ 180 n.278 (citing Christa Glenn FTC Interview at 171). Amazon also stated in an interrogatory response that the penalties for violating the MFPP and ASB include, among other things, removal of the third-party seller's product from the "Buy Box." Dkt. # 181-20 at 6. In an internal memorandum, Amazon stated that in 2018, ████ of new units sold on Amazon were purchased via the "Buy Box." Dkt. # 181-13 at 3.

Plaintiffs also present common evidence that SC-FOD operates as an agreement under which Amazon withholds the "Buy Box" from a third-party seller if the price of the product on

---

[10] Amazon's economics expert, Dr. Loren Hitt, explains that "glance views" are instances that a consumer views a product detail page on the Amazon Marketplace. *See* Dkt. # 233 at 26 ¶ 27(c).

Amazon is higher than the price offered for that product on another website.[11]  Dkt. # 262 at 31

¶ 61.  Dr. Pathak notes that, based on data provided by Amazon, the company monitors product

prices on more than ████ bsites across the Internet.  *Id.*  Amazon's monitoring system "crawls"

competitors' websites to gather price-related information to compare to the prices offered on

Amazon.  *Id.*  Dr. Pathak also notes that "[b]ecause the Buy Box is critical to sales on Amazon,

merchants set their prices accordingly (or raise their prices off Amazon to lower the threshold

price needed to gain the Buy Box).  The effect of this policy is that it reduces the threat to

Amazon's profits posed by other marketplaces, preventing competition on price and raising

fees."  *Id.* at 72 ¶ 172.

   Mike Miller, Amazon's former Director of Product Management, explained that third-

party sellers' products are featured on Amazon's "Buy Box" when "they are price competitive."

Dkt. # 181-33 at 3.  He says that to "enforce this policy, [Amazon] remove[s] featured offer

eligibility through [SC-FOD] when seller's prices on Amazon are higher than prices for offers at

select competitors."  *Id.*; *see also* Dkt. # 181-26 at 9.  He explains that SC-FOD compares a

seller's price on Amazon (Box price + shipping price) to the Box prices offered by competitors.

Dkt. # 181-33 at 3.  He underscores that Amazon does not "offer exceptions to or exemptions

from this policy."  *Id.*  And an internal memorandum about Jet.com, which at one point was an

emerging competitor to the Amazon Marketplace, noted that Amazon's "pricing program is

driving multiple levers to aggressively achieve price competitiveness including price parity

enforcement and price display treatments."  Dkt. # 181-34 at 7.  Amazon says in the

---

[11] The Court notes that to determine liability on a Sherman Act Section 1 claim, "[i]t is not
necessary to find an express agreement, either oral or written, in order to find a conspiracy, but it is
sufficient that a concert of action be contemplated and that defendants conform to the arrangement . . .
Any conformance to an agreed or contemplated pattern of conduct will warrant an inference of
conspiracy."  *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 634 (9th Cir. 2018)
(quoting *Esco Corp. v. United States*, 340 F.2d 1000, 1008 (9th Cir. 1965)) (cleaned up).

1   memorandum that "[p]rice display treatments such as removing Buy[ ]Box eligibility for

2   noncompetitive priced offers are a faster mechanism to price parity." *Id.*

3        Plaintiffs have also provided common evidence that Amazon enforced its anti-

4   discounting policy. Plaintiffs' evidence demonstrates that Amazon extensively monitors off-

5   marketplace prices and punishes third-party sellers for discounting their prices off Amazon. *See*

6   Dkt. # 262 at 90 ¶ 233. Amazon's Competitor Monitoring Team, which in 2015 consisted of

7   around ███ employees, monitors the prices of about ███████ products on other

8   marketplaces and websites. Dkt. ## 181-24 at 6; 262 at 90 ¶ 233. In an internal memorandum

9   dated July 2021, Amazon stated that its goal is "to cover ████████████████

10  ████████████ ████████████████████████

11  ███████████████████████████

12  █████████████████" Dkt. # 181-26 at 9.[12] In the same memorandum the

13  company said that it "██████████████████████████

14  █████████████████████" *Id.*

15       According to Dr. Pathak, Amazon's enforcement data shows that between 2018 and early

16  2023, the company recorded about ██████ incidents of SC-FOD being used to suppress the

17  offers of third-party sellers and removing these third-party sellers' products from the "Buy Box."

18  Dkt. # 262 at 18 ¶ 28. He says that after analyzing transactional and monitoring data provided by

19  Amazon, he concludes that the rate of sellers' compliance with Amazon's anti-discounting

20  policy, before and after the removal of the PPC from the BSA, is virtually unchanged —

21  averaging around 80% across Amazon's product categories. *See* Dkt. # 262 at 311–12 ¶¶ 272–

22

23       [12] An Amazon Standard Identification Number (ASIN) is an Amazon-specific product identifier
     like a Stock Keeping Unit (SKU). Each product on Amazon has a unique ASIN. *See* Dkt. # 232 at 15
24   n.4.

SEALED ORDER GRANTING MOTION FOR
CLASS CERTIFICATION - 17

73; *see also* Dkt. # 307-1 at 24–25 ¶ 57. Dr. Pathak notes that "Buy Box" suppression is

"devastating" to third-party sellers' businesses and is a "highly effective means of enforcing

Amazon's anti-discounting polic[y] and maintaining its monopoly." Dkt. # 262 at 32 ¶ 63; *see*

*also* Dkt. # 307-1 at 26–27 (stating that the evidence shows that "Buy Box" suppression is a

significant event that third-party sellers actively try to avoid and that sellers consider the anti-

discounting policy in their pricing decisions even when their products are not being actively

suppressed on Amazon).

And Dr. Pathak notes that Amazon's internal documents suggest that Amazon is aware

that third-party sellers are setting prices to conform with the company's anti-discounting policy.

*See* Dkt. # 262 at 99 ¶ 249. For example, in a document dated January 2017, Amazon noted that

"Buy Box" suppression "has not led sellers to lower their prices" and "has not motivated sellers

to reduce prices" on Amazon. *Id.* at 99 ¶ 250 (citations omitted). In a 2018 document, an

employee noted that Amazon has increased sellers' costs so much that "it has become more

difficult over time [for sellers] to be profitable on Amazon." *Id.* (citation omitted) (alteration in

original). And in another internal document, an Amazon employee observed that "the Brand

team has received complaints" that Amazon's policy "encourages Sellers to raise their prices on

competitor websites." *Id.* at 99 ¶ 251 (citation omitted). This employee also noted that "Sellers

could perceive this as Amazon's attempt at 'price fixing.'" *Id.* And in an email from 2019, an

Amazon executive recommended that an Amazon employee inform a brand owner that he should

raise prices on other sites to avoid "Buy Box" suppression. *Id.* (citation omitted). In the email,

the executive stated that the Amazon employee should tell the brand owner that "[a]s an

alternative to leaving Amazon and selling directly from their own site, you might want to

recommend to [the brand owner] to control prices across all his channels . . . you might want to

1    ask him to check if his sales on other sites directly or through distributors is putting him and

2    [Amazon] at a relative competitive disadvantage." *Id.* at 99–100 ¶ 251 (Ex. 14).

3            And Plaintiffs have also provided evidence that competing marketplaces, Amazon's

4    third-party sellers, and other marketplace participants have a common understanding of

5    Amazon's anti-discounting policy. *See* Dkt. # 180 at 31–33. For example, ████████████

6    ██████████████████████████████████████████████████████████████

7    ████ ██████████████████████████████████████████████████████

8    ███████████████ Dkt. # 181-54 at 2–3 ¶ 6. ██████████████████████

9    ███████████████████████████████████████████████████

10   ████████████████████████████████████████████████████

11   ██████████████████████████████████████████████████████████

12   *Id.* at 3 ¶ 10. ██████████████████████████████████████████████

13   ████ ████████████████████████████████████████████████████

14   ████████████████████████████████ *Id.* at 4 ¶ 12.

15           Mayer Handler, the CEO of Leveret (a third-party seller on Amazon), stated in a

16   declaration dated September 2022 that "because [Leveret] pay[s] less in fees on [its] website and

17   other websites, [the company] could sell [its] products for lower prices on these websites.

18   [Leveret] does not do this, however, because if [it] do[es], Amazon will disqualify Leveret's

19   offers from the [B]uy [B]ox." Dkt. # 181-53 at 5 ¶ 19. ██████████████████████

20   ████████████████████████████████████████████████████

21   ██████████████████████████████████████████████████████████

22   ████████████████████████████████████████████

23   ████████████████████████████ ██ ████ Dkt. # 181-56 at 2 (emphasis in

24   original). And in 2020, an e-commerce consultant informed their client (a third-party seller on

1    Amazon) the consultant had "parity pricing for eBay, meaning [they will] match the Amazon

2    price" to "ensure that your prices match across the platforms and it also helps you avoid the

3    Amazon listings from being suppressed." Dkt. # 181-50 at 25–26.

4        And there is evidence that other third-party sellers have stopped selling their products on

5    other online retail platforms to ensure compliance with Amazon's policies.  For example,

6    Zulily's CEO, John Lohnas, stated in a declaration dated August 2022 that after his company

7    launched the "Best Price Promise" and added a price-comparison feature to its website, some of

8    its vendors informed Zulily that they lost the "Buy Box" on Amazon because of Zulily offering

9    lower prices. Dkt. # 181-58 at 2–3 ¶ 5–6. According to Lohnas, these third-party sellers stated

10   that they could not afford this conflict with Amazon.  *Id.*  And several of Zulily's vendors who

11   also sold products on Amazon paused or stopped selling their products to Zulily altogether.  *Id.*

12   at 3 ¶ 6.  Some of these vendors informed Zulily that they would no longer do business with the

13   company unless it increased the prices of the vendor's products sold on Zulily. *Id.* at 3 ¶ 7.

14

15

16

17

18                                                        Dkt. # 181-40 at 3.

19                                                                            hat

20

21

22            *Id.* at 2.

23       Last,

24

1    ███████████████████████████████████████████████████████████

2    ████████████████████████    [13] Dkt. # 181-61 at 2.

3        Based on the above, Plaintiffs have presented common evidence that shows, on a more

4    probable than not basis, that a PMFN policy exists. *See In re Valve Antitrust Litig.,* 2024 WL

5    4893373, at *10 (determining that the plaintiffs' evidence of certain contract terms, one-off

6    discussions with third-party gaming companies, and various messages in industry forums

7    established common evidence of the defendant's price parity expectation).

8        Last, the cases Amazon cites on this issue are distinguishable. For example, *Wal-Mart*

9    *Stores, Inc. v. Dukes,* 564 U.S. 338, 358 (2011), concerned a class of over one million then-

10   current and former female employees of Walmart who alleged that the subjective criteria used by

11   local supervisors about pay and promotion-related matters violated Title VII by discriminating

12   against women. *Id.* at 342. The Supreme Court held that the class could not be certified because

13   the plaintiffs could not demonstrate commonality under Rule 23(a). *Id.* at 467. The plaintiffs

14   relied on statistical evidence that female employees were paid less, anecdotal evidence of

15

16       [13] To support its argument that Plaintiffs cannot demonstrate the existence of a PMFN policy,

17   Amazon cites seven declarations from employees who communicate directly with third-party sellers. *See*
     Dkt. # 232 at 29–30. The company says that its employees are not trained to direct sellers on how to price

18   their products on or off Amazon. *Id.* It says that these declarations show that the Court would have to
     conduct individualized inquiries to determine whether a PMFN policy existed. *Id.* at 30. But these

19   declarations do not refute Plaintiffs' evidence. For example, the declarations do not specify when
     employees were trained nor say whether this training happened throughout the class period. *See Miles v.*

20   *Kirkland's Stores Inc.,* 89 F.4th 1217, 1223 (9th Cir. 2024) (determining that the district court erred in
     holding that individual issues would predominate over common ones when it relied on declarations that
     discussed store conditions only in 2021 and not the entire class period from 2014 to the present).

21       One of the employee declarations appears to support Plaintiffs' argument that Amazon enforces
     price parity on its third-party sellers. *See* Dkt. # 234. It describes a sample response that employees use

22   when communicating with a third-party seller that lost the "Buy Box" for one of its products. The
     response states, "Thank you for contacting us regarding Featured Offer for ASIN{{item_id}}. We have

23   determined that currently, you are not eligible to be in Featured Offer for this ASIN because your offer is
     not priced competitively compared to other retailers outside of Amazon." *Id.* at 4 ¶ 12. The sample

24   response directs the third-party seller to "lower [its] offer's total price (Price + shipping) to match or beat
     the Competitive price." *Id.*

discrimination from 120 women primarily from six states, and a sociologist who opined that there was a culture of sex stereotyping at Walmart. *Id.* at 353–54, 58. The Supreme Court found that this evidence could not establish commonality because the evidence did not demonstrate a general policy of discrimination or corporate direction regarding the discretionary decisions of the company's store managers. *Id.* at 359. It agreed with a circuit judge that the employees had "little in common but their sex and this lawsuit." *Id.* at 359–60 (quoting *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 652 (9th Cir. 2010), *rev'd*, 564 U.S. 338 (2011) (C.J. Kozinski, dissenting)). As outlined above, unlike in *Dukes*, Plaintiffs have provided common proof, by a preponderance of the evidence, that Amazon imposed a PMFN policy on its third-party sellers before and after it removed the PPC. They have also presented evidence that Amazon, through various means, actively imposed this policy on its third-party sellers. Plaintiffs have also provided evidence that third-party sellers have been setting prices to conform with Amazon's anti-discounting policy. In the Court's view, the nature and quality of evidence here matter markedly differs from that presented in *Dukes*.

Amazon cites *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011), in which the Ninth Circuit vacated the district court's commonality determination because the court failed to engage in the "rigorous analysis" that Rule 23 requires. *Id.* The Ninth Circuit reasoned that the district court did not "examin[e] the merits to decide this issue" and instead "merely concluded that, because both [the] [p]laintiffs' and Costco's evidence was admissible, a finding of commonality was appropriate." *Id.* Here, this Order engages in the rigorous analysis required by Rule 23. *See Ellis*, 657 F.3d at 981 (stating that "the merits of the class members' substantive claims are often highly relevant when determining whether to certify a class" and a district court *must* consider the merits if they overlap with the Rule 23(a) requirements").

    b.  Widespread Effect of Challenged Conduct

When "a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification." *Olean*, 31 F.4th at 669 n.14. And "whether a proposed class that 'potentially includes more than a de minimis number of uninjured class members' can be certified under Rule 23 is a case-specific inquiry subject to the district court's rigorous predominance analysis." *Hall v. Marriott Int'l, Inc.*, 344 F.R.D. 247, 277 (S.D. Cal. 2023), *on reconsideration in part*, No. 19CV1715-JO-AHG, 2023 WL 9692466 (S.D. Cal. June 6, 2023) (quoting *Olean*, 31 F.4th 669 n.13, n.14).

Amazon contends that the proposed class does not meet the predominance requirement because the challenged conduct did not have a widespread effect—i.e., Plaintiffs' proposed class contains millions of uninjured members. Dkt. # 232 at 32. It also says that courts have held that 5–6% is the outer limit of permissible uninjured class members. *Id.* (citing *In re Rail Freight Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 137–38 (D.D.C. 2017)). Amazon contends that its economics expert, Dr. Loren Hitt, Ph.D., assessed its data and determined that 12.7% of the class would not have been injured by the alleged conduct. *Id.* Hitt concludes that these customers are unharmed because they make very few purchases (i.e., below five transactions) on Amazon. *Id.* (citation omitted). And the company asserts that Dr. Pathak admits that given focal-point bias, "it might be possible to identify particular incidents in which a sale could be plausibly argued to have had the same price in the but-for world as it did in the real word, despite the lower referral fee in the latter." *Id.* (quoting Dkt. # 262 at 145–46 ¶ 387).

Plaintiffs respond that Dr. Pathak acknowledges that idiosyncratic seller behavior such as focal point pricing may sometimes result in the seller not allocating a share of the overcharge to

class members. [14] Dkt. # 306 at 13 (citing Dkt. # 262 at 145–46 ¶ 387). They say that Dr. Pathak, after examining Amazon's transaction data, concludes that when the proposed class is limited to those who have made five or more purchases on Amazon, less than 1% of class members are uninjured. [15] *Id.*

Focal point pricing occurs when retailers set prices at "focal points," such as prices ending in 99 cents or a round number. *See* Dkt. # 262 at 145 ¶ 383; *see also Sidibe v. Sutter Health*, 333 F.R.D. 463, 495 (N.D. Cal. 2019) (describing focal point pricing as "the practice of retailers setting prices at certain 'focal points,' such as prices ending with 9, and not adjusting such prices based on small differences in costs").

In his report, Dr. Pathak explains,

> Given an assumption of focal-point bias, it might be possible to identify particular incidents in which a sale could be plausibly argued to have had the same price in the but-for world as it did in the real world, despite the lower referral fee in the latter. But this possibility does not affect my conclusion that all or virtually all class members [were] harmed by the conduct because virtually all class members made enough purchases to have overpaid on at least some of them.

Dkt. # 262 at 145–46 ¶ 387. In his rebuttal report, Dr. Pathak states that under Plaintiffs' modified class definition (customers who made a minimum of five purchase on Amazon), "the number of class members that would have been unharmed due to the focal-price phenomenon is less than 1%, even under the most conservative assumptions." Dkt. # 307-1 at 93 ¶ 265. He explains that

> The possibility of focal point pricing behavior does not affect my conclusion that all or virtually all class members were harmed by the conduct. This is because virtually all class members made enough purchases to have overpaid on at least one

---

[14] Plaintiffs also assert that Dr. Hitt's conclusion that 12.7% of purchaser accounts on Amazon would have been unharmed is misleading because his analysis is based on the number of times a customer "fills a shopping cart" without counting the number of items the customer ended up buying. *See* Dkt. # 306 at 14 n.13.

[15] As stated above, this Order assesses Plaintiffs' *amended* class definition, i.e., "All persons in the United States who on or after May 26, 2017, *purchased five or more* new, physical goods from third-party sellers on Amazon's marketplace." *See* Sec III.A (emphasis added).

of them, even if they were not harmed on purchases of focally-priced items of merchandise. For example, under the conservative assumption that all items ending in 99 cents in the real world would have also been priced at the same 99-cent increment in the counterfactual world, less than 1% of class members under the modified class definition would have escaped injury.

*Id.* at 93 ¶ 266. In his expert reports, Dr. Pathak addresses focal point pricing in detail and accounts for the possibility of unharmed class members in his analysis (stating that the possibility of unharmed class members is less than 1% under the modified class definition). *See* Dkt. ## 262 at 144–45 ¶¶ 381–87; 307-1 at 92–95 ¶¶ 263–72.

At this stage, and based on Plaintiffs' modified class definition, the evidence does not show that there is such "a great number of members" who were not harmed by the alleged conduct such that "the class definition is fatally overbroad." *See Pampena v. Musk*, No. 22-CV-05937-CRB, 2024 WL 4331811, at *7 (N.D. Cal. Sept. 27, 2024) (quoting *Olean*, 31 F.4th at 669 n.14). As noted by the Ninth Circuit, "fortuitous non-injury to a subset of class members does not necessarily defeat certification of the entire class, particularly as the district court is well situated to winnow out those non-injured members at the damages phase of the litigation, or to refine the class definition." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1137 (9th Cir. 2016) (citation omitted).

c.    Causation

Amazon contends that antitrust standing, injury, and damages are "not a common question because Plaintiffs' claims depend on a complex and multi-step causal chain." Dkt. # 232 at 33. The company asserts that Plaintiffs' theory of causation raises "extensive individual issues" as to injury and damages, and thus the standing of individual members. *Id.* It says that Plaintiffs cannot show that the challenged conduct consistently affects prices, thus raising individual issues. *Id.* at 34.

Plaintiffs respond that Amazon's argument about the purported necessity for individualized inquiries concerning causation disregards Plaintiffs' actual theory of the case and the economic evidence that supports that theory. Dkt. # 306 at 18. They say that it is only necessary that there be sufficient compliance with the company's anti-discounting policy to ensure that rival platforms cannot effectively compete, and Amazon can maintain supracompetitive fees. *Id.* at 18–19. They also note that Dr. Pathak determined, among other things, that despite eBay and Walmart charging third-party sellers fees 20% to 30% lower than Amazon, these platforms failed (about 80% of the time) to attract sellers willing to sell at prices lower than the prices on Amazon. *Id.* (citations omitted). They say that Dr. Pathak also determined that after a "Buy Box" suppression event, prices on other platforms for the affected merchandise raised about 4% a week after the event. *Id.* (citations omitted).

Amazon takes issue with one of Dr. Pathak's suppression event examples. Dkt. # 232 at 34–35. This example concerns "Mr. Medical" cream, which Dr. Pathak says he included in his report for illustrative purposes. Dkt. # 232 at 34–35. Amazon says that the "mistakes" Dr. Pathak made as to this illustrative example show that an individualized inquiry is required for each alleged instance of a price increase. *Id.* at 35. In rebuttal, Dr. Pathak addresses each of the purported "mistakes" that Dr. Hitt identified in his expert report (and which Amazon highlights in its Opposition brief). *See* Dkt. # 307-1 at 53–59 ¶¶ 146–59. For example, Amazon argues that Mr. Medical lost the "Buy Box" due to the price competitiveness of the product on Target; the company says that Dr. Pathak incorrectly states that Mr. Medical lost the "Buy Box" because it reduced its price on the Walmart Marketplace. *See* Dkt. # 232 at 35. In his rebuttal report, Dr. Pathak states, "[T]he enforcement data clearly shows Walmart is the reference price for the suppression throughout the actual period considered in [his] example," which occurred in June and not May as identified by Dr. Hitt. Dkt. # 307-1 at 57 ¶ 155. Considering Dr. Pathak's

responses to Dr. Hitt's critiques,[16] Amazon's criticisms of one of several examples that Dr.

Pathak included in his report does not demonstrate that individual issues predominate.[17]

"Reasonable minds may differ as to" the probative value of Dr. Pathak's Mr. Medical example,

"but that is a question of persuasiveness for the jury once the evidence is sufficient to satisfy

Rule 23." *See Olean*, 31 F.4th at 681 (citing *Tyson Foods*, 577 U.S. at 459); *see also City of

Phila. v. Banc of Am. Sec. LLC*, No. 24-297, 2025 WL 2180607, at *3 (2d Cir. 2025) (noting that

"a district court can only deny class certification based on the persuasiveness of the expert

---

[16] Dr. Hitt also criticizes Dr. Pathak's Mr. Medical example on the following grounds: (1) "Mr. Medical's offer continued to be the Featured Offer during the alleged suppression event"; (2) Dr. Pathak incorrectly notes that a day after the suppression event, Mr. Medical abandoned its discount (Dr. Hitt says that the discount on Walmart lasted for 13 days); and (3) Dr. Pathak incorrectly notes that Amazon provided customers with Amazon Funded Discounts during Mr. Medical's Walmart promotion. *See* Dkt. # 232 at 35 (citations omitted). Dr. Pathak addresses each of these criticisms in his rebuttal report and explains at length why Dr. Hitt's observations of his analysis are "misleading" and "in large part false." *See* Dkt. # 307-1 at 53–59 ¶¶ 146–59. The Court is not persuaded that Amazon's criticisms of one of six illustrative examples that Dr. Pathak included in his report show that individual issues predominate. As noted above, "[r]easonable minds may differ as to" the probative value of Dr. Pathak's illustrative examples, "but that is a question of persuasiveness for the jury once the evidence is sufficient to satisfy Rule 23." *See Olean*, 31 F.4th at 681 (citing *Tyson Foods*, 577 U.S. at 459); *see also Clevenger v. Welch Foods Inc.*, 342 F.R.D. 446, 461 (C.D. Cal. 2022).

[17] Amazon also relies on *In re New Motor Vehicles Canadian Export Antitrust Litigation*, 522 F.3d 6 (1st Cir. 2008), to support its argument that Plaintiffs' theory of causation is too complex. Dkt. # 232 at 33. That case is distinguishable. There, the First Circuit noted that the district court's "ability to probe into the viability of plaintiffs' proffered theory and to formulate some predictions as to how key issues in this novel and complex case would develop was hampered . . . by the incomplete record at the time, as well as by the fact that [the] plaintiffs' expert had not yet fully formulated all aspects of his analysis." *Id*. at 26. As the court reasoned, "Too many factors play into an individual negotiation to allow an assumption—at least without further theoretical development—that any price increase or decrease will always have the same magnitude of effect on the final price paid." *Id*. at 29. It noted that "[a]t the time of class certification, more work remained to be done in the building of [the] plaintiffs' damages model and the filling out of all steps of [the] plaintiffs' theory of impact." *Id*. Thus, the First Circuit remanded the case to the district court to reconsider class certification in light of the First Circuit's order and a more fully developed record. *Id*. at 29–30.

Here, Plaintiffs' theory of injury is not overly complicated: Plaintiffs allege that the challenged policies and practices reduced competition and resulted in higher prices paid by all class members. Dkt. # 262 at 16 ¶ 16. And Dr. Pathak's analysis is "fully formulated." He concludes that the challenged price restraints reduced competition and led to class members paying higher prices for products than they would have absent the restraints. *See* Dkt. # 262 at 16 ¶ 17; *see also Olean*, 31 F.4th at 679 (distinguishing *New Motor Vehicles* because the plaintiffs' price-fixing theory was not novel or complex and the plaintiffs offered well-developed expert testimony and modeling supporting common impact).

1    evidence if 'no reasonable juror could have believed' the expert evidence") (quoting *Tyson*

2    *Foods*, 577 U.S. at 459).

3            Next, Amazon contends that Dr. Pathak's conclusions that he observed, on average, a 4%

4    price increase on other platforms following an SC-FOD suppression event masks variations in

5    price movements. Dkt. # 232 at 35–36. But Dr. Pathak acknowledges that the average increase

6    includes some instances of price decreases; he notes that "that there is a significant degree of

7    'noise' in any individual observation—i.e., short-term fluctuations caused by idiosyncratic

8    factors that are not relevant to the effect in question." *See* Dkt. # 262 at 104 ¶ 257 n. 457. He

9    further explains that because

10           the conduct's purpose is to achieve an overall effect of preventing platform price
             competition, the average I present in my report demonstrates that the policy
11           generally effective. Moreover, where heterogeneity is notably absent is in the
             inflated marketplace fees resulting from the challenged conduct. These fees were
12           paid by all marketplace users through the mechanisms I have described in my
             report, and which Dr. Hitt himself has explained in his testimony.
13
14   Dkt. # 307-1 at 52–53 ¶ 145. Dr. Pathak clarifies that it is not the pricing of any particular item

15   that allows Amazon to maintain inflated referral fees for its third-party sellers; instead, it is

16   Amazon's suppression of platform competition that achieves this. *Id.*

17           And Plaintiffs say that evidence pertaining to Jet.com supports Dr. Pathak's conclusion

18   that Amazon's suppression of platform competition allows the company to maintain inflated

19   referral fees. Jet.com, an online marketplace, launched in 2015. Dkt. # 181-68 at 2. The

20   company charged third-party sellers referral fees similar to Amazon's. Dkt. # 181-68. And

21   customers paid a $49.99 annual membership fee to shop on Jet.com. *Id.* The company would

22   use the referral fees from third-party sellers to fund discounts for the products sold on its

23

24

website. Dkt. # 182-4 at 3. Jet.com's sole source of profit was the annual membership fee. [18]

*Id.* Based on this business model, Jet.com's base prices for products were roughly 9% lower than Amazon's. Dkt. # 181-69 at 2.

Amazon noted in an internal memorandum from 2015 about Jet.com that it is "aggressively enforcing [its] price parity guarantee" by "driving multiple levers to aggressively achieve price competitiveness including price parity enforcement and price display treatment." Dkt. # 181-70 at 7. In that same memorandum, Amazon observed that "[p]rice display treatment such as removing BuyBox [*sic*] eligibility for noncompetitive priced offers are a faster mechanism to price parity." *Id.* The company noted that it would remove "Buy Box" "eligibility for offers [on Amazon] higher than comparable prices on Jet." Dkt. # 181-34 at 4. The year Jet.com launched, Amazon employees held a meeting and an item on the agenda was "Global buying price competitiveness" because it was the "[p]erfect time to train sellers on price parity requirements . . . remove buybox [*sic*] for Amazon [third-party sellers] if they don't get close. Doesn't matter if they're similar or same. Use this to enforce parity. [Amazon ] should train sellers before other marketplaces gain traction." Dkt. # 307-4 at 3. Amazon executives also discussed whether these suppressed offers should be available to consumers at all (under "More Buying Choices") or completely delisted from the Marketplace. Dkt. # 262 at 77 ¶ 194. Dr. Pathak notes that during the months before and after Jet.com's launch on July 21, 2015, Amazon expanded the scope of its "Buy Box" suppression: On July 26, 2015, Amazon removed the "Buy Box" for ███████ SINs sold by third-party sellers. Dkt. # 262 at 78 ¶ 196. By August 25, 2025, more than ███████ SINs were affected. *Id.*

---

[18] Jet.com's founder stated that the company sold products at the company's cost plus "a little to cover overhead." Dkt. # 182-4 at 2. He stated that if a customer ordered a few products at the same time, they would amass 10% to 15% in savings on average. *Id.*

According to Plaintiffs' evidence: By the end of 2015, Jet.com dropped its membership fee model. Dkt. # 181-71. In 2016, Walmart purchased Jet.com. Dkt. # 181-72. In 2018, a third-party seller emailed Amazon and expressed its frustration that its four-pack product listing was being suppressed on the Amazon Marketplace due to "price matching" on Jet.com. Dkt. # 181-73 at 6. At the time, Jet.com was selling a single unit variation of the product at a lower price. *Id.* The third-party seller did not sell any of its products directly to Jet.com; Amazon's employees acknowledged that it was likely that one of the product distributors was selling its inventory to Jet.com. *Id.* at 5–6. Amazon's former Director of Product Management reiterated that under the ASB, brand owners "always need to match . . . external prices" on competitor platforms. *Id.* at 4. He advised that the seller should "work[ ] backwards from the source that Jet/Walmart is using" and that this is a "channel management issue where Jet is able to get better terms" for the product. *Id.* at 4. In 2020, Walmart discontinued Jet.com. Dkt. # 262 at 67–68 ¶155.

Amazon also contends that Plaintiffs cannot show a common injury because the company faces different competitive restraints across products. Dkt. # 232 at 36. The company says that Plaintiffs have not provided a common method showing that the challenged conduct caused Amazon to face less competition for all 237 million products sold in its store. *Id.* at 37.

Plaintiffs counter that Dr. Pathak's model shows that consumers paid higher prices due to inflated referral fees charged by Amazon. Dkt. # 306 at 22. They say that Amazon does not set referral fees on product-by-product basis. *Id.* And they contend that Dr. Pathak's model estimates counterfactual fees for each of Amazon's product categories. *Id.*

Plaintiffs' evidence raises common issues: whether third-party sellers on Amazon are subject to the alleged an PMFN policy, which leads to inflated referral fees across Amazon's product categories, which, in turn, leads to higher prices. *See* Dkt. # 307-1 at 32 ¶ 80. The Court

is not persuaded by Amazon's argument because its referral fees are based on product categories (e.g., footwear, furniture, clothing, and accessories) and not set on an item-by-item basis. *See* Dkt. # 262 at 32 ¶ 65 (a table of Amazon's current referral fee schedule by product category as of January 2024). Dr. Pathak calculates counterfactual fees for each category that Amazon uses to set its referral fees. *See id.* at 162–63 ¶ 448, Ex. 23. Dr. Pathak explains that he calculated fees in this manner because

> Marketplaces in the real world have consistently preferred category-level fee schedules. Thus, although my model is capable of calculating a but-for fee at an item-by-item level, I consider it more realistic to assume that fees in the but-for world, as in the actual world, would be set at the category level to maximize marketplace profits across all merchandise in category.

*Id.* at 162 ¶ 445.

Last, Amazon raises issues concerning Dr. Pathak's regression analyses. Dkt. # 232 at 38. Based on these analyses, Dr. Pathak concludes that empirical data confirms his model's predictions: lower referral fees lead to lower prices for consumers. *Id.* Amazon says that Plaintiffs' contention that third party sellers pass on allegedly inflated referral fees to their customers requires an individualized inquiry. *Id.* The company asserts that Dr. Pathak's regression analyses do not account for heterogeneity such as focal point pricing and that his sample sizes are too small. *Id.* at 38–39. It raised identical arguments about these regression analyses in its *Daubert* motion to exclude Dr. Pathak's testimony. Dkt. # 388 at 20.

Although the Court deemed his arguments admissible under *Daubert*, the Court's inquiry does not end there. *See Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018) (noting that in reviewing "challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*. But admissibility must not be dispositive. Instead, an inquiry into the evidence's ultimate admissibility should go

to the weight that evidence is given at the class certification stage.") (cleaned up); *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1030 (9th Cir. 2024)

Dr. Pathak performed regression analyses on available empirical data to *corroborate* the conclusion of his economic modeling. He does not rely on these regression analyses to show class-wide impact. *See* Dkt. # 306 at 22. And contrary to Amazon's assertion, Dr. Pathak states that his analysis does account for focal point pricing, and he explains why focal point pricing does not impact his determinations. *See* Dkt. # 307-1 at 93 ¶ 266 ("The possibility of focal point pricing behavior does not affect my conclusion that all or virtually all class members were harmed by the conduct. This is because virtually all class members made enough purchases to have overpaid on at least one of them, even if they were not harmed on purchases of focally-priced items of merchandise."). Furthermore, in his rebuttal report, Dr. Pathak emphasizes that he did not "cherry-pick subsets of the data." Dkt. # 307-1 at 99 ¶ 285. He says that he "analyzed all available prices in every category where a fee reduction occurred." *Id.* ("The millions of items that Dr. Hitt highlights in these comparisons are not included in my analysis for a simple reason: they did not experience any fee reduction. They are therefore uninformative about whether drops in fees were passed through to prices."). Last, as shown above, there is significant other evidence to support Plaintiffs' theory of antitrust injury. "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*, 568 U.S. at 459 (emphasis in original). And as mentioned above, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at

the certification stage." *Id.* at 466.  Thus, Amazon's arguments concerning Dr. Pathak's

regression analyses do not defeat predominance.[19]

        d.     Economic Modeling

      Amazon contends that Plaintiffs cannot satisfy Rule 23(b)(3) because Dr. Pathak does not

offer a reliable model demonstrating common injury, damages, and standing.  Dkt. # 306 at 15.

The company says that (1) Dr. Pathak's modeling is unreliable because it is based on theoretical

assumptions that conflict with the challenged conduct; (2) the model assumes a hypothetical

PFMN policy; and (3) the model has a 100% false positive rate.

      Amazon raised identical arguments in its *Daubert* motion to exclude Dr. Pathak's

testimony.  *See* Dkt. # 388 at 11–18.  The Court concludes that Amazon's arguments do not

show that individual issues predominate over the common questions.

      As to Amazon's first and second arguments, Dr. Pathak states that he reviewed the

record, and the facts support his conclusion that Amazon's anti-discounting policies and

practices constitute a PMFN policy.  Dkt. # 307-1 at 19 ¶ 37.  Dr. Pathak evaluates (1) the PPC,

(2) the SC-FOD, (3) the MFPP, (4) ASB and (5) the SCC.  Dkt. # 262 at 68–95 ¶¶ 159–241.  He

explains in his rebuttal report that

> Dr. Hitt mischaracterizes the Boik and Corts model and criticizes the very concept
> of mathematical reasoning from stated premises, even though he acknowledges that
> a model "that was proven based on fundamental math axioms" does not "assume
> its conclusion." The conclusions of the Boik and Corts model are not "assumed" --
> they follow logically from principles and interactions set out at the outset.

---

[19] Amazon also restates its argument concerning class-wide harm and the inclusion of "unharmed
transactions." Dkt. # 232 at 39.  As stated above, based on Plaintiffs' modified class definition, the
evidence does not show that there is such "a great number of members" who were not harmed.  *See Ruiz
Torres*, 835 F.3d at 1137 ("[F]ortuitous non-injury to a subset of class members does not necessarily
defeat certification of the entire class, particularly as the district court is well situated to winnow out those
non-injured members at the damages phase of the litigation, or to refine the class definition.") (citation
omitted).

*Id.* He discusses these policies and practices, describes how Amazon enforces them, and assesses their impact on the conduct of third-party sellers and consumers. *Id.* And as determined above, Plaintiffs have presented sufficient evidence that Amazon's policies and practices function as a PMFN policy. *See supra* Sec. III.B.3.a.

Next, as to Amazon's argument that its policies and practices do not match Dr. Pathak's assumptions because his modeling "assumes perfect compliance," Dr. Pathak has expressly stated that his model does *not* assume perfect compliance with the PMFN policy. *See* Dkt. # 262 at 143 ¶ 375 (stating that he calculates the counterfactual fee as if only a proportion of merchant were bound at any given time by the anti-discounting policy; stating that he uses an 80% rate of compliance as measured in Amazon's documents). He clarifies that his

> analysis shows that roughly 80% of all merchandise prices are set in compliance with Amazon's external price-matching rules, and additional qualitative evidence from merchant testimony confirms that the policy restricted their pricing decisions. This high compliance rate shows Amazon's conduct creates economic outcomes equivalent to a PMFN [policy]. Since the challenged conduct effectively generates widespread price parity, the economic analysis of price parity policies from the academic literature and my report is directly relevant to evaluating Amazon's conduct. [20]

Dkt. # 307-1 at 22 ¶ 48.

---

[20] Amazon also relies on *In re Processed Egg Products. Antitrust Litigation*, 312 F.R.D. 124 (E.D. Pa. 2015), to support its argument that Dr. Pathak's methodology masks numerous individualized issues. But there, the court reasoned that the expert's model masked individualized questions because the "pass-through model improperly assumes, without adequate support, that because one retailer passed through the overcharge at a certain rate averaged across its stores, all retailers *nationwide* shared that overcharge rate or, at least, passed along some positive overcharge—averages cannot account for what the pass-through rate was at the individual store level, and averages might mask stores with no pass-through rate at all." *Id.* at 160 (emphasis in original). Here, by contrast, Dr. Pathak's methodology is not making such impermissible assumptions. In rebuttal, Dr. Pathak explains that his model does not assume "harm on one transaction based on harm on another transaction, whether by the same purchaser or not." Dkt. #307-1 at 35 ¶ 91. And his report "does not extrapolate harm from a small subset of plaintiffs to the broader class." *Id.* at 35 ¶ 92. He "finds that virtually all plaintiffs were commonly harmed by higher referral fees, presents a methodology that can be used to quantify this harm item-by-item, and estimates each plaintiff's damages directly from their own transaction history." *Id.*

As to Amazon's argument that the model generates false positives because it assumes 100% of the time that a PMFN policy raised referral fees and inflated prices, Dr. Pathak explains that the model is not designed to detect the existence of a PMFN policy. In his rebuttal report, he says that Dr. Hitt's contention that his methodology has a 100% false positive rate is misleading because the model "is not a test of whether a PMFN [policy] exists, and it does not return 'positive' or 'negative' results." Dkt. # 307-1 at 16 ¶ 26. He adds that the model does not "assume its conclusion." *Id.* at 73 ¶ 204. Dr. Pathak explains,

> Dr. Hitt mischaracterizes the Boik and Corts model and criticizes the very concept of mathematical reasoning from stated premises, even though he acknowledges that a model "that was proven based on fundamental math axioms" does not "assume its conclusion." The conclusions of the Boik and Corts model are not "assumed" -- they follow logically from principles and interactions set out at the outset.

*Id.* As noted above, Dr. Pathak reviewed the record, and he provides the facts that inform his conclusion that Amazon's anti-discounting policies constitute a PMFN policy that has a class-wide impact on consumers. Dkt. ## 262 at 16–22 ¶¶ 20–35; 307-1 at 19 ¶ 37. After he explains his reasons for determining that Amazon's anti-discounting conduct acts as a PMFN policy, he then analyzes the alleged harm to the class members. *See, e.g.*, Dkt. # 262 at 110–12 ¶¶ 269–80.

As the Supreme Court has instructed,

> Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury. Reasonable minds may differ as to . . . [the correctness of the expert's opinion]. Resolving that question, however, is the near exclusive province of the jury. *The District court could have denied class certification on this ground only if concluded that no reasonable juror could have believed [the expert's opinion].*

*Tyson Foods*, 577 U.S. at 459 (emphasis added). And as the Ninth Circuit has explained,

> *Tyson Foods* established the rule that if "each class member could have relied on [the plaintiffs' evidence] to establish liability if he or she had brought an individual action," and the evidence "could have sustained a reasonable jury finding" on the merits of a common question, then a district court may conclude that the plaintiffs have carried their burden of satisfying the Rule 23(b)(3) requirements as to that common question of law and fact[.]

*Olean*, 31 F.4th at 679 (quoting *Tyson Foods*, 577 U.S. at 445–56) (cleaned up). Based on the above, Dr. Pathak's expert testimony can answer common questions of the entire class. And a reasonable juror could believe Dr. Pathak's expert testimony. Whether Dr. Pathak's opinion is ultimately persuasive is not the question before the Court at the class-certification stage. *See Olean*, 31 F.4th at 668.

    e.  Identifying Uninjured Class Members

    Amazon contends that individual inquiries predominate because Dr. Pathak fails to identify a common method for identifying unharmed class members. Dkt. # 232 at 43. It says that Dr. Hitt concludes that the challenged conduct benefited class members by decreasing prices. *Id.* at 44. The company asserts that individualized inquiries are needed to determine whether the challenged conduct benefits consumers. *Id.* It also says that Dr. Pathak's model fails to account for price lowering mechanisms such as "Amazon Funded Discounts" (AFD). [21] *Id.* at 45.

    Plaintiffs counter that Dr. Pathak has addressed each of Amazon's critiques, which Dr. Hitt first raised in his expert report. Dkt. # 306 at 22–23. Plaintiffs also point out that Dr. Pathak accounted for AFD in his modeling. *Id.*

    In rebuttal, Dr. Pathak explains why, in his opinion, the challenged conduct provided no financial benefit to consumers. He states,

> Insofar as the PMFN [policy] caused certain merchants to lower their prices to match those available on other marketplaces, class members would have had access to these other marketplaces and could have shopped outside of Amazon. Therefore, consumers who encountered lower prices on Amazon due to PMFN [policy] enforcement would, by definition, have been able to access the same price elsewhere. If these consumers purchased from Amazon in the real world at the

---

[21] In his rebuttal report, Dr. Pathak explains that AFD is a "program where Amazon subsidized third-party price parity with lower prices on other platforms, rather than enforcing it through Buy Box exclusion." Dkt. # 307-1 at 41 ¶ 112.

'lower' price identified by Dr. Hitt, they could have purchased at the same price from a non-Amazon marketplace in the but-for world, thereby receiving no financial benefit from the enforcement of the policy.

Dkt. # 307-1 at 36 ¶ 95. He also explains that Dr. Hitt's conclusion that SC-FOD decreases prices is unreliable because (1) Dr. Hitt's definition of an SC-FOD enforcement event omits most available data; and (2) Dr. Hitt's empirical analysis is fatally biased because he does not consider "how a changing competitive environment would prompt both SC-FOD extension and a drop in item level prices." *Id.* at 37–41 ¶¶ 103-09. And Dr. Pathak explains that he included "AFDs in the actual price used to calibrate the model, automatically accounting for these discounts when computing counterfactual prices. The discount does not in any way offset the overcharge, as Dr. Hitt seems to imply with this comparison." *Id.* at 41–42 ¶¶ 112–16.

This dispute between the parties' experts is insufficient to defeat class certification on the issue of predominance. *See Corbett v. PharmaCare U.S., Inc.*, No. 21CV137-JES (AHG), 2024 WL 1356220, at *22 (S.D. Cal. Mar. 29, 2024) (noting that "[e]ven where criticisms are serious and could be persuasive to a finder of fact, at class certification, courts do not determine which expert is correct") (quoting *In re Packaged Seafood Prod. Antitrust Litig.*, 332 F.R.D. 308, 328 (S.D. Cal. 2019)) (cleaned up). Amazon's criticisms of Dr. Pathak's modeling, whether they will eventually carry the day for a factfinder, do not show that the challenged conduct is not capable of being measured on a class-wide basis. Dr. Pathak responds to each of the criticisms above and explains why the economic evidence supports his modeling. *See, e.g.*, Dkt. # 307-1 at 36 ¶¶ 93–95 (Dr. Pathak explains that "[t]he merchant incentive to lower prices of their merchandise is a core part of my model and does not change the finding of harm based on fees"); *see also Olean*, 31 F.4th at 667 ("[A] district court cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to be unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue."); *In re Optical Disk Drive*

1    *Antitrust Litig.*, No. 3:10-MD-2143 RS, 2016 WL 467444, at *11 (N.D. Cal. Feb. 8, 2016) (even

2    when "compelling evidence" exists that contradict expert testimony, "[t]he crucial point is that

3    whether the [ ] theory is right or wrong, it is something that can be decided on a class-wide

4    basis"); *In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. at 328  (same).

5        And the cases Amazon relies on to support its argument are distinguishable.  For

6    example, in *Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16 (D.D.C. 2012), the court noted

7    that the plaintiffs' expert glossed over the economic benefits associated with the Whole Foods

8    merger in his adverse impact analysis.  *Id.* at 24.  In that case, the court reasoned, "Under a

9    framework that properly accounts for both merger-related price increases and declines, some

10   Whole Foods shoppers may have paid more for their baskets of products than they would have

11   without the merger, while others may have paid less—depending upon what mix of products

12   each purchased."  *Id.* at 25.  And calculating the "proportion of shoppers [who] suffered net harm

13   due to price movements caused by the merger therefore requires an analysis of each putative

14   class member's purchases at Whole Foods during the class period and the amount by which the

15   price of each product changed as a result of the merger."  *Id.*  Here, by contrast, Dr. Pathak did

16   consider the merchant incentives to lower prices in his modeling.  Dkt. # 307-1 at 34– 39 ¶¶ 88–

17   102 (reasoning that "[i]nsofar as the PMFN [policy] caused certain merchants to lower their

18   prices to match those available on other marketplaces, class members would have had access to

19   these other marketplaces and could have shopped outside of Amazon. Therefore, consumers who

20   encountered lower prices on Amazon due to PMFN [policy] enforcement would, by definition,

21   have been able to access the same price elsewhere").  And Dr. Pathak also explains why these

22   price reductions do not affect his class overcharge analysis.  *Id.*

23

24

f.    Market Definition & Market Power

To establish indirect evidence of market power, "a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *In re HIV Antitrust Litig.*, 656 F. Supp. 3d 963, 985 (N.D. Cal. 2023) (quoting *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995)).

Amazon asserts that Dr. Pathak fails to establish an overarching market definition that includes almost every product sold on the Marketplace. Dkt. # 232 at 45. It says that consumers do not select Amazon because it is a "one-stop shop" and instead substitute across many other retail options. *Id.* at 46. The company also contends that Dr. Pathak does not provide a common method for analyzing substitutions across other retail channels. *Id.* at 50. It says that Dr. Pathak does not a provide a common method for analyzing the competitive conditions for different product categories sold on its Marketplace. *Id.* It asserts that Plaintiffs have failed to carry their burden of establishing that their market definition is capable of class-wide proof. *Id.* at 51.

Plaintiffs respond that Amazon's arguments about the market definition are not grounds to deny class certification. Dkt. # 306 at 23. They say that Dr. Pathak's opinion, consistent with Supreme Court precedent on this issue, is that the market in which the Amazon Marketplace operates is defined by its facilitating retailer transactions between consumers and third-party sellers—not by the specific products sold on Amazon. *Id.* at 24. They also contend that Amazon's criticism of their indirect evidence of market power focuses on only one of the five features of the Amazon Marketplace that Dr. Pathak uses in determining the relevant product market. *Id.* at 25. They emphasize that Amazon's critique presents a factual dispute that does not defeat class certification. *Id.*

Dr. Pathak states that the Amazon Marketplace assists consumers and third-party sellers

in finding each other "online across a wide variety of product categories and intermediates transactions between them." Dkt. # 262 at 43 ¶ 96. He explains that online marketplaces are sufficiently distinct from other retail channels to justify them being treated as a distinct antitrust market. *Id.* at 56 ¶ 128. He explains his reasons for describing this as the relevant market, including evidence that Amazon distinguishes marketplaces from other forms of e-commerce retail. *Id.* at 54 ¶ 119. He describes a document in which Amazon discusses the competitive restraints on increases to its referral fees and "how easy it would be for competing marketplaces (Alibaba, eBay, Jet, etc.) to disintermediate [Amazon] in categories where [Amazon] has higher revenue shares." Dkt. # 262 at 54 ¶ 119 n.177. And in another document, Amazon refers to eBay in a discussion about the "competitive landscape" it faces in the United States. *Id.* at 54 ¶ 119 n.178. Dr. Pathak also says that online "[m]arketplaces are commonly singled out in research and publications, analytics, and relevant trade press analysis. *Id.* at 53 ¶ 118 n.175 (citing articles).

Dr. Pathak also notes that various governmental bodies, including the House Judiciary Subcommittee on Antitrust in the United States, treat the online retail marketplace as a distinct entity. *Id.* at 54 ¶ 120. For example, that Subcommittee described Amazon as principally operating, for its retail competition, in the "online marketplace." *Id.* The Subcommittee stated that the most basic function of the online marketplace "is to serve as a platform that connects buyers and sellers." *Id.* (citation omitted). And that "[m]arketplaces include product listings from a variety of sellers." *Id.* The United Kingdom's Competition and Markets Authority determined that the "Amazon Marketplace acts as an intermediary between distinct groups of users (sellers and customers) and may, therefore, be described as a two-sided platform." *Id.* (citation omitted). The German Competition Authority, the Bundeskartellamt, determined that Amazon operates as a "multi-sided market (a platform)." *Id.* at 54–55 (citation omitted). The

1    Authority noted that marketplaces "broker a broad product range covering many product

2    categories, if only because the large number of sellers." *Id.* at 55. And the Italian Competition

3    Authority, Autorita Garante della Concorrenza, described Amazon as "a two-sided market for

4    intermediation services between merchants and consumers on online marketplaces." *Id.* (citation

5    omitted).

6        Contrary to Amazon's assertion that Plaintiffs' market definition "disregards bedrock

7    antitrust precent," by providing various services to third-party sellers and consumers, Amazon

8    brings these parties together and thus operates a "two-sided platform." *See Ohio v. Am. Express*

9    *Co.*, 585 U.S. 529, 534 (2018) ("*Amex*"). "As the name implies, a two-sided platform offers

10    different products or services to two different groups who both depend on the platform to

11    intermediate between them." *Id.* And "[o]nly other two-sided platforms can compete with a

12    two-sided platform for transactions." *Id.* at 546. Dr. Pathak identifies other online retail

13    marketplaces, like eBay and Walmart Marketplace, as Amazon's competitors. *See* Dkt. # 262 at

14    61 ¶141. Dr. Pathak's opinion accords with *Amex*: the market in which Amazon operates is

15    defined by its actions as an intermediary between third-party sellers and consumers. *See id.* at 41

16    ¶ 89 (stating that the "two-sided nature of Amazon Marketplace is relevant to defining the scope

17    of the antitrust market. The core product is a transaction service offered to both merchants and

18    consumers."); *see also Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1017 (N.D. Cal.

19    2021), (stating that "[t]he Supreme Court has seemingly resolved the question: two-sided

20    transaction platforms sell transactions" and "the [c]ourt finds that the relevant App Store product

21    is transactions, not services[.]"), *aff'd in part, rev'd in part and remanded*, 67 F.4th 946 (9th Cir.

22    2023) (the district court's defined market of "mobile-game transactions" stood on appeal); *see*

23    *also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 729 F. Supp. 3d 298,

24    321 (E.D.N.Y. 2024) ("[T]he Supreme Court's decision in *Amex* makes clear that the relevant

markets in antitrust cases involving two-sided transactions platforms must include both sides of the platform.") (citing *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019)).

Furthermore, "market power is the ability 'to force a purchaser to do something that [they] would not do in a competitive market.'" *Epic Games*, 67 F.4th at 983 (quoting *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13 (1984), *abrogated on other ground by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006)). Market power is generally inferred from the defendant's possession of a high market share and the existence of "significant barriers to entry." *Id.*

Dr. Pathak states that Amazon has about a 72% market share in the Online Retail Marketplaces Market. Dkt. # 262 at 64 ¶ 147 (Ex. 3); *see also Nicolosi Distrib., Inc. v. FinishMaster, Inc.*, No. 18-CV-03587-BLF, 2018 WL 4904918, at *5 (N.D. Cal. Oct. 9, 2018) ("Courts have quantified substantial share as '40% to 50% of the relevant market.'") (quoting *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1029–30 & n.8 (N.D. Cal. 2015)). He also describes the "significant barriers to entry" into the market. Dkt. # 262 at 66–67 ¶¶ 149–55. For instance, he explains the "consumer inertia" or high switching costs associated with third-party sellers and consumers. *Id.* at 66 ¶ 151. He says that in the online marketplaces market, "familiarity and convenience are important features of the product." *Id.* And "for both consumers and merchants, seeking another platform means initially sacrificing the convenience of a familiar interface." *Id.*

Dr. Pathak also describes multiple failed attempts by competitors to establish rival online marketplaces. *Id.* at 67–68 ¶ 155. For example, Best Buy, an electronics retailer, launched an online marketplace in the United States in 2011. *Id.* It struggled to attract consumers and turn a profit. Best Buy shut down its online marketplace in 2016. *Id.* Rakuten, a Japanese company,

acquired the United States online retailer Buy.com in 2010. *Id.* Ratuken transformed Buy.com into an online marketplace in 2013. *Id.* Despite Ratuken's success in Japan, its United States marketplace failed to gain traction in the market space. *Id.* Ratuken shut down its operations in the United States in 2020. *Id.* Google also attempted to enter the market and launched "Buy on Google." *Id.* Buy on Google allowed users to discover products through Google Search, add the products to a Google shopping cart, and purchase the products through Google. *Id.* Despite attempts to recruit sellers between 2018 and 2020 (and even slashing its referral fees to zero) Buy on Google did not make any headway with third-party sellers and buyers. *Id.* Consequently, Google abandoned the project.[22] *Id.*

Amazon also takes issue with Dr. Pathak's description of the Amazon Marketplace as a "one-stop-shop" for consumers. Dkt. # 232 at 46–50. The company argues that to be a "one-stop-shop," consumers must "purchase multiple products in the same purchase event or in close succession when using the store." *Id.* at 47.

In his explanation of a two-sided platform market, Dr. Pathak discusses "one-stop-shops." Dkt. # 262 at 41 ¶ 88. He says, "From the consumer perspective, online marketplaces are distinguished from other e-commerce retail channels because they are 'one-stop-shops' for consumers. Amazon Marketplace and its direct competitors offer a wide range of different items of merchandise through a single interface, which is convenient for consumers that specialist retailers cannot offer." *Id.* Dr. Pathak's "one-stop-shop" analysis is one of several factors that he uses to determine that the Amazon Marketplace is a two-sided platform. *Id.* at 41–42 ¶¶ 86–89. In rebuttal, Dr. Pathak explains that the "one-stop-shop" critique is

> both untrue and irrelevant. Most consumers do purchase a wide variety of items on
> Amazon Marketplace, often all at the same time. But even for those who do not,
> the value of a one-stop-shop in general, and Amazon Marketplace in particular, is

---

[22] Dr. Pathak also describes Jet.com's attempt to enter into the market. *See supra* Sec. III.2.b.

not that consumers always purchase a wide variety of items on each visit, but that consumers know a wide variety of items are available.

Dkt. # 307-1 at 18 ¶ 33.

To be clear, "there is no requirement to use any specific methodology in defining the relevant market." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482 (9th Cir. 2021). And "[c]ourts regularly find that reasonable estimates concerning market definition and market share performed using all the available data are sufficient." *In re Telescopes Antitrust Litig.*, 348 F.R.D. at 472 (collecting cases). Thus, Amazon's critique of one of the factors Dr. Pathak uses to define the relevant market does not defeat predominance. Dr. Pathak reliably applies economic principles and considers available evidence to define the market. This suffices at the class certification stage.[23]

Based on the above, Plaintiffs have met their burden, by a preponderance of the evidence, regarding both commonality under Rule 23(a)(2) and predominance under Rule 23(b)(3).

3.    Typicality under Rule 23(a)

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with

---

[23] Amazon also relies on statements about the class representatives' shopping habits to support its argument. Dkt. # 232 at 49 (citing declarations of class representatives). As noted by another court in this Circuit, "the 'least reliable' evidence in predicting the effects of a hypothetical price increase is "'subjective' testimony by customers that they would or would not defect in response to a given price increase." *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 127 (C.D. Cal. 2007) (citations omitted). And "[t]hough not irrelevant, such statements are often unreliable, especially when the question is oversimplified." *Id.* (citation omitted). Here, a "review of individual consumer's preferences is not necessary to determine the relevant product market." *In re Cox Enters., Inc. Set-Top Cable Television Box Antitrust Litig.*, No. 09-ML-2048-C, 2011 WL 6826813, at *10 (W.D. Okla. Dec. 28, 2011) (citing *In re Live Concert Antitrust Litig.*, 247 F.R.D. at 127).

SEALED ORDER GRANTING MOTION FOR
CLASS CERTIFICATION - 44

those of absent class members; they need not be substantially identical." *Parsons v. Ryan*, 754

F.3d 657, 685 (9th Cir. 2014) (quoting *Hanlon*, 150 F.3d at 1020).  The inquiry focuses on

"whether other members have the same or similar injury, whether the action is based on conduct

which is not unique to the named plaintiffs, and whether other class members have been injured

by the same course of conduct." *Hanon*, 976 F.2d at 508 (quoting *Schwartz v. Harp*, 108 F.R.D.

279, 282 (C.D. Cal. 1985)).  Typicality exists when "the named plaintiff's claim and the class

claims are so interrelated that the interests of the class members will be fairly and adequately

protected in their absence." *Dukes*, 564 U.S. at 350 n.5.  In the antitrust context, typicality will

generally be "established by plaintiffs and all class members alleging the same antitrust violation

by defendants." *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*,

311 F.R.D. 532, 539 (N.D. Cal. 2015) (quotation omitted).

      Here, the claims of the representative plaintiffs, Elizabeth De Coster, Emma Zaballos,

Maya Gold, Kenneth David West, and Osahon Ojeaga are typical of the class.  *See* Dkt. ## 183–

87 (Plaintiffs' Decls.).  Like other class members, the representative plaintiffs allege that

Amazon uses its market power in the Online Retail Marketplaces Market and the PMFN policy

with third-party sellers to impose supracompetitive fees on these sellers for the use of its

marketplace. *See* Dkt. # 126.  They say that they bought multiple products from third-party

sellers on Amazon on or after May 26, 2017, and because of Amazon's anti-competitive conduct,

they paid inflated prices for the products. *See* Dkt. ## 183–87 (Plaintiffs' Decls.).  The

representative plaintiffs assert that Amazon's conduct constitutes antitrust violations that lead to

cognizable antitrust injuries. *See In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 351

(N.D. Cal. 2005).

      Thus, they satisfy the typicality requirement of Rule 23(a).

4.    Adequacy of Representation under Rule 23(a)

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To satisfy constitutional due process concerns, absent class members must be afforded adequate representation before entry of a judgment which binds them." *Hanlon*, 150 F.3d at 1020. The adequacy requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent as well as the competency and conflicts of class counsel." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 566 (9th Cir. 2019) (quotation omitted). It involves two requirements: (1) the representative plaintiffs cannot have any conflicts of interest with other class members; and (2) the representative plaintiffs and their counsel must prosecute the action vigorously on behalf of the class. *Id.* (quoting *Hanlon*, 150 F.3d at 1020); *see also In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. at 351.

The Court finds no apparent conflicts among the representative plaintiffs, their counsel, and the proposed class members. The representative plaintiffs and their counsel have demonstrated that they will prosecute this action vigorously on behalf of the class. The representative plaintiffs have produced documents and other materials during discovery. *See* Dkt. # 183 at 2 ¶ 5. They have also helped prepare discovery responses. *Id.* Amazon has also deposed the representative plaintiffs. *See* Dkt. # 233 at 705–99. Plaintiffs' counsel has diligently litigated this case, including by filing this motion, among many other motions, and by timely responding to various motions filed by Amazon throughout this litigation. *See, e.g.*, Dkt. ## 39, 155, 180, 189, 311. Plaintiffs' counsel has also taken depositions and conducted discovery. *See, e.g.*, Dkt. ## 181–82 (Plaintiffs' counsel attached more than 100 exhibits, including documents obtained in discovery, in support of Plaintiffs' motion for class

certification).  Last, Plaintiffs' counsel has broad experience in litigating class actions, antitrust

cases, and consumer protection-related matters.  *See* Dkt. ## 182-9, 182-10, 182-11.

Thus, Plaintiffs satisfy Rule 23(a)'s adequacy requirement.

5.    Superiority under Rule 23(b)(3)

As stated above, Rule 23(b)(3) requires that plaintiffs demonstrate (1) questions of law or

fact common to class members predominate over any questions affecting only individual

members, and (2) that a class action is superior to other available methods for fairly and

efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).  Above, this Order addresses

Rule 23(b)(3)'s predominance requirement.  *See supra* Sec. III.B.3.  When analyzing superiority

under Rule 23(b)(3), the court evaluates (1) the interests of the individuals within the class in

controlling their own litigation; (2) the extent and nature of any pending litigation involving the

same issues; (3) the convenience and desirability of involving the litigation in a particular forum;

and (4) the manageability of the class action.  *See* Fed. R. Civ. P. 23(b)(3)(A)–(D); *see also*

*Hanlon*, 150 F.3d at 1023; *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1190–92 (9th Cir.),

*opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001).  "Where classwide litigation

of common issues will reduce litigation costs and promote greater efficiency, a class action may

be superior to other methods of litigation," and it is superior "if no realistic alternative exists."

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234–35 (9th Cir. 1996).

Amazon asserts that given the "unprecedented" size of the proposed class, Plaintiffs

cannot demonstrate that a class action would be manageable.[24] Dkt. # 232 at 52.  Plaintiffs say,

---

[24] Amazon repeats its earlier argument concerning individualized issues and says that the challenged conduct led to lower prices for the products sold on Amazon. Dkt. # 232 at 52. Because this Order addresses this argument above, it does not repeat the analysis here. *See supra* Sec. III.B.3.

"[T]he size of the class alone militates in favor of, not against certification." Dkt. # 306 at 26

(citing Dkt. # 180 at 48)

Given the number of class members allegedly injured by Amazon's actions, a class action "is not only the most efficient and convenient method to resolve this controversy, it is the only 'fair' and 'efficient' means to adjudicate this controversy." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 527 (S.D.N.Y. 1996). "[M]ultiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would be neither 'fair' nor an 'adjudication' of their claims." *Id.* And "individual litigation would consume judicial resources, impose additional burdens and expenses on the litigants, and present a risk of inconsistent rulings." *Winters v. Two Towns Ciderhouse, Inc.*, No. 20-CV-00468-BAS-BGS, 2020 WL 5642754, at *3 (S.D. Cal. Sept. 22, 2020); *see also NASDAQ Mkt.-Makers*, 169 F.R.D. at 527 (noting that "the cost associated with individual claims may require claimants with potentially small claim amounts to abandon otherwise valid claims simply because pursuing those claims would not be economical. This in turn would result in unjustly enriching the [d]efendants; precisely the result antitrust laws are designed to remedy") (quoting *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 699 (D. Minn. 1995)).

Thus, resolution of these claims in a single class action is superior to individual lawsuits because it promotes judicial efficiency and consistent rulings.[25]

---

[25] As to Amazon's argument that the "unprecedented" class size defeats superiority, other district courts have certified class actions, including settlement classes, with millions and in some cases hundreds of millions of class members. *See In re TikTok, Inc., Consumer Priv. Litig.*, 617 F. Supp. 3d 904 (N.D. Ill. 2022) (certifying settlement class including an 89-million-member nationwide class and 1.4 million state specific subclass); *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 940 (N.D. Cal. 2013), *aff'd sub nom. Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016) (certifying settlement class of 150 million class members); *Edwards v. Nat'l Milk Producers Fed'n*, No. C 11–04590 JSW, 2014 WL 4643639, at *4 (N.D. Cal. Sept. 16, 2014) (certifying class of approximately 46 million class members); *In re Zoom Video Commc'ns, Inc. Priv. Litig.*, No. 20-CV-02155-LB, 2022 WL 1593389, at *2 (N.D. Cal. Apr. 21, 2022) (certifying settlement class of about 150 million class members).

C.    Request for Appointment of Class Counsel

Judge Ricardo S. Martinez previously appointed Hagens Berman Sobol Shapiro LLP and Keller Postman LLC (previously Keller Lenkner LLC) as Interim Co-Lead Class Counsel and Quinn Emanuel Urquhart & Sullivan, LLP as an Executive Committee Member.[26] Dkt. # 19. Plaintiffs are now requesting that Hagens Berman and Keller Postman be appointed as Co-Lead Class Counsel and Quinn Emanuel as Executive Class Counsel. Dkt. # 180 at 50.

In considering Plaintiffs' request, the Court evaluates "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources that counsel will commit to representing the class[.]" Fed. R. Civ. P. 23(g)(1)(A).

Over the years, interim class counsel has ably performed on behalf of the putative class, and nothing suggests that counsel will not continue to do so. Counsel has timely responded to Amazon's motions, including multiple Rule 12(b)(6) motions, and has vigorously advocated for Plaintiffs' interests throughout discovery. Counsel's submissions to the Court reflect their knowledge of the governing law and familiarity with class-action procedures. Their present performance in the class certification briefing demonstrates their competence to protect the interests of the class and to pursue the class's claims. And based on a declaration submitted by Plaintiffs' attorney, Steve Berman, and the accompanying exhibits, the Court concludes that Plaintiffs' counsel has adequate resources to litigate this action, and they are familiar with litigating antitrust cases and class actions. *See* Dkt. ## 182-9, 182-10, 182-11.

---

[26] Judge Martinez also appointed Keller Rohrback LLP as a member of Plaintiffs' Executive Committee. For efficiency purposes, Interim-Co Leads are requesting that only Quinn Emanuel be appointed as Executive Class Counsel. Dkt. # 180 at 49.

SEALED ORDER GRANTING MOTION FOR
CLASS CERTIFICATION - 49

1        Thus, the Court appoints Hagens Berman and Keller Postman as Co-lead Class Counsel

2 and Quinn Emanuel as Executive Class Counsel.

3                             **IV**

                        **CONCLUSION**

4

5        Based on the above, the Court GRANTS Plaintiffs' Motion for Class Certification.

6       •   The Court CERTIFIES the following class:

7            All persons in the United States who on or after May 26, 2017, purchased five or
more new, physical goods from third-party sellers on Amazon's marketplace.

8       •   The Court APPOINTS Elizabeth De Coster, Emma Zaballos, Maya Gold,

9            Kenneth David West, and Osahon Ojeaga as class representatives;

10       •   The Court APPOINTS Hagens Berman Sobol Shapiro LLP and Keller Postman

11            LLC as Co-Lead Class Counsel. The Court APPOINTS Quinn Emanuel Urquhart

12            & Sullivan, LLP as Executive Class Counsel.

13        The Court provisionally files this Order under seal. The Court DIRECTS the parties to

14 file a joint statement, on or before August 29, 2025, indicating what redactions, if any, should be

15 included in the public version of the Order.

16        Dated this 6th day of August, 2025.

17

18                                 *John H. Chun*

19                               John H. Chun

20                               United States District Judge

21

22

23

24

**U.S. District Court**

**United States District Court for the Western District of Washington**

**Notice of Electronic Filing**

The following transaction was entered on 8/6/2025 at 5:02 PM PDT and filed on 8/6/2025

**Case Name:**        De Coster et al v. Amazon.com Inc

**Case Number:**      2:21-cv-00693-JHC

**Filer:**

**Document Number:** 408

**Docket Text:**
ORDER granting Plaintiffs' [180] SEALED MOTION for Class Certification. The Court
DIRECTS the parties to file a joint statement, on or before 8/29/2025, indicating what
redactions, if any, should be included in the public version of the Order. Signed by
Judge John H. Chun. (APH) (cc: counsel Via USPS)


**2:21-cv-00693-JHC Notice has been electronically mailed to:**

Steve W. Berman    steve@hbsslaw.com, heatherw@hbsslaw.com,
jennifer.conte@hbsslaw.com, nicolleh@hbsslaw.com, robert@hbsslaw.com,
shelbyt@hbsslaw.com

Derek W Loeser    dloeser@kellerrohrback.com, derek-loeser-0264@ecf.pacerpro.com,
leslie-nims-6342@ecf.pacerpro.com

Garth D Wojtanowicz    garthw@hbsslaw.com

Barbara Mahoney    barbaram@hbsslaw.com

John Goldmark    johngoldmark@dwt.com, danielanajera@dwt.com,
jobyceloza@dwt.com, lit-docket@dwt.com

Shelby R. Smith    shelby@hbsslaw.com

Alicia Cobb    aliciacobb@quinnemanuel.com, alicia-cobb-8505@ecf.pacerpro.com,
calendar@quinnemanuel.com, sarahakerson@quinnemanuel.com

Warren D Postman    wdp@kellerpostman.com, docket@kellerlenkner.com

MaryAnn T Almeida   maryannalmeida@dwt.com, Lit-Docket@dwt.com, danielanajera@dwt.com, emilyparsons@dwt.com

Matthew Steven Hosen   matthosen@quinnemanuel.com, hosenms@gmail.com

Alex J Dravillas   ajd@kellerpostman.com, docket@kellerlenkner.com

Martha L Goodman   mgoodman@dirllp.com

Karen L Dunn   kdunn@dirllp.com

William A Isaacson   wisaacson@dirllp.com

Amy J Mauser   amauser@dirllp.com

Steig Olson   steigolson@quinnemanuel.com, sarahakerson@quinnemanuel.com

David Du LeRay   davidleray@quinnemanuel.com, sarahakerson@quinnemanuel.com

Adam Wolfson   adamwolfson@quinnemanuel.com, sarahakerson@quinnemanuel.com

Nicolas Siebert   nicolassiebert@quinnemanuel.com, sarahakerson@quinnemanuel.com

Zina Bash   zina.bash@kellerpostman.com, docket@kellerpostman.com

Kyle Smith   ksmith@dirllp.com

Jessica B Beringer   jessica.beringer@kellerpostman.com

Anne F Johnson   annej@hbsslaw.com

Maxwell Deabler-Meadows   maxmeadows@quinnemanuel.com

Emily Parsons   emilyparsons@dwt.com, TammyMiller@dwt.com, lit-docket@dwt.com

Meredith R Dearborn   mdearborn@dirllp.com, mao_fednational@paulweiss.com

Xiaoyi Fan   kellyf@hbsslaw.com

Shane Kelly   shane.kelly@kellerpostman.com

Elle Mahdavi   ellemahdavi@quinnemanuel.com

Roseann Romano   roseann.romano@kellerpostman.com

Yotam Barkai    ybarkai@paulweiss.com, mao_fednational@paulweiss.com

Robert D. Keeling    rkeeling@redgravellp.com

Aseem Chipalkatti    aseemchipalkatti@quinnemanuel.com

Mark Weiner    mweiner@paulweiss.com

Krishna Shah    krishnashah@quinnemanuel.com

**2:21-cv-00693-JHC Notice will not be electronically mailed to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1035929271 [Date=8/6/2025] [FileNumber=10454932-0
] [5924a89871b8447a2909ea748f2eb781390d7e654b4718323f2c911eeb73d11d68f
12e57e3eaf0bc3124ab63dd0a47fc798385b31bb4c4fa600100059fe03783]]